UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------
In re ALSTOM SA
SECURITIES LITIGATION.                    03 Civ. 6595 (VM)

-----------------------------------
This document relates to all             DECISION AND ORDER
actions.                                         I
-----------------------------------
```

**VICTOR MARRERO, United States District Judge.**

**TABLE OF CONTENTS**

I.   INTRODUCTION ....................................... 1
II.  BACKGROUND ....................................... 4

     A.  THE PARTIES ................................. 5
         1.  Plaintiffs ............................. 5
         2.  Defendants ............................. 6

     B.  FACTUAL ALLEGATIONS ........................ 12
         1.  Vendor Financing at the Marine Division . 14
         2.  The ABB Joint Venture .................. 15
         3.  Problems Relating to the Turbines
             Are Disclosed ......................... 19
         4.  Revelation of Vendor Financing in the
             Marine Division ....................... 25
         5.  Additional Reserves Taken in Relation to
             the Turbines .......................... 25
         6.  Understatement of Costs at ATI ........ 28

     C.  SCIENTER ALLEGATIONS ....................... 30

     D.  JURISDICTIONAL ALLEGATIONS ................. 33

     E.  PROCEDURAL HISTORY ......................... 36

III. SUBJECT MATTER JURISDICTION .................... 38

     A.  STATEMENT OF LAW ........................... 38
         1.  Subject Matter Jurisdiction ........... 41
             (a)  Effects .......................... 44
             (b)  Conduct .......................... 50
                  (i)  Theory of Fraud and
                       Particulars of the Statutory

      Violation Charged ...........63
   (ii) Location of Relevant Conduct..65
   (iii) Timeline of Relevant Acts ....67
   (iv) Materiality/Substantiality ...71
   (v) Causation ....................75
   (vi) Reasonableness and
     Congressional Policy .........78

 B. DISCUSSION ...................................86
  1. Theory of Fraud ........................87
   (a) The Individual Frauds .............88
   (i) The Marine Fraud .............88
   (ii) The Turbine Fraud ............89
   (iii) The ATI Fraud ...............91

   (b) The Overarching Theory ...........93
   (i) Single Fraud ................93
   (ii) Two Frauds ..................98
   (iii) Three Frauds ...............100

   (c) Analysis .........................102

  2. Location of the Conduct Alleged .......103

  3. Timeline off the Fraud ................106
   (a) The Marine Fraud .................106
   (b) The Turbine Fraud ................108
   (c) The ATI Fraud ....................110

  4. Materiality/Substantiality ...........111

  5. Causation Analysis ...................114

  6. Reasonableness .......................116

 C. CONCLUSION ...................................118

IV. **PERSONAL JURISDICTION** ...........................118

 A. STATEMENT OF LAW ...........................118

 B. DISCUSSION ...................................122
  1. Jurisdiction As To Purves ............122
  2. Jurisdiction As To Tchuruk ...........126

V. **ORDER** .........................................129

# I. **INTRODUCTION**

Lead plaintiffs in this class action, the State Universities Retirement System of Illinois ("SURS"), the San Diego City Employees' Retirement System ("San Diego ERS"), the Louisiana State Employees' Retirement System ("Louisiana ERS"), the West Virginia Investment Management Board ("West Virginia IMB"), and the International Brotherhood of Electrical Workers, Local 269 ("IBEW") (collectively, the "Lead Plaintiffs," as representatives for "Plaintiffs"),[1] filed the Consolidated Amended Complaint for Violations of the Federal Securities Laws, dated June 18, 2004 (the "Complaint"), alleging violations of both the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act"). On September 30, 2004, all defendants moved to dismiss the Complaint. Because of the breadth of issues raised in their various submissions, the Court considers defendants' motions in separate rulings. In this decision, to be referred to as "<u>Alstom I</u>," the Court addresses all motions contesting the jurisdiction of this Court to hear

---

[1] Bay Beav Fonds ("BBF"), "a fund management company located in Munich, Germany," is listed as a plaintiff in the Complaint (Compl. ¶ 32), notwithstanding that the Court did not appoint BBF as one of the co-Lead Plaintiffs in this action, (<u>id.</u> ¶ 33). The Court is mystified as to why BBF was included as a plaintiff in the Complaint, as Lead Plaintiffs do not contend that BBF was appointed by anyone to serve as a representative of the proposed class members. Because only those parties appointed Lead Plaintiff may represent the interests of the class plaintiffs and litigate claims on their behalf, <u>see</u> 15 U.S.C. § 78u-4(a)(3)(B)(i), the Court will ignore the inclusion of BBF in the Complaint as a plaintiff.

the dispute as to certain parties.  In companion opinions to
be issued separately, the Court adjudicates the defendants'
remaining motions.

Defendants Alstom S.A. ("Alstom"), Alstom USA, Inc.
("Alstom USA"), Alstom Transportation Inc. ("ATI"), Alcatel,[2]
the Underwriter Defendants,[3] Pierre Bilger ("Bilger"), Patrick
Kron ("Kron"), Philippe Jaffre ("Jaffre"), Francois Newey
("Newey"), James Milner ("Milner"), William Purves ("Purves"),
Klaus Esser ("Esser"), John Mayo ("Mayo"), Lord George Simpson
("Simpson"),[4] Serge Tchuruk ("Tchuruk"), and Jean-Pierre

---

[2] Alcatel incorporated by reference all arguments set forth in the
Memorandum submitted by Alstom, including those relating to subject matter
jurisdiction.  (Mem. of Law in Supp. of Alcatel's Mot. to Dismiss the
Consolidated Am. Compl., dated September 30, 2004 ("Alcatel Mem."), at 1-
2.)

[3] The Underwriter Defendants are Credit Suisse First Boston (Europe) Ltd.
("CSFB"), Société Générale ("Société Générale"), Merrill Lynch
International ("Merrill Lynch"), ABN AMRO Rothschild ("ABN"), BNP Paribas
(also known as BNP Paribas S.A.) ("BNP"), Credit Agricole Indosuez Lazard
Capital Markets ("Lazard"), Morgan Stanley & Co. International Ltd.
("Morgan Stanley"), and UBS A.G. ("UBS").  They joined in and adopted the
arguments set forth in the Memorandum of Law in Support of the Alstom
Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.
(Underwriters' Mem. of Law in Supp. of Their Mot. to Dismiss Pls.'
Consolidated Am. Compl., dated September 30, 2004 ("Underwriters' Mem."),
at 1 n.1.)

[4] Mayo and Simpson joined in and incorporated by reference the Memorandum
of Law in Support of the Alstom Defendants' Motion to Dismiss for Lack of
Subject Matter Jurisdiction.  (Second Am. Mem. of Law in Supp. of Defs.
Mayo's & Simpson's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) &
12(b)(6), dated October 5, 2004 ("M&S Mem."), at 26-27.)  Mayo and Simpson
also raised a subject matter jurisdiction argument independent of that
addressed by Alstom concerning the Court's jurisdiction over the claims of
investors who purchased Alstom securities that were not offered for sale
in the United States under Section 11 of the Securities Act, 15 U.S.C. §
77k, and Section 18 of the Exchange Act, 15 U.S.C. § 78r.  (M&S Mem. at
23-27; Def. Mayo's Reply Mem. of Law in Supp. of Defs. Mayo's & Simpson's
Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6), dated
January 10, 2005 ("Mayo Reply Mem."), at 9.)

Halbron ("Halbron")[5] (collectively, the "SMJ Defendants") move pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") to dismiss for lack of subject matter jurisdiction the claims pleaded on behalf of foreign purchasers abroad. Their challenge relates only to "the claims pleaded on behalf of investors who are not United States residents and who purchased Alstom common stock on exchanges outside the United States." (Mem. of Law in Supp. of the Mot. of the Alstom Defs. to Dismiss the Claims of Foreign Purchasers Abroad for Lack of Subject Matter Jurisdiction, dated September 30, 2004 ("SMJ Mem."), at 1.) The Court heard oral argument on the issue on September 7, 2005 (the "September 7 Hearing"). For the reasons stated herein, the Court grants the SMJ Defendants' motions to dismiss the claims of foreign purchasers abroad relating to the Marine and Turbine Frauds as defined herein. To the extent that the SMJ Defendants' motions sought to exclude any of the other claims raised by the contested plaintiffs on grounds of this Court's lack of subject matter jurisdiction, the motions are denied.

In addition, defendants Purves and Tchuruk move to dismiss the Complaint as it relates to them. They assert that

---

[5] Tchuruk and Halbron incorporated by reference all arguments set forth in the Memorandum submitted by Alstom, including those relating to subject matter jurisdiction. (Mem. of Law in Supp. of Mot. by Tchuruk & Halbron to Dismiss the Consolidated Am. Compl., dated September 30, 2004 ("T&H Mem."), at 2.)

the Lead Plaintiffs' failed to sufficiently allege facts supporting the exercise of personal jurisdiction over them. (See T&H Mem. at 6; Mem. of Law in Supp. of the Mots. of Esser, Purves, Kron, Jaffre, Bilger, Newey & Milner to Dismiss, dated September 30, 2004 ("Esser et al. Mem."), at 3-4.) The Court finds that Plaintiffs have sufficiently pled a basis for this Court's jurisdiction over Purves and Tchuruk, but will allow for expedited jurisdictional discovery to more fully develop the record and will hold a hearing on the issue.

## I. BACKGROUND

The facts recited in this section are derived entirely from the allegations contained in the Complaint and the documents cited or relied upon for the facts pled therein. Additionally, the Second Circuit held in Kramer v. Time Warner, Inc., 937 F.2d 767 (2d Cir. 1991), that "a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC." Id. at 774. The Court may consider these filings on a motion to dismiss "not to prove the truth of their contents but only to determine what the documents stated." Id. at 773-74; see In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483, 2005 WL 735937, at *13 (S.D.N.Y. Mar. 30, 2005).

A.   THE PARTIES

1.   Plaintiffs

Lead Plaintiffs bring this action "on behalf of themselves and all other persons or entities who purchased or otherwise acquired the publically-traded stock, ADSs or other shares of Alstom between and including August 3, 1999 and August 6, 2003, inclusive (the "Class Period")," and excluding the defendants and related entities and persons. (Id. ¶ 1.)

SURS, San Diego ERS, Louisiana ERS and West Virginia IMB are all public pension systems.  San Diego ERS purchased Alstom shares and also Alstom American Depositary Shares ("ADSs")[6] on February 9, 2001 as a part of the secondary offering of Alstom stock conducted by Alstom, Alcatel and Marconi PLC ("Marconi") on or about February 8, 2001 in the

_____

[6] An ADS can alternatively be referred to as an "American Depositary Receipt" or ADR. (See American Depositary Receipts, S.E.C. Release Nos. 33-6894, 34-29226, IS-274, 48 S.E.C. Docket 1440 (May 23, 1991), available at 1991 WL 294145, at *2 & n.5, and attached as Ex. G to the Decl. of Daniel L. Berger in Opp'n to Defs.' Mot. to Dismiss, dated November 18, 2004 ("Berger Decl.").)  An ADS

> represents an ownership interest in a specified number of securities that have been deposited with a depositary by the holder of such securities.  The securities that are so deposited ("deposited securities") are typically equity securities of a foreign issuer, and the depositary is typically a U.S. bank or trust company.  In exchange for the deposited securities, the depositary issues a negotiable certificate representing the ADRs.

Id.  Although there used to be a distinction between the term ADS, which referred to "the security that represents an ownership interest in deposited securities," and ADR, which referred to "the physical certificate that evidence[d] the ADS[]," that distinction has largely been done away with and the terms may be used interchangably.  Id.  As the parties have consistently used the term ADS, the Court will follow suit and refer to the securities representing an ownership interest in the Alstom shares deposited as a part of the Secondary Offering as ADSs.

United States and elsewhere pursuant to registration statements and prospectuses that were filed with the SEC (the "Secondary Offering").[7]  San Diego ERS purchased ADSs from those underwritten by the Underwriter Defendants and sold to customers, but the Complaint does not specify from whom in particular San Diego ERS purchased the shares.  San Diego ERS paid no commission on its purchases of Alstom shares.  (Compl. ¶¶ 24, 27.)  SURS, Louisiana ERS and West Virginia IMB purchased Alstom shares on the premier marché of Euronext Paris ("Paris Exchange") during the Class Period.  (Id. ¶¶ 28, 29, 30.)  SURS also purchased "Alstom shares" in the Secondary Offering, although the Complaint does not specify whether it purchased ADSs domestically, or Alstom stock on foreign exchanges.  (Id. ¶ 29.)  IBEW purchased Alstom ADSs on the New York Stock Exchange ("NYSE") during the Class Period.  (Id. ¶ 31.)  On January 7, 2004, the Court ordered that SURS, San Diego ERS, Louisiana ERS, West Virginia IMB and IBEW serve a co-Lead Plaintiffs in this action.  (Id. ¶ 33.)

     2.  Defendants

     Alstom is a company incorporated and principally located in France that is involved in many diverse businesses, including rail and marine transportation, and power generation.  As of September 30, 2003, there were 281,660,523

---

[7] The Complaint does not clearly indicate whether San Diego ERS purchased Alstom stock in addition to the ADSs, or whether it purchased only ADSs.

outstanding shares of Alstom traded on the NYSE in the form of ADSs, on the London Stock Exchange in the form of United Kingdom Depositary Shares, and on the Paris Exchange. Alstom filed with the SEC its annual reports on Form 20-F and periodic reports on Form 6-K. (Id. ¶¶ 34-36.)

Alstom USA, a wholly-owned subsidiary of Alstom located in Connecticut, is a holding company for all of Alstom's subsidiaries in the United States, including ATI. ATI is a wholly-owned subsidiary of Alstom located in New York that manufactures railway cars. (Id. ¶¶ 37-38.)

Bilger was appointed Chief Executive Officer ("CEO") of Alstom in 1991 after holding various subsidiary positions at the company, and became Alstom's CEO and Chairman of the Board of Directors (the "Board") on May 14, 1998. He served as CEO until January 1, 2003, and as Board Chairman until March 11, 2003. Bilger also served on various committees on Alstom's Board, and as a member of the Supervisory Board of Alstom Power. The Complaint alleges that Bilger, through Newey, his Attorney-in-Fact, signed the registration statement filed with the SEC on Form F-3 on January 17, 2001, as amended on Forms F-3/A filed on January 24 and February 7, 2001 (the "Registration Statement"). (Id. ¶¶ 27, 39.)

Kron was appointed to Alstom's Board on July 24, 2001, where he served on various committees including the Audit

Committee.  He replaced Bilger as Alstom's CEO on January 1, 2003, and was appointed Chairman on March 11, 2003.  (Id. ¶ 40.)

Jaffre joined Alstom as an advisor to the Chairman and CEO in February 2002, and was appointed Chief Financial Officer ("CFO") in July 2002.  (Id. ¶ 41.)

Newey joined Alstom in March 1998, and was appointed Senior Executive Vice President and CFO of Alstom in July 1998, remaining in that position through July 3, 2002.  Newey is alleged to have signed the Registration Statement.  (Id. ¶ 42.)

Milner served as the Chief Accounting Officer of Alstom "at the time of the Secondary Offering."  He is alleged to have signed the Registration Statement on February 7, 2001 through his Attorney-in-Fact, Newey.  (Id. ¶ 43.)

Stephan Rambaud-Measson ("Rambaud-Measson") was the Senior Vice President of ATI until June 30, 2003.  The Complaint does not allege when he began his term at ATI.  (Id. ¶ 44.)

Joseph Janovec ("Janovec") was the Vice President of Finance at ATI until June 30, 2003.  The Complaint does not allege when he began his term at ATI.  (Id. ¶ 45.)

The Complaint identifies defendants Bilger, Kron, Jaffre, Newey, Milner, Rambaud-Measson and Janovec collectively as the

"Officer Defendants."  The Complaint alleges that each of the
Officer Defendants, as a result of their respective positions
at Alstom, "knew adverse non-public information about Alstom
during the Class Period, including its financial results and
business and financial prospects, and had access to non-public
internal documents."  (Id. ¶ 46.)

Purves was appointed to Alstom's Board on June 17, 1998,
effective beginning on June 25, 1998.  He retired from the
Board on July 28, 2003.  The Complaint alleges that Purves
served as the "Director of Alstom," as Vice Chairman of the
Board, and in other capacities as a Board member at
undisclosed times.  Purves is listed as a signatory on the
Registration Statement.  (Id. ¶ 47.)  The Complaint
additionally alleges that Newey signed the Registration
Statement as Attorney-in-Fact for Purves.  (Id. ¶ 204.)

Esser was appointed to the Board, effective on June 25,
1998.  Through Newey, acting as his Attorney-in-Fact, Esser
signed the Registration Statement.  The Complaint alleges that
Esser served as Chairman of the Audit Committee of the Board
during the Class Period.  The Complaint does not allege when,
if ever, Esser ceased to be a member of the Board.  (Id. ¶
48.)

Halbron was appointed to the Board on May 14, 1998,
allegedly by Alcatel.  He is alleged to have signed the

Registration Statement through Newey, acting as his Attorney-in-Fact.  The Complaint also alleges that Halbron served on the Audit Committee of the Board, and that Halbron is a member of the Board of Directors of Alcatel.  The Complaint does not allege when Halbron ceased to be a member of the Board.  (Id. ¶¶ 49, 55.)

Mayo was appointed to the Board on May 14, 1998, allegedly by Marconi.  Mayo, through Newey, acting as his Attorney-in-Fact, signed the Registration Statement.  Mayo served on the Audit Committee of Alstom's Board, and also is alleged to have been Finance Director and a Director of Marconi.  The Complaint does not allege when, if ever, Mayo ceased to be a member of the Board.  (Id. ¶ 50.)

Simpson was appointed to the Board on May 14, 1998, allegedly by Marconi.  Simpson is alleged to have signed the Registration Statement through Newey, who acted as Simpson's Attorney-in-Fact.  In addition to being a Board member at Alstom, Simpson served as Chief Executive and a Director of Marconi until 2001.  The Complaint does not allege when Simpson ceased to be a member of the Board.  (Id. ¶ 51.)

Tchuruk was appointed to the Board on May 14, 1998, allegedly by Alcatel.  He was listed as a signatory on the Registration Statement; however, the Complaint does not allege that Tchuruk ever actually signed the Registration Statement.

In addition to his responsibilities on the Board of Alstom, Tchuruk served in various high level positions at Alcatel. The Complaint does not allege when Tchuruk ceased to be a member of the Board. (Id. ¶ 52.)

The Complaint identifies Bilger, Purves, Esser, Halbron, Mayo, Simpson and Tchuruk collectively as the "Director Defendants," as they all served on Alstom's Board at various times during the Class Period. (Id. ¶ 53.)

Before the Class Period, Alcatel was a fifty percent owner of Alstom in a joint venture with Marconi, which held the other fifty percent share.[8] In June 1998, Alcatel and Marconi sold part of their ownership stake in Alstom through a global initial public offering ("IPO"). In the Secondary Offering, Alcatel and Marconi sold an additional portion of their ownership shares in Alstom. Finally, in June 2001, Alcatel fully divested itself of its holdings in Alstom.

CSFB, Société Générale and Merrill Lynch acted as Joint Lead Managers of the Secondary Offering, and CSFB and Société Générale acted as Bookrunners for the Secondary Offering. CSFB provides financial services worldwide, and, in connection with the Secondary Offering, agreed to purchase from the selling shareholder 17,591,772 ordinary shares in the form of

---

[8] Because of its having filed for bankruptcy protection, Marconi, formerly known as the General Electric Company of the United Kingdom or GEC, was voluntarily dismissed from this action on November 20, 2003. (Id. ¶ 66.)

either Alstom shares or ADSs. (Id. ¶ 56.) Société Générale provides financial services to corporate and institutional clients, and, in connection with the Secondary Offering, agreed to purchase from the selling shareholder 17,591,772 ordinary shares in the form of either Alstom shares or ADSs. (Id. ¶ 57.) Merrill Lynch provides various financial services around the world, and, in connection with the Secondary Offering, agreed to purchase from the selling shareholder 12,794,015 ordinary shares in the form of either Alstom shares or ADSs. (Id. ¶ 58.)

