UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re ALSTOM SA
SECURITIES LITIGATION.
----------------------------------
This document relates to all
actions.

03 Civ. 6595 (VM)

<u>**DECISION AND ORDER**</u>
**II**

**VICTOR MARRERO, United States District Judge.**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................... 1

II. BACKGROUND .................................... 2

III. STANDARD OF REVIEW ........................... 2

IV. STATUTE OF LIMITATIONS ....................... 7

    A.  LEGAL STANDARD ........................... 7

        1.  Securities Act Claims - Sections 11,
            12(a)(2) and 15 ..................... 7

        2.  Exchange Act Claims ................. 29

        3.  Inquiry Notice ...................... 35

        4.  Retroactivity ....................... 37

    B.  DISCUSSION ............................... 38

        1.  Inquiry Notice ...................... 38

            (a)  The Marine Fraud ............... 39

            (b)  The Turbine Fraud .............. 42

        2.  Statute of Limitations Defenses
            and Relation Back ................... 56

            (a)  The Turbine Fraud .............. 56

            (b)  The Marine Fraud ............... 57

           (c)  GAAP Violations ................ 61

       3.   Conclusion .......................... 63

**V.    ORDER ....................................... 64**

# I. __INTRODUCTION__

Lead plaintiffs in this class action, the State Universities Retirement System of Illinois ("SURS"), the San Diego City Employees' Retirement System ("San Diego ERS"), the Louisiana State Employees' Retirement System ("Louisiana ERS"), the West Virginia Investment Management Board ("West Virginia IMB"), and the International Brotherhood of Electrical Workers, Local 269 ("IBEW") (collectively, the "Lead Plaintiffs"),[1] filed the Consolidated Amended Complaint for Violations of the Federal Securities Laws, dated June 18, 2004 (the "Complaint"), alleging violations of both the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act"). On September 30, 2004, all Defendants[2] moved to dismiss the Complaint. Because

---

[1] Bay Beav Fonds ("BBF"), "a fund management company located in Munich, Germany," is listed as a plaintiff in the Complaint (Compl. ¶ 32), notwithstanding the fact that the Court did not appoint BBF as one of the co-Lead Plaintiffs in this action (id. ¶ 33). The Court is mystified as to why BBF was included as a plaintiff in the Complaint, as Lead Plaintiffs do not contend that BBF was appointed by anyone to serve as a representative of the proposed class members. As only those parties appointed Lead Plaintiff represent the interests of the class plaintiffs and litigate claims on their behalf, see 15 U.S.C. § 78u-4(a)(3)(B)(i), the Court will ignore the inclusion of BBF in the Complaint as a plaintiff.

[2] "Defendants" refers collectively to Alstom, Alstom USA, ATI, Alcatel, the Underwriter Defendants, Bilger, Newey, Kron, Jaffre, Esser, Milner, Purves, Mayo, Simpson, Tchuruk, Halbron, Rambaud-Measson and Janovec, as defined in the Court's companion opinion on issues of jurisdiction in this case. Even if not all of these defendants raised statute of limitations defenses, the Court may dismiss claims against any defendant sua sponte on statute of limitations grounds where the facts supporting that defense are set forth in the Complaint. In re Ultrafem, Inc. Sec. Litig., 91 F. Supp. 2d 678, 691 n.9 (S.D.N.Y. 2000) (citing Leonhard v. United States, 633

of the breadth of issues raised in their various submissions, the Court considers Defendants' motions in separate rulings. In this decision, to be referred to as "<u>Alstom II</u>," the Court addresses the statute of limitations defenses raised as a part of Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). In the companion opinions issued separately, the Court adjudicates all motions contesting the jurisdiction of this Court to hear the dispute as to certain parties and the remaining issues raised under Rule 12(b)(6).

## II.  <u>BACKGROUND</u>

All of the background information relevant to this decision is contained in the prior companion opinion issued on this date in this matter, <u>Alstom I</u>. Familiarity with that opinion and all factual statements, citations and legal determinations contained therein is assumed.

## III.  <u>STANDARD OF REVIEW</u>

In considering a motion under Rule 12(b)(6) to dismiss the complaint for failure to state a claim, the Court should not grant such remedy "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Flores v. S. Peru Copper Corp.</u>, 343 F.3d 140, 148 (2d Cir. 2003) (quoting <u>Conley v.</u>

F.2d 599, 609 n.11 (2d Cir. 1980)).

Gibson, 355 U.S. 41, 45-46 (1957)). Moreover, at this stage, "the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." SEC v. Pimco Advisors Fund Mgmt., LLC, 341 F. Supp. 2d 454, 463 (S.D.N.Y. 2004) (citing Securities Investor Protection Corp. v. BDO Seidman, LLP, 222 F.3d 63, 68 (2d Cir. 2000)).

For the purposes of deciding a motion to dismiss under Rule 12(b)(6), the Second Circuit has

> deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, see Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989), as well as public disclosure documents required by law to be, and that have been, filed with the SEC, see Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991), and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit, see Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000); see International Audiotext Network v. American Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) ("Moreover, when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." (internal quotation marks and alterations

omitted)); <u>Brass v. American Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993).

Plaintiffs state that their investigation into the Alstom transactions at issue here, on which the facts stated in the Complaint are based, included:

> (a) review and analysis of filings made by Alstom with the [SEC]; (b) review and analysis of press releases, public statements, news articles and other publications disseminated by or concerning Alstom; (c) review and analysis of Alstom's analyst conference calls; (d) review and analysis of securities analysts' reports concerning Alstom; (e) review and analysis of documents produced by [NJT]; (f) review and analysis of internal Alstom documents; and (g) other publicly available information disseminated by or concerning Alstom, Alstom USA, . . . ATI, . . . ABB, . . . ABB Alstom, . . . Marconi . . . , Alcatel . . . , and others.

(Compl. ¶ 2.) Plaintiffs cited several articles, reports, press releases and Alstom SEC filings in the Complaint, although they did not attach those documents as exhibits to the Complaint. Defendants have provided in the Joint Appendix the full text of articles and other documents cited in the Complaint. The Court may review those documents in considering the motion to dismiss as if they had been included in the Complaint. <u>See</u> <u>Rothman</u>, 220 F.3d at 89; <u>Cortec Indus.</u>, 949 F.2d at 47-48.

The Court may also take judicial notice of Alstom's stock price on the NYSE, included as Exhibit I.1 in the Joint Appendix and referenced occasionally in the Complaint. <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 167 (2d Cir. 2000) ("The

New York Stock Exchange data mentioned in the opinion below were not attached to the Complaint as an exhibit or incorporated by reference into the Complaint. Nevertheless, the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.").

Defendants have also submitted in their Joint Appendix additional press releases, newspaper articles and Alstom press releases for the Court's consideration. The Court reviews the newspaper articles submitted by the Defendants, but not cited or referenced in the Complaint, not for the truth of the matters asserted therein, but rather merely to note and acknowledge that the existence of those documents and what they contain about relevant matters at relevant times may serve other legitimate purposes in the Court's consideration of the motions before it. See Condit v. Dunne, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) ("The Court does not look to the substance of the articles to resolve any disputed issue on defendant's motion, but does consider the fact of the publication of these articles as evidence of the media frenzy, and thus takes judicial notice of the widespread publicity . . . ."); In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 425 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of

their publication without transforming the motion into one for summary judgment.").

Here, Plaintiffs stated that they relied on such articles in drafting the Complaint, were on notice of the information contained in the documents in the Joint Appendix when the Defendants' filed that information, and did not raise any objection to the Defendants' inclusion of the articles in the Joint Appendix for the Court's consideration. See Cortec, 949 F.2d at 48 ("A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason -- requiring notice so that the party against whom the motion to dismiss is made may respond -- that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."). Additionally, the fact of an article's publication -- which is what the Court's consideration of the documents is limited to -- is "not subject to reasonable dispute in that it is either (1)

generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and thus judicial notice may be taken of such facts. Fed. R. Evid. 201(b).

Other documents submitted by Defendants, but not cited or referenced in the Complaint, will not be considered by the Court in deciding the motion to dismiss under Rule 12(b)(6). Those documents are outside the scope of the Complaint and of the Court's review on such a motion.

## IV.   STATUTE OF LIMITATIONS

A.   LEGAL STANDARD

   1.   Securities Act Claims - Sections 11, 12(a)(2) and 15

The Court must traverse uncharted and somewhat murky legal frontiers in determining the statute of limitations to apply to the Plaintiffs' claims under Sections 11, 12(a)(2) and 15 of the Securities Act (collectively, the "Securities Act claims"). On the one hand, Section 13 ("Section 13") of the Securities Act itself affirmatively states that

> No action shall be maintained to enforce any liability
> created under [Sections 11 or 12(a)(2)] . . . unless
> brought within one year after the discovery of the untrue
> statement or the omission, or after such discovery should
> have been made by the exercise of reasonable diligence .
> . . . In no event shall any such action be brought to
> enforce a liability created under [Section 11] . . . more
> than three years after the security was bona fide offered
> to the public, or under [Section 12(a)(2)] . . . more

than three years after the sale. 15 U.S.C. § 77m.  Although not expressly stated in the statute, the same limitations rule applies to claims under Section 15.  See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 349 n.1 (2d Cir. 1993) ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12, Section 13 applies to it as well.").

On the other hand, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") at Section 804 ("Section 804") extended the statute of limitations for "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws."  Sarbanes-Oxley, Pub. L. No. 107-204, § 804 (codified at 28 U.S.C. § 1658(b)).  The new deadline for filing such suits is either (1) "2 years after the discovery of the facts constituting the violation" or (2) "5 years after such violation."  Id.  The Court must determine which of the preceding statutory periods of limitations, Section 13 or Section 804, applies to the claims raised by the Plaintiffs.

To this end, a threshold question must be answered: whether the Plaintiffs' Securities Act rights of action involve a "claim of fraud, deceit, manipulation, or contrivance" in violation of the securities laws.  Id.

