UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re ALSTOM SA
SECURITIES LITIGATION.
---------------------------------
This document relates to all
actions.

03 Civ. 6595 (VM)

**DECISION AND ORDER**
III

**VICTOR MARRERO, United States District Judge.**


## TABLE OF CONTENTS

I.   INTRODUCTION ...................................... 1

II.  BACKGROUND ....................................... 1

III. SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5   2

    A.   LEGAL STANDARD ............................  2
         1.  Misleading Statement or Omission .......  5
         2.  Scienter .............................  6
             a.  Motive and Opportunity ..........  7
             b.  Conscious Misbehavior or
                 Recklessness ....................  8
         3.  Causation ...........................  10

    B.   DISCUSSION ...............................  11
         1.  Group Pleading .......................  12
         2.  Marine Fraud .........................  18
             a.  Material Misstatements Alleged
                 Concerning the Marine Fraud ......  18
             b.  Rule 9(b) Particularity .........  28
             c.  Scienter as to Marine Fraud ......  31
                 (i)  Scienter of Alstom ..........  31
                 (ii) Scienter as to Officer
                      Defendants .................  37
             d.  Causation as to the Marine Fraud .  40
         3.  ATI Fraud ............................  43
             a.  Material Misstatements Alleged
                 Concerning the ATI Fraud .........  43
             b.  Scienter Concerning the ATI Fraud.  61
                 (i)  Scienter as to ATI ..........  61
                 (ii) Scienter as to Alstom .......  62
                      (a)  Motive and Opportunity .  62

        (b)    Conscious Misbehavior or
                Recklessness Concerning
                the ATI Fraud .......... 64
       (iii) Scienter as to Officer
             Defendants for the ATI Fraud 68
    (c)    Causation ........................ 71
    4.    Applicability of Scheme Liability ...... 72

**IV.   SECTION 18 OF THE EXCHANGE ACT ................... 80**

    A.    LEGAL STANDARD ............................. 80
        1.    Documents Filed Pursuant to the
            Exchange Act ......................... 82
        2.    Actual Reliance ........................ 84
        3.    Scienter .............................. 85

    B.    DISCUSSION ................................. 86
        1.    False or Misleading Statement Contained
            in a Document Filed Pursuant to the
            Exchange Act ......................... 86
            a.    Documents Filed Pursuant to the
                Exchange Act ................... 86
               (i)   Form 6-K ..................... 87
               (ii)  November 6, 2001 Press
                    Release ..................... 88
             (iii) Form F-3 .................... 89
             (iv)  Forms 20-F ................... 90
             b.    Filed Documents Containing False or
                Misleading Statements with Respect
                to Any Material Fact .............. 90

**V.    SECTION 20(A) OF THE EXCHANGE ACT .................98**

    A.    LEGAL STANDARD .............................99
        1.    Primary Violation ......................100
        2.    Control of the Primary Violator ........101
        3.    Culpable Participation .................106
            a.    Plaintiffs Must Plead Culpable
                Participation ...................106
            b.    Culpable Participation Requires a
                Showing of At Lease Recklessness...109

    B.    DISCUSSION .................................113
        1.    Alcatel ................................113
            a.    Primary Violation ...............113
            b.    Control .........................114
            c.    Culpable Participation ...........116
            d.    Conclusion ......................117

```
2.   Bilger ...............................117
     a.   Primary Violation ................117
     b.   Control ..........................118
     c.   Culpable Participation ...........123
     d.   Conclusion .......................125

3.   Newey ................................125
     a.   Primary Violation ................126
     b.   Control ..........................126
     c.   Culpable Participation ...........129
     d.   Conclusion .......................130

4.   Kron .................................131
     a.   Primary Violation ................131
     b.   Control ..........................131
     c.   Culpable Participation ...........134
     d.   Conclusion .......................134

5.   Jaffre ...............................135
     a.   Primary Violation ................135
     b.   Control ..........................135
     c.   Culpable Participation ...........137
     d.   Conclusion .......................138

6.   Rambaud-Measson and Janovec ..........138
     a.   Primary Violation ................138
     b.   Control ..........................138
     c.   Culpable Participation ...........140
     (i)  Culpable Participation is
          Adequately Pled .............144
     d.   Conclusion .......................150
```

**VI.  ORDER** ........................................**150**

# I.  INTRODUCTION

Lead plaintiffs in this class action filed the Consolidated Amended Complaint for Violations of the Federal Securities Laws, dated June 18, 2004 (the "Complaint"), alleging violations of both the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act").  On September 30, 2004, all Defendants moved to dismiss the Complaint, asserting numerous jurisdictional, statute of limitations and substantive objections.  Because of the breadth of issues raised in their various submissions, the Court considers Defendants' motions in separate rulings.  In the companion opinions issued separately, the Court adjudicates all motions contesting the jurisdiction of this Court to hear the dispute as to certain parties ("Alstom I") and the statute of limitations issues raised under Rule 12(b)(6) ("Alstom II").  In this decision, to be referred to as "Alstom III," the Court addresses Defendants' motions to dismiss the claims brought under Section 10(b), Section 18, and Section 20(a) of the Exchange Act.

# II.  BACKGROUND

All of the background information relevant to this decision is contained in the prior companion opinions issued on this date, Alstom I and Alstom II.  Familiarity with those opinions and all factual statements, citations to the record

and court filings, and legal determinations contained therein is assumed.

### III.  SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

A.  LEGAL STANDARD

An assessment of the sufficiency of a claim of fraud brought under the securities laws implicates a statutory and regulatory framework involving Section 10(b) of the Exchange Act, Rule 10b-5, Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the pleading standards required by the Private Securities Litigation Reform Act (the "PSLRA" or the "Act"). In pertinent part, Section 10(b) of the Exchange Act declares it unlawful for any person, directly or indirectly, by the use of any means of interstate commerce, the mails, or national securities exchange:

> to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the Securities and Exchagne Commission (the "SEC") to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999). Under Rule

10b-5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1999).

When allegations of securities fraud are premised on misleading statements, plaintiffs must plead facts demonstrating a violation of Section 10(b) and Rule 10b-5(b). To state a claim for relief under these provisions, plaintiffs must allege that the defendant "made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

Plaintiffs' pleadings in cases alleging violations of Section 10(b) and Rule 10b-5 must also satisfy the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), which requires that "in all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In addition, the passage of the PSLRA in

1995 altered the landscape of securities litigation by, among other things, requiring that plaintiffs alleging securities fraud specify each statement that they contend is misleading and the reason that the statement is misleading, and that they particularize pleadings as to scienter. See Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5). The enhanced pleading standards of the PSLRA are set forth in sections 21D(b)(1) and 21D(b)(2) of the Act. Section 21D(b)(1) requires that in connection with any private action arising under the statute in which plaintiffs allege to have been misled by defendants' untrue statements or omissions of material fact

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) ("Subsection (b)(1)"). Section 21D(b)(2) mandates that in actions under the statute

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) ("Subsection (b)(2)"). Section 21D(b)(3)(A) mandates dismissal of complaints which fail to

-4-

satisfy the pleading standards promulgated in Subsections (b)(1) and (b)(2). See 15 U.S.C. § 78u-4(b)(3)(A) ("Subsection (b)(3)(A)"). In combination, these statutes and rules set forth the hurdles a plaintiff must clear in order to state a claim for a Section 10(b) violation.

1. Misleading Statement or Omission

As noted above, a plaintiff's first obligation in pleading a securities fraud claim based on misrepresentations is to allege that the defendant made a false or misleading statement, or an omission of material information. See Acito v. IMCERA Group, 47 F.3d 47, 52 (2d Cir. 1995). Whether information is material is evaluated from the viewpoint of a reasonable investor:

> [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Furthermore, allegations of omission will not support a claim for securities fraud unless the defendant had a duty to disclose the information. The Second Circuit has held that "one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading." In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993).

2.  Scienter

The PSLRA requires that the complaint allege sufficient facts to support a "strong inference" of the requisite state of mind.  A plaintiff can fulfill this scienter requirement through one of two methods:  "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001) (quotation marks and internal citations omitted).

In the Second Circuit, plaintiffs bringing claims under Section 10(b) and Rule 10b-5 have long been required to state with particularity "facts that give rise to a strong inference of fraudulent intent."  Acito, 47 F.3d at 52.  Thus Congress, in passing the PSLRA, codified the "strong inference" pleading standard for scienter that was established in this Circuit. See Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000); In re Interpublic Sec. Litig., No. 02 Civ. 6527, 2003 WL 21250682, at *10  (S.D.N.Y. May 29, 2003) ("The PSLRA raised the nationwide pleading standard for securities fraud but did not alter the level of pleading previously required by the Second Circuit." (citations omitted)).  Though the Novak court explicitly noted that lower courts and litigants "need and should not employ or rely on magic words such as 'motive and

opportunity,'" it did advise that this Circuit's case law "may be helpful in providing guidance as to how the 'strong inference' standard may be met." Novak, 216 F.3d at 311. In practice, courts in this Circuit have continued, in the wake of the PSLRA's passage, to evaluate pleadings for facts demonstrating either (i) motive and opportunity, or (ii) conscious misbehavior or recklessness, and to look to this Circuit's case law from both before and after the PSLRA's passage for guidance when undertaking this analysis. See Kalnit, 264 F.3d at 138-139 (specifically noting that the Second Circuit's two methods for proving scienter survive the passage of the PSLRA).[1]

a. Motive and Opportunity

In order to support a "strong inference" of fraudulent intent, plaintiffs' allegations of motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Kalnit, 264 F.3d at 138-139 (internal citations omitted). Motives that can be ascribed to "virtually all corporate insiders," or "any publicly owned, for profit endeavor" are not sufficient to support a claim of fraud. Id.; Chill v.

---

[1] For a detailed analysis of the evolution of this Circuit's scienter requirement, both before and after the passage of the PSLRA, and the initial debate surrounding the meaning the PSLRA's "strong inference" standard, see In re Livent Sec. Litig. ("Livent II"), 151 F. Supp. 2d 371, 409-13, 418-22 (S.D.N.Y. 2001).

<u>General Elec. Co.</u>, 101 F.3d 263, 267 (2d Cir. 1996). Examples of general motives which fail to support a strong inference of scienter include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." <u>Kalnit</u>, 264 F.3d at 139.

      b. <u>Conscious Misbehavior or Recklessness</u>

      Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be sufficiently stated by allegations demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness." <u>Id.</u> at 138-39 (internal citations omitted). As set forth in <u>In re Carter-Wallace, Inc. Sec. Litig.</u>,

> To survive dismissal under the conscious misbehavior theory, the [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is, at the least, conduct which is highly unreasonable and [] represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

220 F.3d 36, 39 (2d Cir. 2000) (internal citations omitted); <u>see also</u> <u>Chill</u>, 101 F.3d at 269 (noting that in some cases "[a]n egregious refusal to see the obvious, or to investigate the doubtful" may give rise to an inference of recklessness (quoting <u>Goldman v. McMahan, Brafman, Morgan & Co.</u>, 706 F. Supp. 256, 259 (S.D.N.Y. 1989)).

      The concept of recklessness necessarily introduces

imprecision and matters of degree into measures of culpability in actions brought under Rule 10b-5. See Novak, 216 F.3d at 308 ("Recklessness is harder to identify with such precision and consistency."). Nonetheless, concrete guidance can be gleaned by looking to the facts in cases in which pleadings have been analyzed for allegations constituting recklessness on the part of the defendants. In Novak, the Second Circuit reviewed this Circuit's pre-PSLRA case law in order to give further content to the recklessness analysis. The court specifically highlighted cases in which the factual allegations demonstrated that defendants (1) possessed knowledge of facts or access to information contradicting their public statements; or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Id. at 308 (internal citations omitted); see also Livent II, 151 F. Supp. 2d at 412.

The Circuit Court cautioned, however, that its jurisprudence concerning securities fraud based on reckless conduct encompassed certain important limitations on the scope of liability. First, the court has refused to allow plaintiffs to proceed with allegations of "fraud by hindsight." Novak, 216 F.3d at 309 (citing Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999)); Acito, 47 F.3d at 53 (allegations that defendants should have anticipated

future events and made earlier disclosures did not suffice to make out a claim of fraud).

Second, corporate managers are not obligated to portray business performance and prospects in unduly cautious or gloomy terms in public pronouncements, as long as their representations are consistent with reasonably available data. See Novak, 216 F.3d at 309 (citing Stevelman, 174 F.3d at 85; Shields v. Citytrust Bancorp, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

Third, the Novak court reaffirmed limits on the scope of liability for failure to monitor alleged fraudulent conduct of third persons or, more relevant in this case, corporate subsidiaries. See Novak, 216 F.3d at 309; Chill, 101 F.3d at 269-70 (failure of a parent company to regard the extraordinary profitability of its subsidiary as signaling problems compelling further investigation does not constitute adequate grounds for a finding of recklessness sufficient for liability under Section 10(b)).

3. Causation

Finally, to state a claim for securities fraud, a plaintiff must plead both transaction causation and loss causation. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005). Transaction causation requires a showing

that the plaintiff "relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities," while loss causation is pled through facts alleging "that defendant's conduct caused, at least in part, plaintiff's loss." In re GeoPharma, Inc. Sec. Litig., No. 04 Civ. 9463, 2005 WL 2431518, at *6, n. 86 (S.D.N.Y., Sept. 30, 2005). The Second Circuit has recently elaborated on the loss causation element, finding that a plaintiff must allege that "the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." Lentell, 396 F. 3d at 173.

B.    DISCUSSION

        The Complaint alleges Section 10(b) violations against a number of Defendants in connection with their roles in the Marine Fraud, the Turbine Fraud and the ATI Fraud.[2] Specifically, Plaintiffs have alleged Section 10(b) violations against: Alstom, Alstom USA, ATI, Alcatel and the Officer Defendants (Bilger, Newey, Kron, Jaffre, Milner, Janovec and Rambaud-Measson).  Many of these claims have been disposed of in the Court's statute of limitations ruling, which held that all claims relating to the Turbine Fraud are time-barred, and

_____

[2] The definition and scope of these frauds are set forth in the Court's Alstom I decision in this case, issued this date.

-11-

that all claims against Alcatel, ATI, Alstom USA, and Milner[3]
relating to the Marine Fraud are also time-barred. See Alstom
II, Section IV.B.2. In addition, because Plaintiffs have
alleged no facts regarding Alcatel's role in the ATI Fraud, in
which no misleading statements were made until November of
2002, which was more than a year after Alcatel had sold all of
its shares in Alstom, there are no grounds supporting Section
10(b) liability against Alcatel for the ATI Fraud. Therefore,
this claim is also dismissed. Thus the only remaining Section
10(b) claims are against (i) Alstom and the Officer Defendants
(with the exception of Milner) in connection with both the
Marine Fraud and the ATI Fraud, and (ii) ATI and Alstom USA as
regards the ATI Fraud. The Court will first address the
overarching issue of group pleading, and will then turn to the
remaining Section 10(b) claims relating to the Marine Fraud
and the ATI Fraud.

1. Group Pleading

While Plaintiffs have alleged specific misstatements on
the part of some of the Officer Defendants, they make no such

---

[3] The Complaint does not allege the precise dates of Milner's tenure with
the company; rather it alleges that he held this position "at the time of
the Secondary Offering," which occurred in February of 2001. (Compl. ¶
43.) As the Court has dismissed all claims against Milner relating to the
Marine Fraud, and because Milner is alleged to have held a position at
Alstom only "at the time of the Secondary Offering" (id.), the Court finds
that Milner cannot be held liable for any claims arising out of the ATI
Fraud, in which the first misleading statements are alleged to have been
made in November of 2002. Therefore, all Section 10(b) claims against
Milner are dismissed.

allegations with regard to other Officer Defendants.[4]   In
addition, the only misleading statement attributed directly to
Kron by Plaintiffs relates only to the Turbine Fraud.   (See
Compl. ¶ 277.)  As the Court has dismissed claims relating to
that fraud as untimely, there are no remaining statements
which Kron is alleged to have made directly.   The Complaint
alleges, however, that the Officer Defendants are liable for
the false and misleading statements which were published by
the "group," as the Officer Defendants "were responsible for
creating, reviewing, and/or approving" the statements "before
they were disseminated to the investing public." (Id. ¶ 371.)

Defendants, relying on Southland Securities Corp. v.
INSpire Insurance Solutions, Inc., 365 F.3d 353 (5th Cir.
2004), as well as numerous cases in this District, contend
that group pleading has been foreclosed by the enactment of
the PSLRA, in light of its language requiring that untrue
statements or omissions be set forth with particularity as to
"the defendant," as opposed to "the defendants."  15 U.S.C. §
78u-4(b).   The Court rejects this contention.   The group
pleading doctrine arose out of recognition that "plaintiffs
charging fraud with respect to corporate utterances seldom
have access, prior to the commencement of discovery, to

---

[4] No specific statements are attributed directly to Janovec or Rambaud-
Measson.

information permitting identification of the particular officers, directors and employees who bear personal responsibility for the utterances in question," and thus courts have allowed plaintiffs, for pleading purposes only, to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases and other group published information, are the collective works of those individuals with direct involvement in the everyday business of the company." In re BISYS Sec. Litig., No. 04 Civ. 3840, 2005 WL 2844792, at *15 (S.D.N.Y. Oct. 28, 2005) (internal citations omitted). This Court finds that this reasoning remains cogent and that the group pleading doctrine has survived the passage of the PSLRA. See id. at *19 n.42 (collecting cases permitting group pleading after the passage of the PSLRA).

In order to invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement. See id. at *23; In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 142 (S.D.N.Y. 1999). Here, Plaintiffs allege that each of the Officer Defendants held a high level position with the company during some portion of the class period, but none of the named Officer

Defendants held those positions for the entire duration of the class period.  For statements to be attributable to the Officer Defendants individually, the Complaint must allege that the statements were made at a time when the particular defendant held a high level position indicating that he was an insider, with direct involvement in day-to-day affairs, at the entity issuing the statement.  See In re Flag Telecom Hldgs., Ltd. ("Flag I"), 308 F. Supp. 2d 249, 266 n.7 (S.D.N.Y. 2004). Accordingly, the Court will apply the group pleading doctrine to the Officer Defendants only with respect to statements made during the portion of the class period in the course of which each particular defendant held such a position.  See In re BISYS, 2005 WL 2844792, at *24.

Specifically, Plaintiffs can invoke the group pleading doctrine against Bilger only as to statements made by Alstom between the beginning of the class period and January 1, 2003, during which time he served as CEO for Alstom.  (See Compl. ¶ 39.)  Plaintiffs can invoke the doctrine against Jaffre with respect to statements made by Alstom between July of 2002 and the close of the class period, during which time he served as CFO of Alstom.  (Id. ¶ 41.)  Jaffre joined the company in February of 2002 as an Advisor to then CEO Bilger.  (Id.) However, because the Complaint does not specifically allege facts indicating that Jaffre was an insider who would have had

a significant corporate role in the drafting of group-published information prior to his appointment to the CFO position, the Court limits the applicability to the doctrine to Jaffre to the time period beginning in July 2002 and ending at the close of the class period. The position of "Advisor to the CEO" is not, without any further description of official duties and relationships to other corporate officers and functions, a sufficiently high-level position to enable the Court to infer insider status. Plaintiffs can invoke the doctrine against Kron with respect to statements made by Alstom between January 1 of 2003 and the close of the class period, during which time he served as CEO of Alstom, replacing Bilger. (Id. ¶ 40.) The Complaint also alleges that Kron was appointed to the Board in July of 2001, and that he served on the Audit Committee of the Board "during the Class Period." (Id.) Allegations of membership on an Audit Committee may, in certain circumstances, provide a basis for liability under the group pleading doctrine, but here the allegation as to Kron's membership on the Audit Committee is too vague, both as to Kron's particular role on the Audit Committee and the timeframe of his service,[5] to allow group pleading to be invoked. Plaintiffs can invoke the doctrine

---

[5] The Complaint fails to state the precise timeframe for Kron's membership on the Audit Committee, and as such it is impossible for the Court to determine which group-pled statements may be attributable to him prior to his appointment as CEO.

against Newey with respect to statements made by Alstom between the beginning of the class period and July 3, 2002, during which time he served as Senior Executive Vice President and CFO of Alstom. (<u>Id.</u> ¶ 42.)

Finally, both Janovec and Rambaud-Measson are alleged to have held high level positions at ATI (Vice President of Finance and Senior Vice President respectively) until June 30, 2003, when they were suspended pending the investigation of the alleged accounting improprieties at ATI. (<u>Id.</u> ¶¶ 44 - 45.) The Complaint does not include any allegations suggesting that these ATI officers were insiders of Alstom, or had day-to-day involvement in the affairs of the parent company, which is separated from its ATI subsidiary by several levels of corporate organization. (<u>See</u> <u>id.</u> ¶¶ 37, 38.) Thus, the Court finds that the group pleading doctrine may not be invoked to hold these defendants liable for the statements of Alstom. Further, as is discussed in detail in Section III.B.3.a (Material Misstatements Alleged Concerning the ATI Fraud), <u>infra</u>, absent more particularized pleading in this regard, the Court declines to extend the group pleading doctrine to hold Janovec and Rambaud-Measson accountable for any statements which are found to be attributable to ATI. While group pleading allows Plaintiffs to rely on the presumption that certain types of statements (prospectuses, registration

statements, annual reports, press releases and other group published information) were made by the Officer Defendants, there is no corresponding presumption as to the state of mind of the Defendants with regard to the statements. Thus, though "the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, [Plaintiffs] must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made." <u>In re Citigroup, Inc. Sec. Litig.</u>, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004). In the section of the opinion addressing the particular fraud to which Defendants' statements relate, the Court will analyze the scienter of the Officer Defendants with regard to the statements that they are properly alleged to have made.

2. <u>Marine Fraud</u>

a. <u>Material Misstatements Alleged Concerning the Marine Fraud</u>

As the fastest growing business at Alstom in 1999 through 2000, the company's Marine division sales drew positive analyst and investor attention during this period. (<u>See</u> Compl. ¶ 71.) Alstom's growth in this area was fueled in significant part by Renaissance's orders for eight cruise ships, which were delivered during the time period between June 1998 and February 2001. (<u>See</u> <u>id</u>. ¶ 73.) Purchases of

-18-

ships by other cruise lines such as Royal Carribean Limited, Princess Cruises, Festival Cruises, and Radisson Seven Seas France also contributed to Alstom's remarkable growth. (See id. ¶¶ 163-64, 183-84). This growth included an increase in sales from €830 million in 1999 to €1.3 billion in 2000, as well as a dramatic upturn in the Marine division's operating income, from €25 million in 1999 to €70 million in 2000. (Id. ¶¶ 71-72.)

Plaintiffs allege that Alstom's failure to disclose the important fact that Alstom itself was the guarantor of loans used by Renaissance and other cruise lines to purchase Alstom's ships (through what are known as "vendor financing" arrangements) amounts to a material omission. (See, e.g., id. ¶ 103-08.) Plaintiffs also allege that, by failing to disclose the loan guarantees extended to Renaissance and other customers, Alstom violated U.S. GAAP, in particular the provisions regarding proper accounting for contingencies. (Id. ¶¶ 138-43.) Alstom's response argues that (i) the company disclosed the vendor financing arrangements in certain SEC filings, and (ii) Plaintiffs' allegations amount to pleading fraud by hindsight.

Specifically, the Complaint alleges that the statements Alstom made regarding the Marine division in each of its 1999,

2000, and 2001 Forms 20-F,[6] as well as a number of press releases, and the 2001 Form F-3 Registration Statement (filed with the SEC in connection with the Secondary Offering),[7] were materially misleading. (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 103-04, 165-71, 211-12.) The failure to disclose is also alleged to have significantly impacted the public's perception of the company's debt profile.[8] While the large number of misstatements alleged in the Complaint precludes a description of each statement here, examples from Alstom's 1999 Form 20-F convey the tone of the statements at issue. The 1999 Form 20-F lists six Renaissance cruise ships on a list of "Current Significant Orders" for the company's biggest shipyard. (<u>Id.</u> ¶ 164.) The 1999 Form 20-F also includes the following statements about the cruise ship industry and Alstom's business with Renaissance: (1) "During 1998, firm orders were received worldwide for 17 cruise ships and 12 ships were delivered" (<u>Id.</u> ¶ 163); (<u>see also</u> Alstom's Form 20-F, Annual

---

[6] The Complaint alleges that the 1999, 2000, and 2001 Forms 20-F were signed by Newey. (<u>Id.</u> ¶¶ 162, 183, 215.)

[7] The Form F-3 was signed by Bilger and Newey, on his own behalf and also as attorney-in-fact for Milner. (<u>Id.</u> ¶ 204.)

[8] Prior to the disclosure of the marine financing arrangements, Alstom's disclosed net debt was approximately €2 billion. Plaintiffs allege that if the vendor financing liabilities were included it that number, as they should have been, Alstom's net debt would have risen to €4 billion, €1 billion more than the company's market capitalization. (<u>Id.</u> ¶¶ 104, 107.) Plaintiffs also allege that the favorable perception of the Marine division helped the company to "minimize the risks associated with its liquidity so that it could raise the necessary financing to fund its business." (<u>Id.</u> ¶ 72.)

Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended March 31, 1999, filed with the SEC on August 3, 1999 ("1999 Form 20-F"), at 46-47, included as Ex. A.1 in the J.A.), (2) "While three principle [sic] groups of cruise ship operators . . . continue to dominate the market for very large ships, recent orders of medium-size ships have noticeably expanded the luxury market, which until recently was underdeveloped.  The best example of this growth is the increase in fleet development by [Renaissance] Cruises Inc. and by Radisson Seven Seas" (<u>Id.</u>), (3) "Alstom has focused on cruise ships and ranks third in that industry worldwide, based upon its delivery of 14 cruise ships since 1987" (<u>Id.</u>), and (4) "Recent cruise ship deliveries include the <u>R.One</u> and <u>R.Two</u> for Renaissance, delivered in June 1998 and November 1998, respectively" (<u>id.</u>). Plaintiffs allege that statements of a similar nature regarding Alstom's cruise ship orders were included in Alstom's 2000 and 2001 Forms 20-F, as well as a number of press releases.[9]  (<u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶¶ 170-71, 183-84, 205,

---

[9] For example, the Complaint alleges that a press release issued on January 18, 2000 was misleading in part because of statements regarding the Marine division.  (<u>Id.</u> ¶¶ 170-71.)  That press release stated: "[Marine] sales increased by 67% as a result of the successful delivery of three complete cruise ships, two for Renaissance and one for Festival as well as part completion of the Millennium cruise ship for RCCL and a further cruise ship for Renaissance." (<u>Id.</u> at ¶ 170).  The Complaint also alleges that a May 22, 2000 press release was misleading, in part because of its statement that the company delivered four cruise ships in the previous year and  "[t]he resulting 59% increase in sales is due to the high levels of orders received since 1998."  (<u>Id.</u> ¶ 181-82.)  There are also

215.)    The  Registration  Statement  filed  by  Alstom  in
connection  with  the  Secondary  Offering  reported  that  the
Marine  division  had  been  "awarded  orders  for  three  major
cruise  ships,"  going  on  to  state  that:    "Consequently,  the
order  backlog  stands  at  a  record  level  of  €3.9  billion  and
comprises  12  cruise  ships,  two  high  speed  ferries  and  two
surveillance  frigates."   (Id.  ¶ 205.)

Alstom  argues  that  its  marine  vendor  financing
arrangements  were  disclosed  in  the  Consolidated  Financial
Statements  included  in  its  1999,  2000  and  2001  Forms  20-F,
which  were  filed  with  the  SEC.   Alstom  points  to  language  in
a  footnote  titled  "Financing  Arrangements,"  which  appears,
with  nearly  identical  text,  in  each  of  the  1999,  2000,  and
2001  Forms  20-F.   In  the  1999  Form  20-F,  the  footnote  appears
102  pages  after  the  rosy  statements  cited  by  Plaintiffs  in
their  allegations,  and  never  mentions  Renaissance  or  any  other
particular  cruise  ship  company,  or  the  term  "vendor
financing."   Specifically,  the  footnote  states,  under  the
heading  "Leasing  Entities,"   that  Alstom  has  "eight  special
purpose  leasing  activities,  relating  to  seven  cruise  liners
and  sixty  locomotives."   (1999  Form  20-F,  Note  21,  at  F-29,  at

_____

allegations as to other press releases, including a November 7, 2000 press
release which stated that there had been an increase in sales during the
period "as a direct result of Marine's high order backlog and productivity
improvements."  (Id. ¶ 196-97.)

151.)  The footnote also contains a table of "summarized combined balance sheets for [the] special leasing companies[,]" which includes a line item for "borrowings." Id.  The text following the table states the amounts of "leasing activities directly financed" by the company, and also states the total amount for borrowings which are insured. Id.  Alstom also points to a footnote appearing in its 1999, 2000, and 2001 Forms 20-F, setting forth the company's "Commitments and Contingencies," which lists the amounts of "guarantees given on financial debt." (See, e.g., 1999 Form 20-F, Note 24 at F-36, at 158.)  There is no further description of what these guarantees relate to, or whose debt the footnote refers to. See id.  There is no indication that this number is related to Marine division customers.[10] See id. Altsom argues that these footnotes constitute sufficient disclosure about the cruise ship financing arrangements.

The Court finds that a reasonable investor would indeed be interested in knowing that Alstom, which had issued buoyant reports about its Marine division's orders and sales, was also the guarantor of the substantial loans Renaissance and other Marine division customers were using to pay for the ships they

[10] Paragraph 104 of the Complaint cites a Wall Street Journal article discussing the opaque nature of Alstom's commitments and contingencies disclosure, noting that: "[w]hat Alstom had neglected to disclose is that among the commitments and contingencies were written guarantees it had given to banks that had lent money to cruise lines so that they could buy ships from Alstom."  (Compl. ¶ 104.)

purchased from Alstom, and would view those commitments, if known, as altering the "total mix" of information made available about Alstom's finances. <u>Basic</u>, 485 U.S. at 231-32; <u>In re Time Warner</u>, 9 F.3d at 268 ("A duty to disclose arises whenever secret information renders prior public statements materially misleading[.]") Contrary to Alstom's assertions, the vaguely worded footnotes appearing in each of the 1999, 2000 and 2001 Forms 20-F cannot be deemed adequate disclosure of the vendor financing arrangements, as an investor would not know from reading the footnotes the critical underlying information about Alstom's vendor financing relationship with Renaissance and the other cruise lines to which it had extended financing. Specifically, the footnotes say nothing about the identity and financial soundness of the ship companies whose loans were being guaranteed, the size of the underlying financing provided to these specific customers, or the effect of those contingent liabilities on Alstom's own liquidity and overall business condition.[11] Indeed, the

---

[11] That these claimed disclosures are set forth in two separate places, and use varying and vague terminology further undercuts Defendants' arguments. First, the information, such as it exists, is separated into two, non-consecutive footnotes, adding to the elusiveness of the claimed disclosure. An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances. Second, the language used by Alstom in these footnotes makes it virtually impossible to discern what exactly the company is alluding to. For instance, the "leasing entities" footnote lists "borrowings" to refer to what it is now understood was vendor financing, while the "Commitments and Contingencies" footnote refers to "guarantees given on financial debt." The footnotes themselves do not make clear that these two items (which are not cross referenced or linked in any other manner) actually reflect, in part,

Complaint alleges that financial professionals were taken by surprise following Alstom's initial press release explaining its exposure in the aftermath of the Renaissance bankruptcy. (See Compl. ¶¶ 104-06 (citing a <u>Reuters</u> report which quoted a Paris-based broker saying: "We didn't know Alstom was involved in credit guarantee [sic] for its ships," and quoting a Deutsche Bank engineering analyst as stating: "This appears to have been a contingent liability which was not disclosed in the Alstom report and accounts.").)

As discussed above, an omission is actionable when the failure to disclose renders a statement misleading. <u>See</u> <u>In re Time Warner</u>, 9 F.3d at 268. Here, Alstom's affirmative statements regarding its robust cruise ship sales were rendered misleading by the omission of information about Alstom's role in financing the purchases by Renaissance and other Marine division customers. One analyst report quoted in the Complaint succinctly summarizes the relevance of the vendor financing to Alstom's affirmative statements about its Marine division growth, stating that in light of the eventual vendor financing disclosures, "we question the quality of the turnaround the [Marine division] achieved in the last years, as it seems to have happened on the back of vendor financing."

---

Alstom's commitments arising out of its vendor financing arrangements. It is also not clear whose "financial debt" Alstom is referring to.

(Compl. ¶ 106). Alstom's statements about Renaissances's orders, as well as those of other cruise lines, indicated strong demand for Alstom's ships, without disclosing that this demand was in fact bolstered by Alstom's own financing of the cruise line companies' loans. The omission of adequate disclosure of the loan financing "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," and therefore it is actionable. <u>Brody v. Transitional Hosps. Corp.</u>, 280 F.3d 997, 1006 (9th Cir. 2002).

Alstom next argues that even if the footnote included in the Forms 20-F did not constitute adequate disclosure of the vendor financing arrangements, Plaintiffs' pleading still fails because the company was not obligated to provide detailed disclosure of the financing, and its failure to do so only becomes material with the benefit of hindsight. The Second Circuit has held that "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." <u>Novak</u>, 216 F.3d at 309 (internal citations omitted). Alstom argues that Renaissance's collapse following the terrorist attacks of September 11, 2001, and its subsequent (and nearly immediate) bankruptcy filing could not have been anticipated by Alstom when it failed to disclose the vendor financing arrangements

with Renaissance. Following this reasoning, Alstom claims that its failure to disclose cannot support liability; as the company could not have known the significance of the omissions prior to September 11, 2001 and the bankruptcy, and any allegation that it should have constitutes a pleading of fraud by hindsight. The Court disagrees.

The duty to disclose the omitted vendor financing arrangements did not hinge on Renaissance's eventual bankruptcy filing. The material information omitted by Alstom was that its strong sales of cruise ships to Renaissance and other companies was facilitated by its financing of loans for those purchasers. The omission may have mislead investors both as to the actual market demand for Alstom's ships as well as to the risk exposure that the financing had created for the company and the actual amount of potential liabilities Alstom had outstanding, and thus Alstom's true financial picture.[12] This alleged deception, in itself, gave rise to the duty to disclose. See In re Time Warner, 9 F.3d at 268. That the

---

[12] This risk exposure is significant even if Alstom had no particular reason to believe that the borrowers would default. By their very nature, vendor financing arrangements are most likely to exist in situations where the borrower is at greater risk of default than financially sound borrowers using other forms of financing. The Complaint alleges that Alstom knew or should have known that Renaissance was financially "unstable" prior to the September 11 attacks and the resulting downturn in tourism. Because the Court finds that the vendor financing arrangements constitute material information that should have been disclosed regardless of whether Renaissance was headed for bankruptcy, it does not address Alstom's argument that these allegations are insufficiently pled here. See Section III.B.2.c (Scienter as to Marine Fraud), infra, for further discussion of this issue.

risk was realized after Renaissance's bankruptcy filing is not the determining consideration as to whether or not the information should have been disclosed. Rather, the realization of the risk is, at least in part, the cause of the losses Plaintiffs allege.

### b. Rule 9(b) Particularity

Alstom also argues that Plaintiffs have failed to meet the pleading requirements set forth in Rule 9(b) with regard to the alleged misleading statements. Rule 9(b) requires that, with regard to claims of fraud, the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004). Alstom argues that the Complaint fails to "explain why the statements made were fraudulent" because the Complaint uses nearly identical boilerplate explanations as to why each of the alleged statements regarding the company's Marine division was misleading. (<u>See</u> Alstom Mem., at 29-30.) The Complaint, following each statement by Alstom it alleges to be misleading as it relates to the Marine division, includes the following explanation as to why the statement was misleading: "[The statements] were materially false and misleading because, unbeknownst to the investing public,

Alstom had artificially inflated demand for its cruise ships by secretly guaranteeing hundreds of millions of euros in loans third parties made to Renaissance and other Alstom customers for the purchase of Alstom ships. Thus, the orders and backlog for Alstom cruise ships reflected financing offered to financially unstable customers, not strong demand for Alstom's ships." (See, e.g., Compl. ¶ 188.) When the misstatement alleged by Plaintiffs appears in a financial statement, the explanation then refers the reader to the section of the Complaint outlining Defendants' alleged GAAP violations. (See, e.g., id. ¶ 216.)

The Court finds that this method of pleading is adequate to meet the requirements of Rule 9(b). The explanation given by Plaintiffs may be boilerplate, but it nonetheless adequately describes the fraud alleged and the misleading aspects of the statements. Although the Complaint, which spans 135 pages, may be cumbersome in its organization, it must be looked at in its entirety for the sufficiency of its allegations. The pleadings must be read in the light most favorable to Plaintiffs, and reasonable inferences must be drawn in their favor. Here, while the boilerplate explanation as to why the statements are misleading is conclusory in itself, facts supporting its basis are pled in separate

sections of the Complaint.[13]  (See, e.g., Compl. at ¶¶ 104-06,
138-43, 292-96 (pleading facts demonstrating that loan
guarantees were not disclosed, that demand for cruise ships
was fostered by financing arrangements, and that Renaissance
was financially unstable.).)  These allegations are sufficient
to meet the pleading requirements of Rule 9(b), as support for
the charge that defendant's statements were misleading.  See
In re Tyco Int'l, Ltd. MDL Litig., No. MDL 02-1335-B, 02-266-
B, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004) (finding that
though difficult to decipher, the Complaint, which "list[ed]
all misleading statements in one section but describ[ed]
accounting schemes that make statements misleading in
different sections" complied with PSLRA's requirement that
plaintiff explain why each specifically identified statement
is misleading).  Further, Plaintiffs' pleading technique is
sufficient to address the policy considerations underlying
Rule 9(b), which are: "to provide a defendant with fair notice
of a plaintiff's claim, to safeguard a defendant's reputation
from improvent charges of wrongdoing, and to protect a

---

[13] In its reply brief Alstom argues that Plaintiffs' references to "unnamed
allegedly financially unstable cruise lines which purportedly received
vendor financing are entirely conclusory and cannot support a fraud
claim." (See Alstom Reply Mem., at 16, n.14.)  With regard to claims that
Alstom's non-Renaissance cruise customers were "financially unstable," the
Court agrees that the Complaint fails to allege particular facts as to
these unnamed companies' financial condition.  Sufficient facts are
alleged, however, to support the claim that Alstom had extended vendor
financing to cruise lines other than Renaissance. (See, e.g., Compl. ¶¶
103-04.)

defendant against the institution of a strike suit." <u>Shields</u>, 25 F.3d at 1128.

    c. <u>Scienter as to Marine Fraud</u>

        (i) <u>Scienter of Alstom</u>

It is not enough for Plaintiffs to have adequately pled a harmful omission on the part of Alstom; for the non-disclosure to be actionable they must also allege facts giving rise to a strong inference of fraudulent intent. The Complaint alleges scienter as to Alstom through both methods of pleading available to Plaintiffs: (i) motive and opportunity, and (ii) conscious misbehavior or recklessness. Alstom argues that the Complaint fails to allege sufficient facts to support its claim under either of the two methods. While allegations of scienter are governed by the heightened pleading requirements of the PSLRA and Rule 9(b), "[w]hether a given intent existed is generally a question of fact." <u>Press</u>, 166 F.3d at 538 (noting also that "[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences."). In addition, where the question of intent is at issue, matters are "peculiarly within the defendant's knowledge," and thus Rule 9(b)'s pleading standards are less stringent. <u>Liberty Ridge LLC v. RealTech Sys. Corp.</u>, 173 F. Supp. 2d 129, 136 (S.D.N.Y. 2001).

When viewing the pleadings in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, it is at least arguable that Alstom deliberately omitted adequate information about its vendor financing arrangements from its public statements, and thus portrayed the performance of its Marine division far more favorably than the full facts warranted.  In cases in which scienter is pled in part by alleging that the defendant "knew facts or had access to information suggesting that their public statements were not accurate," the scienter analysis is closely aligned with the analysis as to misleading statements.  Flag I, 308 F. Supp. 2d at 259 (citing Novak, 216 F.3d at 311).  The Court must consider the misstatement "and determine whether plaintiff has pleaded facts demonstrating that the statement or omission was false or misleading and that [the defendant] had access to information indicating that it was." Id.  Here, Plaintiffs have alleged that Alstom, because it was the entity executing the financing arrangements, had access to information about those arrangements and chose not to disclose them to the public.  (See Compl. ¶ 292.)[14]  In these

---

[14] The timing and nature of Alstom's disclosures regarding the vendor financing arrangements also support a strong inference that Alstom acted with the required state of mind.  As discussed above, Alstom buried any reference to the arrangements in vaguely worded footnotes at the end of its financial statements filed with the SEC in 1999, 2000, and 2001.  (See 1999 Form 20-F; 2000 Form 20-F; 2001 Form 20-F.)  Plaintiffs have alleged that Alstom's first meaningful disclosure as to Alstom's exposure did not occur until Alstom issued two press releases (on September 27, 2001 and October 1, 2001) following Renaissance's bankruptcy filing, which outlined

circumstances, Alstom "knew or, more importantly, should have

known that they were misrepresenting material facts related to

---

the arrangement with Renaissance and also disclosed the existence of
further commitments to other cruise ship companies. (<u>See</u> Compl. ¶¶ 230,
233). In November of 2001, Alstom filed a Form 6-K with the SEC, which
included a footnote giving further details about the vendor financing
arrangements. The footnote was titled "Guarantees Related to Vendor
Financing," and stated that Alstom "provides guarantees to financial
institutions in connection with the financing by certain customers of
their purchases of company products totaling €1,735 billion at September
30, 2001, of which . . . €1,296 million . . . was in connection with its
Marine activities." (Alstom's Form 6-K, Report of Foreign Private Issuer
Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934,
for the month of November 2001, received by the SEC on November 13, 2001
("2001 Form 6-K"), Note 12, at 16, included as Ex. C in the Berger Decl.)
Later in the document, under the heading "Off Balance Sheet," the company
stated: "As at 30 September 2001 we had entered into a variety of
financial arrangements to assist in the financing of customer purchases,
notably guarantees on the financing of purchases by Marine customers."
(<u>Id.</u> at 34.) Alstom made additional disclosures regarding the financing
arrangement in later financial filings, including its 2002 and 2003 Forms
20-F. (2002 Form 20-F at F-31-32; 2003 Form 20-F at 41.) Alstom's 2003
Form 20-F stated:

> Some Marine customers request financing assistance in connection
> with the purchase of new cruise ships. Therefore, in addition to
> shipbuilding and project management expertise, Marine has in the
> past provided technical assistance to its customers in obtaining
> appropriate financing for their projects, and in some cases indirect
> financial support. While these cases of customer support allowed
> Marine to increase the number of its customers in the past, they
> have also resulted in increased financial exposure for us. This was
> manifested most recently in the bankruptcy of Renaissance in 2001,
> previously one of our largest customers. For further information on
> Marine vendor financing and its impact on us, please see "Operating
> and Financial Review and Prospects-Marine-Renaissance" and "Key
> Information-Risk Factors-We have given financial assistance in
> connection with the purchase of some of our products by our
> customers which exposes us to longer-term risks of customer defaults
> or bankruptcy."

(2003 Form 20-F at 41.) A fact finder could reasonably conclude that
Alstom's belated disclosures indicated its consciousness of the
impropriety of its actions. <u>See SEC v. PIMCO Advisors Fund Mgmt. LLC</u>, 341
F. Supp. 2d 454, at 465-66 (S.D.N.Y. 2004) (finding that defendant's
significant delay in providing adequate disclosure of market timing
arrangement to mutual fund's board of trustees could support a conclusion
that defendant was aware of the impropriety of his activities).
Tellingly, the disclosure in Alstom's 2003 Form 20-F explicitly
acknowledges, for the first time that the Court is aware of, that the
customer financial support resulted in increased financial exposure to
Alstom should the customer default. The almost inherent risks associated
with loan guarantees to unaffiliated entities should not have been foreign
to Alstom management prior to Renaissance's bankruptcy filing, as these
risks should be familiar to any prudent corporate officer.

the corporation," and scienter is adequately pled. <u>Novak</u>, 216 F.3d at 308 (internal citations omitted).

The Court notes that, while not necessary to substantiate the finding of scienter, Plaintiffs' allegations as to Alstom's knowledge of Renaissance's precarious financial condition further bolster their claims asserting recklessness and conscious misbehavior. In various sections of the Complaint, Plaintiffs allege that Alstom "knew that Renaissance was likely to default because of lost business and poor pricing decisions." (Compl. ¶ 292, <u>see</u> <u>also</u> <u>id</u>. ¶ 107.) The facts alleged to support this claim include: (1) in the late 1990s Renaissance made a business decision to pursue direct bookings, alienating travel agents in the process, which resulted in reduced earnings for the company in 1999 and 2000, (2) because of these losses, Renaissance was restructured in 2001,[15] through a deal with Malvern Maritime (an investment concern of which Alstom was a beneficial owner) and a subsidiary of Credit Suisse First Boston,[16] (3) even

_____

[15] The Complaint alleges that this restructuring took place in April of 2000, when, as Defendants have pointed out, it actually occurred in April of 2001. (<u>See</u> Alstom Mem., at 31.) Plaintiffs have conceded the error and the Court reads the allegation as though the date is stated correctly in the Complaint.

[16] Alstom argues that the investment by Malvern Maritime cannot be used to support an inference of scienter because the allegation that the company invested in Renaissance when it knew Renaissance would go bankrupt defies economic reason. (<u>See</u> Alstom Mem., at 31 (citing cases for proposition that courts have held that theories of motive that defy economic reason will not support a finding of scienter.)) This assertion is unavailing. The citations provided by Alstom involve analysis of the motive prong of

-34-

after the restructuring, analysts believed that Renaissance's long term debt exceeded one billion dollars, and (4) analyst reports and quotes indicated that the bankruptcy was not surprising, as Renaissance was debt-ridden and had been losing money.[17]   (Compl. ¶¶ 293-295.)

These factual allegations demonstrate that Alstom's failure to disclose the loan guarantees became increasingly unreasonable as its alleged awareness of Renaissance's financial troubles increased.[18]   The risks associated with

the scienter analysis.  Here, Plaintiffs' allegations regarding the Malvern Maritime restructuring of Renaissance are pled to show that Alstom was likely to have known that Renaissance was financially unstable.  The motive of Malvern Maritime for engaging in the transaction is not relied on by Plaintiffs to show Alstom's scienter.

[17]  Alstom argues that the allegations as to its knowledge of Renaissance's precarious financial condition are conclusory and thus fail to support Plaintiffs' claim.  Alstom's arguments impose a strenuous burden on Plaintiffs at this early stage in the litigation, contending that the facts pled in the Complaint and described above are not specific enough to give rise to an inference that Alstom was aware of Renaissance's financial condition.  The Court rejects this contention.  Rule 9(b) does not require the Complaint to reflect a "level of specificity . . . that can only be achieved through discovery."  Liberty Ridge LLC, 173 F. Supp. 2d at 137 (noting that a Complaint "need not marshal all the evidence" against a defendant).

[18]  Alstom contends that Plaintiffs' allegations as to its knowledge of Renaissance's financial condition amount to pleading fraud by hindsight.  As discussed above, the Court disagrees.  Accepting as true the facts alleged by Plaintiffs, Alstom would not have had to be 'clairvoyant' to be aware of Renaissance's allegedly unstable financial condition prior to the bankruptcy.  In addition, Plaintiffs' claims are further supported by their allegations describing the business relationship between Alstom and Renaissance.  Renaissance was an important customer for Alstom, having ordered eight cruise ships from Alstom, with the last order being placed in early 1999, and accepting delivery for all eight ships between 1998 to 2001.  (See Compl. ¶ 73)  In connection with those sales, Alstom was providing financing involving hundreds of millions of euros to Renaissance.  (See id.)  These transactions took place during the same general time frame that Renaissance's financial downturn was allegedly occurring, and further supports a strong inference that Alstom should have known about its customer's financial condition.  (See id. ¶¶ 294, 296.)

extending hundreds of millions of euros of guarantees to a financially unstable customer, sales to whom had fueled tremendous growth in the company's fastest growing division, are significant. Furthermore, the facts describing Alstom's increasing access to information about Renaissance's financial condition suggest that Alstom was aware that its financing arrangements posed an expanding risk to the company. This risk is "the danger" which was allegedly known to Alstom and which was "highly unreasonable" for the company to not disclose. In re Carter-Wallace, 220 F.3d at 39 (internal citations omitted) (recklessness is alleged by facts demonstrating that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it."). Thus, it became more and more reckless for Alstom to continue to tout the sales of its Marine division as the attendant risks mounted and were not publicly revealed. Furthermore, even if Alstom was not aware of Renaissance's instability early in the relationship, Plaintiffs have alleged sufficient facts to raise a strong inference that Alstom should have known of the risk Renaissance faced by the middle

---

A reasonable guarantor of loans, especially involving contingent liabilities of the magnitude involved here, should keep reasonably informed of the financial condition of the debtor. See State v. Peerless Ins. Co., 492 N.E.2d 779, 780 (N.Y. 1986) (noting that it has long been settled in New York that a creditor has no duty to keep a surety informed of the debtor's financial situation, but rather that "the surety bears the burden of making inquiries and informing itself of the relevant state of affairs of the party for whose conduct it has assumed responsibility").

of 2001.  In light of this awareness, the failure of Alstom to disclose the loan guarantees in its 2001 Form 20-F, filed in July of 2001, while boasting about the success of its Marine division in that document, was sufficiently egregious to satisfy the recklessness prong of the scienter test.  (<u>See</u> Compl. ¶ 215.)

(ii) <u>Scienter as to Officer Defendants</u>

With regard to the individual defendants, the Court finds that scienter for the Marine Fraud has been adequately pled as to Bilger and Newey, based on allegations of strong circumstantial evidence of conscious misbehavior.[19] Plaintiffs have alleged that Bilger and Newey, as CEO and CFO of Alstom, signed SEC filings containing misrepresentations regarding the Marine division.  (Compl. ¶¶ 162, 183, 204, 215.)  Plaintiffs have also alleged that the Marine division was extremely important to Alstom as it was the company's fastest growing unit, and also because the favorable perception of this division allowed Alstom to borrow money it needed to finance its other business.  (<u>See</u> Compl. ¶¶ 71 -72.)  In order to sign the SEC filing documents, Bilger and Newey had a "duty to

---

[19] As explained above, there can be no liability for Officer Defendants Kron, Milner, Jaffre, Janovec and Rambaud-Measson, for the Marine Fraud.  The Section 10(b) claims against Milner are time-barred. In addition, under the group pleading doctrine Kron can be held accountable only for statements made after January of 2003, Jaffre can be held accountable only for statements made after July of 2002, and the Court declines to extend group pleading to Janovec and Rambaud-Measson, and thus these Officer Defendants cannot be liable for the Marine Fraud.

familiarize themselves with the facts relevant to the core operations of [Alstom]." <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., et al.</u>, 05 Civ. 1898, 2005 WL 2148919, at *63 (S.D.N.Y. September 6, 2005). Given the extent of the vendor financing (allegedly €1.2 billion for Marine division customers), and the importance of the Marine division to Alstom's overall profile and liquidity during the relevant period, Bilger and Newey should have been aware of the loan guarantees.[20] <u>See</u> <u>id.</u>; <u>see also</u> <u>Cosmas v. Hassett</u>, 886 F.2d 8, 13 (2d Cir. 1989) (finding that defendants'

---

[20] While the Complaint alleges that the Marine division was a "relatively small segment" of the company, it asserts that this division was "extremely important" to Alstom because, as noted above, it was Alstom's fastest growing division and it was important to Alstom in order to minimize the risks associated with its liquidity. (Compl. ¶¶ 71 - 72.) The extent of the loan guarantees precludes a finding that they were not of critical importance to the company. A <u>Wall Street Journal</u> article, excerpted in the Complaint, discussed the significance of these guarantees to Alstom's overall financial picture:

> In its first half results, Alstom disclosed net debt of 2 billion euros. Adding the vendor financing liabilities would have doubled the company's net debt to four billion euros, one billion euros more than the company's market capitalization.