ABN, BNP, Lazard, Morgan Stanley and UBS, each of which provides various financial services, all acted as underwriters for the Secondary Offering, and, in connection with the Secondary Offering, agreed to purchase from the selling shareholder 3,198,503 ordinary shares each in the form of either Alstom shares or ADSs. (Id. ¶¶ 59-63.)

In connection with the Secondary Offering, the Underwriter Defendants "were granted a 30-day option to purchase on a pro rata basis up to 7,107,786 additional outstanding shares in the form of either Alstom shares or ADSs to cover over-allotments." (Id. ¶ 64.)

B.   FACTUAL ALLEGATIONS

Alstom, then called GEC Alsthom N.V., was founded in 1989 by Alcatel and the General Electric Company of the United

Kingdom, now known as Marconi.  Marconi and Alcatel each owned a fifty percent share of the company.  On June 22, 1998, Marconi and Alcatel conducted an IPO of Alstom securities on the Paris, New York and London stock exchanges selling approximately fifty-two percent of their collective holdings. Just prior to the IPO, however, Marconi and Alcatel each took a significant dividend payment from Alstom.  Bilger, who at that time was Alstom's CEO, opposed the dividend payment internally, but supported the payment in public.  The dividend payment left Alstom with little liquid capital, as evinced by its sale in July 1999 of €500 million in corporate bonds. (Id. ¶¶ 67-69.)

The bond issue unfortunately did not provide Alstom with all the capital that it required, and thus Alstom began a series of business ventures and practices that form the basis of Plaintiffs' claims of fraudulent conduct.  These questionable dealings include three transactions allegedly engineered by Alstom that constitute, individually or combined, Plaintiffs theory of fraud:  (1) the provision of vendor financing to financially unsound customers at Alstom's Marine division; (2) the formation of a joint venture with ABB, and the subsequent purchase of ABB's fifty percent share, to produce heavy duty gas turbines which Alstom knew from the outset were fatally flawed in their construction; and (3) the

understatement of losses in connection with railcar contracts at ATI.  (<u>Id.</u> ¶ 70.)

     1.   <u>Vendor Financing at the Marine Division</u>

Although Alstom's Marine division comprised a relatively small sector compared with Alstom's other production units, investors took interest in that unit's business by reason of its growth from FY1999 to FY2000.  Alstom also depended on a favorable view of this division to allow Alstom to borrow increasing amounts from banks on behalf of other segments of its business.  However, according to Plaintiffs, this growth was illusory, in that it was based on the extension of vendor financing.  (<u>Id.</u> ¶¶ 71-72.)

For example, Alstom announced in 1996 that a United States-based cruise company, Renaissance Cruise Lines ("Renaissance"), had ordered six ships, later expanding its order to eight.  These ships were to be produced over several years, guaranteeing Alstom significant revenue for an extended term.  Indeed, Alstom recognized the revenue for each ship delivered to Renaissance between June 1998 and February 2001, when the last ship was delivered.  Alstom, however, failed to clearly indicate to investors that it had guaranteed the loans Renaissance obtained to purchase the ships, let alone that Renaissance was a commercially weak company that could not have financed the acquisitions without the Alstom guarantees,

of which Plaintiffs claim Alstom was aware.  Thus, the strong demand for Alstom's cruise ships and the growth experienced in the division was in large part built upon the risk Alstom assumed in the form of loan guarantees which were hidden from the investing public.  (Id. ¶¶ 73, 107.)  Throughout the balance of this opinion, the Court makes reference to the allegedly fraudulent non-disclosure of the vendor financing arrangements at the Marine division as the "Marine Fraud."

### 2.   The ABB Joint Venture

Alstom's largest sector in terms of net sales was its heavy duty gas turbine business, which was a part of the Company's Energy division.  For example, turbine revenue accounted for thirteen and one-half percent of the company's operating profit for FY1997.  Alstom understood that its turbine business was of vital importance to the company's long term prospects.  Thus, in March 1999, when Alstom lost its license to General Electric's ("GE") turbine technology,[9] on which its core turbine technology was based, Alstom immediately announced on March 23, 1999 that it was entering into a fifty-fifty joint venture with ABB, a Swedish-Swiss

---

[9] The Complaint alleges that Alstom lost its license with GE as a result of transactions involved in the 1998 IPO that altered Alstom's holding structure, and apparently breached the licensing agreements with GE.  The IPO prospectus alerted investors that the IPO inherently contained the risk of the loss of the GE licenses, the loss of which would "have a material adverse effect on the Company's position in the market for heavy duty gas turbines and related businesses and on its results of operations and financial condition generally."  (Id. ¶ 75 (quoting from the IPO prospectus).)

conglomerate. ABB had its own proprietary gas turbine technology, which it marketed under the name "GT24/26" turbines, that Alstom was able to market and thus save its heavy duty gas turbine business. (Id. ¶¶ 74-76, 78.)

The joint venture with ABB, however, did not turn out to be an entirely positive development. Alstom was aware as early as January 1999 that ABB's turbines were critically flawed. In an internal analysis of its competitors, Alstom had uncovered that all of the turbine units sold by ABB since 1993 that had been delivered and were in operation had been declared defective or the operation of the turbine had been placed on hold because of various flaws in core components. In the case of one turbine, ABB's own personnel considered the machine "dangerous," and two other turbine customers were already being paid penalties and liquidated damages by ABB. (Id. ¶¶ 78-80.)

Although aware of the significant problems with the ABB turbines, Alstom did not disclose these defects to the public in announcing the joint venture, which was called ABB ALSTOM Power ("ABB ALSTOM"). ABB ALSTOM launched a line of more advanced turbines called GT24B/GT26B turbines. These new turbines, however, were also plagued by structural failures which were immediately apparent. For example, B-grade turbines installed in Taiwan and Korea in 1998 produced

fifteen percent less power than they were designed to generate. Notwithstanding these critical defects, Alstom continued to market and sell turbines in the last half of 1999 and first half of 2000, exposing the company to the risk of paying liquidated damages for the failure of the turbines. Additionally, Alstom could not procure insurance to guarantee the performance of the products, and thus had to establish reserves sufficient to remedy any defects associated with turbines that were sold and failed to meet contractual specifications. (Id. ¶¶ 82-84, 86-87.)

Aware of the difficulties customers experienced with the original and B-grade turbines, ABB ALSTOM created a database, referred to internally as the "Smokers Database," beginning in 1999 to keep track of each turbine client and project, noting any open issues or problems experienced on the specific project or with the client, an estimate of the minimum and maximum costs associated with fixing the problems, and the likely costs to resolve the problems. Alstom also began negotiations with customers to alter contract terms and to develop a plan to remedy the problems and to settle any claims that they may have had. The Complaint alleges that from the information contained in the database and revealed through these negotiations, Alstom was aware of the full extent of its liabilities in connection with its faulty turbines. (Id. ¶

86.)

On May 11, 2000, less than a year after the joint venture was established, Alstom bought out ABB's share of ABB ALSTOM for €1.25 billion, recorded €3.953 billion in goodwill and renamed the company Alstom Power. The main asset Alstom received in the buyout was ABB's gas turbines. The Complaint alleges that this buyout was provoked by Alstom's desire to prevent the already-known costs associated with the defective turbines from being listed as expenses on its income statement, as it allegedly would have to have been recorded under French Generally Accepted Accounting Principles ("GAAP"). As a result of the buyout, Alstom was able to book the costs required to correct the turbine defects "as an increase to the provisions in the liability section of the balance sheet and as a corresponding increase to the goodwill generated by the joint venture purchase." Furthermore, because goodwill was amortized over a period of twenty years, Alstom faced a much smaller charge against current net income as a result of the buyout. In addition, under French GAAP, the allocation of the purchase price between goodwill and the fair value of the assets and liabilities associated with the purchase could be finalized up until the end of the fiscal year following the purchase date, allowing Alstom to increase goodwill each time it established a turbine reserve, instead

of disclosing the reserve as an expense, until March 31, 2002. (Id. ¶¶ 88-89.)

The Complaint alleges that the buyout of ABB was motivated precisely to prevent the reserves Alstom had to take as a result of the turbine defects from impacting its net income. This allegation is supported in the Complaint by the assertion that had Alstom not bought out ABB's share, Alstom's net income would have been reduced by an amount equal to fifty percent of the turbine reserves. (Id. ¶ 90.) Throughout the balance of this opinion, the Court makes reference to the allegedly fraudulent non-disclosure of the full extent of the reserves taken in connection with the defective heavy duty gas turbines as the "Turbine Fraud."

### 3. Problems Relating to the Turbines are Disclosed

Alstom issued a press release dated July 31, 2000 disclosing that it was experiencing difficulties with its turbines. The release stated:

> In the past months, technical issues have arisen which are not unusual in the commissioning of new high-tech complex products of this type, and for which modifications have been identified and are being implemented. Recent inspections have revealed a further localised [sic] deficiency, which will require component modification on all "B" rating machines. . . . The impact of these issues may involved material additional costs. Any such costs will be included in the purchase accounting treatment of the acquisition of ABB ALSTOM Power, which will be reported in the 30 September 2000 interim accounts. On this basis, the Company does not believe that these issues will affect significantly the operating margin target of 6% for 2002-03 previously

disclosed.

(Press Release, Alstom, Market Statement (July 31, 2000), included as Ex. F.6 in the Joint Appendix of Exs. in Supp. of Defs.' Mot. to Dismiss ("J.A."); Compl. ¶ 91.) The Complaint states that this release caused "public concern," and that in response to this concern, Alstom began a publicity campaign to paint a rosier picture of the problems related to the defective turbines. For example, an article in <u>Les Echos</u> dated August 1, 2000 reported that Alstom's management said that "the financial impact of this setback should be minimal." However, the article disclosed that "Alstom will be forced to change the [defective] component in question on all of the turbines already produced or currently undergoing production, a total of up to 80 units. Changing the piece on the first two turbines took the group no less than six weeks." (Compl. ¶¶ 91-93.)

In terms of disclosures concerning reserves taken to account for any costs associated with the turbine defects, €519 million in reserves were taken for the fiscal year ending March 31, 2000. The Complaint alleges that in the Annual Report filed by Alstom for the fiscal year this reserve was not specifically disclosed as relating to the turbine defects. (<u>Id.</u> ¶ 94.) In Alstom's Form 20-F filed for the fiscal year ending March 31, 2000, the reserve charge appeared in a chart

entitled "Provisions for risks and charges" on the line for "Contract loss accruals." (Alstom's Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended March 31, 2000, filed with the SEC on July 14, 2000 ("2000 Form 20-F"), Note 17, at F-26, at 85, included as Ex. A.2 in the J.A.)

Alstom issued a press release on November 7, 2000 stating that design flaws associated with the GT24/26 turbines would require Alstom to set aside an additional €903 million, although this release did not disclose prior reserves relating to the turbines. (Compl. ¶ 96.) The press release stated that the "additional provision was established following a contract by contract analysis and is based on the Company's current assessment of the probable additional costs associated with the implementation and consequences of the modifications to the GT24/26 gas turbines delivered or included in the order book." (Press Release, Alstom, First Half Results 2000/01 (Nov. 7, 2000), included as Ex. F.7 in the J.A.)

The full amount of the turbine reserves taken through September 30, 2000 was revealed on November 30, 2000 in Alstom's half-year consolidated financial statement on Form 6-K, which stated that "[t]he estimates of the related costs as currently determined by the management amount to €903 million. Provisions and other accruals on GT24/26 gas turbines as of 30

September 2000 including this amount total €1,625 million."

(Compl. ¶¶ 96; Alstom's Form 6-K, Report of Foreign Private

Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities

Exchange Act of 1934, for the month of November 2000, received

by the SEC on November 30, 2000 ("2000 Form 6-K"), Note 2, at

9, included as Ex. E.1 in the J.A.)  The Form 6-K stated that

> Further issues related to the GT24/GT26 gas turbines have
> arisen following scheduled inspections on some machines
> in July which revealed accelerated wear of certain parts
> and exposure to extra costs and penalties for lack of
> availability, delay and lack of performance.
>
> Since then, management has undertaken a thorough analysis
> of these issues and has estimated, on the basis of a set
> of assumptions . . ., amounts which may become due to
> customers  . . . . The amount provided reflects the
> expected outcome of the management defined negotiation
> strategy on a contract by contract basis.  The
> negotiations in process and the technical solutions under
> development  and  implementation  provide,  so  far,
> substantiation of the appropriateness of management
> approach and assumptions.
>
> The lack of sufficient operating hours, among other
> factors, results in inherent uncertainty. Any change in
> key assumptions could have a significant impact on the
> level of provisions required.  Actual costs may vary
> particularly as a result of negotiations with individual
> clients and the performance of repaired turbines.
> Accordingly the provision currently recorded may need to
> be adjusted as actual performance and costs evolve due to
> a number of factors including the outcome of a large
> number of individual negotiations which are at an early
> stage.

(2000 Form 6-K Note 2, at 9, included as Ex. E.1 in the J.A.)

In February 2001, Marconi and Alcatel sold over 71

million shares of Alstom stock, representing thirty-three

percent of Alstom's outstanding shares, pursuant to the

Registration Statement.[10]  The Underwriter Defendants, as noted above, served as the underwriters for this sale.  (Compl. ¶ 100.)  The Secondary Offering Prospectus stated on its face in bold type, "Investing in our shares involves risks.  See 'Risk Factors' beginning on page 10."  (Secondary Offering Prospectus, included as Ex. C.3 in the J.A.)  On page 10, the Prospectus reiterated many of the statements already made in connection with the turbine defects, and disclosed the reserve figures described above.  The Prospectus also cautioned that Alstom "cannot guarantee that the total costs that we ultimately incur in connection with the GT 24/26 problems will not exceed the estimates that we have provisioned nor can we guaranty that the rate of spending will be in line with our current estimates.  The total amount and timing of these costs depends in part on factors outside of our control."  (Id. at 10.)

In its 2001 Annual Report, at Note 20, entitled "Provisions for risks and charges," Alstom disclosed that

_____

[10] In paragraph 100, the Complaint alleges that the Registration Statement was filed on February 12, 2001, although in other places it refers to the filing date as being February 7, 2001.  The amended Registration Statement filed in connection with the Secondary Offering included in the Defendant's Joint Appendix states on its face that it was filed with the SEC on February 7, and that it was "processed" on February 12, 2001.  (See Alstom's Form F-3, Amendment No. 2, Registration Statement Under the Securities Act of 1933, Registration No. 333-13078, filed with the SEC on February 7, 2001, included as Ex. C.2 in the J.A.)  The Court will use the official filing date of February 7, 2001.  The prospectus, however, was filed with the SEC on February 12, 2001.  (See Alstom Prospectus, dated February 8, 2001, filed with the SEC February 12, 2001 ("Secondary Offering Prospectus"), included as Ex. C.3 in the J.A.)

"[i]n 2001, provisions related to all activities of the Power Sector acquired from ABB . . . of approximately € 1,274 million have been recorded against goodwill," of which, the Complaint alleges, €1,068 million was attributable to the turbine defects. (Alstom's Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended 31 March 2001, filed with the SEC on July 2, 2001 ("2001 Form 20-F"), Note 20, at F-26, at 75, included as Ex. A.3 in the J.A.; Compl. ¶ 95.)  The Annual Report went on to state that

> These provisions include, among other items, those relating to the GT24/26 turbines which have been estimated on the basis of a set of assumptions, taking into account potential costs relating to the design and manufacture of replacement parts, the opening and repair of the affected turbines, amounts which may become due to customers for delivery delays or under availability and performance guarantees and the specific terms of each individual contract.  The current lack of sufficient operating hours, among other factors, results in inherent uncertainty.  Any change in key assumptions could have a significant impact on the level of provisions required. Actual costs may vary particularly as a result of negotiations with individual clients and the performance of the repaired turbines.  The provisions currently recorded may be adjusted accordingly.

(2001 Form 20-F, Note 20, at F-26, at 75, included as Ex. A.3 in the J.A.)

In June 2001, Marconi and Alcatel sold all of their remaining interest in Alstom.  (Compl. ¶ 101.)

4. Revelation of Vendor Financing in the Marine Division

In the wake of the tragedy of September 11, 2001, on September 25, 2001, Renaissance declared bankruptcy. On September 27, 2001, Alstom admitted that it had guaranteed the loans Renaissance had used to purchase the eight ships it commissioned from Alstom, and that Alstom was now liable pursuant to those guarantees in an amount of €684 million. In addition to what it owed under the Renaissance guarantees, Alstom revealed that it had undertaken obligations of another €1.3 billion in outstanding vendor financing. This revelation came as a shock to both analysts and investors. (Id. ¶ 103-05.)

On October 1, 2001, J.P. Morgan Securities issued an analyst report stating that "Alstom has lost EUR 2.1 billion in market value since it revealed the exposure to Renaissance Group . . . . [I]nvestor focus has shifted to Alstom-specific problems like the high leverage, low cash generation and concern about other potential risks 'hidden' in its off-balance sheet liabilities." The Complaint states that on this date, October 1, 2001, Alstom disclosed "the full extent of the guarantees." (Id. ¶¶ 106, 108.)

5. Additional Reserves Taken in Relation to the Turbines

In a November 8, 2001 analyst report detailing the

settlement of claims relating to the defects in the GT24/26 turbines, Alstom management is cited as stating that it expected existing reserves to be adequate.  However, in its 2002 Annual Report, Alstom stated that it had "retained € 1,440 million of provisions and accrued contract costs at 31 March 2002 in respect of the[] turbines."  (Alstom, Annual Report -- Financial Information, Fiscal Year 2002, at 4, included as Ex. B.3 in the J.A.)  Alstom's 2002 Form 20-F reported that "[i]n the years ended 31 March 2001 and 2002 provisions relating to the activities of the Power sector acquired from ABB of approximately € 1,646 million in aggregate have been recorded against goodwill, of which € 372 million was recorded in the year ended 31 March 2002." (Alstom's Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended 31 March 2002, filed with the SEC on May 24, 2002 ("2002 Form 20-F"), Note 18, at F-22, included as Ex. A.4 in the J.A.)  This statement was followed by language similar to that included in the 2001 Form 20-F giving warning as to the inherent uncertainty of the adequacy of this provision.  (See id.)  In its 2003 Form 20-F, Alstom clearly disclosed that it had taken an additional reserve specifically to correct defects with the turbines in the amount of €1.075 billion for the fiscal year ending March 31, 2002.  (See Alstom's Form 20-

F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended 31 March 2003, filed with the SEC on October 15, 2003 ("2003 Form 20-F"), Main Events of Fiscal Year 2003, at 49, included as Ex. A.5 in the J.A.; Compl. ¶¶ 109-11.)

In a March 12, 2003 press release, Alstom revealed that it was taking an additional €1.2 billion charge on account of defects in the GT24/26 turbines and forecasted a net loss of between €1.3 and €1.4 billion for the fiscal year ended March 31, 2003. (Compl. ¶ 112; Press Release, Alstom, Alstom Presents New Action Plan (Mar. 12, 2003), included as Ex. F.22 in the J.A.) Alstom's 2003 Annual Report stated that "[a]fter application of €1,070 million during fiscal year 2003, the remaining amount of provisions was €370 million. To cover the total revised net exposure, an additional gross provision of €1,160 has been provided during fiscal year 2003. As a result, the total gross provisions and accrued contract costs at 31 March 2003 in respect of these turbines were €1,530 million." (Alstom, Annual Report, Fiscal Year 2003, at 58, included as Ex. B.4 in the J.A.; Compl. ¶ 113.)

Finally, in the 2003 Form 20-F, Alstom acknowledged the full extent of the reserves it had taken over time, identifying each reserve taken since FY2000, totaling €4.299 billion. The Form 20-F also increased the reserve figure

through March 31, 2003 to €1,655 million with respect to the turbine reserves.  The reason for the turbine reserve increase was stated as follows:

> In the fourth quarter of fiscal year 2003 unexpected setbacks and delays, now resolved, were experienced in validating and testing several important components of the recovery package . . . . These delays resulted in our being unable to implement certain scheduled performance recovery measures during the recovery periods agreed with certain of our customers.