Although Plaintiffs affirmatively state in the Complaint that their Securities Act claims do not sound in fraud, despite that disclaimer -- conclusory, self-proclaimed and self-serving though it necessarily is -- on a more objective reading it is clear that the claims are premised on factual allegations permeated with accusations of fraudulent conduct on the part of the defendants. As regards Sections 11 and 15 claims see, e.g., Compl. ¶ 12 ("that worldwide market was defrauded by defendants' conduct . . . ."); ¶ 14 ("Defendants engaged in extensive fraud-related conduct in the United States . . . ."); ¶ 15 ("Even before entering into the joint venture . . . Alstom was committed to entering the U.S. market and using the United States as a base to export its fraud . . . ."); ¶ 20 ("The Alstom defendants' fraudulent conduct in the United States also included pervasive and deliberate improper accounting . . . ."); ¶ 25 ("plaintiffs . . . acquired Alstom securities . . . and were defrauded by defendants' misrepresentations."); with respect to Section 12(a)(2) claims see, e.g., Compl. ¶ 7 ("In order to help keep the Company afloat in the wake of these scandals, Alstom engaged in yet another accounting fraud . . . ."); ¶ 8 ("[U]nsuspecting investors, unaware of the rampant fraud at Alstom, suffered massive losses.").

Having made these broad averments portraying a pervasive

and overarching scheme of fraud, one that apparently imbues all of the their specific causes of action and attendant claims of losses, Plaintiffs then attempt to retreat, apparently to escape the particularity requirement of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). In pleading their various Claims for Relief demanded in Counts I, II and III, and after incorporating all of their preceding allegations of fraud and fraudulent motive by reference, they seek to "specifically exclude" any claims of fraud from those counts, acknowledging that scienter or fraudulent intent is not an element of a claim under Sections 11, 12(a)(2) or 15. (Compl. ¶¶ 331-32, 341-42, 351-52.) However, Plaintiffs cannot so facilely put the fraud genie back in the bottle.

Plaintiffs have erected a complex theory of liability. To lodge their Complaint, they constructed a massive edifice designed to demonstrate Defendants' integrated fraudulent purpose and corresponding wrongful acts. The virtually gothic dimensions of the deceit portrayed encompass all of Plaintiffs' claims. Later in the Complaint, for tactical pleading advantage, Plaintiffs seek to disassemble the structure, disaggregate it into discrete compartments and then sanitize the parts they previously heavily tainted with charges of fraud. The Court has difficulties grappling with the conceptual and practical challenges this task presents,

especially in a case in which the pleadings of fact and the claims they purportedly relate to are so integrally interconnected and are all so infused with sweeping accusations of fraud.

In essence, Plaintiffs' efforts to dismantle and rearrange their pleadings, so as to benefit from the separate standards applicable to claims based on fraud and those asserting only negligence or strict liability, calls upon the Court, with Plaintiffs' purpose in mind, to consider each relevant paragraph twice. Thus, where the Complaint initially avers acts characterized as fraudulent or deceitful, upon rereading the Court would be required to mentally expunge the reference to fraud in such conduct and presumably engage in some artful gyrations: either to fill in the blanks left in those passages with assumptions or inferences of wrongdoing that would satisfy the elements of claims under Sections 11 and 12(a)(2), or to find that, as conceptually modified, enough of the remaining paragraphs nonetheless contain sufficient factual allegations to support the minimum pleading standards applicable to those causes of action. Under the circumstances of the instant case, the Court is not persuaded that it should address the legal and practical difficulties both of these courses present. Accordingly, the Court concludes that as now drafted, Plaintiffs' Complaint, their

disclaimers to the contrary notwithstanding, "sounds in fraud." <u>Rombach v. Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004) (finding that, while plaintiffs had asserted that their Sections 11 and 12 claims did not sound in fraud, "the wording and imputations of the Complaint [were] classically associated with fraud" and thus were subject to Rule 9(b)).[3]

---

[3] The Court recognizes the dilemma the <u>Rombach</u> doctrine presents for plaintiffs. By the very terms of the statute, claims brought under Sections 11 and 12(a)(2) require proof that defendants filed a securities registration document containing "an untrue statement of material fact" or omitted to state material facts necessary to make the registration statement "not misleading." Securities Act § 11(a), 15 U.S.C. § 77k(a); Securities Act § 12(a)(2), 15 U.S.C. § 77l(a)(2) (containing similar language). Thus, the essence of these claims consists of defendants uttering false statements and plaintiffs being misled into making securities investments in reliance on those misrepresentations. To be sure, claims pursuant to Sections 11 and 12(a)(2) are often predicated on the same conduct asserted to support Section 10(b) claims charging actual fraud. However, to hold, as <u>Rombach</u> does, that a claim necessarily "sounds in fraud" if plaintiffs' articulation of the complaint employs particular terms or imputations of conduct that are "classically associated with fraud" -- such as that the prospectus contained material statements of facts that were "inaccurate," "untrue" or "false and misleading" -- places a heavy burden on plaintiffs' pleading of Sections 11 and 12(a)(2) claims. Inserting specific references to such statutory terms may be the most effective way, and perhaps may even be unavoidable, for plaintiffs to state a sufficient claim under the negligence or strict liability standard on which such causes of action are premised.

    The options available to plaintiffs to avert the <u>Rombach</u> pitfall may amount to a Hobson's choice. One method is to do what Plaintiffs (unsuccessfully) attempted here: initially to formulate an expansive theory of liability that features rampant fraud pervading every aspect of the Defendants' activities and transactions at issue, but subsequently, to avoid the effects of Rule 9(b) with respect to claims not implicating the elements of fraud, to ask the Court to ignore their own already deeply embedded references to fraud in such conduct. Alternatively, plaintiffs would have to draft two-part complaints, each portion sufficient to stand alone for its respective pleading purposes, though essentially duplicating and overlapping large components of the other. One section would assert facts detailing fraudulent acts and culpable intent for the purposes of satisfying the higher pleading requirements of Section 10(b) claims. The other segment would relate the same underlying events but somehow antiseptically excise all references to the dreaded "fraud" word or any deed imputing such behavior. Whether the latter option is practical or feasible is uncertain.

    As to the case at hand, however, the question is largely academic. By reason of Plaintiffs' choice to so firmly and pervasively engraft

Because the conduct alleged by the Plaintiffs sounds in fraud, the heightened pleading standards demanded by Rule 9(b) apply to their averments.  <u>See</u> <u>Rombach</u>, 355 F.3d at 172.  The Court is thus presented with the unsettled question of what statute of limitations to apply to claims brought under Sections 11, 12(a)(2) and 15, which do not require proof of fraud as an element of the cause of action, in a situation in which the underlying claims as pled are nonetheless integrally charged with averments of fraudulent conduct.  <u>See</u> Harold S. Bloomenthal, <u>Sarbanes-Oxley Act in Perspective</u> § 10:2 (West 2005) ("When it reaches the Second Circuit, the court may have difficulty reconciling the view that the extended period [of Section 804] is not applicable to Section 11 claims in view of its holding that Section 11 claims alleging false or misleading representations sound in fraud for purposes of Rule 9(b).").

In determining the meaning and applicability of Section 804, the Court "must begin with the words of the text. . . . Whether the meaning of the statute is plain or ambiguous is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." <u>In re WorldCom, Inc. Sec.</u>

---

allegations of fraud into their pleadings, it is now equally impractical to erase every trace and implication of those charges from the Complaint as a whole as now drafted.  In any event, in this respect Plaintiffs have irretrievably crossed the "sounds in fraud" threshold.

Litig., 294 F. Supp. 2d 431, 440-41 (S.D.N.Y. 2003) (internal quotation marks and citations omitted). "When the plain language and canons of statutory interpretation fail to resolve statutory ambiguity, we will resort to legislative history." United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000). After consideration of these various factors, the Court finds that the statute of limitations period expressed in Section 13 of the Securities Act, rather than that contained in Sarbanes-Oxley Section 804, applies to any and all claims under Securities Act Sections 11, 12(a)(2) and 15.

First, Section 804 "by its plain text" does not apply to claims under the securities laws that do not require any showing of fraudulent intent as an element of the cause of action. In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 196-97 (S.D.N.Y. 2003). As the In re Global Crossing court noted, Sarbanes-Oxley Section 804

> does not broadly expand the statute of limitations for all actions brought under the securities laws, as it could easily have done, but rather establishes a distinct federal statute of limitations for certain causes of action arising under the securities laws, namely those that "involve a claim of fraud, deceit, manipulation, or contrivance." . . . This description of the covered causes of action mirrors the language of section 10(b) of the Exchange Act, which creates liability for "any person" who "employ[s] . . . any manipulative or deceptive device or contrivance in contravention of" SEC regulations, 15 U.S.C. § 78j(b), and which thus requires a showing of fraudulent intent. A cause of action that is based on negligence is not a claim for "fraud, deceit, manipulation, or contrivance," all of which are words connoting deliberate, intentional deception.

-14-

<u>Id.</u> at 197 (selected internal quotation marks, citations and alterations omitted); <u>see</u> <u>In re WorldCom</u>, 294 F. Supp. 2d at 444 ("Section 804 does not . . . state that it extends the statute of limitations for all claims under the securities laws.  Instead, it includes limiting language that extends the time for private causes of action under the securities laws only for claims that involve 'fraud, deceit, manipulation or contrivance.'  This language does not encompass Sections 11 and 12(a)(2) claims."); <u>see</u> <u>also</u> <u>In re FirstEnergy Corp. Sec.</u> <u>Litig.</u>, 316 F. Supp. 2d 581, 601 (N.D. Ohio 2004) ("[T]he Sarbanes-Oxley Act is expressly limited to claims of fraud, deceit, manipulation or contrivance.  Since fraud is not a required element for claims under §§ 11 or 12(a)(2), the Court concludes that [the] Sarbanes-Oxley Act does not extend the limitations period for these claims." (internal quotation marks and alterations omitted)); <u>Friedman v. Rayovac Corp.</u>, 295 F. Supp. 2d 957, 974-75 (W.D. Wis. 2003) ("[O]n its face, [Section 804] does not apply to claims brought under the 1933 Act."); Thomas Lee Hazen, <u>The Law of Securities Regulation</u> § 7.10, at 150 (5th ed. 2005) ("The language of the statutes support the view that the shorter limitations periods in section 13 continue to apply to Actions under section 11 and 12 of the 1933 Act.").

First, the Court agrees with the overwhelming body of

judicial opinion addressing this point.  There is little room for doubt that the plain language of Section 804 explicitly prescribes its application to causes of action under the securities laws requiring proof of scienter and motive to defraud, thereby carving out an exception for claims grounded on assertions of negligence or strict liability such as those provided for under Sections 11 and 12(a)(2).[4]  Every court that has ruled on this issue -- whether Section 804's statute of limitations extends to claims under Sections 11 and 12(a)(2) -- has found that it does not, and instead applied the limitations period stated in Section 13 of the Securities Act.[5]  Although no court has directly addressed the precise

---

[4] The Court will refer for the remainder of the analysis only to Sections 11 and 12(a)(2), as liability under Section 15 is premised on an underlying violation of those sections.  As the Second Circuit found in Dodds, the limitations period that is applied to claims under Sections 11 and 12(a)(2) should be applied to Section 15 claims as well.  See 12 F.3d at 349 n.1.