(Compl. ¶ 104.) The article notes that while Alstom did not, in fact, classify its vendor financing liabilities as debt, many analysts indicated that such a classification "would more accurately reflect what they are, since Alstom is the ultimate guarantor of these loans." (Id.) Thus, even if the Marine division was a "relatively small segment" (Compl. ¶ 71) of Alstom's overall operations, the loan guarantees extended in to customers of this division represented a disproportionately high, and very significant amount of the company's overall debt. In light of this, there can be no doubt that Plaintiffs have alleged that the loan guarantees were of "critical importance" to the company and, at the least, should have been apparent to Bilger and Newey. <u>See</u> <u>In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.</u>, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[I]f a plaintiff can plead that a defendant made false or misleading statement when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company.").

statement that sales to the People's Republic of China constituted a significant new source of revenue for the company gave rise to a strong inference that the directors of the company knew of that country's import restrictions since they "eliminated a potentially significant source of income for the company").

The Complaint's allegations as to the direct involvement of both Newey and Bilger in the day-to-day operations of the company (see Compl. ¶ 366), as well as the magnitude of the Marine customer financing arrangements, and the significant length of time (several years) during which the arrangements were not disclosed, together could enable a reasonable fact finder to draw a strong inference of recklessness, at the least, on the part of these two defendants. See In re Atlas Air Worldwide Hldgs., 324 F. Supp. 2d at 497 (holding that it is reasonable to impute knowledge to a signatory of SEC filings directly involved in the day-to-day operations of the company); In re American Bank Note Holographics Sec. Litig., 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding scienter allegation sufficient as to CFO and Comptroller where the defendants were, because of their positions, "uniquely situated" to control the revenue recognition procedures, and the revenues had been overstated for a period of two years in

repeated SEC filings).[21]

    d. <u>Causation as to the Marine Fraud</u>

To maintain their claim under Section 10(b) and Rule 10b-5, Plaintiffs must also plead both transaction causation and loss causation. Here, the Complaint alleges that transaction causation, generally understood as reliance, is established through the "fraud on the market" theory. (<u>See</u> Compl. ¶¶ 329-330.) This theory was described in <u>Basic</u>:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available

---

[21] Defendants also argue that Plaintiffs have failed to allege that any individual officer received documents which contradicted their alleged misstatements. With regard to this argument, the Court echoes the analysis set forth in the recent case of <u>Teamsters Local 445 Freight Div. Pension Fund</u>, 2005 WL 2148919, at *65, finding that: "the cases in which a plaintiff has been required to specify particular reports have been those where a plaintiff alleges that the defendant made overly optimistic statements and that internal company reports should have alerted the defendant to the falsity of his statements." <u>Id.</u> (internal citations omitted). Here, the Complaint does not allege overly optimistic statements with regard to the Marine Fraud. Rather, the statements alleged are those of historic fact, announcing the numbers of sales made, orders received, and growth in the division. Plaintiffs allege that the vendor financing arrangements existed at the time Defendants made those statements, and thus Defendants' knowledge of, or access to information about, the arrangements was contemporaneous with the making of the false statements. <u>See</u> <u>Cosmas</u>, 886 F.2d at 11 (finding that plaintiffs had pled facts giving rise to a strong inference of scienter where the defendants were alleged to have made positive statements regarding their sales to China contemporaneously with the enactment of detrimental import restrictions in that country).

In addition, Defendants argue that Alstom did disclose the guarantees in footnotes in its Form 20-F filings. While the Court has found that these footnotes do not contain adequate information to defeat Plaintiffs' allegation that the guarantees were not sufficiently disclosed and came as a surprise to investors (and financial analysts), the existence of the footnotes cuts against any argument that Bilger or Newey were not aware of the financing arrangements. Defendants' cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that Alstom's CEO and CFO were unaware of those commitments.

-40-

material information regarding the company and its business . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . The causal connection between the defendants' fraud and the Plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

485 U.S. at 241-42 (alterations in original) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)). "Pleading that the defendants perpetrated a fraud on the market . . . fulfills a plaintiff's transaction causation pleading requirement." In re GeoPharma, 2005 WL 2431518, at *6, n.86. Thus, Plaintiffs' allegations of transaction causation are sufficiently pled.

Plaintiffs' allegations regarding the Marine Fraud are also sufficient to support a claim of loss causation. The Complaint states that on the day before Alstom's September 27, 2001 disclosure of its financing for Renaissance, the stock was trading on the Paris Exchange at €18.06. The stock price then fell to €13.20 on the day of the announcement. (Compl. ¶ 108). Alstom made a second announcement, on October 1, 2001, revealing that its total exposure for the Renaissance financing was €684 million, and that Renaissance was not the only Marine division customer to which it had extended loans. The press release revealed that, in fact, the company had "current commitments of €589 million in respect of other

cruise ships already delivered to other ship owners[.]"  <u>Id.</u>
Following this second press release, the stock price dropped
further to €9.20 on the Paris Exchange on October 3, 2001.
(<u>Id.</u> ¶¶ 108, 233).[22]

Alstom's failure to disclose its vendor financing
liabilities concealed not only the risk it bore as a guarantor
of those loans, but also that at least some of the growth in
its Marine division was illusory.  When this information was
disclosed in the two press releases that followed the
Renaissance bankruptcy, Alstom's stock price dropped.  Thus,
Plaintiffs have sufficiently alleged that there was "a false
or misleading statement, which caused an artificial inflation
of the stock, followed by a dissipation of that inflation
after corrective disclosures were made."  <u>In re GeoPharma</u>,
2005 WL 2431518, at *12.  On a motion to dismiss, this
allegation of loss causation is sufficient.

Because the Complaint successfully alleges that Alstom
made statements omitting material facts, with scienter, and

_____

[22] Alstom notes in its reply brief that Plaintiffs have not alleged any
losses arising out of the concealment of its non-Renaissance vendor
financing arrangements.  While the Court recognizes that a drop in stock
price may have been primarily the result of the revelations as to Alstom's
liability for the Renaissance loans, it finds that Plaintiffs have also
alleged a loss resulting from the October 1, 2001 disclosure of the full
extent of Alstom's vendor financing arrangements in its Marine division.
The Complaint alleges that "after disclosure of the full extent of the
guarantees on October 1, 2001, the stock fell further to close at €9.20
on October 3, 2001." (Compl. ¶ 108).  While there was a precipitous drop
in the stock price because of Alstom's exposure following Renaissance's
bankruptcy, there were additional losses that were incurred when the full
extent of the vendor financing was revealed.

that Plaintiffs' reliance on those statements caused their losses, Plaintiffs' Section 10(b) claims based on the Marine Fraud are adequately pled as to Alstom, Bilger, and Newey.

### 3. ATI Fraud

#### a. Material Misstatements Alleged Concerning the ATI Fraud

Plaintiffs contend that "after being badly hurt by the disclosures of its vendor financing scheme and the costs of repairing the defective turbines, Alstom tried to keep the company afloat by committing yet another accounting fraud, this time in its Transport division." (Compl. ¶ 116.) This alleged fraud entailed hiding millions of dollars of costs incurred in connection with railcar contracts performed by ATI, in particular a contract with New Jersey Transit ("NJT"), which ATI allegedly intentionally underbid in 1999. (Id. ¶ 308.) These accounting improprieties resulted in an overstatement of income of i167 million in Alstom=s 2003 accounting statements. (See id. & 116-17.) The accounting irregularities first came to light when an anonymous letter was sent to the SEC, the FBI and ATI, prompting investigations by those agencies as well as an internal investigation on the part of Alstom, conducted by the firm of Hughes, Hubbard & Reed LLP. (Id. & 119.) According to Plaintiffs, after announcing the discovery of the accounting irregularities on

June 30 of 2003, Alstom initially stated that it would record a i51 million after-tax charge, but later disclosed that this number was insufficient as the fraud had resulted in an inflation of i167 million. (<u>Id.</u> & 119-120.)

The specific statements which are alleged to have been materially misleading to investors are included in a November 5, 2002 Press Release[23] filed with the November 2002 Form 6-K (<u>Id.</u> ¶¶ 268-72), in the November 2002 Form 6-K itself[24] (<u>Id.</u> ¶ 160), and in Alstom's 2003 Annual Report, which was furnished to the SEC on June 2, 2003 on Form 6-K.[25] (<u>Id.</u> && 281-82.) Specifically, the November 2002 press release reported that the Transport division's operating income and operating margin for the first half of fiscal year 2003 were

---

[23] This press release includes statements made by Bilger. (<u>Id.</u> ¶ 271.)

[24] This document was signed by Jaffre. (<u>Id.</u> ¶ 268.) In the section of the Complaint outlining GAAP violations, Plaintiffs appear to allege that the financial results reported in the Form 6-K itself, in addition to the statements in the press release, were misleading. (<u>See</u> Compl. ¶ 160 (stating that the Form 6-K was materially untrue in that it represented that for the half year ending September 30, 2002, Alstom's net income was €11.3 million and its shareholder's equity was €2.1 billion, when in fact these numbers failed to include the millions of dollars in costs that ATI had understated in fiscal year 2003.)) This misrepresentation is not listed in the section of the Complaint which sets forth "Defendants' Materially False and Misleading Statements," which, with regard to the ATI Fraud, refers only to the comments in the November 2002 press release and the 2003 Form 6-K. This may be an oversight by the Plaintiffs. The Court will consider the misrepresentation alleged in the GAAP violation section (<u>See</u> <u>id.</u> ¶ 160) as an alleged misstatement. While the PSLRA requires that Plaintiffs specify each statement that they contend is misleading and the reason it is misleading, <u>see</u> 15 U.S.C. § 78u-4(b)(1), the Court finds that the allegations of ¶ 160 of the Complaint fulfills these requirements. There is no requirement that the statements be alleged in chronological order in one section of the Complaint.

[25] This document was signed by Jaffre. (Compl. ¶ 281.)

€90 million and 3.9 percent, respectively. (Id. ¶ 269.) Plaintiffs allege that, in fact, because of the accounting improprieties at ATI, the operating income and margin were artificially inflated by approximately €167 million. (Id. ¶ 270.) The press release is also alleged to be misleading because of Bilger's statements that "the positive dynamics of transport" could help offset troubles in other areas. (Id. ¶¶ 271-72.) The June 2003 Form 6-K is alleged to have been misleading because it reported that, while Alstom had an overall operating loss of €434 million, the Transport division recorded an operating income of €49 million. (Id. ¶ 281.) However, the company's losses were allegedly understated by approximately €167 million, because of the ATI Fraud. (Id. ¶ 282.) In addition, the 2003 Form 6-K was allegedly misleading because the Transport division was not, as reported, operating at a profit, but rather had sustained an operating loss of €118 million. (Id.) Plaintiffs have also alleged that, by failing to properly disclose the cost overruns, Alstom violated GAAP. (Id. ¶¶ 157-61.)[26]

---

[26] The Complaint also alleges that a press release issued by Alstom in November of 2001 included a materially misleading statement about ATI. In the press release, which primarily discusses costs related to turbines, Bilger stated: "We are confident that the sustained long term growth of the global energy and transport infrastructure markets, the strength and the visibility of our order book and the increasing quality of our operations, will lead to improved performance in the years to come." (Id. ¶ 237.) In their explanation of why the statements in the press release were misleading, Plaintiffs set forth several reasons relating to statements regarding turbines, but also allege that "Alstom knew but failed to disclose that its other divisions such as ATI were engaging in improper accounting practices, therefore Alstom could not rely on other

Plaintiffs assert that these alleged statements are materially misleading, in that they misrepresented to inventors the profitability of Alstom's Transport division and the company's earnings. The majority of Defendants charged with Section 10(b) liability on the basis of these statements have done little to argue otherwise, instead focusing their arguments on the contention that they cannot be held liable on this basis. ATI, Alstom USA, Janovec and Rambaud-Measson argue that they did not actually <u>make</u> the statements, and that for this reason they cannot be held liable under Section 10(b). In making this argument, ATI, Alstom USA, and Janovec

---

units to provide improved performance in the years to come." (<u>Id.</u>) In the sections of their brief relating to Section 10(b) violations involving the ATI Fraud, Plaintiffs do not mention this paragraph.

The Court finds that this allegation fails to meet the pleading requirements set forth in Subsection b(1) of the PSLRA, which requires plaintiffs to state with particularity all facts supporting the plaintiffs' belief that a statement is misleading. Here, Plaintiffs assert that the statement is misleading because Alstom knew that ATI was engaging in "improper accounting practices" when the statement was made in November of 2001. (<u>Id.</u>) However, the Complaint fails to allege facts sufficient to support the claim that ATI was engaging in accounting improprieties as of this date. Rather, the Complaint asserts, repeatedly, that ATI understated costs in its Fiscal Year 2003 results. (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 116-20, 160, 304, 306.) In addition, the Complaint alleges that the ATI Fraud was orchestrated by Janovec and Rambaud-Measson in an effort to comply with Alstom's "Restore Value" program, which was announced in March of 2002, suggesting that the fraud did not begin until March of 2002. (<u>See id.</u> ¶¶ 303-06.) While the Complaint does allege that cost overruns arising out of the NJT contract were known within the Company prior to March of 2002 (<u>see id.</u> ¶¶ 311-17), it is devoid of allegations of any accounting fraud in connection with these cost overruns prior to Fiscal Year 2003. Even if Plaintiffs had alleged prior accounting fraud, the Court would not be obliged to "accept as truth conflicting pleadings" claiming that the fraud began in the early days of the NJT contract but also that it began when Janovec and Rambaud-Measson sought to comply with the Restore Value program announced in March of 2002. <u>Livent II</u>, 151 F. Supp. 2d at 405-06. For these reasons, the Court finds that Plaintiffs have not sufficiently pled that this statement is misleading as to the ATI Fraud.

rely in significant part on <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169 (2d Cir. 1998).[27]  There, the Second Circuit, in a case involving the issue of an auditor's liability for the statements of its client, held that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)."  <u>Id.</u> at 175.  In contrast, Alstom, which cannot argue that it did not make the statements, as they are found in its financial reports and press releases, contends that it cannot be found liable under Section 10(b) because allegations of a parent company's dissemination of information provided to it by a subsidiary are not sufficient to demonstrate scienter.  The Court will address the arguments related to each of these defendants in turn.

Plaintiffs argue that ATI is liable for the reporting of materially misleading financial information to Alstom, even though the information was communicated to investors only through Alstom's consolidated financial statements and an Alstom press release, and not directly by ATI.  In support of their argument, Plaintiffs cite <u>In re Kidder Peabody Sec. Litig.</u>, 10 F. Supp. 2d 398 (S.D.N.Y. 1998), which was decided prior to <u>Wright</u>.  There, the court held that a subsidiary can

---

[27] Rambaud-Measson also contends that he cannot be held liable under Section 10(b) because he did not made any statements, but he does not cite <u>Wright</u> in support of his argument.

be held liable for false financial data provided by the subsidiary and incorporated into the financial statements of the parent when the subsidiary was "the original and knowing source of a misrepresentation" and "knew or should have known that [the] misrepresentation would be communicated to investors[.]" 10 F. Supp. 2d at 407. ATI argues that this holding does not survive the <u>Wright</u> decision. The Court disagrees.

The Second Circuit's holding in <u>Wright</u> followed the Supreme Court's decision in <u>Central Bank, N.A. v. First Interstate Bank, N.A.</u>, 511 U.S. 164 (1994), which held that there is no private cause of action against mere aiders and abettors under Section 10(b). <u>Wright</u> involved a plaintiff's claims against an auditor, Ernst & Young, with regard to a press release issued by one of Ernst & Young's clients, describing that client's financial results. The press release at issue expressly stated that the results were "unaudited." <u>Id.</u> at 172. The Court, noting that the press release "did not attribute any assurances to Ernst & Young and in fact did not mention Ernst & Young at all," found that "Ernst & Young neither directly nor indirectly communicated misrepresentations to the investors." <u>Wright</u>, 152 F.3d at 175. Because the press release was issued "without a whisper of Ernst & Young involvement," the Circuit Court found that

plaintiffs could not claim that they had relied on the auditor's representations. <u>Id.</u> at 176. Thus, the court stated that: "a defendant must actually make a false or misleading statement in order to be held [primarily] liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger [primary] liability under Section 10(b)." <u>Id.</u> at 175 (quoting <u>Shapiro v. Cantor</u>, 123 F.3d 717, 720 (2d Cir. 1997)). Because the auditors had not actually made a statement that Plaintiffs could have relied on, they could not be held liable under Section 10(b). <u>Id.</u> at 175 ("[A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination."). By adopting this "bright line" rule requiring that the defendant "actually make a false or misleading statement," the Second Circuit intended to avoid the circumvention of <u>Central Bank</u>. <u>Id.</u>

The Court finds that <u>Wright</u> did not abrogate the rule followed in <u>Kidder Peabody</u>, and that a careful reading of the cases supports a finding that when a subsidiary provides false or misleading financial information to a parent, knowing that the information will be communicated to investors, it can be held liable for the statements made by the parent. <u>Cf.</u> <u>Gabriel Capital, L.P. v. NatWest Fin., Inc.</u>, 94 F. Supp. 2d

491, 508-510 (S.D.N.Y. 2000) (analyzing plaintiff's claims in light of both Wright and Kidder Peabody, and concluding that plaintiffs' claims should be dismissed because they had failed to allege that the defendant subsidiary was the source of the alleged misrepresentations). First, Wright does not foreclose the possibility of primary liability where the statement made was not communicated directly to the investor by the original source, but instead was communicated indirectly. See Wright, at 152 F.3d 175 (recognizing that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach"); see also Seippel v. Sidley, Austin, Brown & Wood, LLP, 03 Civ. 6942, 2005 WL 1423370, at *7 (S.D.N.Y. June 16, 2005) ("Wright does not require that a defendant directly communicate the alleged misrepresentation to the plaintiff."). Further, the Wright court sought to avoid holding Ernst & Young primarily liable "in spite of its clearly tangential role in the alleged fraud," as this "would effectively revive aiding and abetting liability under a different name[.]" Wright, 152 F.3d at 175.

In Kidder Peabody, there was no suggestion that the subsidiary had played a "tangential role" in the fraud. In fact, the subsidiary was the entity at which the actual fraud had occurred and the source of the misleading financial

information communicated to investors by GE, the parent company. The same is true here, as the alleged fraud originated at ATI and ATI was the alleged source of the misleading information published by Alstom.[28] In these circumstances, the holding in <u>Wright</u> does not preclude a finding of potential liability on the part of ATI.

This conclusion is supported by the Second Circuit's subsequent decision in <u>In re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63 (2d Cir. 2001). <u>Scholastic</u> concluded that a company executive could be charged with primary liability for misleading disclosures, even though the operative complaint in that case did not attribute specific misleading disclosures to him, because the complaint alleged that he personally disseminated misleading statements, was "primarily responsible for Scholastic's communications with investors and industry analysts," and "was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading

---

[28] The Complaint alleges that ATI understated its losses in its financial results, and that these results were then incorporated into Alstom's financial statements, which were provided to the SEC. (<u>See</u> Compl. ¶¶ 157-60, 268, 304, 372.) While these allegations are not made in a express manner, the Court concludes that the Complaint is sufficient in this regard to survive a motion to dismiss. The Complaint repeatedly alleges that ATI "understated" its results, which were then included in Alstom's consolidated results. (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 160 ("These representations [in Alstom's financial statements] were materially false and misleading in that they failed to include millions of dollars in costs that <u>ATI understated</u> in fiscal year 2003.) (emphasis added)) The use of the word "understated," which carries a connotation of disclosure of something less than what should be reported, in itself conveys that ATI made a statement of its financial results, and that ATI was the original and knowing source of the misleading information.

statements issued by Scholastic." 252 F.3d at 75-76. While Scholastic does not discuss, or cite, the Wright decision, it appears to allow a finding of Section 10(b) liability where a plaintiff alleges that the defendant was responsible for making the statement, even if the defendant was not identified as the speaker at the time of dissemination. See id.; see also In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 331 (S.D.N.Y. 2004).

Several courts have noted the tension between Wright and Scholastic, in that Wright requires that the statement, if communicated indirectly, be attributed to its source at the time of the dissemination, and Scholastic permits liability despite a lack of specific attribution. See, e.g., PIMCO Advisors, 341 F. Supp. 2d at 466 (noting tension between cases); In re Global Crossing, 322 F. Supp. 2d at 331 ("While Scholastic might indicate some relaxation of Wright's requirement . . . it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation."). However, the cases are consistent in that neither jeopardizes Central Bank's limitation on aider and abettor liability, as the defendant CFO in Scholastic was alleged to have made misstatements and thus played a role exceeding that of an aider and abettor. See In re Scholastic, 252 F.3d at 75-76; see also In re Global

<u>Crossing</u>, 322 F. Supp. 2d at 334 (allowing primary liability to attach to auditor defendant where allegations that the defendant "prepared" or "helped create" the false statements issued by company "place its involvement well beyond the realm of 'aiding and abetting' liability precluded by <u>Central Bank</u>"). As discussed above, ATI's alleged role, as the source of the false information, also extends beyond the realm of aiding and abetting.[29]

---

[29] Furthermore, while <u>Wright</u> held that "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination," this ruling does not necessarily require the conclusion that statements must <u>always</u> be attributed to their maker at the time of dissemination for liability to follow. As has been noted, <u>Scholastic</u> suggests that the <u>Wright</u> doctrine requiring attribution may be relaxed in the case of unattributed statements of a corporate insider. Such a result is not necessarily at odds with <u>Wright</u>, as a corporate insider is distinguishable from an outside auditor. <u>Wright</u>'s requirement of attribution followed from that court's concern that plaintiffs be able to demonstrate that they had relied on the statement of the defendant, in order to fulfill the requirement of reliance under Rule 10b-5. <u>See</u> <u>Wright</u>, 152 F.3d at 174. The <u>Wright</u> court found that the element of reliance was not alleged in that case because the statements in question were made "without a whisper" of Ernst & Young's involvement. <u>Id.</u> at 176. <u>Scholastic</u> can be read as comporting with <u>Wright</u>'s reliance requirement because it is reasonable to infer that an investor, when evaluating the financial statements of a company, at least implicitly relies on the officers of that company, who are generally understood to be responsible for day-to-day corporate affairs including preparation of statements for public disclosure. This is particularly true where, as in <u>Scholastic</u>, the officer in question was alleged to have been in charge of investor communications. This situation is distinct from that of an outside auditor, as to whom it cannot be said that investors generally rely for unattributed representations, unless there is the specific attribution of statements to that auditor, as was required by <u>Wright</u>. A subsidiary, like Kidder Peabody or ATI, is more akin to a corporate officer than to an outside auditor, in that one can infer that investors are more likely to identify with and rely on the statements of the subsidiary, whether made expressly or indirectly, when evaluating the consolidated financial results of the corporate parent. In ATI's case, Alstom's Forms 20-F made clear that ATI's financial results were incorporated into its own consolidated financial statements. <u>See</u> 1999 Form 20-F, at F-12-13; 2000 Form 20-F, at F-13; 2001 Form 20-F, at F-14; 2002 Form 20-F, at F-40; 2003 From 20-F, at F-52 (specifically identifying ATI as one of the companies included in the consolidated financial statements).

Thus, the Court concludes that the Complaint's allegations with regard to ATI are sufficient to state a claim for Section 10(b) liability. First, the Complaint does allege (albeit in a meandering manner) that ATI made a statement, in the form of its financial results, which was communicated to Alstom for incorporation into Alstom's financial results. Further, it is plausible and reasonable to infer that investors, when relying on Alstom's financial results, which consolidated the results of its subsidiaries, implicitly relied on the financial information provided by the subsidiary itself. Accordingly, Plaintiffs have sufficiently alleged that ATI was the "original and knowing" source of the alleged misrepresentations, and, because investors could - at least constructively - attribute this information to the subsidiary, ATI can be held liable under Section 10(b).[30] See In re Global Crossing, 322 F. Supp. 2d at 333 n.14. (noting that a rule requiring the plaintiff to demonstrate that the public could "attribute a misleading statement (at least indirectly) to the

_____

[30] The Court notes that a contrary result would present the dilemma the court described in Kidder Peabody: "[H]olding a subsidiary immune from liability for statements communicated by its parent under these facts would lead to an anomalous result. A subsidiary could freely disseminate false information to the market through its parent, but investors relying on that information to their detriment would be left with no remedy: an action could not be brought against the subsidiary, and the parent would escape liability because it lacked scienter. This would lead to a result so bizarre that Congress could not have intended it." 10 F. Supp. 2d at 408 (internal citations omitted). This anomaly indeed would be the situation in which the Court would find itself in the instant case, where Alstom argues that scienter cannot be imputed to it on the basis of the statements regarding ATI. See Section III.B.3.b(ii) (Scienter as to Alstom) for discussion.

secondary actor at the time it is issued . . . emphasizes constructive, rather than actual, attribution -- a concept consistent with the Second Circuit's emphasis on reliance." (emphasis in original, internal citations omitted)); <u>In re Kidder Peabody</u>, 10 F. Supp. 2d at 407.