>
> In the current state of the energy wholesale markets, customers do not have the incentive to accept these machines.  These delays therefore mean significantly increased exposure as customers are less inclined to agree to further extensions of the recovery periods and are invoking penalties and liquidated damages.  We also incur additional costs because we have been forced to shut down the machines more frequently to replace short life components at our expense.  Our previously expected targets were therefore not achievable in the current context.

(2003 Form 20-F at 49; Compl. ¶ 115.)

### 6.  Understatement of Costs at ATI

In the summer of 2003, as a result of an anonymous letter sent simultaneously to ATI, the SEC and the FBI, Alstom conducted an internal investigation that uncovered significant cost understatements in ATI's financial results.  Alstom revealed the ATI "accounting improprieties" in a press release issued on June 30, 2003, and indicated that the internal review was ongoing.  As a result of these understatements, Alstom stated that it would record a net after tax charge equivalent of €51 million for fiscal year 2003.  In addition,

the press release disclosed that Rambaud-Measson and Janovec had been suspended pending a completion of the internal investigation, and the SEC and FBI were making informal inquiries into ATI. Alstom's stock price declined, a move attributed to the revelation of misconduct at ATI. (Compl. ¶¶ 116-23.)

On August 6, 2003, Alstom announced that the ATI improper cost accounting was more widespread than initially understood, and that in addition to the €51 million after tax charge, the Company would also reduce the first half of FY2004 earnings by another €100 million. On August 11, 2003, Alstom revealed that the SEC had upgraded its review from an informal inquiry to a "formal order of investigation" concerning ATI. (Id. ¶¶ 124-26.)

In the 2003 Form 20-F, Alstom disclosed that the ATI accounting impropriety had eliminated more than €167 million from the Company's operating income and that, therefore, the Transport Division had in fact suffered a substantial net loss. In a November 13, 2003 investors' conference call, Kron called the activities at ATI a "fraud," and indicated that ATI had been reorganized in a way to ensure that there was "a new team in place who can take this business forward with confidence" under strengthened internal controls. (Id. ¶¶ 127-28.) Throughout the balance of this opinion, the Court

makes reference to the allegedly fraudulent under-reporting of costs at ATI as the "ATI Fraud."

C.    SCIENTER ALLEGATIONS

The Complaint alleges that Alstom, Alstom USA, ATI and the Director and Officer Defendants all knew that the public documents and statements issued or disseminated by or in the name of Alstom were materially false or misleading, that they had access to and knowledge of confidential proprietary information that revealed the true facts hidden from the public, and that the ongoing alleged fraudulent schemes recounted above could not have gone on without the knowledge and complicity of personnel a the highest levels at Alstom. (Id. ¶¶ 288-90.)   The Complaint further alleges that the Director and Officer Defendants had the opportunity and motive to commit fraud, specifically that they desired to materially misrepresent Alstom's financial condition, and to hide adverse facts that enabled Alstom to inflate its financials and stock price so as to raise a significant amount of money as a part of the Secondary Offering, and to allow Alcatel and Marconi to unload their Alstom shares at inflated prices.   (Id. ¶ 291.)

The Complaint goes on to allege that Alstom and its officers knew of the loan guarantees to Renaissance and other Marine division customers, because Alstom issued those guarantees, and also knew that Renaissance was likely to

default on the loans by reason of its unstable financial condition. Alstom allegedly is one of the beneficial owners of the company that purchased Renaissance and restructured its debt in April 2001. Additionally, the Complaint notes that analysts were not surprised by Renaissance's bankruptcy declaration, and that one analyst went as far as stating that Alstom was "likely to have known" about Renaissance's shaky financial condition ahead of the bankruptcy filing. (<u>Id.</u> ¶¶ 292-96.)

Moreover, the Complaint alleges that Alstom knew of the defects associated with the ABB turbine technology, and that it nonetheless hid those defects to allow Alcatel and Marconi to sell their Alstom shares at inflated prices. Plaintiffs further allege that Alstom knew from the founding of ABB ALSTOM the full extent of the liabilities associated with the turbine defects and purposefully underestimated the costs in public disclosures to ensure a high stock price for Alcatel and Marconi. (<u>Id.</u> ¶¶ 297-300.)

With respect to the alleged ATI Fraud, the Complaint charges that Janovec and Rambaud-Measson each acted with scienter in that they had actual knowledge that the statements at issue in connection with the ATI accounting scandal were false or misleading, or that they at least acted with reckless disregard for the truth. Plaintiffs assert the following

facts specific to these two defendants in support of the allegation of scienter: that (i) they were suspended pending the internal investigation at ATI and had not been reinstated as of the time the Complaint was filed (<u>Id.</u> ¶¶ 301-02); and (ii) they were motivated to create the false illusion that ATI was exceeding the mandate set forth by Alstom in its "Restore Value" program, a plan designed to strengthen Alstom's balance sheet and restore investor confidence in the company, because they knew that ATI's business was lagging behind that of Alstom's other Transport subsidiaries. (<u>Id.</u> ¶¶ 303, 304, 306).

In addition, the Complaint alleges that the ATI accounting misstatements were motivated by ATI's desire to comply with Alstom's "Restore Value" program, which was revealed company-wide on March 14, 2002. The Complaint also alleges that ATI purposefully underbid the New Jersey Transit ("NJT") contract, which was the contract associated with the majority of ATI's under-reporting of costs, "to keep its work force employed and its manufacturing facilities operating." This underbidding led to significant cost overruns which were allegedly widely known throughout ATI. The Complaint further declares that Janovec traveled to France after March 2002 to inform Alstom about the cost overruns. Finally, the Complaint references analysts' reports stating that the ATI under-reporting of costs was associated with ATI's desire to appear

more liquid than it was in reality.  (<u>Id.</u> ¶¶ 303-18.)

D.   <u>JURISDICTIONAL ALLEGATIONS</u>

Plaintiffs claim that this Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. §§ 1331 and 1337.  (<u>Id.</u> ¶ 9.)  The Complaint alleges that jurisdiction exists under the "effects" test, described <u>infra</u>, over "all investors who purchased or acquired Alstom securities traded on U.S. markets" and all "investors based in the United States who purchased or acquired Alstom securities regardless of where those securities traded."  Additionally, jurisdiction is alleged to exist over the claims of foreign class members who purchased or acquired Alstom securities on foreign securities exchanges under the "conduct" test, described in great depth <u>infra</u>.

To satisfy the conduct test, the Complaint alleges that conduct related to the alleged fraud occurred in the United States.  Specifically, the Complaint claims that Alstom formed the joint venture with ABB at least in part to enter the American gas turbine market.  Alstom sold several turbines in the United States, although the Complaint alleges that the orders were cancelled.  Alstom also manufactured parts for the turbines in America in 1998 and 1999.  When Alstom purchased

ABB ALSTOM, it assumed all of the liability for turbines sold previously by ABB, including turbines sold in the United States. (Id. ¶¶ 15-18.)

In addition, the Complaint alleges that Alstom sold at least eight cruise ships to Renaissance, which was incorporated in the United States with its principal place of business in Ft. Lauderdale, Florida. As described above, Alstom allegedly failed to disclose that it guaranteed the loans used to purchase those vessels in an effort to create a false impression that demand for its cruise ships was strong. (Id. ¶ 19.) At the September 7 Hearing on subject matter jurisdiction, Plaintiffs suggested that Renaissance's corporate status as a United States company alone should satisfy the conduct test. (See September 7 Hr'g Tr. at 11-12, 13-14.)

Moreover, Plaintiffs contend that the alleged deliberate and improper accounting at ATI constitutes conduct in the United States sufficient to confer subject matter jurisdiction. The Complaint asserts that the ATI railway cars were largely built in the United States, that the ATI agreements were negotiated and entered into with companies primarily based in the United States, and that ATI is subject to investigations by the Department of Justice and the SEC. The Complaint additionally claims that the Project Management

Plan for the NJT contract, on which costs were allegedly fraudulently understated, indicated that Alstom's Board had oversight responsibilities for the performance of the contract. Moreover, the Complaint notes that French employees of Alstom came to the United States to attend meetings concerning the performance of the NJT contract. (Id. ¶¶ 20-23.)

The Complaint includes more general allegations of United States-based conduct, including charging that "a significant number of defendants' false and misleading statements were initially made in the United States, and all were disseminated within the United States through the means and instrumentalities of interstate commerce." (Id. ¶ 24.) Plaintiffs also accuse Alstom of filing false and misleading periodic financial reports with the SEC, and of conducting the Secondary Offering in the United States pursuant to the Registration Statement and Secondary Offering Prospectus filed with the SEC. (Id.)

Furthermore, the Complaint points to Alstom's "vast presence in the United States" and lists Alstom's many offices in the United States, business operations that Plaintiffs contend justify the exercise of jurisdiction over the claims of all plaintiffs in this action. Finally, the Complaint indicates that Alstom has been engaged in litigation on at

least one previous occasion in the United States and that Alstom, therefore, is "subject to the jurisdiction of U.S. courts." (Id. ¶¶ 25-26.)

E.   PROCEDURAL HISTORY

The first complaint reciting the facts and certain of the claims alleged in the Complaint was filed on August 28, 2003 in the Western District of New York. (See Dupont v. Alstom SA, et al., No. 03-CV-6419L (W.D.N.Y. Aug. 28, 2003) (the "Dupont complaint").)  The action now before this Court was commenced on August 29, 2003 by the filing of the complaint in a case entitled Abramsky v. Alstom SA, et al., No. 03 Civ. 6595 (S.D.N.Y.).  Additional complaints were filed on September 2, 2003, see IBEW v. Alstom SA, et al., No. 303-CV-1480 (D. Conn.) (the "September 2 complaint"), which is included as Ex. D in the Berger Declaration; September 4, 2003, see Rosenbaum Partners, L.P. v. Alstom SA, et al., No. 03 Civ. 6701 (S.D.N.Y.); September 26, 2003, see State University Retirement Systems of Illinois, et al. v. Alstom SA, et al., No. 303-CV-1650 (D. Conn.); October 2, 2003, see Soyugenc v. Alstom SA, et al., No. 03 Civ. 7777 (S.D.N.Y.); October 10, 2003, see Shelby v. Alstom SA, et al., No. 03 Civ. 8059 (S.D.N.Y.); October 28, 2003, see San Diego City Employees Retirement System, et al. v. Alstom SA, et al., No. 03 Civ. 8515 (S.D.N.Y.); and October 29, 2003, see Allen v.

<u>Alstom SA, et al.</u>, No. 03 Civ. 8549 (S.D.N.Y.).

The Complaint was filed on June 18, 2004. The Complaint alleges violations of Section 11 of the Securities Act, 15 U.S.C. § 77k ("Section 11"), against Alstom, Bilger, Newey, the Director Defendants and the Underwriter Defendants; of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)"), against Alstom, Alcatel and the Underwriter Defendants; of Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15"), against Alcatel, Bilger, Newey and Milner; of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), promulgated thereunder, against Alstom, Alstom USA, ATI, Alcatel and the Officer Defendants; of Section 18 of the Exchange Act, 15 U.S.C. § 78r ("Section 18"), against Alstom, Alstom USA, ATI, Bilger, Kron, Jaffre, Newey, Rambaud-Measson, Janovec and the Director Defendants; and of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), against Bilger, Kron, Jaffre, Newey, Rambaud-Measson, Janovec and Alcatel. (Compl. ¶¶ 331-91.)

The <u>Dupont</u> complaint named as defendants Alstom, Bilger, Newey, Kron, Rambaud-Measson and Janovec, and alleged violations of Sections 10(b) and 20(a) as a result of the alleged ATI Fraud causing losses to "all purchasers of securities of Alstom, between May 7, 2002 to June 30, 2003."

(<u>Dupont</u> complaint ¶ 1.)  The September 2 complaint was the first to raise claims under Sections 10(b) and 20(a) of the Exchange Act relating to the Marine and Turbine Frauds, and to mention alleged violations of GAAP.  The September 2 complaint also expanded the class on whose behalf claims were pled to include purchasers from November 17, 1998 to June 29, 2003.  The first complaint to name Alstom USA, ATI, Alcatel, the Underwriter Defendants, Mayo, Simpson, Purves, Esser, Milner, Tchuruk, and Halbron as defendants in this action, and to state claims under Sections 11, 12(a)(2) and 15 of the Securities Act, was filed on October 28, 2003.  The Complaint was the first pleading to state a claim for relief under Section 18 of the Exchange Act.

### III.  <u>SUBJECT MATTER JURISDICTION</u>

A.  <u>STATEMENT OF LAW</u>

The inquiry on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) concerns whether the district court has the statutory or constitutional power to adjudicate the case.  <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  <u>Id.</u>; <u>see</u> <u>Robinson v. Overseas Military Sales Corp.</u>, 21 F.3d 502, 507 (2d Cir. 1994).  "[J]urisdiction must be shown affirmatively, and that showing

is not made by drawing from the pleadings inferences favorable to the party asserting it." <u>Shipping Fin. Servs. Corp v. Drakos</u>, 140 F.3d 129, 131 (2d Cir. 1998). The preliminary showing that must be made by the plaintiff, however, is not meant to be overly burdensome, "allowing for subject matter jurisdiction so long as 'the federal claim is colorable.'" <u>Cromer Fin. Ltd. v. Berger</u>, 137 F. Supp. 2d 452, 467 (S.D.N.Y. 2001) (quoting <u>Savoie v. Merchants Bank</u>, 84 F.3d 52, 57 (2d Cir. 1996)); <u>see</u> <u>Europe Overseas Commodity Traders, S.A. v. Banque Paribas London</u>, 147 F.3d 118, 121 n.1 (2d Cir. 1998) ("<u>Banque Paribas</u>") ("[A] plaintiff . . . should not be deprived of its day in an American court by a Rule 12(b)(1) order based on erroneous facts. . . . In a close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time." (internal citations and quotation marks omitted)).

Rule 12(b)(1) challenges to subject matter jurisdiction may contest either the facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction in fact. <u>Dow Jones & Co., Inc. v. Harrods, Ltd.</u>, 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002). "In a facial challenge, the court accepts as true the uncontroverted factual allegations in the complaint." <u>Id.</u> In resolving a factual challenge to

subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. See Makarova, 201 F.3d at 113; see also Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). The Court may "weigh the evidence on the record accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute." Dow Jones, 237 F. Supp. 2d at 404.

Plaintiffs claim that the SMJ Defendants failed to challenge any of the factual allegations in the Complaint, raising only a facial challenge to the sufficiency of the allegations, and that, therefore, the Court must accept all of the allegations in the Complaint as true. The Court disagrees. Plaintiffs state in the Complaint that part of Alstom's conduct alleged to have taken place in the United States, thus purportedly conferring jurisdiction over the claims of foreign shareholders, is that "a significant number of defendants' false and misleading statements were initially made in the United States." (Compl. ¶ 24.) The allegedly fraudulent statements listed in the Complaint are all either press releases, reports filed with the SEC or comments made by Alstom's officers and quoted in news media in the United States and abroad. (Id. ¶¶ 162-287.) Alstom contends that all of the press releases, financial statements and documents

-40-

filed with the SEC cited in the Complaint were created in and disseminated from France. (Declaration of Kareen Ceintre, dated September 29, 2004 ("Ceintre Decl."), ¶ 8; Declaration of Nicolas Gallot, dated September 29, 2004 ("Gallot Decl."), ¶¶ 3-7.) The Court, therefore, reads the SMJ Defendants' motion to raise a factual challenge to the allegations in the Complaint. As to these contested issues, the Court "may examine extraneous evidence submitted with the motion and make any findings of fact necessary to determine the existence of subject matter jurisdiction . . . [and] is not obligated to accord presumptive truthfulness to the allegations of the complaint." Dow Jones, 237 F. Supp. 2d at 404; Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Brothers Int'l Ltd., 928 F. Supp. 398, 402 (S.D.N.Y. 1996) ("On a Rule 12(b)(1) motion, the Court need not accept as true contested jurisdictional allegations and may resolve disputed jurisdictional facts by reference to affidavits and other material outside the pleadings.").

1.   Subject Matter Jurisdiction

Defendants' objections to the Court's subject matter jurisdiction implicate the full range of what Judge Henry Friendly, author of numerous opinions articulating the Second

Circuit's jurisprudence governing the underlying dispute,[11] characterized as "vexing questions." ITT v. Cornfeld, 619 F.2d 909, 912 (2d Cir. 1980). The jurisdictional issues raised are many and challenging for various reasons. A detailed overview of the full scope of the complexities may serve as a vehicle to assist understanding and open a path to the resolution of the jurisdictional motions at hand. The Court endeavors below to chart a road map through the maze, and thus delineate the course it will follow in adjudicating the disputes before it.

The exercise of subject matter jurisdiction over the claims of foreign plaintiffs regarding conduct related to foreign securities transactions is governed by whether the facts asserted satisfy either prong of the two-part inquiry the Court must perform under the applicable test. The Court may consider the merits of these claims and apply the antifraud provisions of American securities laws[12] if it finds

---

[11] Judge Friendly wrote the Circuit Court's decisions in most of its leading cases addressing subject matter jurisdiction of United States courts over actions by foreign claimants seeking the application of American laws to alleged fraudulent schemes involving foreign securities transactions. See Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1333-39 (2d Cir. 1972); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 984-93, cert. denied, 423 U.S. 1018 (1975); IIT v. Vencap, Ltd., 519 F.2d 1001, 1015-18 (2d Cir. 1975); IIT v. Cornfeld, 619 F.2d 909, 918-19 (2d Cir. 1980); AVC Nederland B.V. v. Atrium Invest. Part., 740 F.2d 148 (2d Cir. 1984).

[12] The Court's general reference to the phrase "the antifraud provisions of the American securities laws" encompasses actions brought under Sections 11, 12, and 15 of the Securities Act, and under Sections 10(b), 18, and 20 of the Exchange Act. The term "antifraud provision" has been used generically by the Second Circuit to describe claims brought under

evidence in the pleadings and other relevant motion papers

demonstrating sufficient wrongful conduct within the United

States, or substantial adverse effects on United States

investors in or American markets for the securities at issue,

relating to the foreign securities transactions challenged by

the foreign claimants.  See SEC v. Berger, 322 F.3d 187, 192

(2d Cir. 2003); Banque Paribas, 147 F.3d at 125; Psimenos v.

E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983); Bersch,

519 F.2d at 987-89.  Articulation of the rule is easy.  The

rub, like God and the devil, is in the details of its

application.

---

these statutes.  See, e.g., Bersch, 519 F.2d at 986 & n.28; Banque
Paribas, 147 F.3d at 127 n.10.  This Court is thus merely following that
precedent.

    Moreover, although not all of the causes of action created by these
provisions require proof of fraudulent intent as an element of the
underlying claim, they all are designed to remedy the harms wrought by
false or misleading statements and fraudulent actions by the various
participants engaged in securities transactions.  The Court's general use
of the term "antifraud" should in no way be construed by the parties here
as any indication of the Court's findings on other legal issues raised by
Defendants' motions.

    However, the use of this term is meant to respond to the assertions
of defendants Mayo and Simpson, who allege that this Court should analyze
its jurisdiction under Sections 11 and 12 of the Securities Act separate
and apart from that under the fraud-based claims alleged in the Complaint.
The Court is not persuaded, either on the basis of their briefs or on
their presentation at the September 7 Hearing, that this argument is not
simply an extension of Mayo and Simpson's claims concerning standing under
these statutes.  The Court's subject matter jurisdiction over all of
Plaintiffs' claims is governed by the standards outlined in this section.
Furthermore, defendants Mayo and Simpson's arguments concerning standing
under these statutes are deemed moot, given that all of Plaintiffs' claims
under the Securities Act are barred by the applicable statutes of
limitations.  See In re Alstom Sec. Litig. ("Alstom II"), No. 03 Civ. 6595
(S.D.N.Y. December 22, 2005) (concerning defendants' statute of
limitations defenses).

(a)  Effects

The effects test was first articulated by the Second Circuit in Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968).  The Circuit Court there held that district courts have "subject matter jurisdiction over violations of the Securities Exchange Act although the transactions which are alleged to violate the Act take place outside the United States, at least when the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors."  Id. at 208.  As the court explained the rationale for this holding:  "We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities."  Id. at 206.