[5] The following represent the cases identified by the Court as having considered the issue of whether Section 804 applied to claims brought under Sections 11, 12(a)(2) and 15 of the Securities Act, all of which found that Section 804 did not extend to such claims:  (1) as to all three sections: Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., No. 02 C 5893, 2004 WL 574665, at *12-*14 (N.D. Ill. Mar. 22, 2004) (quoting In re WorldCom); In re Enron Corp. Sec., Derivative & "ERISA" Litig., No. MDL-1446, Civ.A H-01-3624, 2004 WL 405886, at *9-*12 (S.D. Tex. Feb. 25, 2004); Friedman, 295 F. Supp. 2d at 974-75; (2) as to Sections 11 and 12(a)(2): In re WorldCom, Inc. (TARGETS) Sec. Litig. ("In re WorldCom (TARGETS)"), Nos. 02 Civ. 3288, 03 Civ. 9499, 2004 WL 1435356, at *4 (S.D.N.Y. June 28, 2004) (citing In re WorldCom); In re FirstEnergy, 316 F. Supp. 2d at 601; In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003); In re WorldCom, 294 F. Supp. 2d at 439-44; (3) as to only Section 11: In re Alamosa Hldgs., Inc. Sec. Litig., No. Civ.A.5:03CV289-C, 2005 WL 712001, at *27-*28 (N.D. Tex. Mar. 28, 2005); In re Global Crossing, 313 F. Supp. 2d at 196-98; (4) as to only Section 12(a)(2): Cohen v. Northwestern Growth Corp., No. Civ. 04-4043, 2005 WL 2000125, at *4-*5 (D.S.D. Aug. 19, 2005) (quoting In re WorldCom); Lieberman v. Cambridge Partners, L.L.C., No. Civ.A. 03-2317, 2004 WL 1396750, at *3 (E.D. Pa. June 21, 2004); ATO RAM, II, Ltd. v. SMC

-16-

issue presented in this case, the substantial weight and uniformity of authority concerning Section 804's inapplicability to negligence and strict liability actions, combined with the specific statute of limitations expressly provided for in Section 13 to govern claims under Sections 11 and 12(a)(2), lends support to a determination of the unresolved question at issue here: the inapplicability of Section 804 to all such claims, however the pleadings may be characterized for Rule 9(b) purposes.[6]

Second, the statutory context in which Section 804 was codified bolsters an interpretation that the longer limitations period does not apply to actions pursuant to Sections 11 and 12(a)(2). Subsection (a) of 28 U.S.C. § 1658, the particular statute that Section 804 amended, provides a limitations period for all civil actions arising under Acts of Congress, "[e]xcept as otherwise provided by law." 28 U.S.C. § 1658(a). The limitations period for claims under Sections

---

Multimedia Corp., No. 03 Civ. 5569, 2004 WL 744792, at *5 (S.D.N.Y. Apr. 7, 2004).

[6] Indeed, Plaintiffs acknowledge in the Complaint that their claims under Sections 11 and 12 are governed by the one-year/three-year limitations period prescribed in Section 13, as they assert that

> [l]ess than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs first filed their first complaint. Less than three years elapsed from the time that the securities upon which this count is brought were bona fide offered to the public to the time plaintiffs first filed their first complaint.

(Compl. ¶ 338; id. ¶ 350 (concerning Section 12 claims).)

11 and 12(a)(2) is expressly provided for in Section 13 of the Securities Act, unlike, for example, a claim under Section 10(b), for which no express statutory limitations period was originally enacted.[7]  See <u>Stephenson v. Deutsche Bank AG</u>, 282 F. Supp. 2d 1032, 1067 (D. Minn. 2003) (citing the language from subsection (a) quoted above as support for the court's conclusion that Section 804 did not override the express statute of limitations period provided for claims under Section 9 of the Exchange Act); Amy Grinol Gibbs, Note, <u>It's About Time:  The Scope of Section 804 of the Sarbanes-Oxley Act of 2002</u>, 38 Ga. L. Rev. 1403, 1430-33 (2004).

Although Sarbanes-Oxley did not address subsection (a) of § 1658, and subsection (b) begins "[n]otwithstanding subsection (a)," that Congress chose to amend this statute, which provides limitations periods only for causes of actions for which no other limitations period is specified, and that it did not amend or repeal the express limitations period provided in Section 13 for actions under Sections 11 and 12(a)(2), offer additional grounds to support a finding that Section 804 does not apply to such claims.  See <u>In re Enron</u>,

---

[7] Prior to Sarbanes-Oxley's enactment, uncertainties and conflicts over the statute of limitations period applicable to claims under Section 10(b) were eventually resolved by the Supreme Court in <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 364 (1991) (holding that "[l]itigation instituted pursuant to § 10(b) and Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation").

2004 WL 405886, at *11 ("Significantly, when Congress passed the Sarbanes-Oxley Act, Congress did not repeal the express one-year/three-year statute of limitations in Section 13 . . . ."); In re Global Crossing, 313 F. Supp. 2d at 197 n.6 ("That section 804 of Sarbanes-Oxley legislatively establishes a limitations period where none had previously been provided for by statute may also explain why Congress created a new provision within 28 U.S.C. § 1658, rather than simply amending the existing statute of limitations provisions already incorporated in 15 U.S.C. § 77m, which Sarbanes-Oxley pointedly left in place.").

Most courts have found the language of Section 804 unambiguous in its inapplicability to securities law claims sounding in negligence or strict liability, and have thus either ignored the legislative history of Sarbanes-Oxley or examined it only in dicta. See, e.g., In re Global Crossing, 313 F. Supp. 2d at 197 n.6; In re WorldCom, 294 F. Supp. 2d at 443. Because the issue now before this Court is narrower and unique, a question which, by some courts' analyses, creates ambiguity as to the applicability of Section 804 to claims under Sections 11 and 12(a)(2),[8] the Court considers the

---

[8] Dicta in In re Enron, In re Global Crossing, and In re WorldCom suggest that the courts in those cases, in deciding that Section 804 did not apply to plaintiffs' Sections 11 and 12(a)(2) claims, relied in part on the plaintiffs' statements that their claims did not allege fraud. See In re Enron, 2004 WL 405886, at *11, *12 (finding that "[s]ince Section 804(b) explicitly applies only to 'a private right of action that involves a

relevant aspects of the Sarbanes-Oxley Act's legislative history.

The legislative history of Title VIII of the Sarbanes-Oxley Act, known as the Corporate and Criminal Fraud Accountability Act and of which Section 804 was a part, focused exclusively on protecting the ability of defrauded investors to bring "private securities fraud actions." See 148 Cong. Rec. S7418-01, S7419 (daily ed. July 26, 2002) (remarks of Sen. Leahy). Senator Leahy, the sponsor and author of Title VIII, did not specifically state whether this reference to "fraud actions" was meant to encompass only securities claims that require proof of fraud as an element of the cause of action, or whether it extended as well to any claim under the securities laws based more broadly on allegations of a fraudulent course of conduct by a defendant. However, Senator Leahy's remarks mentioned the Lampf decision, which concerned the statute of limitations applicable to actions brought under Section 10(b) of the Exchange Act and

---

claim of fraud, deceit, manipulation or contrivance,' application of the longer statute of limitations in § 804 to a claim under either Section 11 or Section 12(a)(2) appears to depend upon whether the particular claim involves 'fraud, deceit, manipulation, or contrivance,'" and holding Section 804 inapplicable to plaintiffs' claims because their complaint expressly disclaimed that the Section 11 claims were grounded in fraud); In re Global Crossing, 313 F. Supp. 2d at 197 n.4 (noting that plaintiffs disclaimed that their Section 11 claims relied on allegations of fraud); In re WorldCom, 294 F. Supp. 2d at 441-42 (noting that plaintiffs admitted that their claims did not sound in fraud); see also In re WorldCom (TARGETS), 2004 WL 1435356, at *4 (same); Lawrence E. Jaffe Pension Plan, 2004 WL 574665, at *13 n.1 (same).

Rule 10b-5 promulgated thereunder. This reference suggests
that Senator Leahy's focus was on causes of action which, like
Section 10(b), require actual proof of fraud. See id. at
S7420; see also In re Global Crossing, 313 F. Supp. 2d at 197
n.6. Additionally, in a Senate Report from the Committee on
the Judiciary regarding the Corporate and Criminal Fraud
Accountability Act, in the section discussing the additional
views of certain committee members,[9] those senators expressed
their understanding of the statute of limitations provision as
not being "intended to conflict with existing limitations
periods for any express private rights of action under the
federal securities laws." S. Rep. No. 107-146, at 29. This
reading suggests that the limitations period in Section 804
would not supplant that stated in Section 13, which
constitutes such an express provision pertaining to specific
causes of action.

The Court recognizes that interpreting legislative
history, particularly such history on an issue discussed in
vague terms as that presented here, is a slippery affair, and
acknowledges the existence of support for a contrary
conclusion in the same texts and quotations referenced above.
However, this apparent ambiguity supports the Court's

---

[9] The additional views section is attributed to Senators Hatch, Thurmond,
Grassley, Kyl, DeWine, Sessions, Brownback and McConnell. See Sen. Rep.
No. 107-146, at 26 (2002), available at 2002 WL 863249.

understanding that Section 804 does not supplant the express limitations periods provided in the securities laws because "repeals by implication are not favored. . . . The intention of the legislature to repeal must be clear and manifest." Watt v. Alaska, 451 U.S. 259, 266-67 (1981) (internal quotation marks and citations omitted); see United States v. Vonn, 535 U.S. 55, 65 (2002) (stating that a repeal of a statute by implication is "a result sufficiently disfavored, Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1017 (1984), as to require strong support"). Congress did not explicitly manifest an intent to repeal the express limitations periods provided in the securities laws in enacting Section 804. Section 804's provisions express an intent to overturn only the Lampf decision. Consequently, the legislative history in its totality, and particularly the absence of a clear intent to amend the express limitations periods provided for in the securities laws, supports the Court's conclusion as to Section 804's inapplicability to claims brought under Sections 11 and 12(a)(2).

Thus, the Court's review of the plain language of Section 804 in its legislative context, and the statutory history of the provision all support the Court's interpretation that the longer limitations period prescribed in Section 804 of Sarbanes-Oxley does not apply to claims brought under Sections

11 and 12(a)(2) of the Securities Act.