With regard to Janovec and Rambaud-Measson, the Court reaches the opposite conclusion. The Complaint fails to allege facts sufficient to demonstrate that these Defendants "made a statement" within the meaning of <u>Wright</u>. First, as currently drafted, there are no specific allegations in the Complaint regarding either Janovec's or Rambaud-Measson's role in the preparation of ATI's financial statements or reports, or alleging that these officers signed any financial reports. While the Complaint contends that Janovec and Rambaud-Measson "created the false illusion that ATI's operating margin and cost cutting strategies had far exceeded the mandate set forth in the Restore Value plan," (Compl. ¶ 306) there is no factual support explaining how or when or where Janovec and Rambaud-Measson created this illusion. That these defendants held positions as Senior Vice President and Vice President of Finance at ATI may be a starting point for a claim of liability, but these titles do not, without additional facts, support a logical inference that those defendants were responsible for the drafting, production, reviewing, or

dissemination of the information communicated by ATI to Alstom.[31] Plaintiffs allege no facts to suggest that it was these officers, and not other officers of ATI, who were primarily responsible for communicating financial results to Alstom.[32] This failure in pleading distinguishes this case from Scholastic, cited by Plaintiffs, where the officer defendant was held liable for statements that he was not alleged to have directly made because the Complaint claimed that he "was involved in the drafting, producing, reviewing and/or disseminating" the false or misleading statements at issue. In re Scholastic, 252 F.3d at 75-76; see also PIMCO Advisors, 341 F. Supp. 2d at 467 (concluding that it would "overstep the limitations imposed by Wright to charge [the defendant] with primary liability for statements the Complaint does not allege he personally drafted or communicated to others[,]" and noting that the complaint "fail[ed] to assert that [the defendant] had primary responsibility for

---

[31] The Court notes that the positions held by Janovec and Rambaud-Measson, Senior Vice President and Vice President of Finance, do not suggest the same degree of authority, insider status, direct involvement, or breadth of responsibility as a title of CEO or CFO connotes. Thus a greater degree of factual support is required to bolster a claim that these officers were responsible for the statements made by ATI.

[32] Plaintiffs apparently deem Janovec and Rambaud-Measson responsible for the ATI Fraud because they are the only officers of ATI alleged to have been suspended from employment following Alstom's internal investigation into the ATI Fraud. While this allegation may distinguish these defendants from the other officers of ATI, it does not contribute any specific information about Janovec and Rambaud-Measson's involvement in providing information or making statements to Alstom regarding ATI's finances.

development or communication of any of the misleading statements.").

Furthermore, the Court declines to extend the group pleading doctrine to the statements allegedly communicated by Janovec and Rambaud-Measson to Alstom. While the doctrine may be invoked to link officers of a company with statements made directly to investors by that company, here the Court would have to apply the doctrine to the officers of a subsidiary, for statements which were issued to the public by the parent. Even though the Court has found that the Complaint sufficiently alleges that the "original and knowing source" of the relevant information communicated in those statements was ATI, the Court will not automatically impute those statements to Janovec and Rambaud-Measson merely by reason of their titles. To do so in this case would not comport with Second Circuit precedent, as there is no reason alleged to support a finding that those defendants were personally responsible for the misleading information provided to Alstom by ATI.[33]

---

[33] The Court notes that, while Scholastic suggests that Wright's requirement of attribution may have been relaxed, to extend group pleading to Janovec and Rambaud-Measson would ignore this requirement completely. In Scholastic, the defendant was alleged to have been primarily responsible for investor communications, and thus was obviously known to investors. As discussed above, Alstom's financial statements make clear that ATI was a transport subsidiary and that its financial results were included in Alstom's consolidated reports. With regard to Janovec and Rambaud-Measson, however, there is no allegation that Plaintiffs even knew of, let alone relied on those defendants when evaluating Alstom's business results. In fact, the first public disclosure cited by Plaintiffs which mentions Janovec or Rambaud-Measson is Alstom's press release announcing their suspension pending the completion of the investigation into the accounting improprieties. (See Compl. ¶ 121.) By comparison, the other

However, because it is conceivable that upon fuller consideration Plaintiffs may be able to plead facts sufficient to fill in the gaps the Court identifies as regards this aspect of Plaintiffs' Section 10(b) claims, the Court will grant leave to replead.

Plaintiffs also argue in their brief that Alstom USA, as the holding company which owned 100 percent of ATI=s stock, was able to control ATI=s actions because ATI was its agent, and thus Alstom USA can be held liable for the actions of ATI. (See Pls. Opp. Mem., at 49.) Under federal securities laws, a principal may be held liable for the acts of its agent. See, e.g., In re Parmalat Sec. Litig. ("Parmalat I"), 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005). Further, an agency relationship exists under New York law[34] "when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent." Id. (further noting that "[t]he element of control often is deemed the essential characteristic of the principal-agent relationship"). Stock ownership is one method of demonstrating control. See id. at

officers for which the Court has permitted the invocation of group pleading are each listed in Alstom's Forms 20-F, filed with the SEC. See, e.g., 1999 Form 20-F, at 112-113 (listing Executive Officers of Alstom).

[34] The law of the forum state governs where, as here, no party alleges that the law of a different state controls and differs from that of the forum. See id. at 290 n.63 (citing Questrom v. Federated Dep't Stores, Inc., 192 F.R.D. 128, 133 n.26 (S.D.N.Y. 2000), aff'd, 2 Fed. Appx. 81 (2d Cir. 2001)).

292;  see also Lipsky v. Commonwealth United Corp., 551 F.2d 887,898 (2d Cir. 1976) (where a subsidiary is wholly owned by a parent, New York courts might pierce the corporate veil either under agency theory or by ignoring the corporate existence of the subsidiary).  In addition, the pleading of the existence of an agency relationship need not meet the heightened standards of Rule 9(b) or the PSLRA, as the agency is not, in itself, an allegation of fraud.  Thus, the agency allegations must be pled only in accordance with Rule 8, which requires only  "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); see also Parmalat I, 375 F. Supp. 2d at 291.

Plaintiffs' claims against Alstom USA fail, however, because even under Rule 8's pleading standards, Plaintiffs do not sufficiently allege this theory of liability.  The Complaint's only factual allegations as to Alstom USA are that it is the wholly-owned subsidiary of Alstom, and that ATI is the wholly-owned subsidiary of Alstom USA.  (See Compl. ¶¶ 37-38.)  The Complaint also alleges that "Alstom, Alstom USA, ATI and Alcatel are liable for each of the statement of the Officer Defendants through the principles of respondeat superior."  (Id. ¶ 371.)  There are no additional allegations discussing the relationship between ATI and Alstom USA, or even a conclusory allegation that Alstom USA is liable for the

acts of ATI as its agent. In their brief, Plaintiffs argue
that they do not "[contend] that Alstom USA is liable because
the individual defendants in this action were its agent," but
rather that "ATI was Alstom USA's agent as its wholly owned
subsidiary and, as such, Alstom USA is liable under
traditional principles of agency as the parent of ATI for
ATI's wrongdoing." (See Pls. Opp. Mem., at 49.) However, as
Plaintiffs fail to articulate this claim in their Complaint,
it cannot be a basis for liability. See Wright, 152 F.3d at
178 (noting that a party may not amend pleadings through
statement in its motion brief). In addition, there can be no
liability against Alstom USA for the statements of the Officer
Defendants based on the theory of respondeat superior, as the
Complaint does not allege that any of the Officer Defendants
were the employees (or agents) of Alstom USA. Plaintiffs fail
to allege any grounds upon which to base their claims against
Alstom USA. However, in this regard, too, it is not
inconceivable for Plaintiffs to amend the Complaint to address
the deficiencies cited in this discussion. Accordingly, the
Court will grant leave to replead these claims.

Lastly, Plaintiffs argue that Janovec, Rambaud-Measson,
and Alstom USA are each liable for the ATI Fraud because of
their participation in a fraudulent scheme or course of
conduct. For the reasons set forth in Section III.B.4

(Applicability of Scheme Liability), <u>infra</u>, the Court rejects all claims based on this theory of liability with regard to the ATI fraud.

b. <u>Scienter Concerning the ATI Fraud</u>

(i) <u>Scienter as to ATI</u>

The facts Plaintiffs allege regarding the ATI Fraud are sufficient to demonstrate ATI's scienter. Indeed, ATI does not assert otherwise, focusing its argument instead on its contention that it did not make a statement. The Complaint alleges that €167 million in costs were excluded from ATI's financial statements because of, as described in an Alstom press release, "the understatement of actual costs incurred, including the non-recognition of costs incurred in anticipation of shifting them to other contracts, and by the understatement of forecast costs to completion." (Compl. ¶ 119.) These claims are sufficient to raise a strong inference that ATI "knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation" through its understatement of costs, <u>Novak</u>, 216 F.3d at 308, 311, as ATI allegedly was aware of the cost overruns (<u>see</u> Compl. ¶¶ 311-13).

(ii) <u>Scienter as to Alstom</u>

(a) <u>Motive and Opportunity</u>

The Complaint fails to allege that Alstom had a sufficient motive to orchestrate the accounting improprieties at ATI.  Plaintiffs set forth various and shifting theories with regard to the ATI Fraud, none of which advances a claim that Alstom acted with scienter.  For example, while Plaintiffs allege that the ATI Fraud was motivated by Alstom's desire to "keep the company afloat" following the Marine and Turbine Frauds, which were not disclosed until 2001 and 2002 (at the earliest), they also claim that the ATI Fraud began with the purposeful underbidding of the NJT contract in 1999. (<u>See</u>, <u>e.g.</u>, Compl. ¶ 116-17, 308-311.)  The Complaint also asserts that the ATI Fraud was motivated by a desire to meet the corporate goals set by Alstom's "Restore Value" Program, which was announced in March of 2002.  (<u>Id.</u> ¶ 303-304.)

Despite this confusion, it is clear that the only motive alleged with regard to Alstom for the ATI Fraud is the claim that Alstom engaged in the fraud "in order to keep the company afloat" in the wake of the disclosure of the Marine Fraud and the Turbine Fraud.  (Compl. ¶ 7; <u>see also</u> ¶¶ 116, 304.) However, the Complaint does not allege any facts to support the assertion that Alstom believed that the ATI Fraud was critical to the company's financial survival.  Indeed, as the

Court has noted elsewhere in this opinion (see Section III.B.4. (Applicability of Scheme Liability), infra) and in Alstom I, the Complaint does not allege sufficient facts to support the claim that the ATI Fraud originated at Alstom in an effort to redeem the company's tarnished image.  Rather, the facts asserted in the Complaint, when read liberally, support an inference that the ATI Fraud was motivated by ATI's desire to appear profitable and thus comply with Alstom's company-wide "Restore Value" program.  Furthermore, to the extent that the Complaint does contend that the ATI Fraud enabled Alstom to point to a profitable division during a period when the failures of its other divisions had severely tarnished its image (see Compl. ¶ 117), this motive is insufficient to raise an inference of scienter under Second Circuit precedent.  As the Second Circuit stated in Chill,

> [t]he motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not entail concrete benefits. . . . In both [Acito] and [San Leandro] we held that, if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.

101 F.3d at 268 (internal citations omitted).  Perhaps recognizing the difficulty of pleading motive as to Alstom, Plaintiffs devote greater energy to arguing that Alstom either knew or should have known of the ATI Fraud.  The Court now

turns to this contention.

      (b) <u>Conscious Misbehavior or Recklessness</u>
              <u>Concerning the ATI Fraud</u>

As noted above, Alstom argues that it cannot be held liable for its statements incorporating ATI=s financial results because there are insufficient allegations of scienter to support this claim. Relying on <u>Chill</u>, which found that a parent corporation's failure to investigate further into reports of "success, [or] even the extraordinary success" at a subsidiary company whose financial results the parent had publicly reported was not sufficient to allege scienter, Alstom claims that there are insufficient facts to demonstrate that Alstom knew, or was reckless in not knowing, that ATI=s financial results were false. <u>Chill</u>, 101 F.3d at 270. <u>Chill</u> is analogous to the facts of this case. There, GE had reported the financial results of Kidder Peabody, a subsidiary of one of GE's operating businesses, GE Capital Services. Those results were artificially inflated because of a fraud perpetuated by an employee of Kidder Peabody. Plaintiffs argued that GE's reporting of the false earnings had been highly unreasonable or reckless because GE had failed to investigate further upon becoming aware of Kidder=s inflated results. The Second Circuit rejected the plaintiffs' argument, finding that GE's failure to "equate record profits

-64-

with misconduct [could not] be said to be reckless," and that while GE may have been guilty of mismanagement, the plaintiffs' allegations were insufficient to support a finding of fraudulent intent by means of the recklessness prong.  Id.

Here, Plaintiffs point to the statements made by Alstom after the discovery of the fraud as evidence of the company's scienter.  In those statements, Alstom admits that a fraud occurred at ATI, referring to the "accounting improprieties" and "accounting irregularities" that occurred at the subsidiary and the resulting significant understatement of costs in ATI's accounts.  (Compl. ¶¶ 119, 121, 124.)  The existence of these statements, however, does nothing to advance Plaintiffs' argument that Alstom knew about the fraud prior to receiving the anonymous letter that prompted its internal investigation.  Statements by a parent company acknowledging the fraud of a subsidiary after that fraud has been discovered do not, without more, raise any reasonable inference that the parent knew about the fraud in advance and nonetheless proceeded to make the statements public.  On the contrary, the facts alleged by Plaintiffs - that Alstom conducted an internal investigation into the fraudulent accounting (Id. ¶ 119), reorganized operations in the United States Transport division (Id. ¶¶ 124, 128), and made repeated statements to the public describing the discovery and then the

extent of the accounting improprieties (<u>Id.</u> ¶¶ 119, 121, 124)
- more plausibly suggest that Alstom took the approach that
would be reasonably followed by any prudent corporation when
confronted with this type of crisis.

The other factual allegations made by Plaintiffs in
support of their contention that Alstom knew about the fraud
at ATI are sparse, and also unavailing.  The Complaint alleges
that sometime after March of 2002, Janovec traveled to Paris
to inform the company about cost overruns.  (<u>Id.</u> ¶ 317.) The
source of this allegation is ATI's former director of
purchasing, who had "heard" of Janovec's trip from "an ATI
employee."  (<u>Id.</u>)  The Complaint also alleges that ATI's
"Project Management Plan" for the NJT project, a contract
which ATI won in 1999 by allegedly intentionally underbidding
competitors, stated that Alstom's Board of Directors had
"oversight responsibilities" for the performance of the
contract.  (<u>Id.</u> ¶ 22.)

These allegations are too vague to demonstrate the
scienter required for fraud on the part of Alstom.  Defendants
first argue that the description of the source of the
allegation regarding Janovec's trip fails to demonstrate "the
probability that a person in the position occupied by the
source would possess the information alleged," <u>Novak</u>, 216 F.3d
at 314, as the actual source of the information is described

in the Complaint only as an "ATI employee."  Putting aside whether information provided by a confidential source who is merely repeating what he or she heard from an inadequately described third party is sufficient to support a factual allegation, the Court finds that the allegation regarding Janovec's trip to Paris is too lacking in specificity to support a finding of scienter.  There is no allegation as to the extent of the conversation between Janovec and Alstom, the degree of costs described by Janovec, or who Janovec met with at Alstom.  There is certainly no allegation that, upon hearing the news of cost overruns from Janovec, Alstom conspired with Janovec to hide the costs in ATI's accounting. This allegation is too vague to demonstrate that Alstom had notice of the degree of cost overruns at ATI such that Alstom should have known that ATI's favorable results were fraudulent.  While Alstom arguably may have been negligent in not investigating ATI's results more carefully, this failure is insufficient to support a finding of liability under Section 10(b).  See Chill, 101 F.3d at 270 ("[P]laintiffs fail to allege facts to support a finding that GE was faced with sufficient information such that its failure to further investigate Kidder's . . . trading practices constituted recklessness.").

The allegation that Alstom's Board had "oversight

responsibilities" for the NJT contract pursuant to that contract's Project Management Plan, is also insufficient. There are no allegations as to what this "oversight" consisted of, what information Alstom might have or should have received regarding the contract as a result of this oversight, or even if this provision of the Project Management Plan was complied with. Thus, there can be no reasonable inference that Alstom, as a result of this provision, had information about the NJT cost overruns, let alone a supportable strong inference of fraudulent intent in connection with the reporting of those costs.

The facts alleged here, like those in <u>Chill</u>, cannot support a sufficient inference of recklessness on Alstom's part.

(iii) <u>Scienter as to Officer Defendants for the ATI Fraud</u>

The only Officer Defendants that the Complaint successfully alleges to have made a statement with regard to the ATI Fraud are Bilger (for the November 2002 statements), Kron (for the June 2003 statement) and Jaffre (for all three statements alleged in connection with this fraud).[35]  For the

---

[35] As explained above, there can be no liability for the remaining Officer Defendants, Newey, Milner, Janovec, or Rambaud-Measson for the ATI Fraud. The Section 10(b) claims against Milner are time barred.  In addition, under the group pleading doctrine, Newey can be held accountable only for statements made before July 2002. The misleading statements alleged with regard to the ATI Fraud were made after that date.  Finally, there can be

same reasons outlined in the Court's analysis of Alstom's scienter, the Court finds that the Complaint fails to allege fraudulent intent as to these officers with regard to the ATI cost overrun statements. There are not sufficient allegations of "concrete benefits" that these defendants could have expected to gain as a result of the ATI Fraud, nor are there allegations supporting a strong inference that these Officers knew or should have known about, or had access to information regarding, the ATI Fraud.

Although Jaffre signed the November 7, 2002 Form 6-K (Compl. ¶ 268), which included the filing of a press release alleged to convey misleading statements about the Transport division,  as well as the June 2003 Form 6-K (Id. ¶ 281), which stated that the Transport division was operating at a profit when in fact it was operating at a loss, these facts do not sufficiently support a sufficient finding of scienter in these circumstances.  While, as discussed in Section III.B.2.c(ii)(Scienter as to Officer Defendants), supra, the signing of SEC filings creates a "duty [for the Officer signing the document] to familiarize [herself] with the facts relevant to the core operations of [the company]," Teamsters Local 445 Freight Div. Pension Fund, 2005 WL 2148919, at *63,

no liability for Janovec or Rambaud-Measson because the Court has found that the Complaint fails to allege that they made a statement within the meaning of Section 10(b).

ATI's business is not alleged to be a "core operation" of Alstom. According to Alstom's 2003 financial statements, all Transport division sales in North America, where ATI is one of two transport-related Alstom subsidiaries, constituted approximately 2.6 percent of Alstom's total sales in that year. (See 2003 Form 20-F, at 33 (listing Alstom's total 2003 sales by division), 69 (listing geographic breakdown of Transport division sales, with North America division sales listed as 11 percent of Transport division total sales.)) While ATI and its earnings are certainly significant to Alstom, Plaintiffs do not allege sufficient facts to suggest that this subsidiary can be considered of such critical importance to Alstom that a strong inference could be raised as to Jaffre's scienter with regard to the ATI Fraud.[36]

---

[36] The Court has allowed Plaintiffs' claims regarding the scienter of Bilger and Newey with regard to the Marine Fraud to survive, relying in part on these Officers' signing of SEC filings which included misrepresentations about that division. See Section III.B.2.c(ii) (Scienter as to Officer Defendants), supra. The Court does not view that finding as inconsistent with its conclusion that Jaffre's scienter is not adequately pled on the basis of his signing of SEC filings that included misrepresentations about the Transport division. The Complaint alleges that Alstom had extended a total of approximately €1.2 billion in cruise-ship-customer related vendor financing that was not disclosed in its SEC filings, despite the company's repeated touting of the Marine division results, in several financial filings as well as a number of press releases and the 2001 Registration Statement that was filed in connection with the Secondary Offering. In contrast, the Complaint alleges that the ATI Fraud consisted of an understatement of $167 million in costs of a North American subsidiary, the consolidated financial results for which are discussed in three allegedly misleading statements. The Court finds these allegations to be qualitatively different in their breadth and scope, to such a degree as to warrant the different conclusions with regard to these officers. The financial results of ATI are not alleged to have been sufficiently critical to Alstom's operations to infer the scienter of Jaffre on the basis that he was the signatory of SEC documents containing the alleged misstatements.

c. <u>Causation</u>

The Complaint's allegations with regard to the ATI Fraud are sufficient to support a claim for transaction and loss causation at the pleading stage. As discussed in Section III.B.2.d (Causation as to the Marine Fraud), <u>supra</u>, Plaintiffs' allegation that Defendants perpetrated a fraud on the market (Compl. ¶¶ 329-30) are sufficient to fulfill the transaction causation requirement at this stage of the litigation. <u>See In re GeoPharma</u>, 2005 WL 2431518, at *6 n.86. Loss causation is also adequately pled, as Plaintiffs allege that "the price of Alstom shares dropped after the ATI improprieties were revealed on June 30, 2003," and that the share value dropped even further after Alstom's August 6, 2003 announcement that the extent of the accounting improprieties were greater than initially realized and that the company would be forced to reduce its earnings by an additional €100 million. (Compl. ¶¶ 122, 125, 284.) Plaintiffs further assert that financial analysts attributed the drop in Alstom's share value to the announcement of ATI's accounting irregularities. (<u>Id.</u> ¶ 123.) These allegations of loss causation are sufficient to survive a motion to dismiss. <u>See In re GeoPharma</u>, 2005 WL 2431518, at *12.

The Complaint successfully alleges that ATI made material misrepresentations, with scienter, and that Plaintiffs

suffered losses because of their reliance on those statements. Accordingly, Plaintiffs' Section 10(b) claims for the losses suffered as a consequence of the ATI Fraud are sustained as against ATI, and dismissed as against all other Defendants, except insofar as leave to replead is granted as described above.

####       4. Applicability of Scheme Liability

In addition to claiming liability for the alleged misleading statements made by Defendants, Plaintiffs posit an alternate theory of liability based on Defendants' alleged use of a manipulative or deceptive device or participation in a scheme to defraud. Plaintiffs argue that Defendants are liable not only under subsection (b) of Rule 10b-5, which prohibits "the making of an untrue statement of a material fact and the omission to state a material fact," but also under subsections (a) and (c), which allow suit against defendants who, with scienter, employ a "device, scheme or artifice to defraud," or engage in an "act, practice, or course of business which operates or would operate a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. To state a claim based on conduct violating Rule 10b-5(a) and (c), plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4)

reliance.  <u>See</u> <u>In re Global Crossing</u>, 322 F. Supp. 2d at 336
(citation omitted).[37]

Thus, a claim of liability for violations of Rule 10b-
5(a) or (c) does not require an allegation that the defendant
made a statement, as liability is premised on a course of
deceptive conduct undertaken by the defendant, rather than on
misrepresentations or omissions.  Because of this standard,
claims of liability under subsection (a) and (c) of Rule 10b-5
need not comport with Subsection (b)(1) of the PSLRA, which
requires that a plaintiff set forth each statement alleged to
have been misleading, and facts giving rise to this belief.
<u>See</u> <u>In re Initial Pub. Offering Sec. Litig.</u>, 241 F. Supp. 2d
281, 385 n.100 (S.D.N.Y. 2003).  However, Subsection b(2) of

_____

[37] The Officer Defendants argue that Plaintiffs' allegations cannot support
a claim for "market manipulation" and therefore fail to state a claim
under subsections (a) and (c) of Rule 10b-5.  In support of this argument,
they cite an oft-quoted description of market manipulation, which states
that "[m]anipulation is virtually a term of art when used in connection
with securities markets.  The term refers generally to practices, such as
wash sales, matched orders, or rigged prices, that are intended to mislead
investors by artificially affecting market activity."  <u>Santa Fe Indus. v.
Green</u>, 430 U.S. 462, 476 (1977) (internal quotations omitted).  However,
subsections (a) and (c) of Rule 10b-5 encompass a wide range of activities
and are not limited to the prohibition of market manipulation.  <u>See</u> <u>In re
Parmalat Sec. Litig.</u> ("<u>Parmalat II</u>"), 376 F. Supp. 2d 472, 492 (S.D.N.Y.
2005) (rejecting the defendants' claims that subsections (a) and (c) apply
only to the narrow category of acts understood as manipulative in a
technical sense, as "[t]his interpretation is refuted by the language of
the rule as well the case law, which make it clear that subsections (a)
and (c) apply to at least some deceptive acts as much as to certain
technical forms of market manipulation."); <u>In re Global Crossing</u>, 322 F.
Supp. 2d at 336 (noting that the plaintiffs in that case "fail[ed] to
assert a market manipulation claim, as those claims are technically
understood" because they had alleged "no illegal <u>trading</u> activity that
would artificially cause stock prices to rise," but that "subsections (a)
and (c) encompass much more than illegal trading activity . . . they
encompass '<u>any</u> device, scheme or artifice,' or '<u>any</u> act, practice, course
of  business' used to perpetrate a fraud on investors.")(citing 16 C.F.R.
§ 240.10b-5(a), (c))(emphasis in original).

-73-

the PSLRA, requiring that the plaintiffs plead facts demonstrating a "strong inference" of scienter does apply to claims asserting scheme liability.  See id.