The Second Circuit further elaborated the standard in Banque Paribas:  "[T]he effects test concerns the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges."  147 F.3d at 128 & n.12; see Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 124 (2d Cir. 1995) (stating that the effects test relates to "fraud which takes place abroad which impacts on stock registered and listed on

[an American] national securities exchange and [is] detrimental to the interests of American investors" (alterations in original)). The effects test, therefore, has no bearing in an action involving the claims of foreign purchasers of a foreign company's securities on foreign exchanges, such as is the case presented here in the SMJ Defendants' motions to dismiss.

Lead Plaintiffs nonetheless argue that subject matter jurisdiction exists in this litigation to adjudicate such foreign plaintiffs claims under the effects test, and also, citing <u>Itoba</u>, 54 F.3d 118, under an admixture of the conduct and effects tests.[13]  (<u>See</u> Pls.' Mem. of Law in Opp'n to the Alstom Defs.' Mot. to Dismiss the Claims of Foreign Purchasers Abroad for Lack of Subject Matter Jurisdiction, dated November

---

[13] This argument represents a change in tack by the Plaintiffs and is undermined by their allegations in the Complaint, which states that "[p]ursuant to the 'effects test' of extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of (a) all investors who purchased or acquired Alstom securities traded on U.S. markets, and (b) investors based in the United States who purchased or acquired Alstom securities regardless of where those securities traded." (Compl. ¶ 11.)  With respect to  the foreign shareholders at issue in Defendants' Motion to Dismiss, the Complaint states

> This Court may also properly exercise subject matter jurisdiction over the claims of foreign class members who purchased or acquired Alstom securities traded on foreign markets under the 'conduct test,' which provides that a federal court has subject matter jurisdiction if (1) the defendants' activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States caused the claimed losses.

(<u>Id.</u> ¶ 13.)  The Court finds that Plaintiffs' statement of the law in the Complaint accurately expresses the state of the law concerning the applicability of the effects test in the Second Circuit.

19, 2004 ("SMJ Opp'n Mem."), at 14-16.)  Plaintiffs suggest
that this Court look to the harm the alleged frauds at Alstom
caused domestic investors and the drastic decline in the share
price of Alstom ADSs on the NYSE, and consider these facts in
determining whether the Court has jurisdiction over the claims
of an entirely separate set of individuals:  the foreign
investors who purchased their Alstom shares on foreign
markets.  The Court does not agree with Lead Plaintiffs that
the foreign purchasers of Alstom shares listed on exchanges
abroad may piggyback on the harm caused by the alleged fraud
to investors and markets in the United States and thus bring
their claims in United States courts.

First, the effects test is more limited than Plaintiffs'
theory contends; it only "directs attention to the impact of
overseas activity on U.S. investors and securities traded on
U.S. securities exchanges."  <u>Interbrew S.A. v. Edperbrascan
Corp.</u>, 23 F. Supp. 2d 425, 429 (S.D.N.Y. 1998).  Under this
more narrow definition, therefore, the effects test is
inapplicable as a source of subject matter jurisdiction to
authorize this Court to consider the claims of the foreign
shareholder plaintiffs in the case at hand.  The SMJ
Defendants' motions are not directed at either domestic
investors in Alstom securities, wherever their stock may have
been purchased, or at holders of Alstom ADSs that were traded

on the NYSE.

Second, insofar as Plaintiffs' claims may be construed to argue that the generalized adverse consequences of Alstom's alleged foreign fraudulent actions on the United States economy or financial markets support this Court's exercise of jurisdiction over the foreign plaintiffs' litigation, such a contention would similarly fail. As the Second Circuit stated in <u>Bersch</u>, "there is subject matter jurisdiction of [sic] fraudulent acts relating to securities which are committed abroad only when these result in injury to purchasers or sellers of those securities in whom the United States has an interest, not where acts simply have an adverse affect on the American economy or American investors generally." 519 F.2d at 989. Were such factors alone sufficient to determine the question of subject matter jurisdiction over foreign transactions, "[t]he anti-fraud provisions of the U.S. securities laws would then be used to address general market conditions rather than redress specific harms suffered by some U.S.-interested party, a goal specifically foreclosed by numerous interpretations of the securities laws." <u>Interbrew</u>, 23 F. Supp. 2d at 430.

Finally, Plaintiffs' reference to the Second Circuit's opinion in <u>Itoba</u> as a basis for this Court's exercise of jurisdiction over foreign plaintiffs is unpersuasive. In

<u>Itoba</u>, the sole plaintiff, a Channel Islands company called Itoba, was merely the nominal purchaser of defendant Lep's shares, while the parties that were actually injured as a result of the fraud were Itoba's parent company, ADT, which financed Itoba's purchases, and ADT's shareholders, fifty percent of whom resided within the United States. <u>See</u> 54 F.3d at 124. This connection with American entities, shareholders and markets led the Circuit Court to hold that subject matter jurisdiction existed over the action at least in part under the effects test. <u>Id.</u> (finding jurisdiction under the effects test because the "fraud occurr[ed] on an American exchange and . . . impacted detrimentally upon thousands of United States shareholders in the defrauded company, <u>i.e.</u>, over $ 100 million lost in the shareholders' corporate equity.").

The situation in <u>Itoba</u> is entirely different from that presented here. In this case, the domestic shareholders and purchasers on domestic exchanges are named as plaintiffs. The Court is not being asked, as the Second Circuit was in <u>Itoba</u>, to look beyond the foreign status of the challenged plaintiffs, and to exercise jurisdiction over their claims if sufficient connections to local harms exist, so as to protect domestic shareholders and interests of United States securities markets. The Court has jurisdiction over the claims of domestic shareholders and may adjudicate their

rights.  Thus, any losses suffered by domestic shareholders or on domestic markets as a consequence of the foreign transactions at issue here are in no way relevant to the determination of whether this Court has jurisdiction over the claims of foreign shareholders who purchased Alstom securities in foreign markets.

The Court concludes that the effects test is not applicable in determining whether this Court has subject matter jurisdiction over the claims of the foreign plaintiffs challenged by the SMJ Defendants' motions to dismiss.  Accord Tri Star Farms Ltd. v. Marconi PLC, 225 F. Supp. 2d 567, 570 (W.D. Pa. 2002) ("Jurisdiction over Tri-Star and other non-resident foreign purchasers of Marconi ordinary shares cannot be premised on domestic 'effects' of foreign conduct. These investors were not American investors, they did not purchase their securities on an American exchange, and they did not suffer the effects of Marconi's alleged conduct within the United States.  Therefore, there is no domestic effect of Marconi's conduct in relation to these plaintiffs."); see also Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1155-56 (S.D.N.Y. 1992) (finding that the effects test was inapplicable to the determination of whether subject matter jurisdiction existed over plaintiffs' claims because no American investor purchased shares in the relevant companies,

nor were shares of those companies listed on an American exchange).  Accordingly, the Court will next review whether subject matter jurisdiction exists over the claims of these plaintiffs under the conduct test.

(b)  Conduct

By way of introduction and backdrop to the perplexities referred to above to which Judge Friendly alluded in Cornfeld, the Court offers some general observations elaborating on a number of the more formative reasons for those difficulties. This assessment should provide a framework for the legal and factual analysis that follows, and serves as the basis for the Court's ruling on the jurisdictional motions now before it.

First among the complications are the obvious delicate legal, jurisdictional and foreign relations policy intricacies entailed in giving extraterritorial effect to American laws over conduct or effects arising from foreign financial transactions and alleged fraudulent acts committed abroad. See, e.g., Restatement (Third) of the Foreign Relations Law of the United States ("Restatement of Foreign Relations") §§ 402, 403, 416, 421 (1987).  As is the case with several other analogous doctrines relating to extraterritoriality and jurisdictional conflicts, whether concerning foreign or

domestic jurisdiction,[14] determining when and where the United States has a sufficient interest in applying its laws under these circumstances inevitably demands drawing many challenging fine lines,[15] giving rise to myriad arguable distinctions, and opening the door for substantial differences of opinions.

A second ground for the problematic questions prevalent in these multinational securities transaction cases, as amply evidenced in the case at bar, arises from the numerous combinations and permutations of, for example, the parties and the types, places, timing and effects of relevant conduct that typically bear upon a determination of whether an American court may properly exercise jurisdiction to consider the merits of what are essentially foreign disputes. In these instances, under governing doctrine, the relevant factors

---

[14] Comparable jurisdictional difficulties are embodied in controversies and legal principles regarding conflict of laws, long arm statutes, interstate crimes and other wrongful conduct affecting transnational interests. See, e.g., Restatement of (Second) of Conflict of Laws §§ 10, 36, 37, 47, 49, 51 (1971) (amended 1988) ("Restatement of Conflict of Laws"); N.Y. C.P.L.R. 302(a) (2005) (the New York long arm statute); N.Y. Crim. Proc. Law § 20.20 (2005) (New York's statute on extraterritorial criminal jurisdiction).

[15] See, e.g., Vencap, 519 F.2d at 1018 (explaining the application of the jurisdictional test to the perpetration of a fraudulent scheme but not to preparatory activities preceding it, the Second Circuit stated: "Admittedly the distinction is a fine one. But the position we are taking here itself extends the application of the securities laws to transnational transactions beyond prior decisions and the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens.").

guiding the jurisdictional analysis includes, at minimum: the pertinent residence of the plaintiff(s) as well as the defendant(s), whether in the United States or in a foreign country; the material elements of the conduct alleged to comprise the fraud at issue, subdivided by the venue in which particular acts occurred, and specifically identifying the extent to which the major participants and their relevant conduct, as well as the significant parts of the alleged fraudulent transaction, were located in the United States or abroad; and the adverse domestic effects brought about by the claimed wrongful behavior. <u>See</u>, <u>e.g.</u>, Restatement of Foreign Relations §§ 403, 416(2). In any given case, therefore, these considerations alone could describe a matrix depicting dozens of variables.

Complicating this inquiry are the commercial realities associated with modern international securities trading. Often these transactions involve multiple components, participants and events centered in several countries.[16] The executives and directors of the company answerable for the wrongdoing may be headquartered in one country. The false

---

[16] <u>See</u>, <u>e.g.</u>, <u>Banque Paribas</u>, 147 F.3d at 120 (noting that the plaintiff was a Panamanian corporation owned by a citizen of Canada; defendant Banque Paribas was a French bank with offices in Monaco; Banque Paribas's relevant asset management subsidiary was a Bahamanian corporation managing the particular fund in question, which was organized under the laws of Luxenberg; the bank's account manager was a national of the U.K. in the bank's London office; and the underlying transaction occurred in communications between plaintiff's owner while traveling transiently in Florida and defendants' representative in London).

representations may be contained in securities disclosure statements registered or in public announcements published in various in other nations. The lawyers, accountants and underwriters who prepared the prospectuses and related documents may have coordinated their drafting activities and structuring of the transaction in yet a different jurisdiction. The marketing of the investments may take place in exchanges around the world. Hence, the conduct constituting the charged fraud causing the asserted financial losses is rarely a single act readily traceable in its entirety to a discrete time and place. Rather, more commonly, the alleged misdeeds may comprise but one aspect of a scheme on a larger scale, a link in a transactional chain forming a continuum that spreads out to multiple jurisdictions. Identifying where the charged fraud starts and where it culminates, and what comprises the numerous material points and participants in the transactions in between, inevitably presents formidable challenges. The judgment calls that the task requires are functions of these many variables.

Further confounding the courts' subject matter jurisdiction determination in claims regarding foreign securities transactions is a substantial degree of doctrinal ambiguity and division that exists in the governing legal rules and precedents. No better evidence of the polemics this

jurisprudence has engendered can be cited than the formidable conflicts that exist between the parties here over the proper interpretation and application of the pertinent case law, with each side quoting snippets from controlling Second Circuit precedents that on the surface may compel equally plausible conclusions. (See SMJ Mem. at 12-17, 18-20; SMJ Opp'n Mem. at 7-16; Reply Mem. of Law in Supp. of the Mot. of the Alstom Defs. to Dismiss the Claims of Foreign Purchasers Abroad for Lack of Subject Matter Jurisdiction, dated January 10, 2005 ("SMJ Reply Mem."), at 4-14.)

To highlight the basis for these profound disagreements, the seminal formulation of the standard applicable in the Second Circuit, as elaborated below, is that enunciated in Bersch, still widely cited as one of the leading and most authoritative decisions addressing the issues. See, e.g., Banque Paribas, 147 F.3d at 128-29; Tri-Star Farms, 225 F. Supp. 2d at 573 (citing Bersch as being "[o]ne of the early and influential cases to address this issue"); 5 Thomas Lee Hazen, The Law of Securities Regulation § 17.4[1] (5th ed. 2005). The Circuit Court in Bersch declared that the antifraud provisions of federal securities laws "[d]o not apply to losses from sales of securities to foreigners outside the United States unless the acts (or culpable failures to act) within the United States directly caused such losses."

519 F.2d at 993.  In consequence, the Court stated, activities that are "merely preparatory" to the foreign transaction do not suffice to confer subject matter jurisdiction over a transaction that is otherwise predominantly foreign.  _Id._ at 987.  The _Bersch_ doctrine on this point thus bases jurisdiction on a somewhat rigorous test grounded on demonstrable causation, that is, the existence of a direct causal connection between the domestic conduct and the losses claimed by the foreign victims of the alleged foreign fraudulent scheme.  Elaborating on this ruling in _Vencap_, decided simultaneously with _Bersch_, the Circuit Court rendered a similarly narrowing instruction.  It declared that, as regards the conduct claimed to have taken place in the United States, "our ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves." 519 F.2d at 1018.

In several more recent cases, however, the Second Circuit Court, while reaffirming _Bersch_ and paying it homage as the Circuit's controlling rule, has nonetheless elaborated other standards that may be construed as modifying the _Bersch_ doctrine, or even taken to create tension with it.  In _Psimenos_, for example, the court remarked that American courts should entertain suits filed in this country by foreign plaintiffs alleging securities fraud "_only_ where conduct

material to the completion of the fraud occurred in the United States." 722 F.2d at 1046 (emphasis added). The apparent shift in emphasis from a test of strict causation to one of materiality of the domestic acts arguably relaxes the Bersch standard, potentially conferring subject matter jurisdiction in a case in which conduct within the United States conceivably may be material to the completion of the fraud but may not necessarily have directly caused the alleged foreign investors' losses. Moreover, the Psimenos court articulated several other criteria upon which its holding relied. Declaring that the relevant test should center the inquiry on "the nature of the conduct within the United States as it relates to carrying out the alleged activity," id. at 1045, the court cited various considerations, none necessarily exclusive or compatible with each other, or with the stricter "directly caused" rule of Bersch: whether the conduct in the United States "constituted the final act" of a fraud perpetrated abroad, see id. at 1044; whether "substantial acts in furtherance of the fraud were committed in the United States," id. at 1045; whether the steps in question were "far removed from the consummation of the fraud," id. at 1046.

If Psimenos's multi-faceted test created a Hydra of sorts from the direct causation-based standard articulated in Bersch, Banque Paribas may have added new twists and turns to

an already labyrinthian challenge.  The Circuit Court there found that material acts of the type held sufficient to sustain subject matter jurisdiction had occurred within the United States; indeed it characterized such conduct as "the most important piece of the alleged fraud."  147 F.3d at 130. The court also found that the domestic activity had directly caused the loss to the foreign claimant, thus satisfying the Bersch causation rule.  Id. at 129.  Nonetheless, because it found that "no relevant interest of the United States was implicated," the court held that the "surrounding circumstances" did not support the exercise of subject matter jurisdiction.  Id.

The application of the diverse formulations from Bersch to Psimenos to Banque Paribas by courts in this Circuit has not shed substantial additional light on the subject.  One court, for instance, read the limitation of Bersch as requiring more than "merely preparatory" conduct to be satisfied "when the final step of the fraud or acts of material importance that had significantly contributed to the fraud occurred in the United States."  In re Vivendi Universal, S.A., No. 02 Civ. 5571, 2004 WL 2375830, at *3 (S.D.N.Y. Oct. 22, 2004).[17]  Ordinarily, there is a substantial

---

[17] Several other district courts have pronounced the standard for the conduct test in terms that may be broadly read as variations on the Bersch theme.  See, e.g., In re Bayer AG Sec. Litig., No. 03 Civ. 1546, 2004 WL 2190357, at *17 (S.D.N.Y. Sept. 30, 2004) ("To support the exercise of

gap between the formative steps of a wrongful transaction and its completion.  Aside from the uncertainty as to whether a "final act" of a fraudulent scheme is, by that reason alone, material to the particular transaction or a direct cause of the claimed losses in all cases, what follows from this test leaves open to interpretation the substantial range of possible domestic activities of securities transactions that could fill the large space between the formulation and consummation of an alleged fraud.

Perhaps in recognition of these difficulties and fine lines, the Second Circuit has qualified its conduct doctrine somewhat, having also counseled that in reaching subject matter jurisdiction determinations in these actions, no particular factor is necessarily dispositive, and no one rule is categorically controlling.  See Cornfeld, 619 F.2d at 918

---

jurisdiction under the conduct test, the plaintiff must allege conduct in the United States 'of sufficient centrality to the claim of fraud to warrant an exercise of such jurisdiction.'" (quoting Nikko Asset Mgmt. Co. v. UBS AG, 303 F. Supp. 2d 456, 464 (S.D.N.Y. 2004))); Froese v. Staff, No. 02 CV 5744, 2003 WL 21523979, at *1 (S.D.N.Y. July 7, 2003) ("Under the conduct test, subject matter jurisdiction exists in a securities claim asserted by aliens [']only where there has been in the United States:  (1) conduct material to the completion of the fraud; (2) perpetration of the fraudulent acts themselves; or (3) the final steps in the fraudulent scheme.'" (quoting Societe Nationale d'Exploitation Industrielle, 928 F. Supp. at 403)); Cromer Finance Ltd. v. Berger, 137 F. Supp. 2d 452, 480 (S.D.N.Y. 2001) (reiterating the conduct test as stating that "where defendants have undertaken significant steps in the United States in furtherance of a fraudulent scheme, United States courts have jurisdiction over suits arising from that conduct even if the final transaction occurs outside the United States and involves only foreign investors"); In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 73 (S.D.N.Y. 1999) (stating the Bersch standard and elaborating on it as follows, "A loss is 'directly caused' if the defendant's actionable misstatement or omission within the United States is a 'substantial' or 'significant contributing cause' of the decision to purchase stock").

("It should be evident by now that 'the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction in transnational securities cases is not necessarily dispositive' in future cases." (quoting Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 414 (8th Cir. 1979))). In Cornfeld, for instance, the Circuit Court noted that while neither the American nationality of the issuers nor the consummation of the transaction in the United States by itself constituted a necessary or sufficient consideration, "the presence of both these factors point[ed] strongly toward applying the anti-fraud provisions of our securities laws." Id.

Similarly, the Second Circuit has instructed that whether the alleged misrepresentations were actually made in the United States, see Leasco, 468 F.2d at 1336, or in another country, see Psimenos, 722 F.2d at 1044, or whether a material domestic act directly caused the alleged harm, see Banque Paribas, 147 F.3d at 129, is not in and of itself determinative. Nor is the site of the preparation of registration statements filed in this country by itself a sufficient jurisdictional consideration. See Itoba, 54 F.3d at, 124; see also Restatement of Foreign Relations § 416(d) ("The United States may generally exercise jurisdiction to

prescribe with respect to conduct occurring predominantly in the United States that is related to a transaction in securities even if the securities transaction takes place outside the United States.") (quoted approvingly in Alfadda v. Fenn, 935 F.2d 475, 479 (2d Cir. 1991)).

In fact, the Circuit Court has cautioned against mechanical reliance on any particular factor as a sufficient decisional guide from one case to another. See Cornfeld, 619 F.2d at 918. As more fully detailed below, insofar as the Second Circuit's subject matter jurisdiction doctrine viewed as a whole suggests an overlying principle to which the court's articulated considerations and precedents point, it is one that, in the final analysis, is grounded on congressional policy as bounded by a standard of reasonableness. As expressed in Bersch, the ultimate question is whether Congress contemplated that American resources would be allocated to adjudicate predominantly foreign disputes and whether the United States has a relevant interest in the litigation. See 519 F.2d at 985, 993; see also Banque Paribas, 147 F.3d at 129; Vencap, 519 F.2d at 1016.