Plaintiffs argue that this position is inconsistent with the Second Circuit's holding in Rombach that negligence-based claims under Sections 11 and 12(a)(2) are subject to the heightened pleading standards of Rule 9(b) when the conduct underlying the claims sounds in fraud. (See Pls.' Mem. of Law in Opp'n to the Alstom Defs.' Mots. to Dismiss Pls.' Claims Brought Pursuant to the Securities Act, dated November 19, 2004 ("Pls.' Securities Act Opp'n Mem."), at 7-9.) Plaintiffs state that if they are to be held to the heightened pleading standards of Rule 9(b), they should have the benefit of the extended limitations period afforded to claims of fraud under Section 804. For this purpose, Plaintiffs expressly back away from the categorical disclaimer asserted in their Complaint, as discussed above, declaring that their Section 11 and 12(a)(2) claims do not sound in fraud or rely on such allegations.[10] Id.; cf. In re WorldCom, 294 F. Supp. 2d at 444 ("There are advantages to bringing solely strict liability and negligence claims: the pleading and proof thresholds are far lower than for claims asserting securities fraud, and liability is 'extensive.' One of the disadvantages of

---

[10] The Court reminds Plaintiffs that they may not amend their Complaint through statements made in their opposition briefs to Defendants' motions. See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001) ("The complaint cannot, of course, be amended by the briefs in opposition to a motion to dismiss.").

bringing negligence claims, however, is a more narrow window of time in which to sue.").

The Court does not agree with Plaintiffs that the Second Circuit's holding in Rombach compels a parallel result as to the issue of the applicability of Section 804 to claims under Sections 11 and 12(a)(2). The statutory provisions in question have distinct purposes. Rule 9(b) expresses a pleading requirement designed primarily to give defendants more particularized notice of plaintiffs' claims if grounded in fraud, and to protect against unfounded allegations of fraudulent or deceitful conduct. The more rigorous standard recognizes the severe personal and financial consequences that attach to such charges in the context of litigation, even if the accusations are ultimately found to be baseless. See Rombach, 355 F.3d at 171 (noting that the purpose of the particularity requirement of Rule 9(b) is to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit" (internal quotation marks omitted)). The Circuit Court found that these interests applied with equal force whether or not the plaintiff's claim required proof of fraud as an element. Id.

The public interest in affording defendants fair notice

and a measure of protection against groundless assertions of fraud does not compel the extension of plaintiffs' time in which to bring suit.  Indeed, the very same reasons cited by the Second Circuit as grounds for applying the particularity requirement of Rule 9(b) to claims under Sections 11 and 12(b)(2) averring fraud were articulated by Congress as a basis for shortening the limitations period adopted in Section 13.  In 1934, Congress shortened the limitations period for claims under Sections 11 and 12(a)(2) in part to deter strike suits and to protect innocent directors from unwarranted litigation.  <u>See</u> 78 Cong. Rec. S10185-10186 (daily ed. June 1, 1934) (statement of Sen. Byrnes), <u>reprinted</u> <u>in</u> <u>Federal Securities Laws Legislative History 1933-1932</u>, item 74 (Securities Law Comm., Federal Bar Assoc. ed., Volume 1, 1983).

Moreover, as Defendants indicate, the adoption of the Plaintiffs' position -- that a longer limitations period should be applied when a complaint's Section 11 or 12(a)(2) claims "sound in fraud," but that a shorter period is applicable where the claims only raise allegations of negligence -- creates uncertainty in an area of the law the purpose of which is expressly to provide certainty for defendants as to when their exposure to liability ends.  As the Supreme Court remarked in addressing this point:

> Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

Burnett v. New York Central R.R. Co., 380 U.S. 424, 428 (1965) (internal quotation marks omitted).

Finally, the application of Rule 9(b) to require plaintiffs asserting claims that "sound in fraud" to furnish the particulars of those claims, while placing some additional burdens on plaintiffs at the pleading stages of litigation for the benefit of defendants, does not necessarily commit plaintiffs at the evidentiary phase to establish actual fraud in order to prevail on a Section 11 or 12(a)(2) claim. The specific elements of those causes of action are defined by statute and, as discussed above, expressly exclude proof of fraudulent knowledge, motive or intent.

When extensive testimonial, documentary and expert evidence of such more extreme conduct implicating a culpable state of mind is explicitly demanded, as is the case for Section 10(b) claims, the law provides for extended statutes of limitations. The longer periods recognize the heavier burden of proof plaintiffs have to satisfy and the substantially greater difficulties entailed in finding

evidence to establish liability in such cases.  Indeed, these precise concerns are reflected in Congress's reasons for enacting the longer limitations period provided in Section 804 for such causes of action.  <u>See</u> S. Rep. No. 107-146, at 9 ("Especially in securities fraud cases, the complexities of how the fraud was executed often take well over a year to unravel, even after the fraud is discovered. . . . [B]y the time a victim learns enough facts to file a complaint under a heightened pleading standard, survives a motion to dismiss, begins discovery, and learns that an additional wrongdoer or theory should be added to the case, that claim is likely to be time barred, then the wrongdoer is able to avoid liability and the victim is left holding the proverbial bag.").

But where reasons supporting the enlarged period of limitations do not exist, justification should not be created merely on the strength of the craft and contents of a particular plaintiff's pleadings, thereby potentially conflicting with what Congress prescribed in defining rights of action and their corresponding statutes of limitations.  To rule otherwise would give rise to an anomaly.  It would place the determination of the relevant statute of limitations in plaintiffs' hands and  identify its source with the pleadings in the Complaint.  In essence, plaintiffs in actions under the securities laws, as their own convenience suited, would be

able to prescribe what statute of limitations would apply to their claims by how skillfully they draft the complaint, effectively contracting or expanding the limitations period for claims brought under Sections 11 and 12(a)(2) on the basis of their artful pleading of fraud, even though they would not be put to the test of proving fraud to make out a case under those statutes. Exacting reasonable disclosure of the particulars of time, place and manner constituting an averment of fraud that does not actually have to be proved should not warrant a substantial extension of the otherwise applicable statute of limitations.

The Court is mindful of the difficulties inherent in this case, and grants that the application of the longer limitations period of Section 804 to claims averring fraud, even when proof of such conduct is not required for liability to attach under the legal claims asserted, may be a reasonably arguable proposition. On balance, the Court finds the arguments against the application of the longer limitations period are the more compelling. As previously noted, every court that has encountered the issue has ruled that Section 804 is inapplicable to claims under Sections 11 and 12(a)(2). It was the Second Circuit that applied the pleading standards of Rule 9(b) to such claims. If the principles underlying the Rombach decision mandate the application of the Section 804

period of limitations to claims under Sections 11 and 12(a)(2) that sound in fraud, it should be left to the Circuit Court to so rule. This Court declines to enlarge Section 804's reach in this respect. The statute of limitations applicable to Plaintiffs' Securities Act claims is the period provided in Section 13 as stated above.

2. Exchange Act Claims

Defendants argue that certain of Plaintiffs' claims under Sections 10(b) and 18 of the Exchange Act are barred by the applicable statute of limitations. Neither Defendants nor Plaintiffs contest that Sarbanes-Oxley amended the statute of limitations for claims brought under Section 10(b). While prior to Sarbanes-Oxley, the statute of limitations for Section 10(b) claims was the one-year/three-year period stated in Section 9(e) of the Exchange Act, see 15 U.S.C. § 78i(e); accord Lampf, 501 U.S. at 364, Sarbanes-Oxley, in overturning Lampf, extended that limitations period, such that an action under Section 10(b) "may be brought not later than the earlier of . . . (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b); In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 208 (S.D.N.Y. 2004) ("There is little doubt that Section 804's expanded statute of limitations applies to § 10(b) claims." (citing In

re WorldCom, 294 F. Supp. 2d at 442)). Plaintiffs' Section 20(a) claims that are based on alleged derivative liability for violations of Section 10(b) are governed by the same limitations periods as those applicable to the Section 10(b) claims. See Dodds, 12 F.3d at 350 n.2 ("Because Section 20 merely creates a derivative liability for violations of other sections of the Act, claims under Section 20 are governed by the limitations periods for those other sections.").

The parties disagree, however, concerning the limitations period to be applied to Section 18 claims. Plaintiffs contend that Sarbanes-Oxley similarly extended the period for Section 18 claims, and Defendants argue that Section 18 remains governed by the limitations period provided in 15 U.S.C. § 78r(c). The parties failed to identify a single decision from any court in the country discussing the issue. The Court identified three decisions that address the issue of Section 804's applicability to claims under Section 18; however, all three opinions express differing conclusions or rationales for their holdings.

In Shriners Hospitals for Children v. Qwest Communications Int'l, Inc., the court, noting the parallels between Section 18 and 10(b), specifically that Section 18 targets "the precise dangers that are the focus of § 10(b)," held that Section 804 applied to claims brought under Section

18.  No. 04-CV-0781, 2005 WL 2350569, at *3 (D. Colo. Sept. 23, 2005).  Additionally, the court considered the plain language of Section 804 and concluded that Section 18 "easily" fell within its parameters.  Id.  Similarly, the court in In re Adelphia Communications Corp. Sec. & Deriv. Litig. found Section 804 applicable to actions under Section 18, but for an entirely different reason.  See No. 03 MD 1529, 2005 WL 1679540, at *4 (S.D.N.Y. July 18, 2005).  The court there stated that "[u]nlike negligence or strict liability-based claims, the [§ 18] defendant is accorded the defense that he acted in good faith and had no knowledge that such statement was false or misleading. . . . Given that § 18 involves more than negligence, [the court found] that the extended two-year/five-year limitations period [of Section 804] applie[d]."  Id. (internal quotation marks and alterations omitted).  On the other hand, the court in WM High Yield Fund v. O'Hanlon found that Section 804 applied only to securities laws claims that require proof of intent, and that Section 804 therefore did not extend to claims under Section 18, which does not require proof of intent as an element of the claim. See No. Civ.A. 04-3423, 2005 WL 1017811, at *11 (E.D. Pa. Apr. 29, 2005) (citing In re Global Crossing, 313 F. Supp. 2d at 197).

The analysis provided in these cases is somewhat limited.

The Court, therefore, finds them unpersuasive as precedents in evaluating the merits of either position of the dispute at hand. However, in light of the extensive discussion detailed above addressing whether Section 804 extends to claims under Sections 11, 12(a)(2) and 15, the Court finds that Section 804 does not apply to claims under Section 18 of the Exchange Act.