Courts have held that a plaintiff may not cast claims of misrepresentations as claims under Rule 10b-5(a) and (c) and thus evade the pleading requirements imposed in misrepresentation cases.  See Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999) (refusing to characterize allegations as market manipulation claims where alleged "scheme to defraud" consisted largely of an aggregation of material misrepresentations to inflate stock, such as research reports containing misrepresentations of the underlying facts and use of false names to solicit investors).  Furthermore, a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made.  Under these provisions, a defendant can be held liable only for "specific false statements to the extent that it can be said to have made those statements under Rule 10b-5(b)."  See In re Global Crossing, 322 F. Supp. 2d at 337 n.17; see also Parmalat II, 376 F. Supp. 2d at 503 (noting that the application of subsections (a) and (c) of Rule 10b-5 "is not a backdoor into

liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5.").[38] Nonetheless, it is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b-5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations. The subsections provide alternate mechanisms of pleading a primary violation of Section 10(b). Thus, even if a defendant who did not make any statements in connection with a particular fraud may not be held liable for fraudulent misrepresentations under subsection (b), that defendant may still be held liable under subsections (a) and (c) if it is alleged that they participated in scheme that encompassed conduct beyond misrepresentations.

Because the Court has already determined that Plaintiffs have successfully stated a claim for liability under Section 10(b) against Alstom, Bilger and Newey for the misleading statements made with regard to the Marine Fraud, it need not address the potential applicability of scheme liability under

---

[38] The question of when a particular defendant can be deemed to have "made" specific statements for purposes of the rule is discussed in greater detail in Section III.B.3.a, <u>supra</u>.

subsections (a) and (c) to this fraud.[39]  With regard to ATI, the Court has determined that Plaintiffs have stated a Section 10(b) claim against ATI for the misleading misrepresentations ATI made, and thus the Court need not consider whether or not participation in a fraudulent scheme has been alleged as to ATI.   Further, because the Court has found that Alstom, Bilger, Kron and Jaffre did not have scienter with regard to the ATI fraud, those defendants also may not be held liable pursuant to Rule 10b-5(a) and (c).  However, there remains the possibility of liability pursuant to subsections (a) and (c) for those defendants (Janovec, Rambaud-Measson, and Alstom USA) that the Court determined did not "make a statement" for purposes of liability under Section 10(b) with regard to the

---

[39]   The Court notes that even under a scheme theory of liability, the remaining Officer Defendants subject to Section 10(b) liability for that fraud (Kron, Jaffre, Rambaud-Measson, and Janovec) could not be held accountable for any scheme or fraudulent course of conduct undertaken in relation to the Marine Fraud.  Kron did not become CEO of Alstom until January of 2003, and there are not sufficient facts alleged to support the contention that he was involved in or had knowledge of the earlier Marine Fraud.  (See Compl. ¶ 40.)  Jaffre similarly did not become CFO until 2002, and there are also not sufficient facts alleged to support the contention that he was involved in or had knowledge of the earlier Marine Fraud. (See id. ¶ 41.)  Janovec and Rambaud-Measson held Officer positions at ATI only, and there are no allegations that they were involved in, or had fraudulent intent with regard to, any scheme that occurred in relation to the Marine Fraud.   In any event, while the analysis is largely academic, the Court notes that the Plaintiffs have not set forth a claim for scheme liability  on the basis of the Marine Fraud.  As discussed at various points in Alstom I, the extension of vendor financing in itself was not fraudulent, nor do Plaintiffs contend that the guarantees themselves  constituted the alleged fraud.  See, e.g., Pls.'s Alcatel Opp'n. Mem. at 13 ("[P]laintiffs do not contend that the guarantees themselves were improper, but rather that defendants' misrepresentations and failure to disclose the existence of those guarantees misled investors.").  Thus, Plaintiffs do not assert that they have pled a theory of  liability for the  Marine  Fraud that extends beyond the misrepresentations made in connection with that fraud.

-76-

ATI Fraud. For such liability to exist, Plaintiffs must allege that the fraud at ATI consisted of a scheme or deceptive course of conduct that encompassed more than the making of the misrepresentations. As noted above, a plaintiff cannot state a claim under Rule 10b-5(a) and (c) by pointing to fraudulent statements and claiming that the defendants were part of a scheme to make those statements, as this method of pleading would result in the circumvention of the Second Circuit's attribution requirements and Central Bank's prohibition of aider and abettor liability.

In the instant case, the Court concludes that the Complaint fails to state a claim for relief pursuant to Rule 10b-5(a) or (c) with regard to the ATI Fraud. The allegations related to the ATI Fraud concern the non-disclosure of the cost overruns at ATI. The Complaint fails to allege that there was a scheme to defraud that went beyond the misrepresentations themselves. See Parmalat II, 376 F. Supp. at 505 (rejecting claims of liability where the transactions pointed to "were not shams" and finding that the arrangements "therefore were not intentions, projects, or schemes with the tendency to deceive. Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere."). While the Complaint alleges that the cost overruns arose out

of a contract between ATI and NJT, which was allegedly intentionally underbid by ATI in 1999, this claim does not support a finding that the ATI fraud consisted of a manipulative or deceptive scheme that was undertaken in 1999. Indeed, the Complaint alleges that the NJT contract was underbid by ATI in order to "fill in business and keep the workforce running." (Compl. ¶ 312.)

As the Court discussed in <u>Alstom I</u>, intentional underbidding of a contract is not, in and of itself, fraudulent. Further, the reasons alleged by Plaintiffs for the underbidding do not provide any support for a claim that the underbidding was fraudulent. Nowhere in the Complaint is it alleged that ATI underbid the NJT contract in 1999 with the intention of understating costs related to the contract several years later, in order to artificially inflate Alstom's financial statements. While such an allegation <u>might</u> support a claim that the ATI Fraud was a scheme undertaken in 1999 in order to perpetrate a fraud on investors, the Complaint does not assert such a theory.[40]

---

[40] As the Court discussed in great detail in <u>Alstom I</u> (and briefly in Section III.B.3.b(ii) (Scienter as to Alstom)), the Complaint includes varying assertions as to the inception of and motive for the ATI Fraud, including the claim that the ATI Fraud was the tail end of one "unitary fraud," in which Alstom undertook its vendor financing, turbine and ATI frauds purposefully in order to carry out one grand scheme designed to inflate Alstom's stock price. For the reasons discussed in depth in <u>Alstom I</u>, the Court has determined that the Complaint, when read in the light most favorable to the Plaintiffs, sets forth claims based on two distinct frauds: (1) fraud on behalf of Alcatel and Marconi in anticipation of the Secondary Offering, based on the allegations that

The costs arising out of ATI's contracts were not, in and of themselves, deceptive. It was only the deliberate non-disclosure of these costs that gave rise to the alleged fraud. Thus the Court finds that Plaintiffs have failed to plead the deceptive scheme theory of liability with regard to the ATI Fraud. This conclusion forecloses any claim for liability arising out of the ATI Fraud for those defendants (Janovec, Rambaud-Measson, and Alstom USA) who did not "make a statement" in relation to that fraud. See In re Global Crossing, 322 F. Supp. 2d at 337 ("Subsection (a) and (c) may only be used to state a claim against [the defendant] for the underlying deceptive devices or frauds themselves, and not as a short cut to circumvent Central Bank's limitations on liability for a secondary actor's involvement in making misleading statements.") (internal citation omitted.)

---

Alstom did not disclose its vendor financing arrangements or the full extent of the Turbine-related reserves, in order to enable Alcatel and Marconi to sell their shares of Alstom stock at artificially inflated prices at the Secondary Offering, and (2) ATI's underreporting of costs associated with certain railcar contracts because of ATI's desire to appear profitable and thus comply with Alstom's company-wide "Restore Value" program. Thus, for the reasons set forth in Alstom I, in addition to the reasons described above, the Court does not read the Complaint to sufficiently assert or support the claim that the ATI Fraud was part of an ongoing scheme designed to include all three frauds. In reaching this conclusion, the Court is mindful that, under Rule 8, Plaintiffs are permitted to plead in the alternative. However, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." Livent II, 151 F. Supp. 2d at 405-06.

Thus, the Court's analysis of Plaintiffs' claims for scheme liability does not alter its findings as to which claims survive Defendants' motion to dismiss. Plaintiffs' Section 10(b) claims relating to the Marine Fraud survive against Alstom, Bilger and Newey. Plaintiffs' Section 10(b) claims relating to the ATI fraud survive against ATI only. All other Section 10(b) claims are dismissed, except insofar as leave to replead is granted as described above.

## IV.  SECTION 18 OF THE EXCHANGE ACT

A.  LEGAL STANDARD

Section 18 ("Section 18") of the Exchange Act creates a private cause of action against any person who makes or causes to be made materially misleading statements in reports or other documents filed pursuant to the Exchange Act, unless that person can prove that he or she acted in good faith and without knowledge that the statement was false or misleading.[41]

---

[41]  In pertinent part, Section 18 provides that:

> Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.

15 U.S.C. § 78r(a).

See 15 U.S.C. § 78r(a); <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 211 n.31 (1976). The statute covers materially false and misleading omissions as well. See <u>Ross v. A. H. Robins Co., Inc.</u>, 607 F.2d 545, 555-56 (2d Cir. 1979) ("A plaintiff seeking recovery under s[ection] 18... must... plead and prove that a document filed with the Commission contains a material misstatement or omission."); <u>In re Caesars Palace Sec. Litig.</u>, 360 F. Supp. 366, 386 n.19 (S.D.N.Y. 1973).

To state a claim under Section 18, a plaintiff must plead that (1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act (or any rule or regulation thereunder); (2) defendant made or caused to be made the false or misleading statement; (3) plaintiff relied on the false statement; and (4) the reliance caused loss to the plaintiff. See <u>In re Stone & Webster, Inc. Sec. Litig.</u>, 414 F.3d 187, 193 (1st Cir. 2005); <u>Ross</u>, 607 F.2d at 552-53 (discussing reliance element); <u>Lindner Dividend Fund, Inc. v. Ernst & Young</u>, 880 F. Supp. 49, 56 (D. Mass. 1995) (discussing reliance and damage elements); <u>Gross v. Diversified Mortgage Investors</u>, 438 F. Supp. 190, 195 (S.D.N.Y. 1977) (discussing reliance and filing elements).[42]

---

[42] The language of the statute clearly suggests these four elements. However, aside from <u>In re Stone & Webster</u>, 414 F.3d at 193, no single case clearly sets out these four elements. For example, <u>Ross</u> states that "Section 18 requires that a plaintiff establish knowledge of and reliance upon the alleged misstatements contained in any document filed with the SEC." 607 F.2d at 552-53. This statement of the prerequisites of a prima

## 1.  <u>Documents Filed Pursuant to the Exchange Act</u>

Section 18 applies only to documents filed pursuant to the Exchange Act.  <u>See</u> 15 U.S.C. § 78r(a) (creating liability for misstatements in documents filed "pursuant to <u>this chapter</u> or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of <u>this title</u>") (emphasis added); <u>Ross</u>, 607 F.2d at 551 (noting that Section 18 creates private remedy for false or misleading statements contained in documents "filed with the S.E.C. pursuant to the 1934 Act"). Thus, the provision does not apply to filings made solely

---

facie case makes no mention of the requirements of (1) materiality; (2) damages; and (3) filing pursuant to the Exchange Act -- all of which are clearly set forth in the statute.  However, this omission in <u>Ross</u> may be explained by the fact that in articulating the standard, the Circuit Court did so in the context of a discussion of the reliance element, and was not then addressing the existence of the other elements.  In fact, later in the same case, while discussing the absence of a scienter requirement, the Circuit Court repeats what plaintiff must establish, but this time includes the materiality element.  <u>See</u> <u>id.</u> at 555-56 ("A plaintiff seeking recovery under s[ection] 18 ... must merely plead and prove that a document filed with the Commissions contains a material misstatement or omission.").

Similarly, some cases recite that the documents must be filed with the SEC, but do not expressly state that the documents must be filed with the SEC pursuant to the Exchange Act.  <u>See</u>, <u>e.g.</u>, <u>Ross</u>, 607 F.2d at 552-53 (discussed above); <u>Ross v. Warner</u>, 480 F. Supp. 268, 272-73 (S.D.N.Y. 1979) ("To establish a section 18 violation, a plaintiff must plead and prove that he has purchased or sold a security in actual reliance on a document, filed with the SEC, that contains a material misstatement or omission.") (citing <u>Ross v. A.H. Robins</u>).  Yet, as will be explained in Section IV.A.1 <u>infra</u>, the statutory language clearly limits Section 18's application to documents filed pursuant to the Exchange Act, and cases examining this issue closely have concluded that it is limited to documents filed pursuant to the Exchange Act, not other securities laws.

Thus, the Court concludes, from a close reading of the language of the statute and drawing from those cases that more meticulously examine the text of Section 18, that these four elements are required to state a claim under that provision of the statute.

under the 1933 Act or any other of the securities laws.  See Gross, 438 F. Supp. at 196 (dismissing Section 18 claims that relied on a prospectus filed as part of a registration statement pursuant to Securities Act, not Exchange Act); see also Hagert v. Glickman, Lurie, Eiger & Co., 520 F. Supp. 1028, 1033 (D.C. Minn. 1981) (holding that a claim made under Section 18 of the 1934 Act must be based on reliance on documents filed pursuant to the 1934 Act, and dismissing Section 18 claims where plaintiffs conceded that the documents relied upon -- registration statement, prospectus, and annual report -- were filed pursuant to the 1933 Act); Forrestal Village, Inc. v. Graham, No. 74-881, 1976 WL 758, Fed. Sec. L. Rep. 95,428 (D.D.C. Jan. 30, 1976) (dismissing Section 18 claim based on prospectus because prospectus was not filed pursuant to 1934 Act).

In addition, SEC regulations expressly exempt certain filings from the provisions of Section 18.  See, e.g., 17 C.F.R. § 240.13a-16(c) (exempting Form 6-K furnished pursuant to Rule 13a-16); 17 C.F.R. § 240.15d-16(c) (exempting Form 6-K furnished pursuant to Rule 15d-16); 17 C.F.R. §§ 240.14a-3(c)-(d), 240.14c-3(b) (exempting annual reports sent to shareholders unless report is incorporated into proxy solicitation materials or other filed reports by reference; subjecting the annual report to Section 18 liability if it is

prepared pursuant to Form 10-K and Form 10-KSB and submitted in satisfaction of the proxy solicitation rules); 17 C.F.R. §§ 240.13a-13(d), 240.15d-13(e) (exempting financial information on Form 10-Q and Form 10-QSB); 17 C.F.R. § 240.12g3-2(b)(4) (exempting certain information filed by foreign private issuers); 17 C.F.R. § 240.17h-2T(c)(5) (exempting certain information filed by brokers or dealers); see also Heit v. Weitzen, 402 F.2d 909, 915-16 (2d Cir. 1968) (holding that an annual report submitted to the SEC was not a filed document within the meaning of Section 18 because 17 C.F.R. § 240.14a-3(c) exempted it from Section 18's provisions, but that the Form 10K submitted to SEC was a filed document within the meaning of Section 18, because the exemption provision applied only to copies of the annual report that accompanied the 10K report but not the 10K report itself).

2. Actual Reliance

Section 18 requires actual, or what has sometimes been referred to as "eyeball," reliance. See Ross, 607 F.2d at 552-53; Heit, 402 F.2d at 916; Gross, 438 F. Supp. at 195 ("[P]laintiffs have failed to allege that they actually read the filed document or documents. Such 'eyeball reliance' is required under § 18."). Thus, to state a claim under Section 18, plaintiffs must allege that they actually read and relied on the filed document. Constructive reliance is not

sufficient.  <u>See</u> <u>Heit</u>, 402 F.2d at 916; <u>Gross</u>, 438 F. Supp. at 195.

3.  <u>Scienter</u>

Contrary to the argument made by certain of the Defendants in the matter at hand, Section 18, unlike Section 10(b), does not require a plaintiff to plead scienter. Instead, the burden of proving the defendants' state of mind falls upon the defendant in the form of a defense:

> A plaintiff seeking recovery under s[ection] 18 [rather than section 10(b)] faces a significantly lighter burden. He must merely plead and prove that a document filed with the Commission contains a material misstatement or omission.  If he can show reliance on the statement, liability is established, unless by the very terms of section 18, the person sued shall prove that he acted in "good faith and had no knowledge that such statement was false or misleading."  As is readily apparent this difference may prove critical.  A plaintiff unable to allege those specific facts necessary under Fed. R. Civ. P. 9(b) which would raise a strong inference of scienter... would not be able to establish a prima facie case under s[ection] 10(b).  The very same plaintiff, however, could proceed under s[ection] 18.

<u>Ross</u>, 607 F.2d at 555-56; <u>see also</u> <u>In re Stone & Webster</u>, 414 F.3d at 193 ("Under [Section 18], unlike Rule 10b-5, a plaintiff bears no burden of proving that the defendant acted with any particular state of mind.  The state of mind with which the defendant acted enters the case instead as a defense."); <u>Magna Inv. Corp. v. John Does One Through Two Hundred</u>, 931 F.2d 38, 40 (11th Cir. 1991) (same).

B.  <u>DISCUSSION</u>

In <u>Alstom II</u> the Court dismissed as time-barred all Plaintiffs' claims relating to the Turbine Fraud, and all Section 18 claims related to the Marine Fraud.  Thus, the only remaining Section 18 claims are those that involve the ATI Fraud.

Plaintiffs have asserted Section 18 claims against Alstom, Alstom USA, ATI, Bilger, Kron, Jaffre, Newey, Rambaud-Measson, Janovec, and the "Director Defendants," who Plaintiffs define in Paragraph 53 of the Complaint as Bilger, Purves, Esser, Halbron, Mayo, Simpson and Tchuruk.  (Compl. Section E.)  Plaintiffs have not asserted Section 18 claims against Milner, Alcatel or the Underwriter Defendants.

1.  <u>False or Misleading Statement Contained in a Document Filed Pursuant to the Exchange Act</u>

This element of Section 18 contains two parts:  (1) a false or misleading statement; (2) the false or misleading statement is contained in a document filed pursuant to the Exchange Act.  Because the second element is dispositive as to most of Plaintiffs' Section 18 claims, the Court addresses it first.

a.  <u>Documents Filed Pursuant to the Exchange Act</u>

The Complaint, in its recitation of GAAP violations and of "Defendants' Materially False and Misleading Statements,"

alleges that the following documents contain materially false or misleading statements related to the ATI Fraud: (1) the November 13, 2002 Form 6-K (Compl. ¶¶ 160-61); (2) a November 6, 2001 press release (Compl. ¶¶ 236-37); (3) a November 5, 2002 press release filed on the November 7, 2002 Form 6-K (Compl. ¶¶ 268-72); and (4) the June 2, 2003 Annual Report filed on Form 6-K (Compl. ¶¶ 281-82). In the section of the Complaint comprising the Section 18 "Count," Plaintiffs incorporate these previous allegations (Compl. ¶ 374), and in addition, allege materially false or misleading statements in "documents filed with the S.E.C. by Alstom, including filings made on Form 20-F, Form 6-K, and F-3." (Compl. ¶ 376.) Finally, the Section 18 Count also alleges that Plaintiffs relied on (1) "Annual Reports on Form 20-F for the years ending March 31, 1999 through March 31, 2002 and the financial statements contained therein"; (2) "Current Reports on Form 6-K during the Class Period";[43] and (3) "Registration Statements on Form F-3, and corresponding Prospectuses, filed between January and March 2001." (Compl. ¶ 377.)

          (i)  <u>Form 6-K</u>

---

[43] Paragraph 377 of the Complaint alleges reliance on a Form "8-K." This is the only place in the Complaint that refers to such a form. In light of this circumstance, as well as that (1) the Complaint repeatedly refers to Forms 20-F, 6-K and F-3, and (2) Alstom, as a foreign private issuer, does not file a Form 8-K, <u>see</u> 17 C.F.R. § 240.13a-11(b), the Court assumes this allegation reflects a typographical error and thus treats the reference to Form "8-K" as intended to mean Form 6-K. If this assumption is not warranted under the circumstances, the parties may address any concerns or implications to the Court for additional consideration.

Although Form 6-K is required by the Exchange Act for certain foreign private issuers, see 17 C.F.R. §§ 240.13a-16, 240.15d-16, 249.306, SEC regulations expressly exempt Form 6-K from forming a basis for Section 18 liability. See 17 C.F.R. § 240.13a-16(c) ("Reports furnished pursuant to this rule shall not be deemed to be 'filed' for the purpose of section 18 of the Act or otherwise subject to the liabilities of that section."); 17 C.F.R. § 240.15d-16(c) ("Reports furnished pursuant to this rule shall not be deemed to be 'filed' for the purpose of section 18 of the Act or otherwise subject to the liabilities of that section."). Thus, Alstom's November 13, 2002 Form 6-K (Compl. ¶¶ 160-61), November 5, 2002 press release filed on Form 6-K on November 7, 2002 (Compl. ¶¶ 268-72), June 2, 2003 Annual Report filed on Form 6-K (Compl. ¶¶ 281-82), or any other Form 6-K cannot form a basis for Section 18 liability. Plaintiffs in effect concede this point, for in their briefs they do not even attempt to argue that a Form 6-K could provide the basis for a Section 18 claim, but simply state that this argument "does little to assist defendants' cause, since defendants concede that Alstom's Form 20-F's form a proper basis for plaintiffs' Section 18 claim." (Pls.' Exchange Act Opp'n Mem., at 76.)

(ii) <u>November 6, 2001 Press Release</u>

Plaintiffs allege that the November 6, 2001 press release contains materially false and misleading statements as to ATI (Compl. ¶¶ 236-37), but do not allege that it was filed pursuant to the Exchange Act. Accordingly, this document cannot form the basis for Plaintiffs' Section 18 claims.

_____(iii)     Form F-3

Plaintiffs also attempt to base their Section 18 claim on materially false or misleading statements in Form F-3 and corresponding prospectuses. (Compl. ¶ 376.). However, Plaintiffs do not allege any misstatements or omissions related to the ATI Fraud in the Form F-3 or its associated prospectuses. Instead, the 2001 Form F-3, which is the only Form F-3 mentioned in the Complaint, is alleged to be misleading for reasons related to the Turbine and Marine Frauds. (Compl. ¶ 210.) More fundamentally, however, Form F-3 is filed pursuant to the Securities Act, not the Exchange Act. See 17 C.F.R. § 239.33 ("Form F-3, for registration under the Securities Act of 1933 of securities of certain foreign private issuers offered pursuant to certain types of transactions"). It therefore cannot serve as a basis for liability under Section 18 of the Exchange Act. See Gross, 438 F. Supp. at 196 (dismissing Section 18 claims that relied on a prospectus filed as part of registration statement pursuant to Securities Act, not Exchange Act). Plaintiffs

essentially concede this point as well, for they do not provide a counter-argument, but instead simply respond that the Forms 20-F provide a proper basis for the Section 18 claims. (Pls.' Exchange Act Opp'n Mem., at 76.)

(iv) <u>Forms 20-F</u>

Plaintiffs also assert Section 18 claims based on Alstom's Forms 20-F from 1999 through 2002. (Compl. ¶ 377.) A Form 20-F is filed pursuant to the Exchange Act, <u>see</u> 17 C.F.R. § 249.220f ("Form 20-F, registration of securities of foreign private issuers pursuant to section 12(b) or (g) [of the Exchange Act], annual and transition reports pursuant to sections 13 and 15(d), and shell company reports required under Rule 13a-19 or 15d-19"), and thus clearly can form the basis for a Section 18 claim.

Defendants contend that none of the alleged misrepresentations as to ATI are contained in the Forms 20-F. This argument is addressed in the next section, which analyzes whether the filed documents contain false and misleading statements with respect to any material facts.

b. <u>Filed Documents Containing False or Misleading Statements With Respect to Any Material Fact</u>

As discussed above, among the documents alleged to form the basis for Plaintiffs' Section 18 causes of action, only the Forms 20-F can support such claims. Defendants argue that

none of the alleged misrepresentations as to ATI are contained in the Forms 20-F.  Indeed, in their catalogue of "Materially False and Misleading Statements," (Compl. ¶¶ 162 - 287), Plaintiffs do not identify any way that the Forms 20-F are misleading as a result of the ATI Fraud.  Paragraph 165 explains that the 1999 Form 20-F was materially false and misleading because it did not disclose costs associated with turbine defects.  (Compl. ¶ 165.)  Paragraph 185 explains that the 2000 Form 20-F was materially false and misleading because it did not disclose costs associated with turbine defects and because Alstom had artificially inflated demand for its cruise ships.  (Compl. ¶ 185.)  Paragraph 216 similarly explains that the 2001 Form 20-F was materially false and misleading because it did not disclose costs associated with turbine defects and because Alstom had artificially inflated demand for its cruise ships.  (Compl. ¶ 216.)  Paragraph 264 explains that the 2002 Form 20-F was materially false and misleading because it did not disclose costs associated with turbine defects.  (Compl. ¶ 264.)

Thus, the Complaint alleges misrepresentations in the Forms 20-F only with respect to the Marine and Turbine Frauds.[44]  By way of contrast, in the Forms 6-K, which cannot

---

[44]  The Forms 20-F are also alleged to be misleading due to the GAAP violations stated earlier in the Complaint.  However, this does not cure the defect in Plaintiffs' pleading, for reasons discussed later in this opinion.

serve as a basis for Section 18 liability, Plaintiffs expressly allege misrepresentations related to the ATI Fraud. See, e.g., Compl. ¶ 282 ("The statements in the 2003 Annual Report were materially false and misleading because the Company's operating income and net income losses were understated ... as a result of the fraudulent accounting at ATI."). Under the heightened pleading standards of the PSLRA and Federal Rule of Civil Procedure 9(b), which the Court determined in Alstom II apply to the Complaint because Plaintiffs' pleadings "sound in fraud," see discussion in

<u>Alstom II</u>, Section IV.A.1,[45] the Complaint therefore does not

---

[45]    As explained in <u>Alstom II</u>, a complaint can sound in fraud under Rule 9(b) even if fraud is not an element of the cause of action.  <u>See Alstom II</u>; <u>see also Rombach</u>, 355 F.3d at 171 ("By its terms, Rule 9(b) applies to 'all averments of fraud.'  This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.") (internal citation omitted).  A claim sounds in fraud if its words and imputations include characterizing a document as "inaccurate and misleading" or containing "untrue statements of material facts, or alleging that "materially false and misleading written statements" were issued.  <u>See Rombach</u>, 355 F.3d at 172.