Thus, any notion that a single precedent or cohesive doctrine may be found which may apply to dispose of all jurisdictional controversies in this sphere is bound to prove as elusive as the quest for a unified field theory explaining

the whole of the physical universe. Even on a surface reading, the variegated standards described above, coupled with the latitude accorded by Second Circuit guidance that no particular consideration may be decisive, rather than offering explicit counsel and a clear path towards the resolution of a jurisdictional challenge in a complex case such as the one at hand, serve only to confirm that the determination is by no means an easy task. Rather, it demands not only rigorous inquiry but accommodating what may be potentially incompatible statements of applicable rules. To this end, in addressing the instant dispute, the Court has endeavored to extract and stitch together from the jurisprudence what appear to be the most common and essential threads, and to apply the connecting central considerations that emerge from the case law. In synthesis, what this effort yields is not a uniform consideration or decisive rule to determine the existence of subject matter jurisdiction in every foreign securities transaction case, but the design of an analytical method, a structured approach to formulating a decision from complex circumstances.

The various rules and reasonings courts in this Circuit have articulated and, in varying degrees, relied upon in adjudicating subject matter jurisdiction challenges asserted in actions involving foreign securities transactions such as

those at issue here may be thematically ordered in accordance with a number of criteria mentioned and given weight in the courts' ultimate determinations:

> (1) the elements of the wrongful conduct in question as pleaded in plaintiff's theory of fraud in relation to the specific acts to which the securities statutes apply;

> (2) the location of domestic conduct and contacts associated with the transaction in relation to those located in foreign states;

> (3) the timeline identifying when and where the relevant domestic and foreign acts occurred;

> (4) the materiality/substantiality of the domestic conduct relative to the particular fraudulent transaction the pleadings describe;

> (5) the causal connection between the domestic conduct and the alleged financial losses resulting from the alleged fraudulent transaction; and

> (6) an overarching measure of reasonableness gauged by the intent of congressional policy and principles of fairness in the circumstances surrounding the particular case.

While none of these considerations is meant to be weighed independent of the others, rather forming a constellation of factors that must be considered in conjunction, in certain cases it may be apparent early on in the analysis that the movant has failed to establish any viable basis for the existence of subject matter jurisdiction. The Court discusses each of these factors with respect to this case in turn.

(i)  Theory of Fraud and Particulars of the
        Statutory Violation Charged

As a point of departure, the Court must note that the
subject matter jurisdiction inquiry must begin with
underscoring what comprises the particular forms of behavior
proscribed by the antifraud provisions of the securities laws.
Not every false statement or omission, or every mode of
wrongful scheme and financial loss attributable to a defendant
in a securities case, is necessarily covered by the United
States statutes.  See Fidenas AG v. Compagnie Internationale
Pour L'Informatique CII Honeywell Bull S.A., 606 F.2d 5, 19
(2d Cir. 1979) ("Fraud there might have been, and plaintiffs
may very well have been damaged by its perpetration.  But the
dispute here presented is rightfully resolved in the courts of
another land."); Vencap, 519 F.2d at 1018 (recognizing that
"the line has to be drawn somewhere if the securities laws are
not to apply in every instance where something has happened in
the United States," however remote the action from a
consummated fraud or its effects in the United States).

The harmful acts that the securities laws specifically
target include the making of material misrepresentations or
omissions of fact uttered in connection with securities
filings or transactions when such conduct induces purchasers
or sellers of those financial instruments to reasonably rely
on false or misleading information in making investment

decisions and causes them losses as a result. Those laws also prohibit the use of a manipulative or deceptive device, practice or course of conduct created to defraud investors. Needless to say, to satisfy this statutory core element, and thus confer subject matter jurisdiction over a suit by foreign claimants invoking American securities laws in connection with a foreign transaction, plaintiffs' pleadings must assert sufficient operative facts describing acts or transactions that, if proved, would constitute a violation of the statutes.

With regard to whether the conduct in question falls within the scope of the activities to which the securities laws properly apply, therefore, a threshold inquiry must examine the theory of the fraud plaintiffs claim, that is, precisely what constitutes the harmful acts the complainants allege comprise the fraudulent securities transaction so as to bring that conduct within the reach of the securities statutes. See, e.g., Vencap, 519 F.2d at 1011-13, 1018 (identifying five distinct theories of fraud that emerged from the facts of the case and examining, in connection with the requirements of the securities laws, what forms of conduct associated with each theory occurred in the United States); see also Berger, 322 F.3d at 194 (concluding that the acts that gave rise to the violation consisted of defendant's preparation, approval and transmission of false financial

information in New York, even if publication of the statements later emanated from abroad); <u>Bersch</u>, 519 F.2d at 987 (noting as to the charges at issue that "[t]he fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands.  Here the final prospectus emanated from a foreign source").

Clearly, if neither the plaintiffs' theory of liability nor the factual allegations of the pleadings presented in support of it portray activities within the scope of the wrongdoing the securities statutes proscribe, the jurisdictional inquiry would end at this point.  <u>See</u>, <u>e.g.</u>, <u>Vencap</u>, 519 F.2d at 1018 (noting that plaintiffs' case failed under the first three theories of fraud the court identified, though the court simultaneously took the analysis through the next steps and found that the domestic activities the theories described amounted to nothing more than formalizing a transaction that, if fraudulent, had been worked out abroad).

(ii)  <u>Location of Relevant Conduct</u>

Upon determination of what constitutes the appropriate and supportable theory of liability, relevant conduct would then have to be closely examined to parse what parts of the alleged wrongful transaction took place in the United States and which portions were formulated abroad.  For subject matter jurisdiction analysis in foreign securities transactions

embodies a spatial component to determine where the "essential core" or center of gravity, and thus where the predominant activities of the alleged fraudulent transaction, can be found to have taken place. <u>Fidenas</u>, 606 F.2d at 8. This determination is made by enumerating and situating, according to place of occurrence, the pertinent material acts that, combined, constitute the alleged fraudulent scheme.

Two fact patterns are common and weigh heavily in the location inquiry: (1) relevant acts or omissions related to the transaction at issue occur in the United States through substantial activities carried out within this country in furtherance of the wrongdoing, and that conduct itself constitutes a violation of the securities laws, or (2) the domestic conduct in question forms a material part of a foreign securities transaction which embodies activities prohibited by the statutes, though the wrongdoing was actually devised and committed abroad. In the first of these prospects, the domestic acts themselves may give rise to a complete securities offense at the time they occur in the United States; in the second, the local conduct forms an essential link which connects to and depends upon actions that take place abroad and which contributes substantially to the consummation of the alleged securities violation. <u>See generally</u> <u>Cornfeld</u>, 619 F.2d at 920-21 (noting that a

determination of subject matter jurisdiction ultimately
"depends not only on how much was done in the United States
but also on how much (here how little) was done abroad");
Fidenas, 606 F.2d at 8 (affirming dismissal for lack of
subject matter jurisdiction where all of the parties to the
litigation were foreign, the "essential core" of the
fraudulent action took place abroad and "any activities in the
United States were clearly secondary and ancillary"); Bersch,
519 F.2d at 985, 987 (finding that subject matter jurisdiction
did not exist where, upon a weighing of the various domestic
and foreign activities involved in the alleged wrongful
conduct, the transactions "on any view [were] predominantly
foreign").

(iii)   Timeline of Relevant Acts

The spatial points of origin and conclusion of the
alleged fraudulent scheme suggests another closely related
connection which also affects the measure of materiality:  a
temporal relationship.  This consideration is ordinarily
reflected in the plaintiff's theory of fraud as a link between
the point at which relevant conduct in the United States takes
place and when the alleged foreign fraudulent transaction
claimed to violate American securities laws is actually

carried out.[18]  Clearly, substantial harmful acts committed
within the United States that either initiate or consummate a
fraudulent securities transaction that is actually formulated
or effectuated abroad would confer subject matter jurisdiction
at the time the conduct occurs.  See Berger, 322 F.3d 194-95
(noting that while the fraudulent document provided to
investors "emanated from a foreign source," the actual
fraudulent conduct at issue occurred when material acts were
"masterminded and implemented" by the defendant in the United
States and not when the false representations were
subsequently published abroad); Psimenos, 722 F.2d at 1044
(sustaining a finding of subject matter jurisdiction where the
conduct in the United States temporally comprised "the
culminating acts of the fraudulent scheme," even if
substantial aspects of the transaction concocted abroad
preceded the domestic activities); Cornfeld, 619 F.2d at 919
(finding subject matter jurisdiction where the investment in
question, though purchased on a foreign exchange, involved
securities of American corporations and "the transactions were
fully consummated within the United States").  But see Banque
Paribas, 147 F.3d at 130 (finding no jurisdiction, though the
wrongful misrepresentation occurred during a telephone

---

[18] Of course, the analysis of when the events pertinent to plaintiffs'
theory take place also facilitates the related evaluation entailed in
application of the relevant statute of limitations.

conversation at a time one of the foreign parties was vacationing in the United States).

Between the preparation and execution of a fraudulent scheme there may be "intermediate step[s]," AVC Nederland, 740 F.2d at 153, such as those involved under some theories of the instant case discussed below, that may or may not suffice to confer subject matter jurisdiction depending upon when they occurred in relation to the conception and manifestation of the alleged fraud. See id. (finding jurisdiction where the alleged misrepresentations communicated in the United States constituted a sufficient "intermediate step" in a series of interactions between the foreign parties that began and ended in their home country); see also Alfadda, 935 F.2d at 478 (noting that "the prospectuses did not become fraudulent until additional voting shares were sold" within the United States that brought about plaintiffs' losses).

This time dimension could have significant implications in the ultimate determination regarding the exercise of subject matter jurisdiction. Where the domestic conduct could not be characterized as fraud in itself at the time it takes place, nor as then being substantially related to a fraudulent scheme already devised or hatched overseas, arguably the basis for the exercise of subject matter jurisdiction, and hence extraterritorial application of American securities laws,

becomes more attenuated, even if such otherwise untainted conduct may be incorporated into acts that ripen and are consummated as a fraudulent scheme at some later point in time.

In Bersch, for example, numerous preliminary activities associated with the alleged fraudulent transaction occurred in the United States that on their face may have been regarded as "neutral," in that conceivably they were carried out prior to the time any fraudulent purpose of a transaction had germinated. In that event, the preparatory steps would be less likely to qualify as a material component of a fraud, and thus would not by themselves have served as grounds sufficient to support a charge of violating the securities laws. The activities in question included meetings in New York among attorneys, accountants and underwriters to organize, structure and draft portions of the prospectus for the securities offering that was ultimately issued on a foreign exchange. The Circuit Court held that these acts were "merely preparatory" to a fraud that was later formulated and materialized abroad, and that, therefore, the acts were not enough to confer subject matter jurisdiction over the claims of the foreign plaintiffs. 519 F.2d at 985 n.24 & 987.

Amplifying the Bersch standard, the Circuit Court in Vencap noted that of subject matter jurisdiction over foreign

transactions should be exercised only when the United States conduct at issue was "limited to the perpetration of fraudulent acts themselves." 519 F.2d at 1048. Under these circumstances, when a particular transaction has not yet been conceived and materialized as a scheme to defraud, arguably it would be difficult to support a finding that substantial acts in furtherance of a fraud were committed or relied upon in the United States. See Vencap, 519 F.2d at 1011 (noting that a finding of subject matter jurisdiction could not be supported by "activities subsequent to the closing . . . and if the fraud had been completed then"); see also Berger, 322 F.3d at 195 (noting that where the defendant's fraudulent acts were masterminded and implemented in the United States, the subsequent preparation and publication of the false statements overseas "was not itself fraudulent"). But see Psimenos, 722 F.2d at 1046 (rejecting a reading of Vencap that limited relevant conduct to "fraudulent acts themselves" where "conduct material to the completion of the fraud occurred in the United States").

(iv) <u>Materiality/Substantiality</u>

A determination of where and when conduct related to the securities transaction in question occurs sets the stage for a judgment as to how the various transactional steps and events, domestic and foreign, stack up on a judgmental scale.

-71-

The analysis entails two measures: a qualitative assessment of how significantly each activity contributes to the formulation of the alleged securities violation, as well as a quantitative weighing of the extent of such actions located both in this country and abroad. In Cornfeld, the Second Circuit referred to this appraisal as a comparison of the "relativity" of the domestic and foreign conduct. 619 F.2d at 920. The relative importance of each act individually, and of the cumulative weight of such conduct on the respective sides, domestic or foreign, would constitute a test of the materiality or substantiality of the activities in the United States as a component of the foreign transaction and in relation to the acts abroad. See id.; Bersch, 519 F.2d at 987 (declining to extend jurisdiction to cases "where the United States activities . . . are relatively small in comparison to those abroad").

The relevant domestic activities may take three forms which bear upon a judgment concerning how material the conduct occurring in the United States is in relation to the entire securities transaction and those aspects of it carried out abroad. The acts may be initiated and performed predominantly in the United States, though formally published abroad, see Berger, 322 F.3d at 194; or the false statements comprising the alleged wrong perpetrated in the United States may

represent an "intermediate step in a series that began and ended in the home country of the plaintiff and the defendants," AVC Nederlander, 740 F.2d at 153; or else the conduct could commence in another country and be consummated in the United States through sufficient contacts by the parties and implementation of significant steps of the transaction within this country, see Psimenos, 722 F.2d at 1046; Cornfeld, 619 F.2d at 918. In sum, to satisfy the materiality measure, the defendants' actions in the United States must substantially arise from, integrally relate to, or be significant to the consummation of the alleged foreign fraudulent transaction.

A further juxtaposition of the affirmative and negative statement of the materiality inquiry may facilitate its application. Extending a theatrical metaphor, a scheme of the kind generally involved in alleged multinational fraudulent securities transactions is rarely composed of a one-act, one-actor play set on a single stage. More commonly the deceptive act integrates into the plot distinct parts performed at different times and places by the different actors the victims list as the cast of characters. Recognizing this reality, in the law as in drama, the jurisdictional determination should focus closely on two key inquiries. The first question is generally what role in the whole fraudulent plan any part of

the action that took place in the United States played in relation to the statutorily prohibited practices. The second is more specific: whether that act was material or collateral to the fraud; whether it was a central part that significantly advanced the main theme of the transaction to the consummation of its unlawful purpose, or merely a stage setter or ancillary sideshow; whether the harmful domestic action featured the substantial role of a lead actor, or a bit part of a bit player.

Presented in this light, the contrast may help to isolate actions performed within the United States that are covered by the securities laws to material or substantial parts of fraudulent schemes, and to screen out the rest as beyond the purview of the courts' subject matter jurisdiction. See, e.g., Bersch, 519 F.2d at 987 (finding no jurisdiction over acts that simply serve to set the stage for the culmination of the fraud abroad: "cases where United States activities are merely preparatory or take the form of culpable nonfeasance"); see also Banque Paribas, 147 F.3d at 129 (finding the domestic contacts minimal and therefore declining to exercise subject matter jurisdiction over plaintiff's claims where even if "phone calls (or any other communications into the United States) soliciting or conveying an offer to sell securities ordinarily would support jurisdiction . . . the surrounding

circumstances show that no relevant interest of the United States was implicated" because the misrepresentations that were the subject of the calls and alleged fraudulent transactions were placed from overseas to a foreigner temporarily in the United States); Leasco, 468 F.2d at 1330 (declaring that the subject matter jurisdiction determination would be guided by the principles the Circuit Court there enunciated if the facts revealed that "the allegedly fraudulent acts of any of the defendants within the United States were non-existent or so minimal as not to be material").

(v)  <u>Causation</u>

By logical extension, the test of the materiality of conduct within the United States leads to a next essential standard articulated in the Second Circuit's subject matter jurisdiction doctrine relating to foreign securities transactions: causation. American antifraud securities laws apply to the alleged foreign fraudulent scheme if there is a sufficient connection between substantial domestic activities of the transaction alleged to have violated the securities laws and the consequential financial losses the claimant asserts. The underlying principle was enunciated in <u>Bersch</u>. As framed by the <u>Bersch</u> court, the antifraud provisions of the securities laws do not apply, and the courts thus lack subject

matter juridiction, as to claims of losses sustained from sales of securities to foreigners outside the United States unless the alleged domestic conduct "directly caused such losses."  519 F.2d at 993.

In <u>Leasco</u>, the Circuit Court referred to that causal relationship as an "essential link."  468 F.2d at 1335 (noting that the "contract, signed in the United States, was an 'essential link' in inducing [plaintiff] to make open-market purchases" that resulted in the claimed damages (quoting <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. 375, 385 (1970))); <u>see also</u> <u>Berger</u>, 322 F.3d at 194 (rejecting defendant's argument that his conduct in the United States was insufficient to confer subject matter jurisdiction because the activity that <u>directly</u> caused the losses to investors emanated from a foreign source, where the Circuit Court found that the domestic acts asserted were extensive and not merely preparatory); <u>Psimenos</u>, 722 F.2d at 1047 (finding subject matter jurisdiction because the acts that consummated the alleged fraudulent transaction occurred in the United States, thus directly causing the losses claimed); <u>Vencap</u>, 519 F.2d at 1018 (noting that particular domestic acts subsequent to the closing of a foreign transaction "would not only be evidence of misrepresentation but the cause of the damage").

The "essential link" this doctrine requires flows from

general principles of causation. Because the rights and remedies created by the securities laws derive doctrinally from common law causes of action defining fraud, negligence and strict liability, causation is an essential element to establish legal responsibility in claims under the securities statutes. Under common law doctrine, a finding of liability may be properly grounded where the injury asserted is a direct result or reasonably probable consequence of the act or omission in question, and that wrongful conduct constituted a substantial factor or significant contributing cause in bringing about the harm. See Wilson v. Comtech Telecomms. Corp., 648 F.2d 88, 92 (2d Cir. 1981); Restatement (Second) of Torts § 431 (1965).

On this basis, the requisite direct causal connection may be satisfied, as in Leasco, Psimenos and Berger, where an unbroken line of causation may be found between the domestic acts which comprise the fraudulent scheme and the losses allegedly resulting from that transaction. Conversely, this standard explains why the preliminary steps of a transaction alone, or minimal local contacts by given participants, do not suffice to confer subject matter jurisdiction. Where the acts within the United States are determined to be merely preparatory or not material enough to the alleged fraudulent transaction that directly brought about the losses at issue,

as in <u>Bersch</u> and <u>Vencap</u>, the causal chain may be too indirect or broken, thereby rendering the connection between the relevant domestic conduct and the harms associated with the alleged foreign fraudulent transaction too attenuated or remote to support a reasonable exercise of subject matter jurisdiction by an American court. <u>See</u>, <u>e.g.</u>, <u>Vencap</u>, 519 F.2d at 1011 (finding that domestic conduct would not support subject matter jurisdiction if it referred to "activities subsequent to the closing [of the alleged fraudulent transaction] . . . and if the fraud had been completed then").

(vi) <u>Reasonableness and Congressional Policy</u>

Application of the preceding inquiry concerning subject matter jurisdiction over substantially foreign securities claims is subject to what may be termed an overarching standard that all of the steps and considerations combined should satisfy: a check of reasonableness. This test derives from the Second Circuit's observation that the language of the securities laws is "much too inconclusive" to justify their application in every instance in which extraterritorial application of American laws is invoked. <u>Leasco</u>, 468 F.2d at 1034; <u>see</u> <u>also</u> <u>Berger</u>, 322 F.3d at 192 (noting that the section of the United States Code which contains the laws governing securities exchanges "is silent as to the extraterritorial application of these statutes"). In this

legislative void, the courts are left to the recourse of the
judicial crystal ball for guidance from reasoned divination of
statutory purpose.  The aim is to project whether a particular
extraterritorial application of American laws is consistent
with what may be reasonably contemplated by the congressional
intent and national policy embodied in the antifraud
provisions of the securities statutes.  In this context, the
analysis essentially asks why the United States should
intervene to resolve a dispute among foreigners concerning a
foreign transaction.  In other words, the question seeks to
discern what vital United States interests would be served by
providing a forum and giving effect to American laws to
adjudicate substantially foreign claims.