First, as stated above, Section 804 by its plain terms applies only to causes of action involving claims of fraud and deceit, which this Court, and many others, understands to refer only to causes of action under the securities laws in which fraudulent intent is an element that plaintiffs are required to plead as a part of the underlying claim. Section 18 does not require the pleading of scienter, or fraudulent intent. See Ross v. A. H. Robins Co., Inc., 607 F.2d 545, 555-56 (2d Cir. 1979) ("To establish a § 10(b) violation, the plaintiff must plead and prove that the defendant acted with scienter in making a material misstatement or omission. A plaintiff seeking recovery under § 18 faces a significantly lighter burden. He must merely plead and prove that a document filed with the Commission contains a material misstatement or omission."). Although the Supreme Court has stated that "something more than negligence on the part of the defendant is required for recovery" under Section 18, see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 211 n.31 (1976)

(emphasis added), this remark refers to the quantum of proof required to succeed on a claim, not what must be pled by a plaintiff to state a claim.  The Section 18 defendant has an affirmative defense if he acted in good faith, see 15 U.S.C. § 78r(a), but it is not the plaintiff's burden to anticipate and plead in his complaint a rebuttal to the defendant's potential defense.  See Ross, 607 F.2d at 556.  The pleading standards, and thus the elements of a claim under Section 18, do not require allegations of "something more than negligence." Hochfelder, 425 U.S. at 211 n.31.  Thus, Section 804 by its plain language as construed by this Court does not apply to claims under Section 18.  See Hazen, supra, § 12.18, at 547 ("Unlike the case with a claim under SEC Rule 10b-5, deception is not an element of a section 18(a) claim; therefore, [Section 804's] longer limitations period should not be applied to actions under section 18(a).").

Second, Section 18 contains an express limitations provision.  See 15 U.S.C. 78r(c).  As noted above, nothing in either the statutory framework of 28 U.S.C. § 1658 or the legislative history of Sarbanes-Oxley show a clear intent to overrule express limitations periods stated in the securities laws.

The court in Shriners Hospitals focused on the similarity between Sections 10(b) and 18, as noted by the Supreme Court

in <u>Musick, Peeler & Garrett v. Employers Insurance of Wausau</u>, 508 U.S. 286, 296 (1993) (quoting, in part, <u>Lampf</u>), in reaching its decision that Section 804 applied to claims under Section 18. <u>See</u> 2005 WL 2350569, at *3. However, Justice Kennedy's dissent, cited favorably in the legislative history of Section 804, <u>see</u> 148 Cong. Rec. S7418-01, S7420, noted that the "purpose and underlying rationale [of Sections 18 and 9 of the Exchange Act] differ from causes of action implied under § 10(b). . . . Neither relates to a cause of action of the scope and coverage of an implied action under § 10(b). Nor does either rest on the common-law fraud model underlying most § 10(b) actions." 501 U.S. at 375-76. This argument of the dissent emphasizes the factors that distinguish claims under Section 18 from those under Section 10(b) and why, therefore, a single limitations period need not be applied to causes of action under both sections.

In its analysis of Section 804 as it relates to claims under Sections 11 and 12(a)(2), this Court elaborated above on the statutory, policy and practical considerations that support the application of different periods of limitations to claims requiring pleading of fraud, as opposed to those grounded on negligence or strict liability. The Court is persuaded that those considerations weigh with equal force as regards Section 18 claims. The Court, therefore, finds that

the limitations period to be applied to Plaintiffs' claims
under Section 18 is that expressly stated in subsection (c) of
Section 18, and not the longer period prescribed in Section
804. Plaintiffs' Section 20(a) claims that are based on
alleged derivative liability for violations of Section 18 are
governed by the same limitations periods as those applicable
to the Section 18 claims. See Dodds, 12 F.3d at 350 n.2.

3. Inquiry Notice

The statute of limitations begins to run once a plaintiff
is put on either actual notice or constructive notice, also
known as inquiry notice, of the facts giving rise to his
claim. See Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993).
"[W]hen the circumstances would suggest to an investor of
ordinary intelligence the probability that she has been
defrauded, a duty of inquiry arises, and knowledge will be
imputed to the investor who does not make such an inquiry."
Dodds, 12 F.3d at 350. For this duty of inquiry to arise,
however, "[t]he fraud must be probable, not merely possible."
Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir.
2003).

Plaintiff's duty of inquiry, however, may be somewhat
qualified and mitigated by the actions or representations of
the defendants. "There are occasions when, despite the
presence of some ominous indicators, investors may not be

considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management." <u>LC Capital Partners, LP v. Frontier Ins. Group, Inc.</u>, 318 F.3d 148, 155 (2d Cir. 2003). Such reassuring words are a factor that must be considered in determining whether a reasonable investor in such circumstances would be aware of the probability that she has been defrauded. "However, reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern. . . . Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on [(1)] how significant the company's disclosed problems are, [(2)] how likely they are of a recurring nature, and [(3)] how substantial are the 'reassuring' steps announced to avoid their recurrence." <u>Id.</u> If, for example, the "'reassuring' statements by management were mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future," a reasonable investor would not reasonably rely on such flimsy remarks and circumstances giving rise to inquiry notice may be found to exist. <u>Id.</u> at 156.

Information that may be held to constitute inquiry notice

includes any financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there may have been either misleading statements or material omissions involved in the sale of the securities at issue. See Dietrich v. Bauer, 76 F. Supp. 2d 312, 343 (S.D.N.Y. 1999); see also Brimo v. Corporate Express, Inc., 229 F.3d 1135, Fed. Sec. L. Rep. 91,236, 2000 WL 1506083, at *2 (2d Cir. Oct. 6, 2000) (unpublished disposition). It is not necessary that this information put a plaintiff on notice of the entire wrongdoing. Newman, 335 F.3d at 193; Dodds, 12 F.3d at 352. When the facts from which knowledge may be imputed are clear from the pleadings and the papers and filings integral to the complaint, the question of inquiry notice may properly be resolved on a motion to dismiss. See LC Capital, 318 F.3d at 156.

4. Retroactivity

The Second Circuit recently held in In re Enterprise Mortgage Acceptance Co. Sec. Litig. that "because neither the statutory language nor the legislative history of Section 804 indicate that Congress clearly favored retroactive application," Section 804 does not resurrect claims that were

time-barred as of the date of Sarbanes-Oxley's enactment: July 30, 2002. 391 F.3d 401, 410 (2d Cir. 2005); see In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 522 (S.D.N.Y. 2005) ("The Second Circuit has held that Section 804 does not apply retroactively to revive otherwise time-barred claims."). Should the Court find that any of Plaintiffs' claims were barred by their respective statutes of limitations as determined above prior to July 30, 2002, those claims will not be revived by looking to the lengthened limitations period stated in Section 804.

B.   DISCUSSION

   1.   Inquiry Notice

The first task faced by the Court is the determination of when, with respect to each instance of fraudulent activities Plaintiffs allege challenged by Defendants on statute of limitations grounds -- the Marine and Turbine Frauds -- a reasonable investor would have had actual or inquiry notice of the facts giving rise to the claims asserted as to each. This task is complicated by the additional question of whether the revelation of facts concerning one of the alleged frauds would have put a reasonable investor on notice as to other of the frauds, i.e., would notice as to the occurrence of the Marine Fraud have put such an investor on notice of the existence of the Turbine Fraud or vice versa.

(a)　The Marine Fraud

　　　As stated in the companion opinions issued in this case,
the Marine Fraud concerned Alstom's alleged concealment of
vendor financing agreements with certain of its customers,
specifically Renaissance in its purchase of eight cruise ships
from Alstom in the late 1990s.  The motive for this non-
disclosure of the agreements is alleged to have been to allow
Alcatel and Marconi to sell their Alstom shares at
artificially inflated values.  Alcatel and Marconi sold a
majority of their Alstom shares in the Secondary Offering in
February 2001, and had completely divested themselves of their
Alstom holdings by June 2001.

　　　On September 27, 2001, two days after Renaissance
declared bankruptcy, Alstom announced that it had guaranteed
the loans that Renaissance had used to purchase eight cruise
ships from Alstom.  (Compl. ¶ 103; see Press Release, Alstom,
Press Release (Sept. 27, 2001), included as Ex. F.13 in the
J.A. ("Alstom has, in general, ultimate liability for a part
of the long-term loans of the financial institutions which
have financed the purchase of these cruise ships.").)  This
announcement was followed by a statement from Alstom on
October 1, 2001 giving further details about the Renaissance
loans:  "The theoretical maximum exposure of ALSTOM with
respect to Renaissance Cruises (based on the hypothetical

-39-

assumption that the cruise-ships are worth zero) is €684 million arising under commitments given by ALSTOM to financial institutions in connection with the funding of the cruise-ships." (Press Release, Alstom, Press Release (Oct. 1, 2001) ("October 1 Press Release"), included as Ex. F.14 in the J.A.; Compl. ¶¶ 104, 106.) Alstom further disclosed separate vendor financing commitments in the Marine division: "Separately, ALSTOM has current commitments for an amount of €589 million in respect of other cruise-ships already delivered to other ship owners, which are backed by mortgages on the relevant cruise-ships. Of this, €422 million existed at 31 March 2001." (October 1 Press Release at 2.)

Alstom contended in its Press Releases that these liabilities had been disclosed in various footnotes in its Annual Reports. (See October 1 Press Release at 1.) However, "many observers were shocked to discover that Alstom had guaranteed Renaissance's loans. . . . Peter Reilly, engineering analyst at Deutsche Bank in London, stated: 'This appears to have been a contingent liability which was not disclosed in the Alstom report and accounts.'" (Compl. ¶ 105.) Alstom's stock price on September 26, 2001 was $22.71; on September 27, 2001, it was $16.95; on September 28, 2001, it was $15.85; on October 1, 2001, it was $14.92; and by October 3, 2001 was down to $12.35. (See Chart, Alstom

Historical Stock Price (June 1, 1999 - August 6, 2003), created from information provided by Yahoo! Finance, included as Ex. I.1 in the J.A.; Compl. ¶ 108.) An analyst report issued by J.P. Morgan Securities, Ltd. on October 1, 2001 stated: "Alstom has lost EUR2.1 billion in market value since it revealed the exposure to Renaissance Group . . . . [I]nvestor focus has shifted to Alstom-specific problems like the high leverage, low cash generation and concern about other potential risks "hidden" in its off-balance sheet liabilities. . . . We question the quality of the turnaround of the [Marine] division achieved in the last years, as it seems to have happened on the back of vendor financing." (Compl. ¶ 106 (emphasis removed).)