    Here, there can be no dispute that Plaintiffs' Section 18 claims sound in fraud.  First, Plaintiffs clearly characterize the claim as one of fraud.  <u>See</u>, <u>e.g.</u>, Compl. ¶ 7 ("Alstom engaged in yet another accounting fraud, this time at its Transport division...."); ¶ 14 ("Defendants engaged in extensive fraud-related conduct in the United States by... artificially inflating earnings and shareholders' equity through the omission of huge expenses from its financial statements at... ATI"); ¶ 20 ("The Alstom defendants' fraudulent conduct in the United States also included pervasive and deliberate improper accounting regrading the ATI railway cars...."); ¶ 21 ("[T]he accounting fraud at ATI involved, in part, understating costs incurred in connection with a $280 million contract to build railcars for NJT."); ¶¶ 116-17 ("... Alstom failed to recognize millions of dollars in costs incurred in connection with railcar contracts that ATI performed during fiscal year 2003.... [T]his fraudulent accounting inflated the Company's fiscal year 2003 net income...."); ¶ 129 ("As a result of the massive fraud that was perpetrated at ATI....").

    In addition, the ATI-related claims contain those words and imputations "classically associated" with fraud.  <u>See</u>, <u>e.g.</u>, Compl. ¶ 160 ("The November 13, 2002 Form 6-K was <u>materially</u> <u>untrue</u> insofar as Alstom's financial results were materially overstated and not prepared in conformity with GAAP ....  These representations were <u>materially</u> <u>false</u> <u>and</u> <u>misleading</u> and violated fundamental GAAP provisions.....") (emphasis added); ¶ 270 ("The statements in the November 5, 2002, press release regarding Alstom's financial results and Transport division were <u>materially</u> <u>false</u> <u>and</u> <u>misleading</u> because the Company's operating income and operating margin had been artificially inflated ... as a result of the accounting fraud at ATI....") (emphasis added); ¶ 272 ("These statements were also <u>materially</u> <u>false</u> <u>and</u> <u>misleading</u> because the purported 'improvement' in Alstom's operating income... stemmed, in large part, from the ATI accounting fraud....") (emphasis added); ¶ 282 ("The statements in the 2003 Annual Report were <u>materially</u> <u>false</u> <u>and</u> <u>misleading</u> because the Company's operating income and net income losses were understated... as a result of the fraudulent accounting at ATI.") (emphasis added); ¶ 376 ("[T]he Section 18 Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, <u>false</u> <u>or</u> <u>misleading</u> <u>with</u> <u>respect</u> <u>to</u> <u>material facts</u>....") (emphasis added); ¶ 377 ("Plaintiffs.. relied on these S.E.C. filings not knowing that they were <u>false</u> <u>and</u> <u>misleading</u>.") (emphasis added).

    Thus, under the <u>Rombach</u> doctrine, as well as by Plaintiffs' own characterizations, the Section 18 claims sound in fraud, and the

state a claim under Section 18 for the alleged ATI Fraud.[46]

Plaintiffs attempt to overcome this defect in their pleading by arguing that "even though the problems [relating to ATI] were not disclosed until 2003, the Complaint alleges that those problems existed for many years prior, rendering the earlier 20F Forms materially inaccurate." (Pls.' Exchange Act Opp'n Mem., at 74 n.39.). As an example, they point to

---

heightened pleading standards of Rule 9(b) apply to those claims.

The Court notes as well that courts in this Circuit have without hesitation applied Rule 9(b)'s heightened pleading requirements to Section 18 claims. See, e.g., Denny v. Barber, 576 F.2d 465, (2d Cir. 1978) (affirming dismissal of Section 18 claims for failure to allege fraud with the particularity required by Fed. R. Civ. P. 9(b)); Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 522 (S.D.N.Y. 1977) (applying Rule 9(b)'s heightened pleading standards to Section 18 claims).

[46] The PSLRA applies to all private actions arising under the Exchange Act that are brought as plaintiff class actions. 15 U.S.C. § 78u-4(a)(1). As stated above in connection with the discussion of the Section 10(b) claims, for such actions in which the plaintiff alleges that the defendant made an untrue statement of a material fact (and the pleadings thus sound in fraud or are grounded in actual fraud), the complaint must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1); Rombach, 335 F.3d at 170. In their Section 18 claims, Plaintiffs allege that Defendants made or caused to be made false or misleading statements with respect to material facts. (Compl. ¶ 376.) Thus, the PSLRA's requirement that Plaintiffs specify each misleading statement and the reason why it is misleading applies to Plaintiffs' Section 18 claims. See also In re Stone & Webster, 414 F.3d at 194 (applying PSLRA requirements regarding misleading statements to Section 18 claims).

However, as set forth above, Section 18 does not require that Plaintiffs plead scienter. See 15 U.S.C. §78(4)(a); Ross, 607 F.2d at 555-56. Therefore, the PSLRA's "strong inference" requirement for fraudulent intent does not apply to Section 18 claims. The "strong inference" standard applies only where plaintiff must prove that the defendant acted with a particular state of mind. See 15 U.S.C. § 78u-4(b)(2). Section 18 does not require plaintiff to prove that defendant acted with a particular state of mind, but instead places that burden upon the defendant in the form of an affirmative defense. See In re Stone & Webster, 414 F.3d at 195, 202.

Paragraph 124 of the Complaint.  (<u>Id.</u>)  This argument fails for several reasons.

First, Paragraph 124 does not allege that problems at ATI existed for many years prior to 2003.  Instead, it addresses alleged improprieties that affected "fiscal 2003 earnings" and "fiscal 2004 earnings."  (Compl. ¶ 124.)  Nor does the Complaint elsewhere clearly allege earlier problems at ATI. Although Plaintiffs at one point allege that the ATI Fraud involved, in part, understating costs incurred in connection with a 1999 contract (Compl. ¶ 308), Plaintiffs elsewhere concede that this underbidding was motivated by a non-fraudulent reason:  a desire to keep a work force employed (Compl. ¶ 311).  Moreover, the Court has rejected this theory of the fraud and has held that any conduct prior to the March 14, 2002 announcement of the Restore Value cannot have been related to the ATI Fraud.  <u>See</u> <u>Alstom I</u>; <u>see also</u> <u>supra</u> n.40.

Second, and more fundamentally, even if the ATI Fraud had begun earlier, and even if other sections of the Complaint had pointed to those earlier problems, this method of pleading would not satisfy the PSLRA and Federal Rule of Civil Procedure 9(b).  Under the heightened pleading standards of the PSLRA, the complaint must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.  15 U.S.C. § 78u-4(b)(1); <u>Rombach</u>,

335 F.3d at 170. In addition, because Plaintiffs' Section 18 claim sounds in fraud for pleading purposes, Federal Rule of Civil Procedure 9(b) requires those claims to be stated with particularity. The Second Circuit has interpreted this particularity requirement to mean to that the complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). Plaintiffs' attempt to substitute allegations of misconduct set forth in other forms and communications for the required explanation of why a statement in Form 20-F is misleading is not appropriate. Although, as noted in the Court's discussion of Plaintiffs' 10(b) claims, supra Section III.B.2.b, a boilerplate explanation of why a statement is misleading may be appropriate provided that it is coupled with fuller explanations earlier in the Complaint, here the allegations do not contain even a boilerplate explanation as to how the ATI Fraud affected the Forms 20-F.[47] The reference to GAAP violations does not save Plaintiffs' Complaint. In addition to alleging that the Forms 20-F are misleading because of

---

[47] The absence of any explanation involving ATI stands in marked contrast to Plaintiffs' descriptions of why the Forms 6-K were misleading; the latter descriptions clearly explain how the ATI Fraud rendered the Forms 6-K inaccurate. See, e.g., Compl. ¶¶ 270, 282.

issues related to vendor financing and turbine defects, the Complaint also states that each Form 20-F is materially false and misleading "as a result of the GAAP violations set forth in Section VI." (Compl. ¶¶ 165, 185, 216, 284.) Section VI does contain alleged GAAP violations that relate to the ATI Fraud. (Compl. ¶¶ 157-161.) However, those alleged violations relate solely to Alstom's preparation of its 6-K forms. (See, e.g., ¶ 160 ("The November 13, 2002 Form 6-K was materially untrue insofar as Alstom's financial results were materially overstated and not prepared in conformity with GAAP.").) In contrast, the Forms 20-F are linked to GAAP violations solely for reasons related to the Marine and Turbine frauds. (Compl. ¶¶ 153-56). Thus, the reference to GAAP violations does not provide any explanation of how the Forms 20-F are misleading as a result of the ATI Fraud.

In addition, Plaintiffs allege in the Complaint that the ATI Fraud impacted only fiscal year 2003 results. (Compl. ¶¶ 7, 116-29, 157-61, 236-37, 265-71, 281-84, 304-07, 372(f), 389.) However, the 1999-2002 Forms 20-F did not report fiscal year 2003 results. Indeed, the Form 20-F filed on May 24, 2002, which is the most recent Form 20-F of those alleged to give rise to a Section 18 claim, contains an annual report for the fiscal year ending March 31, 2002. (See 2002 Form 20-F, included as Ex. A.4 in the J.A.)

Thus, even reading the Complaint in the light most favorable to Plaintiffs, the Court finds that the Complaint does not provide any sufficient explanation of how the Forms 20-F are misleading in a way that relates to the only fraud in the case with remaining Section 18 claims -- the ATI Fraud. The Complaint therefore does not state a claim under Section 18 for the ATI Fraud. Plaintiffs' explanation, in their response to the instant motion, for why the Forms 20-F are materially inaccurate with respect to the ATI Fraud amounts instead to an inappropriate attempt to amend pleadings through subsequent briefs. See Wright, 152 F.3d at 178; Parmalat II, 376 F. Supp. 2d at 513; Livent II, 151 F. Supp. 2d at 432.[48]

Accordingly, all of Plaintiffs' Section 18 claims must be dismissed.

## V.  SECTION 20(A) OF THE EXCHANGE ACT

Plaintiffs bring "control person" claims under Section 20(a) ("Section 20(a)") of the Exchange Act against Alcatel, Bilger, Kron, Jaffre, Newey, Rambaud-Measson and Janovec.

"'Controlling-person liability' is a separate inquiry from that of primary liability and provides an alternative

---

[48]    Plaintiffs' allegations would fail even the ordinary notice pleading standards.  The Complaint does not contain even a conclusory statement as to why the Forms 20-F were misleading as to the ATI Fraud.  Nowhere in the Complaint is anything that would put Defendants on notice that Plaintiffs were basing their Section 18 claims related to the ATI Fraud on the Forms 20-F.

basis of culpability." In re Scholastic, 252 F.3d at 77; In re Adelphia Communications Corp. Sec. & Derivative Litig., No. 03 MD 1529, 2005 WL 2979066, at *14 (S.D.N.Y. Nov. 7, 2005). Although a defendant cannot be held liable as both a primary violator and a controlling person, such alternative theories are permissible at the pleadings stage. In re Adelphia Communications, 2005 WL 2979066, at *14; Parmalat I, 375 F. Supp. 2d at 310 (citing In re Scholastic, 252 F.3d at 77).

A.   LEGAL STANDARD

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to establish a prima facie case of liability under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation.'" Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Sec., Inc.,

101 F.3d 1450, 1472 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997) (internal quotation marks and citations omitted)); see also Ganino, 228 F.3d at 170 (reiterating First Jersey standard). Once a plaintiff makes a out a prima facie case of liability under Section 20(a), the burden shifts to the defendant to show that he or she acted in good faith and did not directly or indirectly induce the act or acts constituting the violation. See 15 U.S.C. § 78t(a); First Jersey, 101 F.3d at 1473.

## 1. Primary Violation

A plaintiff must first plead facts showing a primary violation of the securities laws by the allegedly controlled person. See Endovasc Ltd. v. J.P. Turner & Co., No. 02 Civ. 7313, 2004 WL 634171, at *14 (S.D.N.Y. Mar. 30, 2004) (dismissing Section 20(a) claim when plaintiff failed to state a primary violation of the securities laws under Section 10(b)); Brown v. Hutton Group, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) ("[I]t is impossible to state a claim for secondary liability under Section 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party.").

2. <u>Control of the Primary Violator</u>

A determination of Section 20(a) liability requires "an individualized determination" of a defendant's control of the primary violator, as well as of the defendant's particular culpability. <u>Boguslavsky</u>, 159 F.3d at 720.

Control over a primary violator may be established by showing that the defendant "possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" <u>First Jersey</u>, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2).

"Actual control is essential to control person liability." <u>In re Livent, Inc. Sec. Litig.</u> ("<u>Livent I</u>"), 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999); <u>see also</u> <u>In re Global Crossing, Ltd. Sec. Litig.</u>, No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) ("To be liable as a control person, the defendant 'must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person.'") (quoting <u>Wallace v. Buttar</u>, 239 F. Supp. 2d 388, 396 (S.D.N.Y. 2003)); <u>In re Flag Telecom Hldgs., Ltd. Sec. Litig.</u> ("<u>Flag II</u>"), 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (same); <u>In re Deutsche Telekom AG Sec. Litig.</u>, No. 00

Civ. 9475, 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002) (same).[49]

Thus, exercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control for purposes of Section 20(a).  See Flag II, 352 F. Supp. 2d at 458 ("Control in this context 'is not the mere ability to persuade, but almost always means the practical ability to direct the actions of people who issue or sell securities.'") (quoting Ross v. Bolton, No. 83 Civ. 8244, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989)) (internal quotation omitted); In re Blech Sec. Litig., 961 F. Supp. 569, 587 (S.D.N.Y. 1997); see also Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 494 (7th Cir. 1986).[50]

Moreover, the Section 20(a) defendant must not only have actual control over the primary violator, but have "'actual

---

[49] Several of these cases analyze control under Section 15 of the Securities Act.  The provisions of Section 15 of the Securities Act and Section 20(a) of the Exchange Act "are essentially parallel" and "are interpreted in the same manner."  In re Global Crossing, 2005 WL 1881514, at *11; see also In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288, 2004 WL 1097786, at *2 n.9 (S.D.N.Y. May 18, 2004).

[50] For this reason, the phrasing used by some courts -- that a plaintiff must plead facts supporting a reasonable inference that defendant had the power to "influence and direct" the primary violator -- is not accurate to the extent that it implies that influence alone is enough.  See, e.g., In re Deutsche Telekom, 2002 WL 244597, at *7 (quoting Sloane Overseas Fund Ltd. v. Sapiens Int'l Corp., 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996)).  Since actual control is required, the mere power to influence, without also the power to direct, is not enough.

control over the <u>transaction</u> in question.'"  <u>In re Global Crossing</u>, 2005 WL 1875445, at *3 (quoting <u>Ross</u>, 1989 WL 80428, at *3) (emphasis added); <u>see</u> <u>Wallace</u>, 239 F. Supp. 2d at 396; <u>In re Sotheby's Hldgs., Inc.</u>, No. 00 Civ. 1041, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) ("Actual control over the wrongdoer <u>and</u> <u>the</u> <u>transactions</u> <u>in</u> <u>question</u> is necessary for control person liability.") (emphasis added).

Applying these standards necessarily involves an individualized, fact-sensitive analysis. <u>See</u> <u>Boguslavsky</u>, 159 F.3d at 720; <u>In re Global Crossing</u>, 322 F. Supp. 2d at 351 (noting that control person analysis is a "decidedly fact-based determination").  In conducting such analyses, courts have held that officer or director status alone does not constitute control for the purposes of Section 20(a) liability.  <u>See</u>, <u>e.g.</u>, <u>Rich v. Maidstone Fin., Inc.</u>, No. 98 Civ. 2569, 2002 WL 31867724, at *11 (S.D.N.Y. Dec. 20, 2002); <u>Livent II</u>, 151 F. Supp. 2d at 436.  In contrast, if that same officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled.  <u>See</u> <u>Flag II</u>, 352 F. Supp. 2d at 457 (concluding that officers or directors who signed registration statement controlled company at time of company's IPO; but dismissing control-person claims against individuals who did not sign

registration statement and were not officers or directors at time of IPO); In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (holding that directors who also signed registration statement controlled those who wrote the report).[51]

---

[51] A note on "officer status": Some courts, including this one, have stated that officer or director status alone is not sufficient to constitute control. See, e.g., Livent I, 78 F. Supp. 2d at 221 ("Officer or director status alone does not constitute control."); Rubenstein v. Skyteller, Inc., 48 F. Supp. 2d 351, 323 (S.D.N.Y. 1999) ("Officer or director status alone... is not enough to establish control person liability."); Sloane Overseas Fund, 941 F. Supp. at 1378 ("'A person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under § 20.'") (quoting Hemming v. Alfin Fragrances, Inc., 690 F. Supp. 239, 245 (S.D.N.Y. 1988)). Yet, an outside director and an officer such as a CEO or COO occupy very different positions in relation to the day-to-day management and operation of the company. The CEO or COO presumably has the power to control a corporation in a way that an outside director does not. Moreover, in the cases stating that officer or director status is insufficient, such proposition was used to require more allegations to plead control by an outside director or some figure other than an internal officer. See, e.g., Livent I, 78 F. Supp. 2d at 221 (discussing control person status of outside director); Rubenstein, 48 F. Supp. 2d at 323 (discussing control person status of wife of CEO); Sloane Overseas Fund, 941 F. Supp. at 1478 (discussing control person status of company that was underwriter, creditor and founder of primary violator). It may be that fewer additional facts need be alleged to support an inference of control by a CEO or similar internal officer than control by an outside director. See, e.g., Parmalat I, 375 F. Supp. 2d at 310 ("Plaintiffs allege that Copeland was the chief executive officer of DTT and his alleged role in resolving disputes in respect of the Parmalat auditors. It could be inferred from these facts that he had actual control over the primary violators."); see also 3 Thomas Lee Hazen, The Law of Securities Regulation § 12:24, at 610-11 (5th ed. 2005) ("Corporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons. In contrast to officers, corporate directors are not automatically liable as controlling persons.").

In this regard, the Court notes that the origin of the proposition that officer status alone is not enough seems to be the district court decision Hemming, 690 F. Supp. at 245. However, the court there was looking at whether demonstrating control was enough for recovery under Section 20(a), and noted that it was not because the plaintiffs also needed to demonstrate culpable participation. Id. Read in this context, the district court's statement that "[a] person's status as an officer, director or shareholder, absent more, is not enough to trigger liability under § 20," id., means that such status is not enough because while it may demonstrate the control element, it does not demonstrate the culpable participation element.

Similarly, membership on an audit committee, by itself, does not constitute control for purposes of Section 20(a) liability. However, an outside director and audit committee member who signs an SEC filing can be presumed to have the power to control those who write the report, within the meaning of Section 20(a). See Livent II, 151 F. Supp. 2d at 437. This result follows because such a person is in a position to approve the corporation's financial statements and thus has the power to direct or cause the direction of the management and polices of the corporation, at least insofar as the management and policies referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign. See id. at 437; see also Jacobs v. Coopers & Lybrand, L.L.P., No. 97 Civ. 3374, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999).

Minority stock ownership is not enough to establish control person liability, since minority stock ownership does not give the owner the power to direct the primary violator.

---

In fact, while Sloane quoted Hemming for the proposition that officer status alone is not sufficient, the court in Sloane also held that pleading "officer/director status from which control can be directly inferred without more[] provides a sufficient basis to show control liability," while if a plaintiff seeks to attribute control status to a "third party, director, or employee who is not in a control position... then further factual allegations must be made to show that in fact such control can be inferred." Sloane, 941 F. Supp. at 1378. This distinction suggests that the factual reference to the corporate position of certain officers presumably could be enough to allege control person status, as long as control "can be directly inferred without more," id., from that title. Arguably, a CEO could fall under this category.

See <u>Flag II</u>, 352 F. Supp. 2d at 458-59 (ownership of 30 percent of voting shares and ability to appoint three of nine board members did not constitute control); <u>In re Deutsche Telekom</u>, 2002 WL 244597, at *6-*7 (22 percent ownership does not constitute control); <u>Travelers Ins. Co. v. Lewis</u>, 756 F. Supp. 172, 177 (S.D.N.Y. 1991).

### 3. <u>Culpable Participation</u>

#### a. <u>Plaintiffs Must Plead Culpable Participation</u>

Relying on <u>In re Initial Public Offering Sec. Litig.</u>, 241 F. Supp. 2d 281 (S.D.N.Y. 2004), Plaintiffs ask this Court to reconsider its holding in <u>Livent II</u> that culpable participation must be pled in order to state a claim for Section 20(a) liability. <u>See</u> 151 F. Supp. 2d at 414-16. The Court declines to do so. In <u>Livent II</u>, this Court reviewed the split of authority in this district over whether a plaintiff must plead culpability to state a claim under Section 20(a), as well as relevant decisions by the Second Circuit, and concluded that "[w]hile this Court would wish clearer guidance, until the Court of Appeals addresses the issue more explicitly, ... the authority available balances toward holding that the plaintiff bears the burden of pleading culpability as part of a prima facie case under § 20(a)." <u>Id.</u> at 416. No such clearer Second Circuit guidance has issued since <u>Livent II</u> was decided.

It is true that some district courts, such as that in *In re Initial Public Offering*, have since interpreted the Second Circuit's decision in *First Jersey* to render any culpable participation pleading requirement "essentially meaningless." *See*, *e.g.*, *In re Initial Pub. Offering*, 241 F. Supp. 2d at 395 (concluding that plaintiff survived motion to dismiss by adequately alleging control). The basis of that view is that in *First Jersey*, after setting forth culpable participation as an element of plaintiffs' prima facie case, the Circuit Court, in the same opinion, stated that

> the district court properly found that First Jersey violated the 1934 Act; and for the reasons discussed[,]... there can be no question that Brennan was a controlling person with respect to First Jersey. Hence, in order to escape controlling person liability, Brennan had the burden of showing that he did not induce the Firm's violations and that he maintained and enforced a reasonable and proper system of supervision and internal control over the pertinent personnel.

*First Jersey*, 101 F.3d at 1473. However, in *Livent II* this Court considered just this ambiguity in the *First Jersey* decision and concluded that it was best resolved by interpreting *First Jersey* to require a culpable participation pleading requirement. *See* *Livent II*, 151 F. Supp. 2d at 416 (holding that although "requiring the plaintiff to plead culpability, [while] at the same time requiring the defendant to prove good faith at trial, engenders an awkward allocation of pleading and proof whereby both parties bear burdens on the

same issue[,]... [n]othing precludes such a burden-shifting scheme, and ... reading _First Jersey_ this way reconciles the apparent inconsistency").   Because the Second Circuit has issued no more definitive guidance to resolve the conflict and compel a change in the Court's interpretation of _First Jersey_, the question here is not whether this Court reconsiders its ruling in _Livent II_, but whether the Circuit Court clarifies, distinguishes or overrules _First Jersey_.[52]   Plaintiffs' arguments, therefore, would be more properly addressed to the Circuit Court.[53]

Indeed, while some district courts have interpreted _First Jersey_ to not require culpable participation at the pleading stage, other district courts have also interpreted _First_

---

[52] The Second Circuit's decision in _Suez Equity Investors, L.P. v. SEI Associates_, 250 F.3d 87 (2d Cir. 2001), did not shed any more light on this debate.  In _Suez_, the Circuit Court, citing _First Jersey_, stated that "[c]ontrolling-person liability is a form of secondary liability, under which a plaintiff may _allege_ a primary § 10(b) violation by a person controlled by the defendant and _culpable participation_ by the defendant in the perpetration of the fraud."   _Id._ at 101 (emphasis added).   This statement would suggest that culpable participation must be alleged. However, the Circuit Court went on to hold that although the allegations were "somewhat broad," plaintiffs had sufficiently pled that a bank controlled an individual employee who was a primary violator where the complaint alleged that (1) the employee was an officer of the bank, and (2) the employee had primary responsibility for the dealings of the bank and other corporate defendants.   _Id._   Thus, just as it did in _First Jersey_, the Circuit Court first set out language suggesting that culpable participation is an element but then seemed to blur the culpable participation element.   The Court therefore finds that this discussion in _Suez_ contains the same ambiguity as that in _First Jersey_ and does not provide any clarity on this issue that would require a departure from the reasoning in _Livent II_.

[53] In _Livent II_, the Court pointed out that even after the ambiguity _First Jersey_ raised on this point had become apparent, the Second Circuit nonetheless expressly reiterated the same standard in several subsequent cases.   _See_ _Livent II_, 151 F. Supp. 2d at 416.