       The operation of the jurisdictional inquiry at this
point in the process is best illustrated by <u>Banque Paribas</u>.
There the Second Circuit, though finding that the domestic
conduct comprising the alleged fraud was sufficient to satisfy
the tests of both materiality and causation, nonetheless held
that the "surrounding circumstances" did not justify an
exercise of subject matter jurisdiction.  147 F.3d at 129.
Even if the predominant harmful misrepresentation and reliance
had occurred in the United States, the securities deal at
issue was a foreign transaction involving foreign parties and
interests.  The court stressed that one of the foreign

participants, by happenstance, had been traveling on vacation in the United States at the time the wrongful agreement was consummated and that the transaction was subject to "the regulatory jurisdiction of another country with a clear and strong interest in redressing any wrong." Id. In the final analysis, the Circuit Court found that application of the American rules of conduct to the transaction was "unreasonable," id. at 131, because Congress could not have "intended to make the securities laws have such broad reach or to make U.S. courts available for such suits," id. at 129.

In evaluating the standard of reasonableness, the Second Circuit has superimposed several related considerations that may be viewed as two sides of the same coin, both alluded to in Banque Paribas. These issues generally reflect the overriding role that principles of national policy and reasonableness play in determining jurisdictional questions, whether or not other equities may suggest the existence of a right or remedy. One criterion generally encompasses questions of national policy pertaining to allocation of resources and protection of domestic investors and markets. A second factor entails a value judgment about the appropriateness of exercising jurisdiction in the light of all of the preceding circumstances, taking into account larger issues of comity and fairness. See id. at 129.

The Bersch court, while freely acknowledging that neither the language or the legislative history of the statutes compelled the rules the Circuit Court had enunciated, formulated an oracular standard that it grounded not only on the relevant case law and commentary but also on "our best judgment as to what Congress would have wished if these problems had occurred to it." 519 F.2d at 993. Expanding on this method, the court described the pertinent question as "[w]hether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [predominantly foreign transactions] rather than leave the problem to foreign countries." Id. at 985; see also Banque Paribas, 147 F.3d at 129 (finding no basis to accept jurisdiction over the dispute "because the surrounding circumstances show that no relevant interest of the United States was implicated"); Vencap, 519 F.2d at 1016 ("It is simply unimaginable that Congress would have wished the anti-fraud provisions of the securities laws to apply" if all of the acts charged had been perpetrated abroad and had defrauded only foreign investors).

Citing the congressional policy question as relevant in the context of supporting the exercise of subject matter jurisdiction in another case, the Second Circuit declared that "Congress did not want 'to allow the United States to be used

as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" Psimenos, 722 F.2d at 1045 (quoting Vencap, 519 F.2d at 1017); see also SEC v. Kasser, 548 F.2d 109, 116 (3rd Cir.), cert. denied, 431 U.S. 938 (1977) (noting that the antifraud provisions of the United States securities laws were designed "to ensure high standards of conduct in securities transactions within this country" and to protect domestic markets and investors).

Thus, implicit in the Second Circuit's reading of congressional intent, and underlying its guidance in these jurisdictional judgment calls, is an abiding concern for the protection of the integrity of financial markets and of investors in the United States, whether nationals or foreigners, as much from substantial conduct that forms an integral part of frauds devised in the United States and exported abroad, as from schemes concocted overseas and consummated by similarly material acts transpiring in this country.[19]   See Psimenos, 722 F.2d at 1048 ("'[t]o hold

_____

[19] The Court notes, for clarity's sake, that the consideration of the effects of the alleged fraud on United States investors and markets in determining the reasonableness of the Court's exercise of jurisdiction over foreign plaintiffs' claims is not a retreat from the Court's prior holding concerning the inapplicability of the effects test to the determination of the Court's subject matter jurisdiction in this case. Whether such domestic effects may serve as a predicate for jurisdiction over the claims of foreigners is an entirely separate question from whether those domestic effects make the exercise of such jurisdiction, once found, reasonable.   In the former, foreign plaintiffs are piggybacking on the losses of others to establish the Court's jurisdiction

otherwise could make it convenient for foreign citizens and corporations to use this country . . . to further fraudulent schemes.'" (quoting <u>Grunenthal GmBh v. Hotz</u>, 712 F.2d 421, 425 (9th Cir. 1983))).

Ultimately, the bounds of reasonable judicial authority that Congress may confer in the exercise of subject matter jurisdiction in cases implicating the extraterritorial application of American securities laws is circumscribed by the contours of due process standards. <u>See</u> <u>Banque Paribas</u>, 147 F.3d at 127 ("Congress's power to impose civil penalties for fraud in predominantly foreign securities transactions is limited only by the Due Process Clause of the Fifth Amendment."). However, this Circuit has long and consistently recognized that the federal securities laws do not reach this constitutional limit. <u>See</u> <u>Vencap</u> 519 F.2d at 1016; <u>Leasco</u>, 468 F.2d at 1334.

In construing the extent to which Congress has granted subject matter jurisdiction in this sphere, the Second Circuit endorsed as the test of reasonableness the various "relevant factors" promulgated in the Restatement of Foreign Relations

over their claims; in the latter, the Court weighs whether, after foreign plaintiffs have made a showing that the Court has jurisdiction over their claims, the exercise of such jurisdiction is nonetheless reasonable.

§§ 403 and 416.[20]  See <u>Banque Paribas</u>, 147 F.3d at 129; <u>AVC</u>

---

[20]  The pertinent part of the Restatement is set forth in §§ 403 and 416. These sections provide:

§ 403 Limitations on Jurisdiction to Prescribe

(1)  Even when one of the bases for jurisdiction under § 402 is present, a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.

(2)  Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

> (a)  the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

> (b)  the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

> (c)  the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

> (d)  the existence of justified expectations that might be protected or hurt by the regulation;

> (e)  the importance of the regulation to the international political, legal, or economic system;

> (f)  the extent to which the regulation is consistent with the traditions of the international system;

> (g)  the extent to which another state may have an interest in regulating the activity; and

> (h)  the likelihood of conflict with regulation by another state.

(3)  When it would not be unreasonable for each of two states to exercise jurisdiction over a person or activity, but the prescriptions by the two states are in conflict, each state has an obligation to evaluate its own as well as the other state's interest in exercising jurisdiction, in light of all the relevant factors, Subsection (2); a state should defer to the other state if that state's interest is clearly greater.

§ 416 Jurisdiction to Regulate Activities Related to Securities

(1)  The United States may generally exercise jurisdiction to prescribe with respect to

<u>Nederlander</u>, 740 F.2d at 154.  This test requires an evaluation and judgment call weighing a broad array of national and international interests, including the principle of comity.  <u>See</u> Restatement of Foreign Relations § 403(2).

---

(a)(i) any transaction in securities carried out in the United States to which a national or resident of the United States is a party, or

> (ii) any offer to enter into a securities transaction, made in the United States by or to a national or resident of the United States;

(b) any transaction in securities

> (i) carried out, or intended to be carried out, on an organized securities market in the United States, or

> (ii) carried out, or intended to be carried out, predominantly in the United States, although not on an organized securities market;

(c) conduct, regardless of where it occurs, significantly related to a transaction described in Subsection (1)(b), if the conduct has, or is intended to have, a substantial effect in the United States;

(d) conduct occurring predominantly in the United States that is related to a transaction in securities, even if the transaction takes place outside the United States; or

(e) investment advice or solicitation of proxies or of consents with respect to securities, carried out predominantly in the United States.

(2) Whether the United States may exercise jurisdiction to prescribe with respect to transactions or conduct other than those addressed in Subsection (1) depends on whether such exercise of jurisdiction is reasonable in the light of § 403, in particular

> (a) whether the transaction or conduct has, or can reasonably be expected to have, substantial effect on a securities market in the United States for securities of the same issuer or on holdings in such securities by United States nationals or residents;

> (b) whether representations are made or negotiations are conducted in the United States;

> (c) whether the party sought to be subjected to the jurisdiction of the United States is a United States national or resident, or the persons sought to be protected are United States nationals or residents.

Under these standards, applying United States laws to foreign securities transactions where the relevant connection of the parties and their dealings within the United States are minimal or remote at best, in other words, not sufficiently material or linked to the core of the alleged fraudulent activities, would be unreasonable. See Banque Paribas 147 F.3d at 129 (noting that without the added weight of any tipping factors in the case, "the exercise of prescriptive jurisdiction by Congress would be unreasonable within the meaning of the Restatement of Foreign Relations . . . §§ 416(2) and 403"); id. at 131 ("Congress may not be presumed to have prescribed rules governing activity with strong connections to another country, if the exercise of such jurisdiction would be unreasonable in the light of established principles of U.S. and international laws") (citing Restatement of Foreign Relations § 403)); AVC Nederlander, 740 F.2d at 154-55 (finding it "reasonable" to apply the American securities laws to a foreign transaction where the scales tipped slightly in favor of subject matter jurisdiction upon application of the standards endorsed in the Restatement of Foreign Relations).

B.    DISCUSSION

       In evaluating Defendants' challenge pursuant to Rule 12(b)(1) to the Court's jurisdiction over the subject matter

of the foreign plaintiffs' claims, the Court reiterates the standard stated above: that it is the burden of the party asserting subject matter jurisdiction to prove by a preponderance of the evidence that such jurisdiction exists. See Makarova, 201 F.3d at 113. Moreover, because plaintiffs must establish the Court's jurisdiction affirmatively, the Court is not obligated to draw favorable factual inferences from the pleadings on the plaintiffs' behalf in resolving a challenge to the Court's jurisdiction. Shipping Fin. Servs. Corp., 140 F.3d at 131; see Norton v. Larney, 266 U.S. 511, 515 (1925) ("[T]he jurisdiction of a federal court must affirmatively and distinctly appear and cannot be helped by presumptions or by argumentative inferences drawn from the pleadings."). Under these guiding principles, the Court embarks on the course of analysis it has mapped out above.

    1.   <u>Theory of Fraud</u>

The first stage of the review calls for a hybrid analysis, requiring the Court to consider issues that shall be addressed in and critically bear upon the Court's subsequent consideration of Defendants' motions pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss the Complaint. See Vencap, 519 F.2d at 1011. Therefore, taking into account the Court's obligation in adjudicating Defendants' Rule 12(b)(6) motions to construe the pleadings in

the light most favorable to the Plaintiffs and draw all reasonable inferences in their favor, see Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997), the Court in this section examines and interprets the Complaint to determine what set of facts and what theory it fairly expresses that could state a claim on which relief could be granted. The Court stresses that its review under this more liberal standard applies only to the Court's interpretation of the allegations in the Complaint. It does not alter the Plaintiffs' obligations as just recited to support any viable legal theory that emerges from a construction of the pleadings, and to establish the Court's jurisdiction by a preponderance of the evidence, in accordance with the Rule 12(b)(1) standards discussed above.

The analytical framework outlined in the previous section suggests two levels of inquiry concerning the theory of the fraud alleged in the Complaint: first the theory of each individual instance of alleged fraudulent conduct must be construed and sketched out, and then the overarching theory linking the frauds must be determined.

(a) <u>The Individual Frauds</u>

(i) <u>The Marine Fraud</u>

The Marine Fraud Plaintiffs describe concerns Alstom's knowing extension of loan guarantees to financially unworthy

clients that were likely to default. Alstom then allegedly concealed the guarantees from the public by failing to disclose them properly in public statements, including filings with the SEC, while simultaneously touting the growth of business in its Marine division to investors. The fraudulent intent charged is that Alstom concealed the existence of the loan guarantees in an effort to create an image of demand for Alstom's marine products and thereby maintain Alstom's stock value. In places, the Complaint alleges that Alstom maintained the stock value for its own purposes, while in others, the motive is expressed as the maintenance of the stock price to allow Alcatel and Marconi to divest themselves of their ownership interest in Alstom for the greatest sum. On the basis of these allegations, the specific acts or transactions that gave rise to the violation of the securities laws Plaintiffs charge would consist of the non-disclosure of the loan guarantees in filings made with the SEC, particularly those made in connection with the Secondary Offering, and in other statements disseminated concerning the Marine division, making those statements misleading as to the financial condition of Alstom and artificially inflating the price of Alstom's securities.

(ii)  <u>The Turbine Fraud</u>

The Turbine Fraud concerns Alstom's knowledge of the full

extent of the costs associated with repairing the ABB turbines, and its failure to disclose that information in a timely fashion, choosing instead to dribble out steadily increasing reserve figures and more and more dismal prospects concerning its ability to settle customers' claims. The intent alleged behind this asserted deception of the public as to the full extent of Alstom's exposure in relation to the defective turbines was to maintain Alstom's stock price. As with the Marine Fraud, the motive underlying the intent to bolster Alstom's stock value is at times stated as a general motive to keep the company looking profitable to investors, but is more often described as being perpetrated to allow Alcatel and Marconi to sell their Alstom shares at a profit. On the basis of these allegations, the specific acts or transactions that gave rise to the violation of the securities laws Plaintiffs charge would consist of the non-disclosure of the full extent of the reserves established to cover costs associated with the defects in the ABB turbines in filings made with the SEC, particularly those made in connection with the Secondary Offering, and in other statements disseminated concerning the turbines, making those statements misleading as to the financial condition of Alstom and artificially inflating the price of Alstom's securities.

The ATI Fraud concerns the under-reporting of costs on ATI's railcar construction projects, and Alstom's knowing, reckless or negligent incorporation of those results into its financial statements.  The Complaint, and Plaintiffs' brief on the issue of subject matter jurisdiction (<u>see</u> SMJ Opp'n Mem. at 7-10), focus on the conception and execution of the fraud at ATI's offices in the United States, with ATI's motive for failing to disclose the growing costs associated with the NJT contract described as being its desire to comply with Alstom's "Restore Value" program announced in March 2002.  The point of the concealment of the costs was for ATI to appear profitable with respect to an internal company policy as compared with the other sectors in the Transport Division.  (<u>See</u> Compl. ¶¶ 304-06.)  Indeed, the allegations in the Complaint and the press releases and other public documents released by Alstom concerning the conduct at ATI give the impression that Alstom was as shocked as its investors at the revelation of the nondisclosure of contract costs at ATI.  Assuming Alstom's expressed public reaction is real, this theory of the ATI Fraud therefore raises the issue of whether any defendant outside of ATI can be held responsible for the ATI Fraud.[21]

---

[21] Vague allegations from various corners of the Complaint must be strung together to discern a fraudulent motive for any defendant outside of ATI, including Alstom, with respect to the ATI Fraud.  For example, several scattered factual allegations may plausibly be connected so as to suggest

Depending on what overarching theory of the fraud may be adopted by the Court, however, the fraudulent motive and conduct alleged with respect to the actions at ATI changes. For example, if all three alleged frauds separately identified above represent discrete parts of a single, integrated fraudulent scheme, as described below, then the alleged wrongful activity at ATI would have to have been concocted in the late 1990s, and the allegations in the Complaint concerning ATI's desire to comply with the "Restore Value" program would be surplusage.  Additionally, such a unitary scheme would have to have been operated centrally from Alstom, and thus the actions at ATI would have to be integrally linked to those in France prior to 2002.  However, if the Court were to adopt either the two or three frauds theory, the motivation behind the ATI Fraud would constitute, as alleged in the Complaint (see Compl. ¶¶ 304, 306) and summarized above, ATI's desire to appear profitable in terms of Alstom's company-wide

a culpable intent:  that Alstom's Board was listed in the Project Management Plan for the NJT contract as having oversight responsibility over the project (Compl. ¶ 22); that "sometime after March 2002, Janovec . . . traveled to Paris to inform the Company about the cost overruns in connection with the NJT Contract" (id. ¶ 317); that Alstom announced the "Restore Value" plan publicly, such that it was not simply an internal policy mandate (id. ¶ 303), the theory of fraud that could emerge from the allegations is that when Janovec went to the Board in March 2002, he informed the Board members about the cost overruns on the NJT project and that ATI would not be in compliance with the "Restore Value" policy, and that the Board, or other Officers of Alstom, instructed or conspired with Janovec, acting on ATI's behalf, to hide the costs in ATI's financial statements and to then knowingly incorporate those falsified results into Alstom's financials.  However, this theory is not explicitly alleged in the Complaint.

"Restore Value" program.

On the basis of these allegations, the specific acts or transactions that gave rise to the violation of the securities laws Plaintiffs charge would consist of the non-disclosure of the costs associated with railcar construction contracts at ATI in filings made with the SEC and in other statements disseminated concerning the Transport division, making those statements misleading as to the financial condition of Alstom and artificially inflating the price of Alstom's securities.

(b)  The Overarching Theory

Plaintiffs' pleadings support three conceptions of the connection between the distinct instances of fraudulent conduct alleged in the Complaint.  The first is that all of the alleged actions comprise a single fraud extending over the whole of the Class Period.  The second is that the actions relating to the defective gas turbines and the Marine division's cruise ship loan guarantees comprise one fraud, and that the scandal at ATI constitutes a distinct second fraud. The third is that each case of alleged fraud is unique and stands alone.  There are reasonable arguments both in favor of and against the Court's adoption of any one of these theories.

(i)  Single Fraud

The single fraud theory would bundle all of the three instances of alleged fraudulent actions into a single

integrated scheme concocted by Alstom managers and directors in the late 1990s and running throughout the Class Period. The allegations of motive articulated in the Complaint that support this theory are that all three instances of alleged fraudulent activity were perpetrated in "an attempt to shore up Alstom's financial condition and its stock price, and in some instances merely to allow its owners, Marconi and Alcatel, to divest themselves of their Alstom stock at an artificially inflated price." (Compl. ¶ 70; see also id. ¶ 87 ("Alstom knowingly set up deficient reserves so as not to alarm the public and to protect its stock price."), ¶ 116 ("After being badly hurt by the disclosure of its vendor financing scheme and the costs of repairing the defective turbines, Alstom tried to keep the Company afloat by committing yet another accounting fraud, this time in its Transport Division."), ¶ 237 (discussing the November 6, 2001 press release as containing misstatements relating to the Turbine and ATI Frauds), ¶ 290 ("[T]he Alstom Defendants concealed adverse information about the Company while they completed offerings of Company stock and, with respect to Marconi and Alcatel, sold their own Company stock holdings.").) The need for this financial "shoring up" was a direct result of the €1.2 billion dividend paid to Marconi and Alcatel prior to Alstom's IPO, which was widely regarded as a

devastating financial blow to Alstom.  (<u>Id.</u> ¶¶ 69, 71.)

Supporting the adoption of this unitary theory of the fraud is that if all three instances of alleged fraudulent conduct are integrated into a single continuous strand, then the activities that occurred in the United States in connection with one of the alleged frauds may be used to establish jurisdiction over foreign plaintiffs' claims concerning the two other instances of fraud.  Additionally, this is the conception of the case advocated by the Lead Plaintiffs at the September 7 Hearing.  (<u>See</u> September 7 Hr'g Tr. at 11-12, 13-14.)

The potential consequences counseling against the adoption of this theory are significant.  For example, the only motive Plaintiffs articulate as underlying the single fraud theory that would apply to all three instances of alleged fraud -- that the fraudulent acts were perpetrated in "an attempt to shore up Alstom's financial condition and its stock price" -- is not sufficient to plead scienter under the "motive and opportunity" prong of the Second Circuit's test for fraudulent intent.  As the Second Circuit stated in <u>Chill v. General Electric Co.</u>,

> The motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not "entail concrete benefits." . . . In both [<u>Acito v. Imcera Group, Inc.</u>, 47 F.3d 47, 54 (2d Cir. 1995)] and [<u>San Leandro Emergency Med. Group Profit Sharing Plan v.</u>

> > *Philip Morris Cos.*, 75 F.3d 801, 813-14 (2d Cir. 1996)]
> > we held that, "if scienter could be pleaded on that basis
> > alone, virtually every company in the United States that
> > experiences a downturn in stock price could be forced to
> > defend securities fraud actions."