Plaintiffs concede in the Complaint that "the full extent of the guarantees [was disclosed] on October 1, 2001." (Compl. ¶ 108; see id. ¶¶ 103-07.) In their opposition briefs, however, they contend that they were not "on notice of Alstom's vendor financing until November 13, 2001, when Alstom filed its financial statements for the first six months of fiscal 2002 with the SEC on Form 6-K." (Pls.' Securities Act Opp'n Mem. at 10; see Pls.' Mem. of Law in Opp'n to the Mots. of the Alstom Defs. to Dismiss Pls.' Claims Brought Pursuant to the Exchange Act, dated November 19, 2004 ("Pls.' Exchange Act Opp'n Mem."), at 83-84 & n.48.) Plaintiffs' argument,

however, fails to address a vital principle: that "[a]n investor does not have to be on notice of the entire fraud being perpetrated to be on inquiry notice." Dodds, 12 F.3d at 352. Surely the revelations on September 27 and October 1, 2001 of previously unknown and, at best, vaguely disclosed vendor financing arrangements, the precipitous decline in Alstom's stock price after those announcements, particularly from September 26 to 27, and the analyst statements referenced in the Complaint, particularly that quoted above issued by J.P. Morgan, would put a reasonable investor on notice that Alstom had engaged in vendor financing and had not adequately disclosed that fact in earlier SEC filings and other public disclosures such as to create a duty of inquiry for investors. As Plaintiffs do not allege having made any inquiry into the facts of the Marine Fraud, the Court finds that as of October 1, 2001, investors were on notice of the Marine Fraud. See LC Capital, 318 F.3d at 154, 156.

(b)   The Turbine Fraud

As stated in the companion opinions issued in this case, the Turbine Fraud concerned Alstom's alleged concealment of the costs necessary to fix the defects in the GT24/26 turbines, the full extent of which Plaintiffs allege Defendants knew at the time Alstom entered into the joint venture with ABB.  The motive for this non-disclosure of the

costs is alleged to have been to allow Alcatel and Marconi to sell their Alstom shares at artificially inflated values. Alcatel and Marconi sold a majority of their Alstom shares in the Secondary Offering in February 2001, and had completely divested themselves of their Alstom holdings by June 2001.

The Court first addresses the contention of Alstom,[11] the Underwriter Defendants, Mayo and Simpson that once the Plaintiffs were on notice of the Marine Fraud, they should be found to have been on notice of the Turbine Fraud. (<u>See</u> Mem. of Law in Supp. of Alstom's Mot. to Dismiss, dated September 30, 2004 ("Alstom Mem."), at 17 ("Once Plaintiffs were on notice of an allegedly false statement in the prospectus, they were on notice that it could contain additional false statements."); Underwriter's Mem. at 15 n.7 (arguing that notice as to the Marine Fraud put Plaintiffs on notice as to "other non-disclosure claims"); Reply Mem. of Law in Supp. of Alstom's Mot. to Dismiss, dated January 10, 2005 ("Alstom Reply Mem."), at 6-8; Def. Simpson's Reply Mem. of Law in Supp. of Defs. Mayo's & Simpson's Mot. to Dismiss Pursuant to Rule 12(b)(1) & 12(b)(6), dated January 10, 2005 ("Mayo Reply Mem."), at 5-7.)

---

[11] Alstom's arguments were incorporated into the memoranda of law submitted in support of the motions to dismiss of defendants Esser, Purves, Kron, Jaffre, Bilger, Newey and Milner (<u>see</u> Esser et al. Mem. at 2), Alcatel (<u>see</u> Mem. of Law in Supp. of Alcatel's Mot. to Dismiss the Consolidated Am. Compl., dated September 30, 2004 ("Alcatel Mem."), at 1), and Tchuruk and Halbron (<u>see</u> T&H Mem. at 7; T&H Reply Mem. at 4).

The statements noted above concerning the Marine Fraud in no way relate to the allegedly fraudulent conduct claimed to underlie the Turbine Fraud. Alstom's disclosure that it had concealed having guaranteed loans in its Marine division to certain cruise customers would not by itself place an investor on notice of other undisclosed and unrelated liabilities in an entirely separate division of the company. Although the allegedly misleading financial misstatements were contained in the same documents, i.e. various SEC filings, including the Secondary Offering Prospectus, the financial data claimed to have been false or misleading is entirely different as to each fraud. See Newman, 335 F.3d at 193 (stating that to establish inquiry notice, the "triggering financial data must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants"). Additionally, that Plaintiffs allege the same motive behind both the Marine and Turbine Frauds does not automatically mean that when Plaintiffs received notice of one aspect of that scheme, they were on notice of the entire scope of the alleged deception where, as here, the fraud involved entirely separate courses of conduct relating to different products of different divisions of the company. Cf. Matthews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 254-55 (3d Cir. 2001) (finding that where class included investors in three

distinct funds, all of which concerned investment in American
real estate in the South and Southwest, at a single company
and where plaintiffs alleged a common scheme of fraud as to
each fund, inquiry notice as to two of the funds created
inquiry notice as to the entire class of investors).
Therefore, the Court does not find Defendants' arguments
persuasive as to this issue.

The first disclosure alleged in the Complaint relating to
the Turbine Fraud occurred on July 31, 2000 in an Alstom Press
Release.    (Compl. ¶ 91; Press Release, Alstom, Market
Statement (July 31, 2000) ("July 31 Press Release"), included
as Ex. F.6 in the J.A.)   The July 31 Press Release stated:

> ALSTOM today announced that it has experienced further
> technical difficulties in the introduction of new heavy
> duty gas turbine technology.
>
> The first "B" rating version of the Company's GT24/26 gas
> turbines are currently being introduced to service.  In
> the past months, technical issues have arisen which are
> not unusual in the commissioning of new high-tech complex
> products of this type, and for which modifications have
> been identified and are being implemented.   Recent
> inspections have revealed a further localized deficiency,
> which will require component modification on all "B"
> rating machines.  The first modified machines will re-
> start in August 2000.  As a result, some GT24B and GT26B
> projects will experience some start-up and commercial
> operation delays.  ALSTOM is working with each customer
> to manage their specific issues.
>
> The impact of these issues may involve material
> additional costs.  Any such costs will be included in the
> purchase accounting treatment of the acquisition of ABB
> ALSTOM Power, which will be reported in the 30 September
> 2000 interim accounts.  On this basis, the Company does
> not believe that these issues will affect significantly

> the operating margin target of 6% for 2002/03 previously
> disclosed.

(July 31 Press Release; Compl. ¶ 91.)  From this release, a
reasonable investor could discern that all of Alstom's B-grade
turbines had a defect, in addition to the usual technical
start-up difficulties, and that those issues may involve
material additional costs, but that targets for operating
margins should not be affected.

Following this disclosure, in an article in <u>Les Echos</u> on
August 1, 2000, Alstom stated that the defect existed in all
of its B-rated turbines already produced or then currently in
production, and that it took about six weeks to complete the
necessary repairs.  Management anticipated, though, that "the
financial impact of this setback should be minimal."  (Compl.
¶ 93.)

Alstom next issued a press release concerning its first-
half year results for 2000/2001 on November 7, 2000.  (<u>Id.</u> ¶
96.)  In that release, Alstom reiterated that it had
discovered the defects in the turbines, that it was in the
process of negotiating settlements with customers over the
defects and that "[a]n <u>additional</u> €903 million provision
corresponding to this issue is included in the First Half
accounts through the purchase accounting method applied to the
integration of Power.  €53 million of this provision was spent
in the First Half.  The Company expects to spend the remaining

additional costs over a period of at least three years."
(Press Release, Alstom, First Half Results 2000/01 (Nov. 7, 2000) ("November 7 Press Release") (emphasis added), included as Ex. F.7 in the J.A.; Compl. ¶ 96.)  This release by itself should have raised a warning flag for reasonable investors, in particular from the use of the term "additional."  Certainly, it would have been reasonable for an investor to have asked, "In addition to what?"

The answer to this inquiry came on November 30, 2000 when Alstom filed the 2000 Form 6-K.  There, Alstom restated the previously released €903 million reserve figure, and then stated that "[p]rovisions and other accruals on GT24/26 gas turbines as of 30 September 2000 including this amount total €1,625 million."  (2000 Form 6-K at Note 2, at 9; Compl. ¶ 96.)  A reasonable investor could gather from those statements that (1) Alstom had taken at least two reserves to cover costs associated with the defects in the GT24/26 turbines as of the filing of the 2000 Form 6-K, and (2) at least one of those reserves was not disclosed when it was taken.[12]

These reserve figures were again disclosed to investors

---

[12] Upon realization of the previously undisclosed reserves, an investor might have looked back over Alstom's 2000 Form 20-F, filed with the SEC on July 2, 2001, which indicates at Note 17, concerning "Provisions for risks and charges," the increasing total provisions figures.  (See 2000 Form 20-F at F-26.)  However, nowhere does the Note describe in relation to what specific events, products or contingencies any of those provisions were taken.

in the Secondary Offering Prospectus, filed with the SEC on
February 12, 2001, which included cautionary language that the
costs associated with repairing the defective turbines may
exceed the amounts already provisioned, and that the "total
amount and timing of these costs depends in part on factors
outside of our control." (Secondary Offering Prospectus at
10.) Defendants contend that as of February 12, 2001 at the
latest, Plaintiffs were on inquiry notice of the Turbine
Fraud. (<u>See</u>, <u>e.g.</u>, Alstom Mem. at 17; Alcatel Mem. at 9-10;
T&H Reply Mem. at 5.) The Court agrees.

The fraudulent scheme alleged by the Plaintiffs as it
pertains to the gas turbines is that Alstom knew when it
formed ABB ALSTOM in March 1999 that the reserves necessary to
cover the costs associated with repairing its defective
turbines would total approximately €4 billion, and that,
instead of disclosing that information to investors, and in an
attempt to maintain Alstom's share value to allow Alcatel and
Marconi to sell their respective interests in Alstom at a
profit, Alstom chose to conceal the provisions it took to
cover such costs. The crux of this scheme is that Alstom took
substantial reserves for material business purposes that it
did not disclose to the public, not solely that Alstom failed
to take adequate reserves. (<u>See</u> Pls.' Exchange Act Opp'n Mem.
at 85.) Thus, the type of information that would put an

investor on notice of this scheme would be exactly the type of information disclosed in this case -- the existence of large reserves taken by Alstom that were not revealed to the public when they were actually taken and that may have made a material difference to reasonable investors had the disclosures been made.