Jersey to state such a requirement. See, e.g., In re Bayer AG Sec. Litig., No. 03 Civ. 1546, 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004); In re Global Crossing, 322 F. Supp. 2d at 349 & n.24; In re Philip Servs. Corp., 383 F. Supp. 2d at 486 n.13; Burstyn v. Worldwide Xceed Group, Inc., No. 01 Civ. 1125, 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002). The Court thus reiterates its holding in Livent II that Plaintiffs must plead culpable participation in order to state a claim under Section 20(a).

b.  Culpable Participation Requires a Showing of At Least Recklessness

Culpable participation clearly requires "something more than negligence." See Hochfelder, 425 U.S. at 209 n.28 (holding that "something more than negligence" is required for each provision of the 1934 Act, including Section 20(a), that expressly creates civil liability, except those directed to specific classes of people). Disagreement exists within the Second Circuit, however, as to precisely what conduct, beyond negligence, the test entails. Analyzing this uncertainty, this Court held in Livent II that recklessness is the minimum standard of culpability that plaintiffs must plead under Section 20(a). See 151 F. Supp. 2d at 417 (dismissing claim because plaintiffs alleged nothing more than negligence). Supporting this view is the practical and equitable

consideration that Section 20(a) liability could encompass some participants in corporate governance, such as outside directors, who are not always involved in the day-to-day management of the company's affairs. Thus, as to them, some measure of involvement in alleged wrongdoing committed by the business entity in securities transactions, beyond just "being there," and thus within the striking range of any lawsuit, would be justifiable so as not to unduly burden officers with such ordinarily narrower roles in corporate activities, and thereby discourage their participation. Recognition of that policy is reflected in the PSLRA and those provisions of the securities laws in existence even prior to the PSLRA that manifest solicitude to the more limited functions of outside corporate directors. See H.R. Conf. Rep. No. 104-369, at 37-38 (1995) (noting that PSLRA reformed traditional rules of joint and several liability for outside directors because traditional rules "made it impossible for firms to attract qualified persons to serve as outside directors"); Lanza v. Drexel & Co., 479 F.2d 1277, 1307 (2d Cir. 1973) ("'If people of stature and creative potential are still wanted for corporate directorships, we must take care how agonizingly subtle their choices are to be.'" (quoting lower court)).

"To qualify as reckless conduct, the [alleged conduct] must have been 'highly unreasonable,' representing 'an extreme

departure from the standards of ordinary care ... to the
extent that the danger was either known to the defendant or so
obvious that the defendant must have been aware of it.'"
Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000) (quoting
Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir.
1978) (internal quotation marks omitted)).  An "egregious
refusal to see the obvious, or to investigate the doubtful,
may in some cases give rise to an inference of ...
recklessness." Novak, 216 F.3d at 308.  The Second Circuit,
noting that these are general standards and looking to the
actual facts of securities fraud cases to provide more
concrete guidance, has explained that recklessness typically
is established when plaintiffs (1) specifically allege
defendants' awareness of facts or access to information
contradicting their public statements and thus that they knew
or should have known they were misrepresenting material facts
related to the corporation; or (2) allege facts demonstrating
that defendants failed to review or check information that
they had a duty to monitor, or ignored obvious signs of fraud.
Novak, 216 F.3d at 308; see Flag I, 308 F. Supp. 2d at 258-59.
In such situations, however, the conduct must still rise to
the level of "highly unreasonable or extreme misconduct,
rather than simply to mere deviations from standards of
ordinary care." Livent II, 151 F. Supp. 2d at 422.  Thus,

fraud by hindsight, positive public statements consistent with reasonably available data, failure to adequately monitor the behavior of others, and accounting violations standing alone, do not rise to the level of recklessness.  See <u>Novak</u>, 216 F.3d at 309; <u>Livent II</u>, 151 F. Supp. 2d at 422.

In addition, culpable participation must be pled with particularity, since the PSLRA provides that "in any private action arising under this chapter in which the plaintiff may recover damages only on proof that the defendant acted with a particular state of mind," the complaint shall "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); <u>see</u> <u>In re Bayer</u>, 2004 WL 2190357, at *16; <u>Sotheby's</u>, 2000 WL 1234601, at *7 (recklessness not sufficiently pled through boilerplate allegations that defendant knew or should have known of the fraudulent conduct based solely on the positions).  Thus, Plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with recklessness.  In other words, Plaintiffs must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator was engaging in fraudulent conduct, or that the controlling person failed to review or check information that he or she had a duty or

monitor, or that the controlling person ignored obvious signs
of fraud. <u>See</u> <u>Burstyn</u>, 2002 WL 31191741, at *7; <u>Sotheby's</u>,
2000 WL 1234601, at *7-*8 (dismissing Section 20(a) claims
against certain defendants where plaintiffs did not allege
scienter element of Section 10(b) claims against those
defendants, including not alleging facts demonstrating failure
to review or check information that they had a duty to monitor
or ignoring obvious signs of fraud).

B.   <u>DISCUSSION</u>

　　　　　Plaintiffs bring claims under Section 20(a) against
Alcatel, Bilger, Kron, Jaffre, Newey, Rambaud-Measson and
Janovec.   The Court will address the sufficiency of the
pleadings against each of these Defendants in turn.

　　　　　1.   <u>Alcatel</u>

　　　　　a.   <u>Primary Violation</u>

　　　　The Court already has found that Plaintiffs have
adequately alleged violations of the securities laws by the
following persons:   (1) Alstom, under Section 10(b) of the
Exchange Act, for fraud in connection with vendor financing of
its cruise ships; (2) Bilger, under Section 10(b) of the
Exchange Act, for fraud in connection with vendor financing of
Alstom's cruise ships; (3) Newey, under Section 10(b) of the
Exchange Act, for fraud in connection with vendor financing of

Alstom's cruise ships; and (4) ATI, under Section 10(b) of the Exchange Act, for fraud in connection with underreporting of costs in Alstom's transportation division. These allegations are sufficient to plead a primary violation of the securities laws under Section 20(a). However, in <u>Alstom I</u> this Court dismissed those Section 20(a) claims against Alcatel that related to the Marine Fraud. Thus, only ATI's primary violation will be considered in analyzing Alcatel's liability under Section 20(a).

b.   <u>Control</u>

The Court next must examine whether Plaintiffs sufficiently have pled that Alcatel had control over the primary violator -- here, ATI.

It is not clear that Plaintiffs are attempting to allege that Alcatel controlled ATI. While Plaintiffs allege that Alcatel had control over <u>Alstom</u> through stock ownership and its ability to appoint directors to Alstom's board (Compl. ¶¶ 387, 388), the Section 20(a) count expressly names only Janovec and Rambaud-Measson as control persons of ATI (Compl. ¶ 389). However, even assuming that Plaintiffs do allege that Alcatel controlled ATI through its ownership interest in ATI's parent company and the ability to appoint directors to the parent company's board, these allegations are not sufficient

to state a claim for control-person liability under Section
20(a).

Minority stock ownership and the ability to appoint a
minority of the board do not create power to direct management
and policies, and thus do not constitute sufficient control
under Section 20(a).  See Flag II, 352 F. Supp. 2d at 458-59
(ownership of 30 percent of voting shares and ability to
appoint three of nine board members did not constitute
control); In re Deutsche Telekom, 2002 WL 244597, at *6-*7;
Travelers Ins. Co., 756 F. Supp. at 177.  Yet, by the time the
Class Period began, Alcatel was a minority shareholder:  prior
to the Class Period, Alcatel had held 50 percent of Alstom,
but it sold 26 percent of this ownership during the IPO in
June 1998, leaving it with 24 percent.  (Compl. ¶ 54; Pls.'
Alcatel Opp'n Mem., at 19).  Moreover, after June 2001,
Alcatel no longer owned any shares of Alstom.  (Compl. ¶ 54.)
The ATI Fraud began, at the earliest, on March 14, 2002, after
the announcement of the Restore Value program.  See Alstom I.
Thus, by the time the ATI Fraud began, Alcatel did not own any
stock in Alstom.  Even looking earlier, to 1999, when
Plaintiffs allege that an underbidding at ATI occurred (Compl.
¶ 308), Alcatel was a minority shareholder of Alstom by that
time.  Thus, under any theory of the fraud, Alcatel was a
minority stockholder in ATI's parent company by the time the

fraud began, and thus could not have been a controlling person under Section 20(a).

### c. Culpable Participation

_____Plaintiffs also have not alleged culpable participation by Alcatel in the ATI Fraud.  The Section 20(a) Count of the Complaint does not even mention culpable participation, presumably by reason of Plaintiffs' view that such pleading was not required.  In their briefs, Plaintiffs so argue, but allege that if culpable participation were demanded, Plaintiffs sufficiently alleged it by pleading control.  (<u>See</u> Pls.' Alcatel Opp'n Mem., at 22; <u>see</u> <u>also</u> Pls.' Exchange Act Opp'n Mem., at 76-77 n.42.)  This allegation is not enough to plead culpable participation under the standard articulated above.  Plaintiffs have not alleged any facts supporting a strong inference of any extreme conduct that even approximates recklessness by Alcatel in connection with the ATI Fraud. Even if the Court were to accept Plaintiffs' argument that control equals culpable participation, Plaintiffs have not sufficiently alleged that Alcatel controlled ATI.  Thus, Plaintiffs have not pled culpable participation by Alcatel in the ATI Fraud.

d.    Conclusion

Because Plaintiffs have not adequately pled that Alcatel controlled ATI, and because Plaintiffs also have not adequately pled that Alcatel culpably participated in the ATI Fraud, Plaintiffs' remaining Section 20(a) claim against Alcatel must be dismissed.

2.    Bilger

The Court already has found that Plaintiffs have adequately alleged a primary violation of the securities laws by Bilger under Section 10(b) for fraud in connection with vendor financing of Alstom's cruise ships.    However, Plaintiffs also bring a Section 20(a) claim against Bilger. Because such alternative theories are permissible at the pleadings stage, the Court will analyze whether the Complaint adequately states a claim under Section 20(a) against Bilger.

a.    Primary Violation

As explained above in Section V.B.1.a, Plaintiffs have adequately alleged primary violations by Alstom and Newey for fraud in connection with vendor financing of Alstom's cruise ships, and by ATI for fraud in connection with underreporting of costs in Alstom's transportation division.[54]

---

[54] Bilger's own primary violation is not considered when addressing his control-person liability under Section 20(a).

-117-

b.    Control

The Court next must examine whether Plaintiffs
sufficiently have pled that Bilger had control over the
primary violators -- here, Alstom, Newey and ATI.

The Complaint alleges that Bilger served as Alstom's CEO
from May 14, 1998 until January 1, 2003, and that he also
served as Chair of the Board from May 14, 1998 until March 11,
2003. (Compl. ¶ 39.) It also alleges that he signed Alstom's
Registration Statement on February 7, 2001 in connection with
the Secondary Offering, through his attorney-in-fact Newey.
(Id.; see also ¶ 204.) The Complaint also asserts that Bilger
was a member of Alstom's "Executive Central Management" and
the Executive Committee. (Compl. ¶ 39.) Finally, the
Complaint alleges that Bilger was, during the Class Period and
at the time of the Secondary Offering, a member of the
Nominations and Remuneration Committee of the Board. (Compl.
¶ 39.) This committee is alleged to have been responsible for
reviewing and making recommendations to the Board on issues
including nomination of the Chair, CEO, directors, and members
of the Executive Committee; corporate governance; composition
and functioning of the Board and its committees; company

polices relating to stock option plans and employee share purchase schemes; and Director's fees. (Id.)[55]

In the Section 20(a) Count, Plaintiffs allege that each 20(a) Defendant, and hence Bilger, had "direct control and/or supervisory involvement in the operations of" Alstom and ATI, and "therefore had the power to control or influence the particular transactions giving rise to the [alleged] securities violations." (Compl. ¶ 386.) The Count further alleges that each Section 20(a) Defendant, and hence Bilger, controlled Alstom "[b]y reason of their status as officers and members of management and/or as senior executives or Alstom and/or ATI." (Compl. ¶ 387.) Finally, the Complaint alleges that each Section 20(a) Defendant, and hence Bilger, "was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by the plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." (Compl. ¶ 390.)

In their brief, Plaintiffs state that their Section 20(a) claims against Bilger are limited to the period from August 3,

---

[55] The Complaint also alleges that Bilger served as a member of the Supervisory Board of Alstom Power, but this relationship is not relevant to the Marine Fraud. (Compl. ¶ 39.)

1999 until March 11, 2003.  (Pls.' Exchange Act Opp'n Mem., at 77.)

The Court finds that Plaintiffs sufficiently allege that Bilger controlled Alstom through January 1, 2003, but not afterward.  Although status as officer or committee member is generally not enough to constitute control, and thus a mere recitation of Bilger's title as CEO along with the committees upon which he sat is not sufficient, Bilger also had the power to sign the Registration Statement and is alleged to have signed it through his attorney-in-fact, Newey.  It "comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."  Jacobs, 1999 WL 101772, at *18; accord Livent II, 151 F. Supp. 2d at 437.  The Registration Statement is alleged to be misleading as to the Marine Fraud.  (Compl. ¶ 210.)  Plaintiffs therefore have sufficiently alleged that Bilger had "the power to direct or cause the direction of the management and policies" of Alstom in relation to the transaction at issue here, First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2), and thus have adequately pled that Bilger is a control person of Alstom for purposes of Section 20(a).[56]  Defendants do not genuinely dispute Bilger's

---

[56] This finding is not based on the allegations relating to Bilger's poisition on the Nominations and Remuneration Committee of the Board, as the latter is alleged to be responsible only for reviewing and recommending certain policies and nominations.  (Compl. ¶ 39.)  Reviewing

status as a control person during his tenure as CEO, focusing their arguments instead on his post-January 1, 2003 status. (See Esser et al. Mem., at 7; Esser et al Reply Mem., at 13.)

After January 1, 2003, Bilger cannot be liable as a control person.  Although he remained chair of the board until March 2003, mere status as a board member is not enough to demonstrate actual control over the company and the transaction in question, see, e.g., Rich, 2002 WL 31867724, at *11; Livent II, 151 F. Supp. 2d at 436, and the Complaint does not contain any allegations from which it can be inferred that he exercised actual control over Alstom after he stepped down as CEO.  All references to Bilger concern events prior to 2003. Thus, Bilger is not liable as a control person for any fraud occurring after January 1, 2003.

Although the Complaint sufficiently pleads a primary violation by Newey, it does not sufficiently plead that Bilger controlled Newey for the purposes of Section 20(a) liability. Plaintiffs do not appear even to have contemplated control person liability over any of the individuals involved, but instead have alleged control person liability only by certain individuals over the entities of Alstom, ATI, and Alstom USA.

---

and recommending policies and nominations falls under the category of influence, rather than control, and is therefore insufficient to support control allegations.  See Flag II, 352 F. Supp. 2d at 458.

(Compl. ¶ 386 (alleging control over "the Company, Alstom USA, and ATI"); ¶ 387 (alleging that defendants are "'controlling persons' of Alstom").) Although the Section 20(a) Count states, in conclusory fashion, that "each of the 20(a) Defendants controlled <u>persons</u> <u>or</u> <u>entities</u> who violated Section 10(b) of the Exchange Act and Rule 10b-5" (Compl. ¶ 391 (emphasis added)), this boilerplate language is not supported by any more specific allegations that Bilger controlled Newey. The Court declines to read into the Complaint allegations that Plaintiffs do not even attempt to plead.

Whether Bilger could be liable as a control person over ATI for the ATI Fraud is less clear. Bilger was CEO of Alstom, ATI's parent company, through at least part of the allegedly fraudulent events at ATI. On the one hand, a parent corporation and its subsidiary generally are regarded as legally distinct entities absent a veil-piercing analysis, and so it is not entirely clear that Bilger's position as CEO of the parent company suffices to establish his control person status over the subsidiary. <u>See</u> <u>In re Worldcom</u>, 2004 WL 1097786, at *3. On the other hand, Alstom is alleged to wholly own Alstom USA (Compl. ¶ 37), which in turn is alleged to wholly own ATI (Compl. ¶ 38). Control through ownership of voting securities can constitute control for purposes of Section 20(a). <u>See</u> <u>First Jersey</u>, 101 F.3d at 1472-73 (quoting

17 C.F.R. § 240.12b-2). Moreover, where a subsidiary is wholly owned by a parent, New York courts might pierce the corporate veil. See Lipsky, 551 F.2d at 898. Yet, Plaintiffs' Section 20(a) Count discusses stock ownership only as it relates to control of Alstom, not ATI. (Compl. ¶ 387 (alleging that defendants controlled Alstom through ownership of substantial amounts of Alstom stock); ¶ 388 (alleging that Alcatel controlled Alstom through ownership of Alstom stock). When referring to ATI, the Count discusses only Janovec's and Rambaud-Measson's control status, and does not state that ATI was controlled through stock ownership. (Compl. ¶ 389.) The Court is thus not entirely persuaded that Plaintiffs clearly allege that Bilger was a control person of ATI. Ultimately, however, the resolution of this issue does not matter, for, as discussed below, the Court finds that Plaintiffs have failed to plead culpable participation of Bilger in the ATI Fraud.

c. Culpable Participation

The Court finds that Plaintiffs have sufficiently pled culpable participation by Bilger in the Marine Fraud. It is true that Plaintiffs do not use the words "culpable participation" in the Section 20(a) Count of the Complaint, unlike in the Section 15 Count, which expressly alleges that each Section 15 Defendant is a "culpable participant" in the

-123-

underlying Securities Act claims. (Compl. ¶ 355.) Presumably this is because Plaintiffs, as is apparent from their briefs, maintain that culpable participation is not an element of Section 20(a). Nonetheless, the Court still finds that Plaintiffs have sufficiently alleged facts giving rise to a strong inference that Bilger culpably participated in the Marine Fraud. As discussed in the analysis of Bilger's scienter under Section 10(b), Bilger signed Alstom's SEC filings and thus had a duty to familiarize himself with Alstom's core operations; the Marine division was extremely important to Alstom's overall profile and liquidity during this time period; the SEC filings contained misrepresentations regarding the Marine division; Bilger was alleged to be directly involved in the day-to-day operations of the company (Compl. ¶ 366); and the vendor financing arrangements were large in scope and extended over a significant length of time. See supra Section III.B.2.c(ii). These facts support a finding of more than negligence, and raise a strong inference of at least recklessness by Bilger as to the Marine Fraud.

In contrast, Plaintiffs have not sufficiently alleged that Bilger was a culpable participant in the ATI Fraud. As discussed in the analysis of Bilger's scienter under Section 10(b), the Complaint contains no allegations supporting any reasonable inference that Bilger knew or should have known

about the ATI Fraud. <u>See</u> <u>supra</u> Section III.B.3.b(iii). Although he signed the Form F-3, that document is not alleged to contain any misleading statements with regard to ATI's operations. Further, as discussed in the Section 10(b) analysis, "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary ... as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." <u>Novak</u>, 216 F.3d at 309; <u>see</u> <u>Chill</u>, 101 F.3d at 269-70.

### d. Conclusion

Plaintiffs have adequately pled a Section 20(a) claim against Bilger for control over Alstom in connection with the Marine Fraud. However, because Plaintiffs have not adequately pled that Bilger culpably participated in the ATI Fraud, Plaintiffs' Section 20(a) claim against Bilger as regards the ATI Fraud must be dismissed.

### 3. Newey

Plaintiffs have adequately alleged a primary violation of the securities laws by Newey under Section 10(b) of the Exchange Act for fraud in connection with vendor financing of Alstom's cruise ships. Since alternative theories are permissible at the pleadings stage, the Court will also

examine whether Plaintiffs have adequately stated a claim under Section 20(a) against Newey.

a. <u>Primary Violation</u>

As explained above in Section V.B.1.a, Plaintiffs have adequately alleged primary violations by Alstom and Bilger for fraud in connection with vendor financing of Alstom's cruise ships, and by ATI for fraud in connection with underreporting of costs in Alstom's transportation division.[57]

b. <u>Control</u>

The Complaint alleges that Newey joined the company in March 1998 as Corporate Director, Finance, and was Senior Executive Vice President and CFO from July 1998 to July 3, 2002. (Compl. ¶ 42.) Additionally, Newey signed the following forms that are alleged to be misleading for reasons involving the Marine Fraud: 1999 Form 20-F (Compl. ¶¶ 162, 165); 2000 Form 20-F (Compl. ¶¶ 183, 185); November 16, 2000 Form 6-K with an attached press release (Compl. ¶¶ 194, 197); the 2000 Form F-3 (Compl. ¶¶ 204, 210); 2001 Form 20-F (Compl. ¶¶ 215, 216); 2001 Annual Report contained in the 2001 Form 20-F (Compl. ¶¶ 215, 217, 221). The Complaint does not allege that Newey signed any forms that are alleged to be misleading for reasons involving the ATI Fraud.

---

[57] Newey's own primary violation is not considered when addressing his control-person liability under Section 20(a).

Additionally, in the Section 20(a) Count, Plaintiffs allege that each Section 20(a) Defendant, and hence Newey, had "direct control and/or supervisory involvement in the operations of" Alstom and ATI, and "therefore had the power to control or influence the particular transactions giving rise to the [alleged] securities violations." (Compl. ¶ 386.) The Count further alleges that each Section 20(a) Defendant, and hence Newey, controlled Alstom "[b]y reason of their status as officers and members of management and/or as senior executives or Alstom and/or ATI." (Compl. ¶ 387.) Finally, the Count alleges that each Section 20(a) Defendant, and hence Newey, was "provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by the plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." (Compl. ¶ 390.)

In their brief Plaintiffs state that their Section 20(a) claims against Newey are limited to the period from August 3, 1999 to July 3, 2002. (Pls.' Exchange Act Opp'n Mem., at 78.)

The Court finds that Plaintiffs have sufficiently alleged that Newey controlled Alstom through July 3, 2002, but not afterward. Plaintiffs allege not only that Newey was CFO and Executive Vice President during the time of the Marine

Fraud, but also that he signed several documents containing misstatements relating to the Marine Fraud. Newey therefore had "the power to direct or cause the direction of the management and policies" of Alstom in relation to the Marine Fraud, First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2), and thus have adequately alleged that Newey is a control person of Alstom for purposes of Section 20(a). See Livent II, 151 F. Supp. 2d at 437; Jacobs, 1999 WL 101772, at *18.

Defendants do not genuinely dispute Newey's status as a control person during his tenure as CFO, instead arguing that there is no basis to hold him liable as a control person after July 3, 2002 when he stepped down as Alstom's CFO. (See Esser et al. Mem., at 18.) The Court agrees that after July 3, 2002, Newey cannot be liable as a control person. Plaintiffs do not offer any allegations supporting any reasonable inference of control after Newey stepped down as CFO on that date, and concede in their brief that the control person claims against Newey are limited to the period from August 3, 1999 to July 3, 2002. (Pls.' Exchange Act Opp'n Mem., at 78.) The ATI Fraud began, at the earliest, on March 14, 2002, after the announcement of the Restore Value program, and the documents containing misleading statements as to the ATI Fraud were not signed by Newey and were filed after he stepped down

from Alstom.  For this reason, the Court finds that Newey was not a control person for purposes of the ATI Fraud.[58]

Finally, Plaintiffs do not plead that Newey controlled Bilger and the Complaint contains no facts from which the Court can infer that Newey controlled Bilger.  Accordingly, Plaintiffs have not pled control person liability as to Newey for Bilger's primary violation.

### c. Culpable Participation

The Court finds that, for the reasons discussed in the analysis of scienter under Section 10(b), Plaintiffs have sufficiently pled culpable participation by Newey in the Marine Fraud, but not in the ATI Fraud.  Newey, like Bilger, signed Alstom's SEC filings and thus had a duty to familiarize himself with Alstom's core operations.  Given the size and importance of the vendor financing transactions to Alstom's overall stability and liquidity during the relevant time period, as well as allegations that Newey was directly involved in the day-to-day operations of the company (Compl. ¶ 366), Plaintiffs have alleged facts supporting a finding of more than negligence, and raising a strong inference of at

---

[58] Plaintiffs also allege that a November 6, 2001 press release containing statements from Bilger was misleading as to the ATI Fraud.  (Compl. ¶¶ 236-37.)  This document was published while Newey was CFO at Alstom; however, Plaintiffs offer no facts demonstrating how the existence of this press release supports an inference that Newey actually controlled ATI. Moreover, for the reasons discussed in <u>Alstom I</u>, Plaintiffs have not adequately pled that the ATI Fraud began prior to March 14, 2002.

least recklessness by Newey as to the Marine Fraud.[59]    In contrast, Plaintiffs have not sufficiently alleged that Newey was a culpable participant in the ATI Fraud, as the Complaint contains no allegations supporting any reasonable inference that Newey knew or should have known about the ATI Fraud. Although he signed several documents containing Alstom's financial statements, including the Form F-3, none of these documents are alleged to contain any misleading statements with regard to ATI's operations, and as discussed earlier, a parent company's failure to interpret positive performance by a subsidiary as problematic does not amount to recklessness under the securities laws.    See Novak, 216 F.3d at 309; Chill, 101 F.3d at 269-70.

　　d.　Conclusion

　　Plaintiffs have adequately pled a Section 20(a) claim against Newey for control over Alstom in connection with the Marine Fraud.  However, because Plaintiffs have not adequately pled that Newey controlled ATI during the ATI Fraud and culpably participated in the ATI Fraud, Plaintiffs' Section 20(a) claim against Newey as regards the ATI Fraud must be dismissed.

---

[59] As discussed above in the section on Bilger's liability under Section 20(a), the fact that Plaintiffs do not use the words "culpable participation" in the Section 20(a) Count of the Complaint does not undermine the otherwise sufficient allegations giving rise to a strong inference that Newey culpably participated in the Marine Fraud.

4. <u>Kron</u>

a. <u>Primary Violation</u>

As explained above in Section V.B.1.a, Plaintiffs have adequately alleged primary violations by Alstom, Bilger and Newey for fraud in connection with vendor financing of Alstom's cruise ships, and by ATI for fraud in connection with underreporting of costs in Alstom's transportation division.

b. <u>Control</u>

The Court next will examine whether Plaintiffs have sufficiently alleged control by Kron over the primary violators for the fraudulent transactions in question.

The Complaint alleges that Kron was appointed to Alstom's board on July 24, 2001, replaced Bilger as Alstom's CEO on January 1, 2003, and was appointed Chairman of the Board on March 11, 2003. (Compl. ¶ 40.) It also alleges that he served on the Audit Committee of the board "during the Class Period." (<u>Id.</u>) The Audit Committee is alleged to "assist the Board in its oversight of the quality and accuracy of the Company's financial statements and other financial information provided to shareholders; the Company's compliance with legal and regulatory requirements; the performance of the Company's internal audit function; and the company's system of internal controls and accounting and financial reporting processes

generally." (Id.)   Finally, the Complaint alleges that Kron
was a member of Alstom's Executive Committee, but does not
specify a time frame for his position on this committee.
(Id.)