101 F.3d 263, 268 (2d Cir. 1996); <u>see also</u> <u>id.</u> at 268 n.5 ("If we accept this as sufficient motive, then we must accept as motive that every publicly-held corporation desires its stock to be priced highly by the market. At that point, the motive requirement becomes meaningless."). To accept the single fraud theory would thus expose all of the claims requiring proof of fraudulent intent to the possibility of dismissal. Additionally, Plaintiffs mention the motive underlying the single fraud theory sparingly, and certainly not in any thorough fashion, as compared to the motive the Complaint more expansively and coherently alleges as regards the two frauds theory, discussed below.

Moreover, Lead Plaintiffs admit that they were on notice of the "full extent" of the Marine Fraud as of October 1, 2001 (Compl. ¶ 108), and that therefore at least certain of their claims based on that alleged fraud are time barred (<u>see</u>, <u>e.g.</u>, Pls.' Mem. of Law in Opp'n to the Underwriter Defendants' Mot. to Dismiss, dated November 19, 2004 ("Pls.' Underwriter Opp'n Mem."), at 6 n.9). If all of the alleged activities described in the Complaint form part of a single integrated fraud, the revelation of one aspect of that unitary scheme could be

interpreted as putting the Plaintiffs on actual or inquiry notice of the entirety of the deception perpetrated by Alstom, thus rendering all of the claims barred by the applicable statute of limitations. See Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (stating that plaintiffs need not be on notice of the entire fraud to be put on inquiry notice, but cautioning that the triggering financial data must relate to the misrepresentations and omissions later claimed to have caused plaintiffs' losses); Dodds v. Cigna Sec., Inc., 12 F.3d 346, 351-52 (2d Cir. 1993). (See, e.g., Underwriter's Mem. at 15 n.7.)

Finally, the time periods each of the frauds encompass do not logically support the single fraud theory. For example, the Complaint could be read to allege that the ATI Fraud began in 1999 when ATI underbid the NJT contract, which would place the conception of all three instances of fraudulent conduct within a similar time frame. However, the Complaint states that ATI's reason for underbidding the NJT contract was not a fraudulent one -- ATI desired to keep its work force intact and to generate business for the Hornell, New York facility. (See, e.g., Compl. ¶ 311.) Additionally, underbidding a contract is not fraudulent in itself. On this basis, the ATI Fraud occurred, if at all, when the mounting costs associated with the underbidding of the NJT contract were hidden,

allegedly to comply with Alstom's "Restore Value" program, which was announced in March 2002. Thus, the ATI Fraud would have occurred years after the alleged conception of the Marine and Turbine Frauds.

### (ii)  Two Frauds

The two frauds theory divides the Complaint into two time frames. The first period extends over the fraudulent activites related to the Secondary Offering, namely the Marine and Turbine Frauds. The second period encompasses fraud occurring after the Secondary Offering, namely the ATI Fraud. The motive behind the fraudulent conduct during the first period was allegedly to prop up the value of Alstom's stock to allow Alcatel and Marconi, Alstom's corporate parents, to sell their interest in Alstom at inflated prices by hiding adverse financial information regarding the Marine and Power divisions. (See, e.g., id. ¶¶ 5-6, 8, 73, 77, 84, 90, 93, 98, 99, 290, 291, 297, 299.) The motive behind the fraudulent activities of the second period was to use the ATI under-reporting of costs to restore value to Alstom and shore up its stock price in the wake of the prior adverse revelations concerning the Marine and Turbine Frauds. (See, e.g., id. ¶¶ 7, 116, 304.) At the September 7 Hearing, some of the Defendants argued in favor of the two frauds reading of the Complaint. (See September 7 Hr'g Tr. at 24.)

There are significant reasons supporting the adoption of the two frauds theory of the case. First, it is the most logical reading of the Complaint, given that the pleadings contain so few allegations linking the ATI Fraud to the other two. Plaintiffs themselves have argued that the motive behind the ATI Fraud was different from that alleged as underlying the Marine and Turbine Frauds: "plaintiffs do not contend that the fraud at ATI was motivated by the secondary offering, but rather that it was an attempt to keep the Company afloat after the vendor financing and turbine defect scandals came to light." (Pls.' Mem. of Law in Opp'n to the Mots. to Dismiss of Alcatel, Tchuruk & Halbron, dated November 19, 2004 ("Pls.' Alcatel Opp'n Mem."), at 14 n.10.) Second, this interpretation comports with the time periods alleged for each of the frauds. The Marine and Turbine Frauds occurred largely prior to 2001, and the ATI Fraud is almost entirely discussed in relation to the post-Secondary Offering time period. The two distinct time periods also segregate the defendants that can be held responsible for the conduct related to the alleged frauds. For example, defendants who ceased to be officers or directors of Alstom in 2001 logically cannot be held responsible for the alleged misstatements in 2002 and 2003 relating to the ATI Fraud. In addition, this construction, reflecting the reading of the pleadings in the light most

favorable to the Plaintiffs, provides Plaintiffs with the benefit of retaining claims related to the ATI Fraud, as they could potentially survive any statute of limitations arguments fatal to the Marine and Turbine Frauds.

One argument counseling against adopting the two frauds theory relates directly to the Court's subject matter jurisdiction analysis. As is discussed in the next sections, the separation of the ATI Fraud from the other two instances of alleged fraudulent conduct exposes the claims of foreign plaintiffs relating to the Marine and Turbine Frauds to dismissal for lack of subject matter jurisdiction, in that most of the alleged domestic activities the Complaint depicts pertain solely to the ATI Fraud. (See infra Part II.B.2-3.) In addition, the adoption of the two frauds theory exposes the claims related to the defective turbines to the risk of dismissal on statute of limitations grounds for the reasons stated above.

### (iii)  Three Frauds

The three frauds theory considers each of the instances of alleged fraudulent conduct described above to constitute a distinct scheme, and therefore holds that all three are linked only by the coincidence that the activities occurred at Alstom at least in part during the Class Period and happened to have all been included in the Complaint. The support in the

pleadings for this theory is meager, found in the construction of vague references in the Complaint.  (See, e.g., Compl. ¶ 70 (listing the frauds separately and referring to "each of these schemes," implying that they were distinct), ¶ 116, ¶ 290.)

Arguing for the adoption of this theory is that each fraudulent scheme would remain unscathed by the pleading flaws that on close scrutiny may fell any of the others.  Additional support for this theory can be distilled from the parties's legal arguments for or against the various Defendants' motions to dismiss, all of which considered the three concepts of fraudulent conduct separately.  (See, e.g., SMJ Mem. at 12-13; Pls.' Mem. of Law in Opp'n to the Mots. of the Alstom Defs. to Dismiss Pls.' Claims Brought Pursuant to the Exchange Act, dated November 19, 2004 ("Pls.' Exchange Act Opp'n Mem."), at 22, 26, 36.)  Moreover, this theory arguably comports with an understanding of the corporate structure of Alstom, as each of the alleged frauds occurred at separate divisions of a multinational company.

Several points counsel against dividing the case in this fashion.  First, separating the Marine and Turbine Frauds negates the major fraudulent motive so oft repeated in the Complaint -- that these actions were concealed to maintain Alstom's stock price until Alcatel and Marconi could profitably unload their shares in Alstom.  Second, as with the

two frauds theory, the severance of the ATI Fraud presents a significant problem for the foreign plaintiffs in establishing subject matter jurisdiction over their claims.

(c)  Analysis

Having laid out these various theories, the Court finds that the two frauds theory presents the most cohesive and logical interpretation of the facts alleged in the Complaint. The Complaint repeatedly refers to the motivation actuating the Marine and Turbine Frauds to consist of Alstom's complicity in the desire of Alcatel and Marconi, aware of the adverse information pertaining to Alstom's defective turbines and cruise ship guarantees, to sell their Alstom shares at the highest possible value, and that the ATI Fraud was driven by Alstom's interest in improving its financial condition after the revelation of those two frauds.  The adoption of either the single or three frauds theory would compel the Court to overlook what is certainly the clearest and most plausible expression of the Plaintiffs' articulation of fraudulent intent in the Complaint:  the two frauds theory.  As stated above, this theory also corresponds with the relative time frames of the various instances of fraudulent conduct alleged in the Complaint.  Thus, the Court proceeds in its analysis under this understanding of the Complaint's allegations.

2. <u>Location of the Conduct Alleged</u>

The conduct alleged by the Plaintiffs to have occurred within the United States is recounted above in Part I.D. In terms of conduct applicable to all of the alleged frauds, the Complaint asserts that Defendants initially made statements in the United States, which were additionally disseminated throughout the country by the means and instruments of interstate commerce, and that during the Class Period Alstom filed reports and financial statements with the SEC reflecting false or misleading representations of the company's financial condition. The Defendants contest these allegations through the submission of affidavits stating that all of the press releases cited in the Complaint were prepared in and published from Paris, France (<u>see</u> Ceintre Decl. ¶ 8), and that all of Alstom's financial statements, annual reports, and periodic filings with the SEC were prepared in and published from France (<u>see</u> Gallot Decl. ¶¶ 3-7).

Plaintiffs' claim that "a significant number" of statements alleged in the Complaint to be false and misleading originated from the United States is wholly unsupported, and fails to make reference to any particular statement as being issued from within the United States. In fact, nowhere in the Complaint is the source country for any of the statements alleged to be false or misleading indicated. On the other

hand, certain of the Alstom press releases included in the Joint Appendix provided by the Defendants state on their faces that they were disseminated from outside the United States. (See, e.g., Press Release, Alstom, ABB and Alstom Create World Leader (Mar. 23, 1999) (indicating its source as simultaneously Brussels, Zurich and Paris), included as Ex. F.2 in the J.A.)  Plaintiffs' conclusory and unsupported allegations have been successfully contested by Defendants, who have supported their claims through the submission of affidavits.  The Court concludes on the preponderance of the evidence that it will not credit the allegation in the Complaint that "a significant number" of the claimed false and misleading statements contained in the Complaint originated in the United States, and will not consider this allegation in deciding the issue of subject matter jurisdiction.  See Makarova, 201 F.3d at 113.

Other allegations of domestic conduct applicable to all three frauds alleged in the Complaint include Alstom's having conducted the Secondary Offering in part domestically on the NYSE.  In addition, Plaintiffs allege that Alstom has a "vast presence in the United States," including approximately fourteen offices in nine states.  Finally, Alstom has been engaged on at least one previous occasion in litigation in the United States, that case concerning Alstom's sale of defective

turbines.  (Compl. ¶¶ 24-26.)

The allegations particular to each of the three frauds are as follows.  With respect to the Marine Fraud, the only "conduct" alleged to have occurred in the United States is that Renaissance is a United States company based in Florida. In its best light, the allegation could be construed as Alstom having delivered the cruise ships to Renaissance in the United States, although the Complaint contains no such specific allegation.  There is no allegation that any meetings concerning the vendor financing occurred in the United States, that any Alstom representative traveled to the United States to arrange for the financing, or that any communications from abroad to the United States by other means -- for example, telephone, fax or email -- contained the alleged false or misleading representations that constituted the alleged fraudulent scheme.  (Id. ¶ 19.)

With respect to the Turbine Fraud, the "conduct" in the United States consisted of Alstom's having entered into the ABB joint venture at least in part to allow it entry into the American heavy duty gas turbine market.  Additionally, Alstom sold GT24/26 turbines in the United States as a part of the joint venture and, after buying out ABB, assumed all liabilities associated with the turbines sold in the United States by ABB prior to the formation of the joint venture.

Furthermore, Alstom produced parts for its turbines at facilities located in the United States.  (Id. ¶¶ 15-18.)

With respect to ATI, Plaintiffs allege that the ATI accounting fraud concerned ATI railway cars that were produced in the United States.  Additionally, ATI negotiated contracts with United States companies and is the subject of investigations by United States governmental agencies.  The Complaint also alleges that Alstom employees from France traveled to the United States to meet with staff at ATI and NJT in connection with the execution of the NJT contract. (Id. ¶¶ 20-23.)  Additional allegations of conduct regarding the ATI Fraud are noted above, although they are pled outside of the section on jurisdiction in the Complaint.  Nowhere does the Complaint allege that the fraud was concocted outside of the United States; to the contrary, all of the scheming alleged in the Complaint occurred domestically.

3.  Timeline of the Fraud

The timeline aspect of the analysis requires the Court to order the above mentioned allegations of conduct with respect to each claimed fraudulent scheme from the earliest activity to the latest.

(a)  The Marine Fraud

The first step in the string of events surrounding the alleged Marine Fraud was the purchase of the cruise ships by

Renaissance and other customers and the negotiation of the vendor financing arrangements. The Complaint contains few if any specific allegations about this stage of the alleged transaction. (<u>Id.</u> ¶ 73.) However, even if specific facts were pled concerning the sale and negotiation of the vendor financing agreements, the Complaint contains no allegation that Renaissance or any other Marine customer was involved in the decision to not disclose those arrangements, which is the only fraudulent conduct Plaintiffs allege. The extension of vendor financing in itself is not fraudulent, nor do Plaintiffs contend that the guarantees themselves constituted the alleged fraud. (<u>See</u>, <u>e.g.</u>, Pls.' Alcatel Opp'n Mem. at 13.) It is the failure to disclose the financing arrangements that Plaintiffs claim constitute the fraud. Thus, the Marine Fraud, assuming there was one, occurred after the sale of the ships and the negotiation of the vendor financing arrangements. The fraud would have occurred within Alstom with the decision to not disclose the existence of such vendor financing agreements, or, at best, to only vaguely disclose those agreements in two separate footnotes of the Forms 20-F and Annual Reports. (<u>See</u> Press Release, Alstom, Press Release (Oct. 1, 2001) ("ALSTOM's commitments as at 31 March 2001 in respect of Renaissance Cruises were reflected in Notes 24 and 27 of ALSTOM's Annual Report for the fiscal year ended 31

March 2001."), included as Ex. F.14 in the J.A.)

The publication of the allegedly fraudulent misstatements and omissions relating to the Marine Fraud was the next step in the scheme, as the fraud was not simply concealing material information, but hiding it for the purpose of deceiving investors into believing the Company was more profitable than it in fact was, such that Alstom's stock price would remain artificially high. The publication of the false public statements, therefore, constitutes an integral part of the fraud. As noted above, the Court credits the Defendants' factual assertions concerning the timing, creation and dissemination of all Corporate statements as emanating from France, and thus from outside the United States. The publication, dissemination or filing with the SEC or within the United States of those documents, statements and press releases created in France was secondary to this primary disclosure. See Berger, 322 F.3d at 194-95.

The Secondary Offering was the necessary final step in the fraud. For the scheme to succeed, Alcatel and Marconi had to be able to sell their Alstom shares prior to the revelation of the concealed vendor financing scheme. See Psimenos, 722 F.2d at 1044.

(b)   The Turbine Fraud

The Turbine Fraud similarly concerns Alstom's failure to

-108-

disclose information to investors, specifically, its failure
to disclose the full extent of its liabilities with respect to
the ABB GT turbines, which Plaintiffs allege Alstom knew from
the start of the joint venture with ABB.  (See Compl. ¶¶ 297-
99.)  The Turbine Fraud does not relate to the sales of
individual defective turbines, to the construction of turbines
or turbine parts, nor to Alstom's decision to market turbines
in the United States or its ability to do so as a result of
the joint venture with ABB.  In and of themselves, these
activities cannot be classified as fraudulent at the time they
occurred.  Rather, the fraud allegedly associated with this
conduct concerns the accounting related to the sales of
turbines and the failure of the financial statements created
as a result of that accounting to reveal the full extent of
the liabilities incurred in relation to the ABB GT turbines.
Cf. In re Bayer AG Sec. Litig., No. 03 Civ. 1546, 2004 WL
2190357, at *2-*4, *17-*18 (S.D.N.Y. Sept. 30, 2004) (finding
that allegations that defendants had considered the success of
the drug Baycol in the United States important for Bayer, that
defendants learned of Baycol's dangers from information
collected in the United States, and that defendants had
actively marketed Baycol in the United States, among other
allegations, were insufficient to constitute conduct in the
United States supporting the Court's subject matter

jurisdiction over the claims of foreign purchasers abroad).

As discussed above, the Turbine Fraud embodies three main steps:  (1) the decision to hide material information concerning the full extent of the reserves required to cover liabilities resulting for the ABB GT turbine defects, (2) the publication of false and misleading statements to investors concerning turbine reserves in an effort to maintain Alstom's stock price, and (3) the sale of shares by Alcatel and Marconi.  As to the first step, the Complaint contains no allegations concerning the specifics of the decision to conceal the full extent of the necessary turbine reserves.  Regarding the second step, the Court has found that the statements issued by Alstom originated outside of the United States.  The statements, however, were eventually published, disseminated or filed within the United States.  As to the third step, the Secondary Offering took place in part in the United States.

(c)  <u>The ATI Fraud</u>

As previously noted, ATI's underbidding of the NJT contract was not in itself fraudulent when it occurred.  Indeed, Plaintiffs admit that the underlying motivation for ATI's low bid on the NJT contract in 1999 was to attract business to its facility in an effort to maintain its workforce and operations.  (Compl. ¶ 311.)  A desire to remain

in business and to retain employees is not in itself fraudulent. The alleged fraud at ATI occurred when ATI began under-reporting its costs in its financial statements to appear more profitable in compliance with Alstom's "Restore Value" program. The "Restore Value" program was not announced until March 14, 2002. (Id. ¶ 303.) Thus any conduct in the United States prior to that date cannot have been related to the alleged fraud.

The alleged fraud relating to the under-reporting of costs occurred in the United States at ATI's office in New York. In an effort to comply with the Company's "Restore Value" plan, and in light of its poor performance relative to other Transport divisions, ATI began hiding the mounting costs associated with its construction of railcars on the NJT contract and others. ATI then sent these inaccurate financial statements to Alstom's headquarters in France, where the false or misleading information was incorporated into Alstom's corporate financial statements, whether with knowledge of, or in reckless disregard of, the ATI information's falsity, or as a result of negligence or perhaps even innocently.

### 4. Materiality/Substantiality

The Court shall now endeavor to determine the relative weight to be accorded to the acts alleged to have occurred in the United States that are contemporaneous and in fact a part

of the alleged fraudulent conduct.  As described above, there are two measures to this analysis -- the quantitative measurement of the sheer number of events alleged to have occurred in the United States, and the qualitative analysis as to the relative importance of each of those acts.

As to the Marine Fraud, the United States-based conduct alleged in the Complaint is that the cruise ships were sold to a United States company, Renaissance; false and misleading statements were filed with the SEC or otherwise disseminated within the United States; and that Alstom conducted the Secondary Offering in part within the United States.  As stated previously, the sale of the cruise ships to Renaissance occurred prior to the fraud and thus will not weigh into the Court's analysis of its subject matter jurisdiction.  The filing of documents with the SEC or dissemination of press releases and other statements that were originally created in France pales in the comparison of its relative importance to the fraud to the foreign conduct alleged in the Complaint. The fraud, if any occurred, took place when Alstom or any other defendant determined that the vendor financing arrangements would not be clearly disclosed to investors, and when the rosy financial figures for the Marine division were created and publicized in an effort to mislead investors as to the strength of demand for Alstom's marine products.  All of

these actions took place in France. The republication in the United States of Alstom's statements, which were originally made in France, was secondary to the fraud. The filing of documents, which were produced and, in large part, previously disseminated in France, with the SEC also appears to exist one step away from the conduct constituting the alleged fraud. The Secondary Offering, on the other hand, as the final step necessary to consummate the fraud, presents significant conduct within the United States.

The analysis concerning the Turbine Fraud is largely the same as that concerning the Marine Fraud. As noted above, most of the conduct alleged to have occurred within the United States in relation to the Turbine Fraud constitutes merely preparatory or ancillary activity for the fraud or, at worst, totally irrelevant conduct to the fraud. The sales of turbines in the United States, or the importance of the United States as a market for turbines, or the creation of parts for the turbines in the United States are all far removed from the fraud alleged to have caused the foreign investors losses. As just stated concerning the Marine Fraud, the most important conduct with respect to the Turbine Fraud occurred in France, and the dissemination and filing of information in the United States was truly secondary to that conduct. The most significant conduct within the United States regarding the

Turbine Fraud was the completion of the Secondary Offering within the United States.