Additionally, Alstom disclosed in a single announcement (1) that, within the first two years of the joint venture's formation and within six months of its having taken over ABB ALSTOM, Alstom was taking a reserve with respect to its Power division, (2) that this reserve was not the first reserve taken with respect to the turbine costs, and (3) that the second reserve more than doubled the original reserve provision taken for the turbines. Viewed contextually and as a whole, this information would have put a reasonable investor on notice that at least through November 2000 there was something amiss in Alstom's calculations of the financial ramifications resulting from the turbine defects.

These revelations, combined with the increasingly speculative language associated with the cost provisions, which became more and more cautious about Alstom's ability to estimate the costs associated with the turbines, support a finding that as of February 12, 2001, a reasonable investor would have been on inquiry notice of the probability of the

fraudulent activity alleged by the Plaintiffs. (<u>Compare</u> July
31 Press Release ("The impact of these issues may involve
material additional costs."); November 7 Press Release at 8
(explaining how the additional provision was calculated and
listing the relevant factors), <u>with</u> 2000 Form 6-K at 9 ("The
lack of sufficient operating hours, among other factors,
results in inherent uncertainty.   Any change in key
assumptions could have a significant impact on the level of
provisions required.  Actual costs may vary particularly as a
result of negotiations with individual clients and the
performance of the repaired turbines.   Accordingly the
provision currently recorded may need to be adjusted as actual
performance and costs evolve due to a number of factors
including the outcome of a large number of individual
negotiations which are at an early stage."); Secondary
Offering Prospectus at 10 ("We cannot guarantee that the total
costs that we ultimately incur in connection with the GT 24/26
problems will not exceed the estimates that we have
provisioned nor can we guaranty that the rate of spending will
be in line with our current estimates.  The total amount and
timing of these costs depends in part on factors outside of
our control."); <u>id.</u> at 22 ("The modifications that we are
making to the GT 24/26 turbines and the related settlement
agreements that we are negotiating will be costly.").)

Plaintiffs argue that they were not on inquiry notice as of February 2001, and, rather, that they "were not on notice of the full extent and cost of the turbine defects until, at the earliest, Alstom's disclosure of the fifth established, but only second disclosed, reserve on March 12, 2003." (Pls.' Securities Act Opp'n Mem. at 14.) This statement, however, is inaccurate for two reasons. First, Plaintiffs do not need to have had notice of the full extent of the fraud to be found to have had inquiry notice of it. See Dodds, 12 F.3d at 352. Second, as noted above, the first reserve disclosed was important for inquiry notice purposes not only because it disclosed a reserve, but also because it disclosed that Alstom had taken previously undisclosed reserves. (See 2000 Form 6-K at Note 2, at 9.)

Plaintiffs additionally point out that the March 12, 2003 announcement sent Alstom's "shares falling by 49% on the NYSE to close at $1.50 on March 12, 2003, down $1.47 from its close the previous day of $2.97." (Compl. ¶ 112.) However, the March 12 announcement was not solely about the increase in Alstom's turbine reserves. (See Press Release, Alstom, Alstom Presents New Action Plan (Mar. 12, 2003) ("March 12 Press Release"), included as Ex. F.22 in the J.A.) The March 12 Press Release announced that Alstom was taking a €1.2 billion provision to account for various financial difficulties,

specifically that, "since November 2002, as a consequence of
delays experienced in finalising [sic] the technical recovery
package, coupled with a tougher than expected commercial
attitude of customers, ALSTOM [wa]s facing extra costs and
significantly increased exposure." (March 12 Press Release at
3.)  More importantly, the March 12 Release also announced
that Alstom expected an estimated net loss overall for fiscal
year 2002/03 in the range of €1.3 to 1.4 billion, "as compared
to a reported net loss of €139.4 million for the prior year."
(Compl. ¶ 112; March 12 Press Release at 5.)  The Court,
therefore, is not persuaded that the stock decline subsequent
to this much more broadly-based devastating loss estimate
supports Plaintiffs' theory that the decline in share value is
evidence of the market's response to the disclosure of the
turbine reserve figure.

Finally, Plaintiffs claim that assurances from management
at Alstom comforted investors, negating the impact of any
potentially ominous indicators.  See LC Capital, 318 F.3d at
155.  They cite to management's statements that the company's
operating margin would not be affected by the turbine defects,
and that management claimed that "so far" the negotiations
with customers had supported management's assessments of the
reserve figures.  (See Pls.' Securities Act Opp'n Mem. at 15-
17.)  Plaintiffs call Alstom's statements concerning the risks

associated with the turbine defects "vague statements about possible future risks." (Id. at 17.)

As stated in LC Capital, "[w]hether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." 318 F.3d at 155. The problems disclosed by Alstom were significant, as evinced by the "public concern" cited by Plaintiffs after the July 31 Press Release disclosing solely the turbine defects. (Compl. ¶ 93.) Alstom warned that the problems existed in its entire line of turbines, including those already distributed to customers, and that the company had no control over certain factors that could lead to material increases in the costs associated with fixing the turbines. Thus, the investing public was aware that the adjustments already made to Alstom's provisions for the turbine defects were potentially recurring. Moreover, any reassurances given as to the steps taken to remedy the problem were couched in qualified, hesitant terms, noting that Alstom was making its best estimates as to the defects associated with the turbines, but that many of the factors that went into that cost estimate were beyond Alstom's control. This cautionary language contains precisely the type

of caveat so "freighted with subtle implications," <u>Hawks v.</u> <u>Hamill</u>, 288 U.S. 52, 57 (1933) (Cardozo, J.), that, even by the veiled forms lurking behind what it reveals should alert a reasonable investor that much more remains concealed.  These factors all suggest that the reassurances cited by Plaintiffs would not have justified investors' reasonable reliance, such that the inquiry notice provided by Alstom's disclosures was negated.

Furthermore, unlike Plaintiffs, the Court does not read any of the risk statements made by management regarding the turbine defects to be "vague."  The risk statements were not general boilerplate assessments of the general risks associated with Alstom's business ventures; rather, those statements were unique to the turbine problem, noting the specific factors related to that particular issue that were outside of Alstom's control and which could lead to material increases in the costs associated with the problem.

The vague statements, if any were made by management, were those asserting a hopeful outlook in the face of the turbine difficulties.  Statements that all of the B-rated turbines were defective and that the issues may involve material costs were followed by the vague and hopeful statement that "the Company does not <u>believe</u> that these issues will affect significantly the operating margin" targeted for

the year. (July 31 Press Release; see also Compl. ¶ 93
(quoting the August 2000 Les Echos article, which stated that
"[a]ccording to Alstom management, the financial impact of
this setback should be minimal" (emphasis added)); ¶ 109
(quoting a November 8, 2001 analyst report: "Alstom is
negotiating with its customers to settle compensation payments
for late delivery and below-standard operational performance.
These negotiations are apparently proceeding well and
management expects the existing provisions to be adequate."
(emphasis added)).) Moreover, the Power division was not
comprised solely of the heavy duty gas turbine business. As
evinced by Alstom's press releases, the positive spin given to
its business prospects in the Power division was based at
least in part on the other products produced in that part of
the company and was not simply an effort to paper over the
problems with the GT24/26 turbines. For example, in the
November 7 Press Release, the company noted:

> Following the technical problems encountered with the
> GT24/26 gas turbines and in parallel with the remedial
> actions currently in progress, Power is refocusing its
> commercial efforts to concentrate on other machines with
> proven operating track records from its full range of
> heavy duty gas turbines . . . .
> . . . .
> In addition to the heavy duty gas turbine orders
> previously mentioned, major orders received during the
> First Half include orders for a number of steam turbine-
> generators in the U.S., Turkey and the United Arab
> Emirates and several large Heat Recovery Steam Generators
> (HRSGs) for combined cycle projects (in conjunction with
> gas turbines supplied by third party manufacturers).

(November 7 Press Release at 9; see 2000 Form 6-K at 27
(same); Secondary Offering Prospectus at 35 (same).) The
Court finds that the "'reassuring' statements by management
were mere expressions of hope, devoid of any specific steps
taken to avoid under-reserving in the future," and also
concerned the larger business of the Power division and were
not intended solely to patch over the bad news about the
GT24/26 turbine defects. LC Capital, 318 F.3d at 156. The
reassurances from management, therefore, did not justify an
investor's reasonable reliance that the storm warnings had
dissipated. See id. at 155.

The Court finds on the basis of the disclosures noted
above and referenced in the Complaint that a reasonable
investor would have been on inquiry notice of the fraudulent
scheme alleged by the Plaintiffs in connection with the
disclosure of provisions taken to account for costs arising
out of the defects in Alstom's GT24/26 gas turbines no later
than February 12, 2001. Plaintiffs have failed to allege that
they made any inquiry into the Turbine Fraud after that date,
and therefore knowledge is imputed to the Plaintiffs as of
February 12, 2001. Id. at 154, 156.

    2.   Statute of Limitations Defenses and Relation Back

       (a)   The Turbine Fraud

The Court turns next to Defendants' limitations defenses

as to the Turbine Fraud.  The Court finds that all claims brought with respect to the Turbine Fraud are time barred as a result of the Second Circuit's holding in <u>In re Enterprise Mortgage</u>.  <u>See</u> 391 F.3d at 406 (holding that Section 804 does not revive claims for which the statute of limitations period expired prior to July 30, 2002).  The pre-Sarbanes-Oxley limitations periods for all claims brought by Plaintiffs, under Sections 11, 12 and 15 of the Securities Act and Sections 10, 18 and 20 of the Exchange Act, would have run on February 12, 2002, about five months prior to when the extended limitations periods enacted through Sarbanes-Oxley became effective.  (<u>See</u> Alcatel Mem. at 8 n.7.)

(b)  <u>The Marine Fraud</u>

For the reasons previously stated, the Court does not find that a reasonable investor would have been on inquiry notice as to the Marine Fraud as a result of their being on notice of the Turbine Fraud because of the wholly dissimilar factual bases for the claims, although the Plaintiffs, and the Court, have linked the motive underlying the two frauds. Therefore, the Court must analyze Defendants' limitations defenses as to the Marine Fraud separately.

As to the Marine Fraud, the Court has found inquiry notice to have existed as of October 1, 2001.  The limitations period for Plaintiffs' claims under the Securities Act and

Section 18 of the Exchange Act expired as of October 2, 2002. (See supra Part IV.A.1-2.)  The first complaint filed in any action related to this case raising claims as a result of the Marine Fraud was filed on September 2, 2003.  (See Complaint, IBEW v. Alstom, No. 3:03-CV-1480 (D. Conn. Sept. 2, 2003) ("September 2 complaint"), included as Ex. D in the Berger Decl.)  Thus, all of Plaintiffs' Securities Act and Section 18 claims related to the Marine Fraud are time barred.