In their brief, Plaintiffs limit their Section 20(a)
claims against Kron for the period from July 24, 2001 to
August 6, 2003.  (Pls.' Exchange Act Opp'n Mem., at 78.)

The Court finds that Plaintiffs have not adequately pled
that Kron was a control person of Alstom during the relevant
time period for the Marine Fraud.  The Marine Fraud occurred
substantially from 1999 to 2001 and is alleged to have been
fully disclosed by October 3, 2001.  (Compl. ¶ 108.)  Yet
prior to January 1, 2003, Kron was merely a member of Alstom's
board.   Director status alone is insufficient to establish
control person status.  See Rich, 2002 WL 31867724, at *11;
Livent II, 151 F. Supp. 2d at 436.  It is true that Plaintiffs
also allege that Kron served on the Audit Committee "during
the Class Period," although the Complaint is unclear as to
when during the Class Period he so served.  However, even
assuming that Kron served on the Audit Committee while the
Marine Fraud was occurring, the Complaint indicates only that
the Audit Committee assists the Board in various oversight
functions; it does not allege that the Audit Committee had the
power to approve the corporation's financial statements, nor

does it allege that Kron in this capacity signed any such documents. Thus, his position as board member and Audit Committee member is insufficient to allege control person liability. <u>See</u> <u>Livent II</u>, 151 F. Supp. 2d at 437 (requiring that Audit Committee member sign an SEC filing in order to be held liable as control person under Section 20(a)); <u>see</u> <u>also</u> <u>Flag II</u>, 352 F. Supp. 2d at 458 (holding that control means ability to direct, not mere ability to persuade).

Because the Complaint does not contain any facts from which it can reasonably be inferred that Kron controlled Bilger or Newey, Plaintiffs have not stated a claim for control person liability of Kron for Bilger's or Newey's primary violations.

Whether Plaintiffs sufficiently plead that Kron was a control person of ATI during the ATI Fraud is, for the reasons discussed in the Court's analysis of Bilger's control person status over ATI, less than certain. Although Kron was CEO through at least part of the allegedly fraudulent events at ATI, he was CEO of the parent company, whose control over its subsidiary is less than clear for purposes of this Section 20(a) analysis. As with Bilger, however, the resolution of this issue does not matter, for the Court finds, as discussed below, that Plaintiffs have not pled culpable participation by Kron in the ATI Fraud.

c.  Culpable Participation

Plaintiffs have not pled culpable participation by Kron in either the Marine Fraud or the ATI Fraud.  Regarding the Marine Fraud, the last allegedly misleading statement was made in the 2001 Form 20-F and Annual Report, which was filed on July 2, 2001.  (Compl. ¶ 215.)  Plaintiffs have limited their Section 20(a) claims against Kron to a period beginning on July 24, 2001.  (Pls.' Exchange Act Opp'n Mem., at 78.)  Thus, Kron could not have been a culpable participant in the Marine Fraud.

Regarding the ATI Fraud, the Complaint contains no allegations supporting any reasonable inference, let alone a strong inference, that Kron, as CEO of Alstom, knew or should have known about the fraud at Alstom's subsidiary ATI.  See Novak, 216 F.3d at 309; Chill, 101 F.3d at 269-70.  Under these circumstances, Kron cannot be said to have culpably participated in the ATI Fraud.

d.  Conclusion

Because Plaintiffs have not adequately pled that Kron controlled Alstom during the Marine Fraud and culpably participated in the Marine Fraud, Plaintiffs' Section 20(a) claim against Kron in connection with the Marine Fraud must be dismissed.  In addition, because Plaintiffs have not

adequately pled that Kron culpably participated in the ATI Fraud, Plaintiffs' Section 20(a) claim against Kron as regards the ATI Fraud must be dismissed.

5. <u>Jaffre</u>

a. <u>Primary Violation</u>

As explained above in Section V.B.1.a, Plaintiffs have adequately alleged primary violations by Alstom, Bilger and Newey for fraud in connection with vendor financing of Alstom's cruise ships, and by ATI for fraud in connection with underreporting of costs in Alstom's transportation division.

b. <u>Control</u>

The Complaint alleges that Jaffre became advisor to Bilger on February 21, 2002, and CFO in July 2002. (Compl. ¶ 41). It also alleges that Jaffre "is a member of the Company's Executive Committee" but does not indicate when he held this position. (<u>Id.</u>)

In their brief, Plaintiffs limit their Section 20(a) claims against Jaffre for the period from February 2002 to August 6, 2003. (Pls.' Exchange Act Opp'n Mem., at 78.) Since the Marine Fraud occurred substantially from 1999 to 2001 and is alleged to have been fully disclosed by October 3, 2001 (Compl. ¶ 108), Plaintiffs cannot support a control

person claim against Jaffre over any primary violator in the Marine Fraud -- Alstom, Bilger or Newey.

Although Jaffre became advisor to Bilger on February 21, 2002, Plaintiffs do not indicate that this advisory position gave him the actual control to direct Alstom's management or policies, as is required under Section 20(a).  Plaintiffs assert, without any supporting case law, that "it is axiomatic that the man advising [Bilger] also exercised control over Alstom."  (Pls.' Exchange Act Opp'n Mem., at 78.)  The Court is not persuaded that this conclusory statement is axiomatic at all. Rather, "the ability to persuade and give counsel is not the same thing as 'control', which almost always means the practical ability to <u>direct</u> the actions of" the alleged primary violators.  <u>Barker</u>, 797 F.2d at 494; <u>see</u> <u>Flag II</u>, 352 F. Supp. 2d at 458; <u>In re Blech</u>, 961 F. Supp. at 587.  Thus, Jaffre cannot be liable as a control person for any actions prior to July 2002, when he became CFO.

After July 2002, Jaffre stepped into the position of CFO. As CFO, he signed financial documents relating to the ATI Fraud, including the November 7, 2002 Form 6-K (Compl. ¶ 268) and the June 2, 2003 Form 6-K containing the 2003 Annual Report (Compl. ¶ 281).  A CFO who signs financial statements can be presumed to have control over those who make the statements.  <u>See</u> <u>Livent II</u>, 151 F. Supp. 2d at 437; <u>Jacobs</u>,

1999 WL 101772, at *18.  Defendants do not directly argue that Jaffre was not a control person after this date.  (See Esser et al. Mem., at 18.)  Thus, the Court finds that Plaintiffs have adequately pled that Jaffre was a control person of ATI in relation to the ATI Fraud.

### c.  Culpable Participation

The Court finds that Plaintiffs have not pled culpable participation by Jaffre in either the Marine Fraud or ATI Fraud.  Regarding the Marine Fraud, Plaintiffs have limited their Section 20(a) claims against Jaffre to a period beginning on February 2002 (Pls.' Exchange Act Opp'n Mem., at 78), after  the Marine Fraud had occurred and was disclosed.  Thus, Jaffre could not have been a culpable participant in the Marine Fraud.

Regarding the ATI Fraud, although Jaffre signed several documents containing materially false or misleading statements relating to ATI's operations, as discussed in the Court's analysis of Jaffre's scienter under Section 10(b), Plaintiffs have not alleged that ATI's financial results were sufficiently critical to Alstom's operations to warrant a finding that Jaffre was reckless in signing those documents.  Thus, Plaintiffs have not alleged facts supporting a finding of more than negligence and raising a strong inference that Jaffre acted recklessly in regard to the ATI Fraud.

d.    Conclusion

Because Plaintiffs have not adequately pled that Jaffre controlled Alstom in connection with the Marine Fraud and culpably participated in the Marine Fraud, Plaintiffs' Section 20(a) claim against Jaffre for the Marine Fraud must be dismissed.    In addition, because Plaintiffs have not adequately pled that Jaffre culpably participated in the ATI Fraud, Plaintiffs' Section 20(a) claim against Jaffre as regards the ATI Fraud must be dismissed.

6.    Rambaud-Measson and Janovec

a.    Primary Violation

As explained above in Section V.B.1.a, Plaintiffs have adequately alleged primary violations by Alstom, Bilger and Newey for fraud in connection with vendor financing of Alstom's cruise ships, and by ATI for fraud in connection with underreporting of costs in Alstom's transportation division.

b.    Control

Plaintiffs have alleged that Rambaud-Measson was Senior Vice-President of ATI until June 30, 2003, when he was suspended pending completion of Alstom's investigation into the alleged accounting improprieties at ATI.    (Compl. ¶¶ 44, 121).    Plaintiffs have alleged that Janovec was Vice-President of Finance of ATI until June 30, 2003, when he also was

suspended pending the completion of Alstom's investigation. (Compl. ¶ 45, 121). According to Plaintiffs, Rambaud-Measson and Janovec were control persons of ATI "by virtue of, among other things, their positions as senior officers at ATI." (Compl. ¶ 389.) Plaintiffs also assert that Rambaud-Measson and Janovec were "in positions to control and did control the false and misleading statements and omissions contained in Alstom's 2003 Annual Report and the November 5, 2002 press release announcing Alstom's fiscal 2003 half-year results, with respect to the ATI accounting fraud." (Compl. ¶ 389.) Finally, the Count alleges that each Section 20(a) defendant, and hence Rambaud-Measson and Janovec, was "provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by the plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." (Compl. ¶ 390.)

Despite its general allegations, the Section 20(a) Count does not even attempt to link Rambaud-Measson and Janovec to the Marine Fraud. Instead, it expressly draws a correlation only between their positions and the ATI Fraud. (Compl. ¶ 389.) Nor does the Complaint contain any allegations suggesting that Rambaud-Measson or Janovec controlled those

involved in the Marine Fraud or controlled the transactions related to the Marine Fraud. Thus, Plaintiffs have not pled that Rambaud-Measson and Janovec are control persons of Alstom, Bilger or Newey for the Marine Fraud.

Regarding the ATI Fraud, the Complaint fails to adequately plead that Rambaud-Measson or Janovec were control persons. The titles of Senior Vice President and Vice President of Finance at ATI, alone, do not support an inference that these defendants controlled ATI with regard to the specific transactions at issue. See Rich, 2002 WL 31867724, at *11; Livent II, 151 F. Supp. 2d at 436. Yet, Plaintiffs merely allege that Rambaud-Measson and Janovec, through their titles, were control persons, and were "in positions to control and did control the false and misleading statements and omissions." (Compl. ¶ 389.) Plaintiffs' conclusory allegations merely recite the legal standard instead of alleging "facts supporting an inference of actual control." In re Deutsche Telekom, 2002 WL 244597, at *7.

c. Culpable Participation

Because Plaintiffs have not sufficiently pled that Rambaud-Measson and Janovec are control persons of ATI, the Court does not need to reach the issue of their culpable participation in the ATI Fraud. However, before bypassing this issue, the Court finds that two recent decisions by Judge

Lynch in <u>In re Global Crossing</u> bear upon the ultimate disposition of the question at hand and thus warrant further discussion.

In 2004, Judge Lynch examined the control person status of two officer defendants who were not primarily liable under Section 10(b) because the complaint was devoid of any factual support that they were involved in the alleged scheme. <u>See</u> <u>In re Global Crossing</u>, 322 F. Supp. 2d at 350. He held that because culpable participation had been adequately alleged, but whether control had been adequately alleged was a "close call," the control-person claims should go forward to a later phase of litigation in light of the decidedly fact-based nature of the determination. <u>Id.</u> at 351.[60] Under this reasoning, if Plaintiffs successfully allege culpable participation, and the issue of control is a close call, the Court should deny the motion to dismiss and allow the litigation to proceed, at least until the factual record could be more fully developed. As will be discussed below,

_____

[60] Plaintiffs had sufficiently alleged defendants' culpable participation in the scheme because the complaint cited, in considerable detail, "a host of internal correspondence and documents demonstrating widespread internal knowledge of the schemes... which spanned from the bottom of the company to its top reaches," in the face of which it would "simply be implausible" to conclude that the defendants "did not know of and in some sense culpably participate in" the alleged fraud. <u>Id.</u> at 350-51.

In contrast, the issue of control was a close call because the pleadings relied solely on the defendants' titles to support the allegations of control, but those titles indicated an extremely high rank in the company involving direct oversight of the primary violators. <u>Id.</u> at 350-51.

Plaintiffs have adequately pled culpable participation by Rambaud-Measson and Janovec.

Given the persuasive authority that pleading control by status is not enough, and given the particular titles of Rambaud-Measson and Janovec, the Court at first glance is not inclined to deem the control person inquiry here a close call. Senior Vice President and Vice President of Finance do not connote the same presumption of occupying "the highest levels of the corporate hierarchy" and "direct[] overs[ight]" of the primary violators that the positions in In re Global Crossing did. 322 F. Supp. 2d at 350.

However, in a recent ruling in In re Global Crossing, Judge Lynch found that plaintiffs had successfully pled control despite meager allegations to support such control,[61] because "even if the specific facts alleged by plaintiffs, taken alone, would not be enough to establish actual control over the [primary violator], dismissal is improper as long as it is at least plausible that plaintiff could develop some sort of facts that would pass muster." In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005). In so holding, Judge Lynch pointed out that recent decisions, such as Twombly v. Bell Atlantic

---

[61] Plaintiffs had alleged solely that the primary violators were appointed by the Section 20(a) defendant. Id. at *8.

<u>Corp.</u>, 425 F.3d 99 (2d Cir. Oct. 3, 2005), have emphasized that where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim and "'relief could be granted under [some] set of facts consistent with the allegations.'" <u>Id.</u> at *8 (quoting <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512-14 (2002)). Accordingly, he allowed Section 15 control-person claims to proceed, because the case did not fit "into that narrow category of cases in which it is 'implausible' or mere 'unlikely speculation' that plaintiffs can develop a record that would support a finding of control, especially given the decidedly fact-based nature of the control inquiry." <u>Id.</u> (quoting <u>Twombly</u>, 2005 WL 2420523, at *11) (other internal quotations and citations omitted).[62]

Like the situation in <u>In re Global Crossing</u>, it is not implausible that a more fully developed factual record could support control person status of Rambaud-Measson and Janovec, particularly since these two relatively high-ranking defendants -- who were not outside directors but internal officers -- were the only ones suspended in relation to ATI's accounting fraud. (Compl. ¶ 121; Press Release, Alstom, ALSTOM Revised Consolidated Accounts (June 30, 2003) ("June

---

[62] Judge Lynch allowed the Section 15 control person claims to proceed because culpable participation was not required, but dismissed the Section 20(a) control person claims because culpable participation was required and plaintiffs had not adequately pled culpable participation.

30, 2003 Press Release"), included as Ex. F.23 in the J.A.)
Under these circumstances, and in light of the intensely
factual nature of the control-person analysis, whether
Rambaud-Measson and Janovec had actual control over the
primary violator and the transaction in question is a closer
call. This determination, combined with the sufficient
allegations of culpable participation (as will be explained
below), leads the Court to conclude that it should not deny
the Section 20(a) claims against Rambaud-Measson and Janovec
for the ATI fraud at this time. Instead, the Court will grant
limited discovery on the issue of Rambaud-Measson's and
Janovec's control over ATI in relation to the ATI Fraud.[63]

(i) <u>Culpable Participation is Adequately Pled</u>

The Court did not analyze Rambaud-Measson's or Janovec's
scienter in its analysis of Plaintiffs' Section 10(b) claims,
because it found that neither of these two defendants made a
statement. A state of mind of at least recklessness is
required to plead culpable participation under Section 20(a).
<u>See</u> <u>Livent II</u>, 151 F. Supp. 2d at 417.

---

[63] While cautioning that this discovery is to be limited to the issue of
Rambaud-Measson's and Janovec's control over ATI as it bears on their
possible control of the fraudulent transactions at ATI, the Court
recognizes that this discovery could yield information that could impact
Plaintiffs' ability to plead Section 10(b) claims against Rambaud-Measson
and Janovec. For this reason, to the extent that any such discovery
supports Plaintiffs' claims for primary liability for Section 10(b),
Plaintiffs may use this information in repleading those claims.

The Complaint contains multiple allegations that the cost overruns at ATI from the NJT contract were widely known at ATI. For example, a former ATI project manager who worked at ATI from February 1999 to February 2002 stated that "everyone" at the Alstom facility in Hornell, including Janovec and Rambaud-Measson, knew about the cost overruns, as "the signs were on the wall and the wall was pretty big." (Compl. ¶ 312.) A "deliverables specialist" at ATI until 2003 stated that by April 2003, before the June 30, 2003 revelation of the accounting fraud, ATI announced to its employees that it had losses of $40 million or more on the NJT contract. (Compl. ¶ 313.) A "quality assurance manager" employed at ATI from October 2000 to July 2002 also stated that the cost overruns were widely known throughout ATI as early as 2000. (Compl. ¶ 314.) A "buyer" at ATI from July 2000 to September 2003 described how, as a result of ATI's complex financial management software, and that the employee responsible for overall costs accounting at ATI reported directly to Janovec, if a cost accounting problem exited, "there was no way that Janovec didn't know about it." (Compl. ¶ 316.) Finally, ATI's former director of purchasing from December 2000 until March 2002 stated that he had heard from another ATI employee that Janovec allegedly traveled to Paris some time after March

2002 to inform Alstom about the cost overruns.   (Compl. ¶ 317.)

Aside from the last allegation, the Court finds that these pleadings support a sufficiently strong inference that cost overruns at ATI were widely known, and a reasonable fact-finder could consider it reckless for Rambaud-Measson and Janovec to disregard ATI's contrary statements in its public documents.   That the sources are unnamed does not matter, because even under the PSLRA, plaintiffs need not name confidential sources as long as "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."   Novak, 216 F.3d at 314.   The sources are identified as ATI employees, with title and division, who were employed at the time of the ATI Fraud; as such, it is probable that they would possess the information alleged:  that everyone at ATI knew about the cost overruns.

In this regard, this case is distinguishable from In re MSC Industrial Direct Co., Inc. Sec. Litig., 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003), which found that the confidential sources in an alleged accounting fraud were insufficiently described when the complaint failed to state how long the sources worked at the company, how the sources had any

connection to the accounting department, or how the sources'
work responsibilities would provide them with a basis for
knowing the details of the company's accounting.  Here,
Plaintiffs do allege the duration of the sources' work for the
company, and although that in itself is not dispositive, the
type of information at issue here -- whether the cost overruns
were widely known -- does not depend on whether the employee
had a link to a particular department at ATI.  The allegation
is that cost overruns were widely known, and is thus supported
by the fact that various employees, throughout the relevant
time period, stated that "everyone knew" of the cost overruns.
However, the allegation that ATI's former director of
purchasing "heard from an ATI employee" that Janovec traveled
to Paris to inform Alstom of the cost overruns is not
described with sufficient particularity, as this is not an
allegation that "everyone knew" of the cost overruns, but
rather, that Janovec traveled to Paris to relay certain
information to the parent company, and the Complaint does not
describe what position this ATI employee held, when he or she
held it, and why that position would give that employee
knowledge of Janovec's trip, the reasons for the trip and the
content of the meeting.

Based on the foregoing, the Court finds that, like the
defendants in <u>In re Global Crossing</u>, Rambaud-Measson and

Janovec faced "widespread internal knowledge" of the material facts and it "would simply be implausible to argue in the face of the evidence presented that [they] did not know of and in some sense culpably participate in" the fraud. In re Global Crossing, 322 F. Supp. 2d at 350-51.

That Rambaud-Measson and Janovec were suspended pending investigation into accounting improprieties at ATI, and were not reinstated a year later, could also enable a reasonable fact-finder to draw a strong inference of recklessness. (Compl. ¶¶ 121, 302, 310). Defendants argue that an officer's departure does not necessarily give rise to an inference of scienter. However, the cases they cite, none of which are from this Circuit, are distinguishable in that in those cases the executives had resigned. See, e.g., Southland Sec. Corp., 365 F.3d at 383; Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002); Branca v. Paymentech, Inc., No. Civ. A. 3:97-CV-2507-L, 2000 WL 145083, at *11 (N.D. Tex. Feb. 8, 2000). As a district court in this Circuit has recently noted, "there are any number of reasons that an executive might resign, most of which are not related to fraud." In re BISYS, 2005 WL 2844792, at *10. Thus, a plaintiff cannot simply point to a resignation, without "linking the resignation ... to the accounting improprieties." Id. In In re BISYS, the defendants contended that one resigned to accept

-148-

another opportunity and the other resigned for health reasons, and plaintiffs made no attempt to challenge these non-fraud related explanations.  Id.  In contrast, here Plaintiffs do not allege that Rambaud-Measson and Janovec resigned, but rather, that they were suspended, which more strongly connotes wrongdoing than does a voluntary resignation.  Further, Plaintiffs allege that the reason for the suspension was the ATI Fraud, and point to an Alstom press release announcing a review of the alleged accounting improprieties at ATI and stating that these two defendants were suspended "pending completion  of the review."  (Compl. ¶ 121; June 30, 2003 Press Release, included as Ex. F.23 in the J.A.)  Plaintiffs thus link the suspensions to the alleged fraud, and defendants offer  no  contrary  explanation  for  Rambaud-Measson's  and Janovec's  departures.  Under  these  circumstances,  the suspensions support a strong inference of scienter.  This case is more like In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, at 1273-74 (N.D. Cal. 2000), which held that scienter  was  adequately  alleged  where  the  company's announcement of the defendants' departures indicated that were dismissed immediately for cause and were criticized by the new chairman for participation in the allegedly wrongful conduct.

d.   <u>Conclusion</u>

Because Plaintiffs have not adequately pled that Rambaud-Measson and Janovec controlled Alstom during the Marine Fraud or culpably participated in the Marine Fraud, Plaintiffs' Section 20(a) claims against Rambaud-Measson and Janovec in connection with the Marine Fraud must be dismissed.  However, because Plaintiffs have adequately pled culpable participation by Rambaud-Measson and Janovec in the ATI Fraud, and whether Plaintiffs have adequately pled control person status of Rambaud-Measson and Janovec is a close call, the Court grants the parties the opportunity to conduct limited discovery on the issue of Rambaud-Measson's and Janovec's control over ATI in relation to the ATI Fraud.

## VI.  <u>ORDER</u>

For the foregoing reasons, it is thereby

**ORDERED** that the motion of Alstom SA to dismiss [Doc. 83] is DENIED with respect to the Plaintiffs' claims under Section 10(b) arising out of the Marine Fraud, GRANTED with respect to the Plaintiffs' Section 10(b) claims arising out of the ATI Fraud, and GRANTED with respect to Plaintiffs' claims under Section 18, but Plaintiffs are granted leave to replead under Section 10(b) to the extent described above; and it is further

**ORDERED** that the motion of Pierre Bilger, Patrick Kron, Philippe Jaffre, Francois Newey, James Milner, to dismiss [Doc. 93] is DENIED with respect to the claims brought under Section 10(b) and Section 20(a) against Pierre Bilger and Francois Newey arising out of the Marine Fraud; GRANTED with respect to the Plaintiffs' Section 10(b) and Section 20(a) claims against Patrick Kron and Philippe Jaffre arising out of the Marine Fraud; GRANTED with respect to Plaintiffs' Section 10(b) and Section 20(a) claims against Pierre Bilger, Francois Newey, Patrick Kron, and Philippe Jaffre arising out of the ATI Fraud; and GRANTED with respect to Plaintiffs' claims under Section 18; but Plaintiffs are granted leave to replead under Section 10(b) to the extent described above; and it is further

**ORDERED** that the motions of Jo Janovec [Doc. 81], and Stephan Rambaud-Measson [Doc. 101] to dismiss are GRANTED with respect to the Plaintiffs' Section 10(b) claims, GRANTED with respect to Plaintiffs' claims under Section 18, GRANTED with respect to Plaintiffs' Section 20(a) claims arising out of the Marine Fraud, and DENIED with respect to Plaintiffs' Section 20(a) claims arising out of the ATI Fraud, but Plaintiffs are granted leave to replead under Section 10(b) with respect to the claims arising out of the ATI Fraud to the extent described above; and it is further

**ORDERED** that the motion [Doc. 87] of Alstom Transportation, Inc. ("ATI") and Alstom USA, Inc. ("Alstom USA") to dismiss is DENIED with respect to the Plaintiffs' Section 10(b) claims against ATI arising out of the ATI Fraud, GRANTED with respect to the Plaintiffs' Section 10(b) claims against Alstom USA arising out of the ATI Fraud, and GRANTED with respect to Plaintiffs' claims under Section 18, but Plaintiffs are granted leave to replead to the extent described above; and it is further

**ORDERED** that the motion of Alcatel SA to dismiss [Doc. 88] is GRANTED with respect to the Plaintiffs' Section 10(b) claims arising out of the ATI Fraud, and GRANTED with respect to Plaintiffs' Section 20(a) claims; and it is further

**ORDERED** that the motion of John Mayo and Lord George Simpson to dismiss [Doc. 98] is GRANTED with respect to the Plaintiffs' claims under Section 18; and it is further

**ORDERED** that the motion of Jean Pierre Halbron and Serge Tchuruk to dismiss [Doc. 84] is GRANTED with respect to the Plaintiffs' claims under Section 18; and it is further

**ORDERED** that Plaintiffs and defendants Rambaud-Measson and Janovec may engage in limited discovery on the issue of Rambaud-Measson's and Janovec's control over ATI in relation to the ATI Fraud, and it is finally

**ORDERED** that insofar as leave to replead is granted herein Plaintiffs shall file an amended Complaint within thirty (30) days of the date of this Order.


**SO ORDERED.**

Dated:    New York, New York
          22 December 2005

                                    _____
                                        Victor Marrero
                                          U.S.D.J.