Finally, with respect to the ATI Fraud, all of the allegedly fraudulent conduct occurred within the United States. ATI is located in New York and the fraud, if any in fact occurred, was concocted and executed within ATI. All of the information alleged by Plaintiffs in the Complaint and contained in the documents provided to the Court by the parties supports this understanding of the ATI Fraud. Even if the Court were to find that Alstom knowingly incorporated ATI's falsified data into its corporate financials, that finding would in no way minimize the importance of the domestic conduct with respect to the ATI Fraud. See In re Gaming Lottery, 58 F. Supp. 2d at 74 (finding that where a foreign defendant illegally operated a subsidiary in the United States and incorporated the subsidiary's earnings into its consolidated financial statements, the defendant's "United States conduct was far more than 'merely preparatory' to the fraud; its activities within this nation's borders are the very factual predicates of fraud which lie at the heart of plaintiffs' case").

5. <u>Causation Analysis</u>

The Court next considers whether the material conduct alleged to have occurred within the United States was in fact

the conduct that caused the foreign purchaser plaintiffs'
losses.  See Bersch, 519 F.2d at 993.  The only conduct
material to the fraud that occurred within the United States
with respect to both the Marine and Turbine Frauds was the
Secondary Offering.  However, the Secondary Offering did not
take place only within the United States; the Secondary
Offering included the sale of Alcatel and Marconi's shares in
a "single global offering," consisting "of an international
offering, of which the U.S. public offering [wa]s a part, and
an 'Open Price Offering' limited to retail investors in
France." (Secondary Offering Prospectus, included as Ex. C.3
in the J.A.)  Whatever losses foreign purchasers abroad
suffered, they were not directly caused by the Secondary
Offering as it occurred in the United States because to have
suffered any losses as a result of the offering in the United
States, the purchasers would have had to have purchased the
shares that were offered in the United States.  Any purchaser
of shares in the United States on the NYSE in the form of ADSs
is not the subject of the SMJ Defendants' motion.  Therefore,
if the foreign purchasers abroad suffered any losses as a
result of the Secondary Offering, those losses were not caused
by that portion of the Secondary Offering that occurred within
the United States.  Thus, although the Secondary Offering may
have been material to the fraud, the United States-based

portion of the Offering was not an "essential link" in the losses suffered by the foreign plaintiffs who are the subject of this motion.  See <u>Leasco</u>, 468 F.2d at 1335.

With respect to the ATI Fraud, the domestically-based conduct certainly served as an essential link in the causal chain leading to the losses suffered by foreign purchasers abroad.  The fraud -- the creation of the false financial data -- was concocted and executed in America.  The false documents may have been sent to Alstom headquarters in France and incorporated into the Company's financial reports, but, as was the case in <u>Berger</u>, the mailing of the fraudulent documents for publication outside of the United States does not render the conduct in the United States any less of a cause of plaintiffs' losses.  See 322 F.3d at 194.

### 6.  Reasonableness

From the above analysis, the Court concludes that only the Plaintiffs' allegations concerning the ATI Fraud support the exercise of the Court's jurisdiction over foreign purchasers abroad.  Because the Court understands the Complaint to allege a two part fraud, the domestic conduct relating to the ATI Fraud does not support the exercise of jurisdiction over the two other frauds alleged in the Complaint.  In other words, because of the remoteness of the activities involved in the Marine and Turbine Frauds to the

United States and any vital interest this country may have in adjudicating those disputes, it would be unreasonable for this Court to exercise subject matter jurisdiction over the claims of foreign purchasers abroad concerning the conduct at issue in those allegedly fraudulent transactions.  Therefore, the Court need only assess the reasonableness of its exercise of jurisdiction over the claims of foreign purchasers abroad relating to the ATI Fraud.

The Court finds that it is reasonable to exercise jurisdiction over the claims of foreign purchasers abroad with respect to the ATI Fraud.  As stated in <u>Vencap</u>, the Court does "not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." 519 F.2d at 1017.  The ATI Fraud was conceived of and executed within the United States and then sent abroad to be published and to thus mislead investors.  The Court believes that the United States has an interest in policing that kind of activity perpetrated upon its shores.  Indeed, the United States is already expending its law enforcement resources investigating the alleged conduct at ATI, in that the SEC and FBI have instituted investigations of the subsidiary.  (Compl. ¶¶ 121, 126.)

The Court is also persuaded that the factors expressed in

the Restatement of Foreign Relations in Sections 403, 416 and 421 support the exercise of jurisdiction over such claims. The conduct related to the allegedly fraudulent securities transactions occurred predominantly within the United States. <u>See</u> Restatement of Foreign Relations § 416(1)(d). Additionally, the conduct at ATI had a substantial effect on the market for Alstom stock, including Alstom stock traded in the United States or held by United States citizens or residents. <u>See</u> <u>id.</u> § 416(2)(a)-(c); <u>see also</u> <u>id.</u> § 403(2)(a), (c)-(e).

C.   <u>CONCLUSION</u>

The Court finds that only the claims of foreign purchasers abroad relating to the alleged fraud at ATI satisfy the restrictions of the conduct test as understood and described above by the Court. Therefore, the Court grants the SMJ Defendants' motion to dismiss pursuant to Rule 12(b)(1) the claims of foreign purchasers abroad that are based on the alleged Marine and Turbine Frauds. The Court denies the motion to the extent that it seeks to preclude all claims of foreign purchasers abroad.

**IV.   PERSONAL JURISDICTION**

A.   <u>STATEMENT OF LAW</u>

Defendants Purves and Tchuruk contest the Court's exercise of personal jurisdiction over them. Plaintiffs bear

the burden of showing that the Court has such personal jurisdiction. See Robinson, 21 F.3d at 507. "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, see Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990); see also Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). Even where, as here, the defendant has challenged the plaintiffs' factual allegations of jurisdiction, "the court may provisionally accept disputed factual allegations as true. In making such a ruling, the court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose." Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 153 (2d Cir. 1999).

The Securities and Exchange Acts allow for personal jurisdiction over foreigners not present in the United States to the extent that the Due Process Clause of the Fifth Amendment permits. See Bersch, 519 F.2d at 998; Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1340 (2d Cir. 1972). "Where, as here, jurisdiction is based on a statute that provides for nationwide service of process, two

components must be established to satisfy the jurisdictional requirements of the Due Process Clause: (1) the defendant must have 'minimum contacts' with the United States as a whole, and (2) the exercise of jurisdiction over the defendant must be 'reasonable.'" In re DaimlerChrysler A.G. Sec. Litig., 247 F. Supp. 2d 579, 582 (D. Del. 2003) (citing SEC v. Euro Sec. Fund, No. 98 Civ. 7347, 1999 WL 76801, at *2 (S.D.N.Y. Feb. 17, 1999)).

As to the first inquiry, the court considers "(1) whether the defendant has purposefully directed his activities toward the forum, and (2) whether the litigation arises out of or is related to the defendant's contacts with the forum." In re DaimlerChrysler, 247 F. Supp. 2d at 582 (citing Metropolitan Life, 84 F.3d at 567-68). The Restatement of Conflict of Laws lists three types of acts which may establish jurisdiction over a person: (a) an individual's having done business within a state, see § 35; (b) an individual's having done an act within the state, see § 36; and (c) an individual who has caused effects in the state by an act done elsewhere, see § 37. See also Bersch, 519 F.2d at 998. As to the acts described in Section 37, the Second Circuit stated in Leasco that "[a]t a minimum the conduct must meet the tests laid down in § 18 of the Restatement of Foreign Relations, including the important requirement that the effect 'occurs as a direct and

foreseeable result of the conduct outside the territory.'" 468 F.2d at 1341. "Jurisdiction over the representatives of a corporation 'may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state.'" <u>Charas v. Sand Tech. Sys. Int'l, Inc.</u>, No. 90 Civ. 5638, 1992 WL 296406, at *4-*5 (S.D.N.Y. Oct. 7, 1992).

Next, in evaluating the reasonableness of exercising personal jurisdiction over a defendant, the Court looks to

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

<u>Metropolitan Life</u>, 84 F.3d at 568. Where the plaintiff has made a prima facie showing of minimum contacts under the first prong, the exercise of personal jurisdiction is favored unless the defendant makes a showing that such an exercise of jurisdiction is unreasonable. <u>See</u> <u>Metropolitan Life</u>, 84 F.3d at 568 ("While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction

unreasonable.'" (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471
U.S. 462, 477 (1985)).

B.    <u>DISCUSSION</u>

    1.    <u>Jurisdiction As To Purves</u>

    Plaintiffs allege in the Complaint three bases for
jurisdiction over Purves: (1) that Purves was a member of the
Board of Directors of Alstom from June 25, 1998 through July
28, 2003, and that Alstom's Board was responsible for the
oversight of ATI's execution of the contract with NJT; (2)
that Purves "was listed as a signatory" on the Registration
Statement for the Second Offering filed on February 7, 2001,
and that Newey signed the Registration Statement on his
behalf; and (3) that the Director Defendants, of which Purves
is listed as being a part, "signed and/or were otherwise
responsible for the contents and dissemination of the
Registration Statements." (Compl. ¶¶ 22, 47, 204, 336.) As
none of these allegations include a claim that Purves ever
entered the United States, the Court considers Plaintiffs'
assertions in light of the Restatement of Conflict of Laws §
37, which states that

> A state has power to exercise judicial jurisdiction over
> an individual who causes effects in the state by an act
> done elsewhere with respect to any claim arising from
> these effects unless the nature of the effects and of the
> individual's relationship to the state make the exercise
> of such jurisdiction unreasonable.

Restatement of Conflict of Laws § 37.

Plaintiffs' first allegation is insufficient as a matter of law to establish jurisdiction over Purves. Purves's status as a Board member in itself, even if he in some respect oversaw ATI's execution of the NJT contract, is too tenuous a connection to plausibly claim that this status alone directly and foreseeably gave rise to the effects complained of by the Plaintiffs. Leasco, 468 F.2d at 1341; see In re Parmalat Sec. Litig., 376 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (finding that a defendant's status as a member of Parmalat's board was "insufficient to warrant the conclusion that her contacts with the United States satisfied the requirements of due process"); In re DaimlerChrysler, 247 F. Supp. 2d at 587 ("[W]here a board member's only contact with the forum has been in the scope of his corporate capacity, the individual's contact is insufficient to support the exercise of personal jurisdiction." (explaining Calder v. Jones, 465 U.S. 783 (1984))); Charas, 1992 WL 296406, at *5 ("[A]ny fraudulent activities that Defendants may have committed in relation to Sand's public offerings cannot reasonably be deemed the 'direct and foreseeable result' of the alleged failure of an outside director residing in Japan to monitor the Canadian corporation's affairs." (citing Leasco)).

Plaintiffs' second allegation is sufficient at this stage of the litigation to defeat Purves's motion to dismiss. Newey

is alleged to have signed the Registration Statement, which forms the basis for certain of Plaintiffs' claims in this litigation, as attorney-in-fact for Purves. (Compl. ¶ 204.) The signing of documents filed with the SEC which form the basis for Plaintiffs' claims is sufficient contact with the jurisdiction to justify this Court's exercise of jurisdiction over Purves. See, e.g., In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 305-06 (E.D.N.Y. 2002) (holding that the "signing the Registration Statement was enough to put the defendant on notice of potential suit in the United States and shows purposeful availment," thus conferring personal jurisdiction over her, and citing cases). As to the second prong of the jurisdiction analysis, Purves has made no argument that the exercise of jurisdiction over him by this Court is unreasonable. See Metropolitan Life, 84 F.3d at 568. Plaintiffs have, therefore, established a prima facie case for the exercise of personal jurisdiction over Purves. Because the Court finds that it has jurisdiction over Purves on this basis, the Court does not consider the third basis for jurisdiction over Purves at this time.

In challenging the Plaintiffs' allegations, Purves directs the Court's attention to the Registration Statement itself, which plainly was not signed by Purves personally; however, that document on its face does not contradict the

Plaintiffs' allegation that Newey signed on Purves' behalf. (See J.A. Ex. C.2 at 5-6; J.A. Ex. J.1 at 292-95.) Although Ex. C.2 in the Joint Appendix shows that Newey signed as attorney-in-fact for some directors, but not Purves, it does not foreclose the possibility that substantiating evidence may be uncovered in discovery that supports Plaintiffs' allegations. Although Purves has provided affidavits and other documentary evidence to challenge this assertion, at this stage of the litigation, prior to any discovery and without the Court's having held an evidentiary hearing on the issue of personal jurisdiction, the Plaintiffs may proceed on the allegations stated in the Complaint.[22] See Credit Lyonnais, 183 F.3d at 153. As Plaintiffs have pled a prima facie case for personal jurisdiction over Purves, the Court denies Purves's motion to dismiss. However, Purves's submission has squarely raised a factual dispute that merits limited jurisdictional discovery and an evidentiary hearing on this issue.

---

[22] Plaintiffs are cautioned that they may not rest on these allegations beyond this phase of the litigation. "While a court may initially deny [a 12(b)(2)] motion to the extent it attacks the plaintiff's theory of jurisdiction without conducting inquiry into the disputed jurisdictional facts, eventually it must determine whether the defendant in fact subjected itself to the court's jurisdiction. The plaintiff still must prove the jurisdictional facts by a preponderance of the evidence, either at an evidentiary hearing or at trial." Credit Lyonnais, 183 F.3d at 154.

2. <u>Jurisdiction As To Tchuruk</u>

The Complaint contains the following allegations which may be interpreted as support for the establishment of personal jurisdiction over Tchuruk: (1) that Tchuruk is a member of Alstom's Board of Directors, and that Alstom's Board was responsible for overseeing ATI's performance of the NJT contract; (2) that Tchuruk is listed as a signatory on the Registration Statement; and (3) that the Director Defendants, of which Tchuruk is listed as being a part, "signed and/or were otherwise responsible for the contents and dissemination of the Registration Statements."[23]  (Compl. ¶ 22, 52, 336.) As with Purves, all of Plaintiffs' claims asserting jurisdiction over Tchuruk relate to alleged acts completed outside of the United States and having effects therein, and thus fall under Section 37 of the Restatement.

As noted above, Plaintiffs' first allegation by itself fails to establish <u>in personam</u> jurisdiction over Tchuruk. Plaintiffs' second allegation is also insufficient to plead a prima facie case of jurisdiction.  While Tchuruk is listed as

---

[23] Plaintiffs' allegations that Tchuruk had some contact with the United States in his capacity as a Director and Officer of <u>Alcatel</u> does not support this Court's jurisdiction over Tchuruk with respect to Plaintiffs' claims against him for his role as a Board member of <u>Alstom</u>. <u>Charas</u>, 1992 WL 296406, at *4 ("[Defendant's] business trips to the United States as a director of corporations that are unrelated to Sand and accordingly to any issue in this lawsuit do not establish presence for jurisdictional purposes." (citing <u>Hoffritz for Cutlery, Inc. v. Amajac, Ltd.</u>, 763 F.2d 55, 58 (2d Cir. 1985))). Moreover, as noted previously, a defendant's status as a Board member is insufficient standing alone to establish personal jurisdiction. <u>See id.</u>

-126-

a signatory, the Registration Statement on its face indicates clearly that he did not sign the document. (See J.A. Ex. C.2 at 5-6 (signature line identifying space for Tchuruk's signature blank); J.A. J.1 at 292-95 (same).) Plaintiffs make no allegation that anyone signed the Registration Statement on his behalf. Being listed as a signatory on a document is a matter quite different from actually signing a document, as the signing of the document indicates an affirmative act.

The final question is whether the allegation that a group of Alstom representatives, of which Tchuruk was a part, "were otherwise responsible for the contents and dissemination of the Registration Statements" is sufficient to establish this Court's jurisdiction over Tchuruk.[24] As alleged by Plaintiffs in the Complaint, the Registration Statements were filed in the United States as a part of the Secondary Offering, and Plaintiffs suffered adverse effects in the United States as a result of the misleading information in the Registration Statements. If Tchuruk were sufficiently responsible for the contents and dissemination of the Registration Statements, then this fact would support the exercise of this Court's jurisdiction over Tchuruk under Section 37.

---

[24] Plaintiffs do not argue in their briefs that this allegation supports the exercise of jurisdiction over Tchuruk. (See Pls.' Alcatel Opp'n Mem. at 26-27 (arguing, among other reasons, that the question of this Court's personal jurisdiction over Tchuruk persists because a factual question exists as to whether Tchuruk signed the Registration Statement).)

The Registration Statements directly caused certain of Plaintiffs' claimed injuries and, as the Statements were created for filing with the SEC in connection with the United States-based portion of the Secondary Offering, it would have been foreseeable to those creating and disseminating the Statements that the documents would have an effect in the United States. See Bersch, 519 F.2d at 1000 (considering the Restatement of Conflict of Laws § 37 and finding that personal jurisdiction did not exist because the defendant's actions could not be shown to have directly and foreseeably led to plaintiffs' injuries); In re DaimlerChrysler, 247 F. Supp. 2d at 591-96 (finding that plaintiffs failed to show that the defendant either purposefully aimed tortious conduct at the United States and that there was some nexus between the defendnt's conduct and their alleged losses).

Tchuruk does not present any argument that the exercise of jurisdiction over him is unreasonable, such that the presumption in favor of the exercise of jurisdiction would be overcome. (See T&H Mem. at 6-7; Reply Mem. of Law in Further Supp. of Mot. by Tchuruk & Halbron to Dismiss the Consolidated Am. Compl., dated January 10, 2005 ("T&H Reply Mem."), at 2-3.) Thus Plaintiffs third allegation, while indeed a frail hook on which to hang this Court's jurisdiction, can be read as support for this Court's exercise of jurisdiction over

Tchuruk at this stage of the proceedings. Therefore, Plaintiffs have established a prima facie case of jurisdiction over Tchuruk. As with Purves, however, the Court grants the parties the opportunity to conduct limited jurisdictional discovery on the issue of this Court's personal jurisdiction over Tchuruk, and will subsequently conduct an evidentiary hearing to resolve this issue.

## V. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motions to dismiss [Doc. 72, 76, 84, and 91] of defendants Alstom S.A., Alstom USA, Inc., Alstom Transportation Inc., Alcatel SA, Credit Suisse First Boston (Europe) Ltd., Société Générale, Merrill Lynch International, ABN AMRO Rothschild, BNP Paribas (also known as BNP Paribas S.A.), Credit Agricole Indosuez Lazard Capital Markets, Morgan Stanley & Co. International Ltd., UBS A.G., Pierre Bilger, Patrick Kron, Philippe Jaffre, Francois Newey, James Milner, William Purves ("Purves"), Klaus Esser, John Mayo, Lord George Simpson, Serge Tchuruk ("Tchuruk"), and Jean-Pierre Halbron under Federal Rule of Civil Procedure 12(b)(1) on the basis of this Court's lack of subject matter jurisdiction over the claims of foreign plaintiffs who purchased Alstom securities on foreign stock exchanges ("Foreign Plaintiffs") are GRANTED IN PART, in that all claims of the Foreign Plaintiffs relating

to either the Marine or Turbine Frauds as defined in this Decision and Order are hereby DISMISSED, and such motions are DENIED IN PART, in that the Court finds that it has subject matter jurisdiction over all claims of the Foreign Plaintiffs concerning the ATI Fraud as defined in this Decision and Order; and it is further

**ORDERED** that Purves's motion [Doc. 93] under Federal Rule of Civil Procedure 12(b)(2) ("Rule 12(b)(2)") to dismiss the Complaint for lack of personal jurisdiction is DENIED; and it is further

**ORDERED** that Tchuruk's motion [Doc. 84] under Rule 12(b)(2) to dismiss the Complaint for lack of personal jurisdiction is DENIED; and it is further

**ORDERED** that plaintiffs the State Universities Retirement System of Illinois, the San Diego City Employees' Retirement System, the Louisiana State Employees' Retirement System, the West Virginia Investment Management Board, and the International Brotherhood of Electrical Workers, Local 269 and defendants Purves and Tchuruk may engage in limited jurisdictional discovery on an expedited basis, and shall thereafter appear before this court on **February 22, 2006 at 10:00 a.m.** for a hearing on the issue of this Court's personal jurisdiction over Purves and Tchuruk.

**SO ORDERED.**

Dated:    New York, New York
          22 December 2005

                          Victor Marrero
                            U.S.D.J.