As only claims under Sections 11 and 18, both having a one year limitations period (see supra Part IV.A.1-2), are pled against Esser, Purves, Mayo, Simpson, Tchuruk and Halbron, all claims against those defendants relating to the Marine Fraud are dismissed.

The next issue is whether the Sections 10(b) and 20(a) claims against Alcatel relate back to the date of the filing of the first complaint to raise claims based on the alleged Marine Fraud, September 2, 2003.  (See, e.g., September 2 complaint ¶¶ 4(g), (l)-(m).)  If the claims do not relate back, then these claims against Alcatel would be barred by the applicable two-year statute of limitations (see supra Part IV.A.2), as the first complaint to name Alcatel as a defendant was not filed until October 28, 2003 (see Complaint, San Diego ERS v. Alstom, No. 03 Civ. 8515 (S.D.N.Y. Oct. 28, 2003); see also Alcatel Mem. at 7 n.6), more than two years after

Plaintiffs were on inquiry notice of the Marine Fraud.

Federal Rule of Civil Procedure 15(c) ("Rule 15(c)") governs the relation back of amendments to a complaint. Fed. R. Civ. P. 15(c). It is the plaintiff's burden to establish the requirements for relation back under Rule 15(c). <u>See</u> <u>Cornwell v. Robinson</u>, 23 F.3d 694, 705 (2d Cir. 1994); <u>In re</u> <u>Sterling Foster & Co. Sec. Litig.</u>, 222 F. Supp. 2d 216, 261 (E.D.N.Y. 2002). "There are . . . three requirements that must be met before an amended complaint that names a new party can be deemed to relate back to the original timely complaint. First, both complaints must arise out of the same conduct, transaction, or occurrence. Second, the additional defendant must have been omitted from the original complaint by mistake. Third, the additional defendant must not be prejudiced by the delay." <u>VKK Corp. v. NFL</u>, 244 F.3d 114, 128 (2d Cir. 2001); <u>see</u> Fed. R. Civ. P. 15(c)(3) (governing relation back when "the amendment changes the party or the naming of the party against whom a claim is asserted").

As to the second element,

> Rule 15's "requirement that a new defendant 'knew' he was not named due to a mistake concerning identity presupposes that in fact the reason for his not being named was a mistake in identity." [<u>Cornwell</u>, 23 F.3d at 705]. A "mistake" regarding the identity of the "proper party" for purposes of Rule 15(c) can be a mistake of either fact or law. A mistake of fact occurs when a plaintiff misapprehends the identity of the individual she wishes to sue. <u>Soto v. Brooklyn Correctional</u> <u>Facility</u>, 80 F.3d 34, 36 (2d Cir. 1996). A mistake of

> law occurs when the plaintiff misunderstands the legal
> requirements for her cause of action. Id. A common
> application of the relation-back doctrine permits a
> plaintiff to name individual government officers as
> tortfeasors instead of their government agency employer.
> Id. at 37.

In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288, 2004 WL
555697, at *4 (S.D.N.Y. Mar. 19, 2004).

Plaintiffs fail to make any argument supporting the
relation back of claims against Alcatel to the filing of the
September 2 complaint. Moreover, the Court does not find
plausible any argument that Plaintiffs were mistaken as to
Alcatel's identity at the time of the filing of the September
2 complaint, or that this mistake was the reason for Alcatel's
omission from the September 2 complaint. Although the theory
of the fraud asserted in the September 2 complaint appears to
be different from that alleged in the Complaint as to the
Marine Fraud,[13] Alcatel is mentioned in the September 2
complaint and is disclosed in the SEC filings relied on in
that complaint, at least as to its sale of shares in the
Secondary Offering. (See Complaint, IBEW v. Alstom, No. 3:03-
CV-1480 (D. Conn. Sept. 2, 2003), included as Ex. D in the
Berger Decl.) Moreover, the Plaintiffs were not required to

---

[13] The September 2 complaint theorizes that the Marine Fraud was a scheme
between Alstom and its Officers, including Bilger, Newey, Jaffre and Kron,
for the purpose of protecting their executive positions, to raise money in
stock offerings in the Summer of 2001, to enhance the value of their
stock, and to improve Alstom's financial façade so that Alstom could
minimize risks to its liquidity and raise necessary financing. (September
2 complaint ¶¶ 2-3, 17.)

sue Alcatel in bringing their Rule 10(b) and 20(a) claims alleged in the September 2 complaint.  Therefore, Alcatel's omission from the September 2 complaint, "in light of [Plaintiffs'] obvious knowledge and the detailed nature of that pleading's exhibit, must be considered a matter of choice, not mistake."  <u>Cornwell</u>, 23 F.3d at 705.  Because Plaintiffs do not make any showing, and are found by this Court to be unable to make any argument to support a showing, that the requirements for relation back outlined in Rule 15(c) have been met, the Court finds that the claims against Alcatel do not relate back to the filing of the September 2 complaint.  As a result, all claims against Alcatel arising out of the Marine Fraud are time barred.

In addition, the first complaint to be filed naming Alstom USA, ATI or Milner as a defendant was the October 28, 2003 complaint.  No argument was made by Plaintiffs as to why any claims concerning the Marine Fraud against these defendants should relate back to the filing of the September 2 complaint.  For the reasons stated above, therefore, the Section 10(b) claims brought against these defendants with respect to the Marine Fraud, to the extent such claims are pled in the Complaint, are time barred and are dismissed.

(c)  <u>GAAP Violations</u>

The Underwriter Defendants, Alcatel, Tchuruk and Halbron

argue that Plaintiffs's allegations concerning Alstom's violation of GAAP are time barred because the first complaint to allege violations of GAAP was the Complaint, dated June 18, 2004.  As Lead Plaintiffs point out (see Pls.' Alcatel Opp'n Mem. at 6; Pls.' Exchange Act Opp'n Mem. at 87), this assertion is inaccurate, as the September 2 complaint raised allegations that Alstom's financials during the relevant time periods did not comply with GAAP (see September 2 compl. ¶¶ 80-92).

Furthermore, although the Complaint expands on the allegations concerning GAAP violations contained in the September 2 complaint, the new GAAP allegations relate back to that original filing because the new claims "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  Fed. R. Civ. P. 15(c)(2); see Stevelman v. Alias Research, Inc., 174 F.3d 79, 86 (2d Cir. 1999) (finding that an amendment's addition of claims concerning violations of GAAP related back to the original complaint because the allegations arose out of the same transactions and conduct).  The GAAP allegations in the Complaint merely state in greater detail the factual allegations contained in the September 2 complaint, both those pled in general and specifically with respect to GAAP. (Compare Compl. ¶¶ 130-61, with September 2 complaint ¶¶ 80-

-62-

92.)  The only entirely new GAAP allegations concern the ATI
Fraud, which would certainly not have been time barred as to
any of the claimed causes of action in June 2004.

      3.  <u>Conclusion</u>

Plaintiffs' Securities Act claims concern alleged
misstatements and omissions in the Registration Statement on
Form F-3, dated January 17, 2001; the Registration Statement
on Form F-3/A, dated January 24, 2001; the Registration
Statement on Form F-3/A, dated February 7, 2001; the
Prospectus Supplement dated February 12, 2001; and the
Prospectus Supplement dated March 21, 2001.  (Compl. ¶ 334.)
Plaintiffs allege misstatements or omissions in these
documents only in relation to the Marine and Turbine Frauds.
(<u>Id.</u> ¶¶ 204-10.)  Because all of the Plaintiffs' Securities
Act claims are governed by a one year statute of limitations
(<u>see</u> <u>supra</u> Part IV.A.1), and given the Court's findings as to
when Plaintiffs were on inquiry notice of the alleged Marine
and Turbine Frauds, the Court finds that all of Plaintiffs'
Securities Act claims, specifically those claims arising under
Sections 11, 12(a)(2) and 15 of the Securities Act, are
dismissed as being barred by the applicable statutes of
limitations.

Plaintiffs admit that all of their claims against the
Underwriter Defendants as to the Marine Fraud are time barred.

(See Pls.' Mem. of Law In Opp'n to the Underwriter Defs.' Mot. to Dismiss, dated November 19, 2004, at 6 n.9.)  However, as only Securities Act claims are pled against the Underwriters, all of Plaintiffs claims against the Underwriter Defendants are time barred and are therefore dismissed.

# V. ORDER

For the foregoing reasons, it is thereby

**ORDERED** that the motions [Doc. 83, 88, 93, and 72] of Alstom S.A., Alcatel SA, Pierre Bilger, Francois Newey, William Purves ("Purves"), Klaus Esser, John Mayo, Lord George Simpson, Serge Tchuruk ("Tchuruk"), and Jean-Pierre Halbron to dismiss are GRANTED with respect to all claims pled in this action brought by plaintiffs the State Universities Retirement System of Illinois, the San Diego City Employees' Retirement System, the Louisiana State Employees' Retirement System, the West Virginia Investment Management Board, and the International Brotherhood of Electrical Workers, Local 269 (collectively "Plaintiffs"), under the Securities Act of 1933, 15 U.S.C. § 77a et seq.; and it is further

**ORDERED** that the motion [Doc. 72] of Credit Suisse First Boston (Europe) Ltd., Société Générale, Merrill Lynch International, ABN AMRO Rothschild, BNP Paribas (also known as BNP Paribas S.A.), Credit Agricole Indosuez Lazard Capital Markets, Morgan Stanley & Co. International Ltd., and UBS A.G. to dismiss is GRANTED; and it is further

**ORDERED** that all claims brought by Plaintiffs herein against Alstom S.A., Pierre Bilger, Patrick Kron, Philippe Jaffre, Francois Newey, Stephan Rambaud-Measson, and Joe Janovec alleging a cause of action under Section 18 of the

Exchange Act as a result of the Marine Fraud are DISMISSED; and it is further

ORDERED that all claims brought by Plaintiffs herein alleging a cause of action as a result of the Turbine Fraud are DISMISSED; and it is further

ORDERED that all claims brought by Plaintiffs herein against defendants Klaus Esser, William Purves, John Mayo, Lord George Simpson, Serge Tchuruk, Jean-Pierre Halbron, James Milner, Alcatel SA, Alstom USA, Inc., and Alstom Transportation, Inc. asserting a cause of action as a result of the Marine Fraud are DISMISSED.

SO ORDERED.

Dated:    New York, New York
         22 December 2005

_____
         Victor Marrero
         U.S.D.J.